UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:                          . Case No. 09-16230 (REG)
                                .
DANIEL GORDON,                  .
                                .
              Debtor.           .
------------------------------. Adv. No. 10-03767 (REG)
ANGELA TESE-MILNER, Trustee     .
of the Estate of Daniel         .
Gordon,                         .
                                .
              Plaintiff,        .
                                .
        v.                      . One Bowling Green
                                . New York City, NY  10004-1408
DANIEL GORDON,                  .
                                .
              Defendant.        . March 12, 2013
. . . . . . . . . . . . . . . . 9:54 a.m.

TRANSCRIPT OF TRIAL
BEFORE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:              Law Offices of Gabriel Del
                                Virginia
                             By:  GABRIEL DEL VIRGINIA, ESQ.
                                  YITZHAK GREENBERG, ESQ.
                             880 Third Avenue
                             New York, NY  10022


Audio Operator:              Kevin Su


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311  Fax No.  (609) 587-3599**

2

APPEARANCES (Cont'd):

For the Plaintiff:          Fox Rothschild, LLP
                            By:  YANN GERON, ESQ.
                                 NICOLE N. SANTUCCI, ESQ.
                                 BARRI A. FRANKFURTER, ESQ.
                            100 Park Avenue, Suite 1500
                            New York, NY  10017

For the Defendant:          Akerman Senterfitt LLP
                            By:  DONALD N. DAVID, ESQ.
                            335 Madison Avenue, Suite 2600
                            New York, NY  10017

                            ---

3

# <u>I N D E X</u>

<u>**PAGE**</u>

<u>**WITNESSES FOR THE TRUSTEE**</u>

DANIEL L. GORDON

  Cross Examination by Mr. Geron              8

  Redirect Examination by Mr. David      118

  Recross Examination by Mr. Geron        168

  Further Redirect Examination by Mr. David   185

  Further Recross Examination by Mr. Geron   187

  Further Redirect Examination by Mr. David   188

1          THE COURT:  Have your seats, please.  Okay.  We're

2   here for trial on Daniel Gordon.  I've read the pretrial order.

3   I understand the issues.  I don't need openings.  We'll go

4   right into questioning, unless we have any preliminary matters.

5          MR. GERON:  Good morning, Your Honor.  My name is

6   Yann Geron for the Trustee of Fox Rothschild.  With me are

7   Nicole Santucci, Barri Frankfurter, who are my colleagues and

8   lawyers in my firm, and Jeanette Litos who is a law clerk.

9          Ms. Tese-Milner -- just two, actually three

10  preliminary matters.  Ms. Tese-Milner needs to leave at ten to

11  -- five to ten, but will be back directly afterwards.  She has

12  a meeting with the U.S. Trustee's Office that was not

13  adjournable, and for that she expresses her apologies.  She'll

14  be back right afterwards.

15         By way of --

16         THE COURT:  We can proceed in her absence, can't we?

17         MR. GERON:  Yes.  Of course, Your Honor.  I just

18  wanted to explain her not being here and her coming --

19  returning shortly.

20         THE COURT:  Okay.

21         MR. GERON:  I was going to waive opening statements.

22  Obviously, the Court has already ruled on that.

23         With respect to substantive stipulations and one

24  preliminary matter, after some further discussions internally,

25  I have advised, and I think we have stipulated with defendant's

1  counsel, there is a sub-count in the -- in our complaint under

2  727(a)(2) which relates to our allegation that the debtor's

3  discharge should be denied for his intentional failure,

4  intentional and fraudulent failure to list -- to schedule

5  $158,000 tax overpayment.  We will withdraw that claim and I

6  will not be asking -- that sub-claim I would say, I will not be

7  asking --

8         THE COURT:   Is that the one where he had asked to be

9  -- have it credited against future taxes and he said he did it

10  on the advice of counsel?

11         MR. GERON:  Correct, Your Honor.  And based on that,

12  based on those developments and based on further review of what

13  that testimony would elicit and the consequences of that

14  testimony, we will withdraw that claim at this point.

15         THE COURT:  Okay.  Does that eliminate the need for a

16  witness, too, Mr. Del Virginia?

17         MR. GERON:  That's my understanding is that Mr. Del

18  Virginia will no longer be testifying and therefore, we've

19  eliminated that issue completely.

20         THE COURT:  Okay.

21         MR. GERON:  And then one truly housekeeping matter,

22  with respect to Exhibit 49, which is the separation agreement

23  between Mr. Gordon and his ex-wife, there -- we noticed as we

24  were looking at our exhibits that there were two pages missing.

25  And what I would like to do with the Court's permission, there

6

1   are -- there's a binder that the Court has, we have a binder

2   for the witnesses.  What I'd like to do is the Court's binder,

3   to correct, there are two extra pages that I'd like to add into

4   the Court's binder.  They're already preprinted, they're just

5   simply marked as -- with additional Bates stamps, so the page

6   immediately preceding it is 00310, I would propose to add

7   00310-1 and 00301-2.

8            Those two pages are to complete the document, they

9   are not different from the original document.  They just are

10  missing in the photocopying for some reason.

11           THE COURT:  Okay.

12           MR. GERON:  I will also have extra copies of these.

13           THE COURT:  And you've already consulted Mr. David on

14  that and on the mechanics?

15           MR. GERON:  I neglected to consult Mr. David on that,

16  Your Honor.  I was -- it was all happening quite late last

17  night, but --

18           MR. DAVID:  Your Honor, there is no objection

19  obviously to complete documents to be --

20           THE COURT:  Okay.  Well, as long as you can detail

21  somebody to stick it in my binder and knows where to do it and

22  so forth, that's fine.

23           MR. GERON:  I would like to do that.  I'm going to be

24  asking question of Mr. Gordon with respect to this document, so

25  if we could take literally a minute, I could get that done

1  right now.

2          THE COURT:  Okay.

3          MR. GERON:  May I approach, Your Honor?

4          THE COURT:  Yes.

5          MR. GERON:  And just -- can I just come around?

6          THE COURT:  Yes.

7          MR. GERON:  That's all I have with respect to

8  preliminaries, Your Honor.  I will be providing Your Honor's

9  law clerks with copies of the exhibits as we go forward and

10 I'll give one to the Court reporter.  And I'll move the --

11 almost, I think, essentially all but one of the exhibits that

12 will be used today have already been stipulated as admissible,

13 so I'll move them into evidence at the conclusion of the

14 record, at the closing of the record just for the sake of

15 efficiency.

16         THE COURT:  All right.  Standby for a second.  Mr.

17 David, do you have any preliminaries on your side?

18         MR. DAVID:  No, Your Honor.  I do not.

19         THE COURT:  Okay.  All right.  Go ahead then, Mr.

20 Geron.

21         MR. GERON:  Trustee calls Dan Gordon to the stand.

22         THE COURT:  Okay.

23          DANIEL L. GORDON, TRUSTEE'S WITNESS, SWORN

24         MR. GERON:  Your Honor, I'll ask for the Court's

25 ruling under F -- Federal Rule of Evidence 611(c), that Mr.

Gordon - Cross/Geron                                    8

1  Gordon is an adverse party and hostile witness and therefore I

2  ask for leave to proceed by leading questions?

3          THE COURT:  I am inclined to grant that.  Mr. David.

4  Do you want to be heard?

5          MR. DAVID:  No, Your Honor.  I believe that that's

6  appropriate, it seems.

7          THE COURT:  Okay.  Granted.

8                        CROSS EXAMINATION

9  BY MR. GERON:

10 Q    Good morning, Mr. Gordon.  By way of preliminaries, you

11 graduated William Prep School in New London, Connecticut as a

12 high schooler?

13 A    No, I attended that school.

14 Q    Where did you graduate high school?

15 A    I left high school early and went to college.

16 Q    All right.  And you attended Boston University College?

17 A    I --

18 Q    University, sorry.

19 A    Yes.

20 Q    And did you graduate from BU?

21 A    I did.

22 Q    You have a master's in development economics from Yale

23 University that was acquired in 1997?

24 A    Yes.

25 Q    By way of work experience, you worked briefly as an

1 analyst at Constellation Power Source in Baltimore?

2 A    I did.

3 Q    And in 1999, you started working for Merrill Lynch?

4 A    I believe I started in 1998 at Merrill Lynch.

5 Q    In the year 2000, you became the president of Merrill

6 Lynch's energy trading unit?

7 A    No, I -- from the time I started Merrill Lynch, I was in

8 charge of the energy commodities division.  I didn't hold the

9 title of president.  I don't -- I think  my title was director

10 or managing director.

11 Q    And you later became the president of Allegheny Energy

12 Global Markets?

13 A    I did.

14 Q    Was that a division or somehow related to Merrill Lynch?

15 A    No, Merrill Lynch had sold its energy trading business to

16 Allegheny Energy and, as part of that sale, the employees left

17 Merrill Lynch and joined Allegheny and that's when I took the

18 title of president of that subsidary.

19 Q    All right.  You, at one time, also owned two seats on the

20 New York Stock Exchange?

21 A    No.

22 Q    On seat in your own name and one seat in the name of a

23 company called Cascar, is that correct?

24 A    No, it --

25        MR. DAVID:  Object to the form.

Gordon - Cross/Geron                          10

1          THE COURT:  Overruled.

2   A    No, the seats were on the New York Merchantile Exchange --

3   Q    Oh, I'm sorry.

4   A    -- not the New York Stock Exchange.

5   Q    So let me just retrace, you owned seats on the New York

6   Merchantile Exchange at one time?

7   A    Yes.

8   Q    And in June 2007, you sold one of your seats for

9   approximately $510,000?

10  A    Yeah, around that time, I don't have the specific

11  documents in front of me, but around that time for that amount.

12  Q    And the seat that was then put into a company name called

13  Cascar, C-a-s-c-a-r, that was sold in December 2007 for

14  approximately $690,000?

15  A    Yes.

16  Q    Now, one more area of general background, you were married

17  to Laura Gordon on November 25th, 2000?

18  A    Yes.

19  Q    You have one daughter born in 2004?

20  A    Yes.

21  Q    You were separated 2006 and ultimately divorced from Laura

22  Gordon?

23  A    We were separated before 2006, but we ultimately divorced.

24  Q    Now, coming to this bankruptcy -- now, this particular

25  Chapter 7 filing by you was filed October 19th, 2009, was that

1   correct?

2   A     That's correct.

3   Q     Your bankruptcy counsel throughout this case has been

4   Gabriel Del Virginia?

5   A     Yes.

6   Q     Now, you conferred with Gabe Del Virginia in advance of

7   the filing of your bankruptcy, is that correct?

8   A     In September 2009 was the first time I met Mr. Del

9   Virginia?

10  Q     So it's fair to say from September 2009 through the filing

11  or through the immediately before the filing, you conferred in

12  preparation of the filing of the bankruptcy, is that correct?

13  A     There was an initial meeting, but we didn't really begin

14  to work on any of the schedules or any of the documents until

15  early October when it became apparent that a bankruptcy filing

16  may, in fact, be necessary.

17  Q     And in early October you started providing Mr. Del

18  Virginia with information to compile your bankruptcy schedules

19  and bankruptcy filings?

20  A     I was given a series of worksheets to complete and I

21  completed those.  They asked for pro forma information and

22  around that time, I began to try to obtain documents from

23  various companies that might be implicated in the bankruptcy

24  filing.

25  Q     So the answer to my last question would have been yes?

1          MR. DAVID:  Objection.

2          THE COURT:  Overruled.

3    A    Yes.

4    Q    And then Mr. Del Virginia compiled the information and put

5    them into the form of bankruptcy filings that were ultimately

6    filed in the bankruptcy case, is that correct?

7    A    Yes.

8    Q    Ultimately, on or before or just immediately before the

9    October 19th filing date, you reviewed the documents that were

10   compiled by Mr. Del Virginia and signed them in his office, is

11   that correct?

12   A    Yes.

13   Q    Are you familiar with what is called bankruptcy schedules

14   and the statement of financial affairs documents that are

15   generically called by those names?

16   A    Yes.

17   Q    Now, on November 22nd, 2009, you filed your original

18   bankruptcy schedules and statement of financial affairs, is

19   that correct?

20   A    Around that time I did.  I don't -- sitting here today, I

21   don't recall the specific date.  But, yes, around that time,

22   the schedules and the statement of financial affairs was filed.

23          MR. GERON:  All right.  Your Honor, may I approach

24   the witness?  I have two exhibit binders.  What I would propose

25   to do is leave the exhibit binders up there, refer to specific

1  numbers, draw the Court's attention to them and then give those

2  specific documents to Your Honor's law clerks and to the court

3  reporter.  The same binders, same numbers are before Mr. Donald

4  David and are ready to be used in that way.

5           THE COURT:  All right.

6           MR. GERON:  May I approach the witness, Your Honor?

7           THE COURT:  Yes.

8  BY MR. GERON:

9  Q    Mr. Gordon, I draw your attention to the binder in front

10 of you, please take a look at Exhibit 24.  And after you've

11 reviewed 24, please look at Exhibit 26.  Mr. Gordon, have you

12 reviewed Exhibits 24 and 26?

13 A    Yes.

14 Q    Do you recognize those documents as being your original

15 bankruptcy schedules and original statement of financial

16 affairs?

17 A    Yes.

18 Q    And you reviewed those documents in connection with this

19 bankruptcy filing, is that correct?

20 A    I did.

21 Q    And you signed them on or about November 22nd, 2009,

22 right?

23 A    Yes.

24 Q    Please read out loud for me and for the Court, on Exhibit

25 24, the statement that appears directly before your signatures

Gordon - Cross/Geron                              14

1  in a page that's entitled declaration concerning debtor's

2  schedules.  It's Bates marked ST-00184.

3  A    I declare, under penalty of perjury, that I have read the

4  foregoing summary and schedules consisting of 19 sheets and

5  that they are true and correct to the best of my knowledge,

6  information and belief.

7  Q    And the document that we have is an S slash with your

8  signature, do you recall signing this document in your

9  attorney's office?

10 A    Yes.

11 Q    And you read that statement before you signed that

12 document?

13 A    Yes.

14 Q    All right.  I'm going to ask you the same questions

15 quickly with respect to Exhibit 26, take a look at the last

16 page which is Bates marked ST-00212.  And I ask you, please, to

17 read out loud the single sentence that appears just before your

18 signature on that page.

19 A    I declare, excuse me, I declare under penalty of perjury

20 that I have read the answers contained in the foregoing

21 statement of financial affairs and any attachments thereto and

22 that they are true and correct.

23 Q    And, again, you read this document before you signed it?

24 A    Yes.

25 Q    And you read this particular -- this specific statement

Gordon - Cross/Geron                          15

1   that you just read before you signed it?

2   A    Yes.

3   Q    And you understood what that statement and the statement

4   that you just read out loud a few moments ago, you understood

5   what they meant --

6   A    Yes.

7   Q    -- and what they mean today?

8   A    Yes.

9   Q    Okay.  Taking you forward to February 1st, 2010, you filed

10   amended statement of financial affairs, isn't that correct?

11   A    Is that an -- I just wanted to confirm the date, that was

12   my only concern.

13   Q    No problem.  Take a look, please, at Exhibit 27.

14   A    Yes.  Yeah.

15   Q    This is more than three months after your original filing

16   of October 19th, 2009, isn't that correct?

17   A    Yes.

18   Q    And, again, I draw your attention, I will not ask you to

19   read it out loud, but I draw your attention to the signature

20   page, that is your signature, which is ST-00221?

21   A    Yes.

22   Q    And that comes -- that appears directly under the

23   statement of declaration under perjury which you just read out

24   loud?

25   A    Yes.

Gordon - Cross/Geron                                16

1  Q    And, again, you read that document and understood the

2  meeting of that statement when you signed that document?

3  A    Yes.

4  Q    Now, I draw your attention, please, to exhibits -- these

5  are stipulated exhibits, by the way, Your Honor, all of these

6  so far, Exhibits 25 and 28, have you reviewed those documents,

7  Mr. Gordon?

8  A    Yes.

9  Q    So you'll confirm for me, please, that on December 8th,

10 2010, more than about 14 months after the filing of your

11 petition, you read, signed and had filed for you amended

12 schedules and a second amended statement of financial affairs,

13 is that correct?

14 A    Yes.  Yeah, although the schedule says second amended, but

15 I think that just might be a --

16 Q    Well --

17 A    -- typo.

18 Q    -- I may have compounded the question.  Let me just --

19 there are two different things.  There's, on Exhibit 25 --

20 A    Right.

21 Q    -- you have second amended schedules, that's what you're

22 talking about, that's the schedules that really were the first

23 amended bankruptcy schedules?

24 A    Right.  I think so.  I think there was a typo when this

25 was filed, that it was called second amended, but it was really

                        Gordon - Cross/Geron                        17

1    the first amended schedules and the second amended statement of

2    financial affairs.

3    Q    That -- okay.

4    A    I just wanted to make sure I was being -- I just want to

5    make sure we're talking about the same document.

6    Q    We are talking about --

7    A    Okay.

8    Q    -- the same documents and I appreciate that correction.

9    And so, again, those were, just to complete the loop, those

10   were signed by you under penalty of perjury as being true,

11   correct and complete to the best of your knowledge?

12   A    Yes.

13   Q    Now, more broadly, you understand that the trustee alleges

14   in her complaint that you intentionally made false or

15   misleading statements on these schedules, is that correct?

16   A    I understand that, yes.

17   Q    And you understand that your honesty, complete honesty

18   today in court is of paramount importance?

19            MR. DAVID:  Objection.

20            THE COURT:  Sustained.  You made your point, Mr.

21   Geron.

22   Q    All right.  Last question then on that, Your Honor, is --

23   or Mr. Gordon, is you understand that you're testifying under

24   oath?

25   A    Yes.

1  Q    You testified earlier that you worked for Merrill Lynch,

2  isn't that correct?

3  A    I did.

4  Q    And then ultimately isn't it the case that you defrauded

5  Merrill Lynch?

6            MR. DAVID:  Objection.

7            THE COURT:  Leave the room, please, Mr. Gordon.

8            MR. DAVID:  Your Honor, should we close the door?

9            THE COURT:  After he leaves, yes.

10                 (Witness exits courtroom)

11           THE COURT:  All right.  Gentlemen, it's my style when

12 the colloquy on an objection might be coaching the witness or

13 otherwise be stuff that the witness shouldn't hear that we do

14 it out of the witness' presence which is why I had him leave

15 the room.  Was the objection on relevance or form or what?

16           MR. DAVID:  It was on form, Your Honor.  If I may,

17 the fact --

18           THE COURT:  Come to a microphone, please, Mr. David.

19           MR. DAVID:  I apologize, Your Honor.  All right.  It

20 was on form.  There is no question that Mr. Gordon pled guilty

21 ten years ago to a felony.  However, the proper way to present

22 that is in exactly that form, not a generalized question of

23 whether he defrauded Merrill Lynch.  The proper way to present

24 that, and I don't dispute that it has relevance, the proper way

25 to present that is to ask whether he was, in fact, convicted of

Gordon - Cross/Geron                                    19

1   a crime and what the crime was or to even state in leading form

2   what the crime was.  The crime is not defrauding Merrill Lynch

3   and it's not a proper question as phrased.

4            THE COURT:  Okay.  Mr. Geron, do you want to be heard

5   in opposition or do you want to just rephrase?

6            MR. GERON:  I'll withdraw the question and rephrase,

7   Your Honor.  I'll do that.

8            THE COURT:  I'll right.  Bring him back, please.

9                    (Witness enters courtroom)

10           MR. GERON:  For the record, I'll withdraw the last

11  question, Your Honor.  And with the Court's permission, I'll

12  rephrase it differently.  May I proceed?

13           THE COURT:  Yes.

14  BY MR. GERON:

15  Q    Mr. Gordon, in 2003, you pled guilty and were convicted of

16  the following felony charges, wire fraud in connection with a

17  scheme to defraud your employer, Merrill Lynch, of $43 million,

18  is that correct?

19  A    That's correct.

20  Q    Money laundering, that's another count that you pled

21  guilty and were convicted of, is that correct?

22  A    Yes.

23  Q    And conspiracy to defraud the United States, is that

24  correct?

25  A    The -- I don't remember what precisely the third count

Gordon - Cross/Geron                                        20

1  was.  It had something to do with a books and records

2  violation, but if -- there were three counts that I had pled

3  guilty to.

4  Q    Was there also a tax fraud involved?

5  A    No.

6  Q    Okay.  For those crimes that you pled guilty and were

7  found -- I'm sorry, that you pled guilty on, you were convicted

8  and sentenced to a prison and served time in prison from late

9  2005 through 2007, is that correct?

10 A    That is correct.

11 Q    At the time of your separation from Laura Gordon, we

12 covered earlier that Laura Gordon is your ex-wife, at the time

13 of your separate from Laura Gordon, you had a home equity line

14 of credit with Laura Gordon, is that correct?

15 A    Yes.

16 Q    And that was secured by property at 1049 5th Avenue,

17 Apartment 15B, is that correct?

18 A    Yes.

19 Q    That apartment, title to that apartment was owned

20 exclusively by Laura Gordon, is that correct?

21 A    Yes.

22 Q    Now, pursuant to your separation agreement with Laura

23 Gordon, you were precluded from increasing the line of credit

24 on Apartment 15B, isn't that correct?

25          MR. DAVID:  Objection, Your Honor.

1          THE COURT:  Overruled.

2   A    I'm sorry, could you just repeat the --

3   Q    Pursuant to the terms of your separation agreement with

4   Laura Gordon, you were precluded from increasing the home

5   equity line of credit on Apartment 15B, isn't that correct?

6   A    That's correct.

7   Q    And, in fact, after you came out of jail for your felony

8   fraud conviction, from between February 22nd, 2008, and

9   February 16th, 2009, you made multiple withdrawals from that

10  very same line of credit totaling $3.9 million, isn't that

11  correct?

12         MR. DAVID:  Objection.

13         THE COURT:  Overruled.

14  A    No, I made -- I drew down on the line sometimes and I made

15  repayments sometimes, but the total amount was not $3.9

16  million.  That was the total credit line itself.  When I came

17  out of prison, there was an existing balance on the credit line

18  of around, I think, eight or $900,000.

19  Q    So you testimony would be that you withdrew -- that you

20  drew down, without Laura Gordon's knowledge or consent, on that

21  line of credit about $3.3 million, is that right?

22  A    I don't know the precise amount, but I did draw down on

23  that credit line and I made repayments against that credit line

24  during the time in question.

25  Q    And that draw down was, again, without Laura Gordon's

Gordon - Cross/Geron                                    22

1 | knowledge or consent, is that correct?

2 |         MR. DAVID:  Your Honor, may I please be heard on

3 | this?

4 |         THE COURT:  Yes.  Leave the room please, Mr. Gordon.

5 |                 (Witness exits courtroom)

6 |         MR. DAVID:  Your Honor, if I may, there was no crime

7 | of which Mr. Gordon was convicted as it relates to this.  And

8 | as to prior bad acts, this is not directly relevant to the

9 | case.  The issue of whether he drew down with or without her

10 | consent is not an issue which goes to his credibility or

11 | permissibly goes to his credibility under the federal rules of

12 | evidence.  And that's why I started with my objections and the

13 | Court overruled them, so, you know, that was it.

14 |         But at this point in time, we're now wandering off

15 | into asking him questions that have absolutely nothing to do --

16 |         THE COURT:  I understand.  I had earlier understood

17 | your objection to be on form and not on prior bad acts.  Mr.

18 | Geron, do you want to respond?

19 |         MR. GERON:  Your Honor, the defendant's -- the

20 | debtor's credibility is very much at issue here and, in this

21 | particular instance, I would submit to the Court that the

22 | evidence, the probative value of the prior bad acts outweighs

23 | the prejudicial by far.  What he's done in the past -- and this

24 | is, by the way, the only other prior bad act that I will draw

25 | into the record, but what he's done in the past is very much an

1  indication of, at least, evidence that the Court can consider

2  in terms of evaluating the debtor's credibility.

3         And the debtor himself recognized that his

4  credibility is at issue.  We, of course, have alleged that

5  facts that the Court will have to weigh in favor or against

6  with respect to his credibility.  So in view of that, I -- we

7  -- I submit to the Court that there is significant probative

8  value to prior bad acts.

9         THE COURT:  I must confess that I haven't dealt with

10  this with the kind of case load that I normally have in a

11  commercial court, and I'm going back to my training in evidence

12  45 years ago or more, but I thought that it's only conviction

13  of a felony or a bad act that -- just a minute.  And, frankly,

14  I was trained under the common law of evidence before the

15  federal rules of evidence were put into place.

16         Mr. David, what's the federal rule of evidence, the

17  codified rule that's relevant here?

18         MR. DAVID:  Your Honor, unfortunately, I -- I'm

19  almost as old in terms of practice as you are.  I don't recall

20  the federal rule, but my understanding and recollection is that

21  it is a felony or a misdemeanor punishable by more than one

22  year in prison.  And the fact is this is not what it is.  It's

23  not meant to be a open inquiry into whatever you think the

24  person did who -- which was supposedly bad.  And I think the

25  burden would be upon the trustee to tell us how this qualifies

1   under the federal rules of evidence.

2          THE COURT:  Mr. Geron, if he had lied and lying was

3   only a misdemeanor, I would be inclined to agree with you.  But

4   unless you can give me a carve out under the federal rules of

5   evidence, I'm inclined to sustain Mr. David's objection.

6          MR. GERON:  And I hear Your Honor.  I'll add two

7   quick things for the evaluation (1), the money that was drawn

8   down, the is a relevance, there is a separate relevance point

9   and I should have made this earlier.

10          THE COURT:  Forgive me a second.  I think it might be

11  Rule 404.  Let me just read it before --

12          MR. GERON:  404(b)(1), Your Honor.

13          THE COURT:  Yes, I've read 404(b)(1).  It's

14  substantially the same as I remember under the old common law

15  and substantially the same as what Mr. David described.  In

16  substance, you're trying to show these as bad acts to show that

17  this witness has a propensity to make false statements or to be

18  dishonest and that's close enough in my view, under 404(b)(1),

19  to make it inadmissible, except insofar as you've already

20  established the conviction of the crimes.

21          So Mr. David's objection is sustained and, on my own

22  motion, I'm striking the testimony of the one or two predicate

23  questions that you asked before Mr. David more fully fleshed

24  out his objections and limiting the testimony, vis-a-vis his

25  past conduct, as relevant to this adversary proceeding to the

Gordon - Cross/Geron                                      25

1  convictions of a crime.

2              MR. GERON:  Very well, Your Honor.

3              THE COURT:  Bring him back, please.

4                   (Witness enters courtroom)

5              MR. GERON:  May I proceed, Your Honor?

6              THE COURT:  Yes.

7  BY MR. GERON:

8  Q    At the time of the filing of the bankruptcy, Mr. Gordon,

9  you resided at 151 East 85th Street, Apartment 10C?

10 A    Yes.

11 Q    The monthly rent of that apartment was $19,000 a month?

12 A    Yes.

13 Q    In 2009, you had a summer rental, you leased a summer

14 rental for premises located at 15 Jeffrey (sic) Lane in East

15 Hampton, New York?

16 A    Yes.

17 Q    The lease period for that monthly rental was May 22

18 through September 8th, 2009?

19 A    Yes.

20 Q    And the total rent for that one period, the May through

21 September period that I just outlined, was $140,000, isn't that

22 correct?

23 A    Yes.

24 Q    All right.  I want to, if I could, please, turn to a

25 company called Allstar Capital Corp and, specifically, some

Gordon - Cross/Geron                                    26

1  general information with respect to that company.  Allstar form

2  -- was formed in January -- on January 4th -- sorry, strike

3  that.  Let me start again.  Allstar was formed on January 15th,

4  2008?

5  A    January 2008, I don't recall the precise date.  But, yes.

6  Q    You are the president and sole officer of Allstar?

7  A    Yes.

8  Q    You are the director of Allstar?

9  A    Yes.

10  Q    You're the chairman of Allstar?

11  A    I don't -- I know I'm the president of Allstar.  I don't

12  know that we have a position of chairman.  It very well could

13  be, I just don't know.

14  Q    When you say we, who is we?

15  A    I meant -- sorry, I meant Allstar.

16  Q    Is there anybody else other than you associated with

17  Allstar?

18  A    No, it's -- Allstar has shareholders of which I am not

19  one, but I am the only officer and director of Allstar.

20  Q    And you're the sole manager of the business affairs of

21  Allstar?

22  A    Yes.

23  Q    Now, Allstar is in the business of making financial

24  investments, isn't that correct?

25  A    It's primarily in the business of making loans?

Gordon - Cross/Geron                    27

1  Q    Okay.  To be clear, Allstar does not maintain any physical

2  office?

3  A    No.

4  Q    It has no office space, no physical property whatsoever,

5  right?

6  A    No, it does not.

7  Q    No furniture, no fixtures, no telephone?

8  A    No.

9  Q    You control personally the books and records of Allstar,

10 isn't that correct?

11 A    Yes.

12 Q    Allstar does not maintain a general ledger, that's

13 correct, isn't it?

14 A    It does not.

15 Q    It does not maintain a cash receipts journal either?

16 A    No, it would have no need for one.

17 Q    So the answer is no on that one, is that correct?

18 A    No, it does not have a cash receipts journal.

19 Q    Allstar does not maintain a disbursement journal -- I'm

20 sorry, the -- strike that question, please.  Allstar

21 shareholders are Carolina (phonetic) E. Gordon Trust and the

22 Gordon Family One, LP, is that correct?

23 A    Yeah, her name is pronounced Carolina, but, yes, they're

24 both shareholders of Allstar.

25 Q    Carolina is your daughter?

Gordon - Cross/Geron                    28

1  A    Yes, she is.

2  Q    You are the trustee of the Carolina E. Gordon Trust?

3  A    Yes.

4  Q    And you are a limited partner of Gordon Family One, LP, is

5  that correct?

6  A    Yes.

7  Q    On October 22, 2008, that's less than a year before the

8  filing of the bankruptcy, you made, you personally made a

9  transfer of funds of $2 million to Allstar, isn't that correct?

10  A    Yeah, I made a loan to Allstar, yes, of $2 million.

11  Q    Okay.  So your testimony and your position today is that

12  the transfer of $2 million made, within a year of the filing of

13  the bankruptcy, that is before the end -- I'm sorry, within a

14  year of the filing of the bankruptcy, that that $2 million is a

15  loan, it was loaned by you to Allstar, isn't that correct?

16  A    Yes.

17  Q    Now, that transfer was not listed on your statement of

18  financial affairs that which you looked at before, the amended

19  statement of financial affairs or the second amended statement

20  of financial affairs, isn't that correct?

21  A    That's correct, yes.

22  Q    And it was not listed in either response to Question 10 of

23  those statement of financial affairs and we can look at those

24  in a moment, and it was not listed in response to Question 3(c)

25  of either of those financial -- of any one of those financial

Gordon - Cross/Geron                                    29

1  statements?

2  A    That's --

3  Q    I'm sorry, statement of financial affairs.

4  A    Do you want me to look --

5  Q    We can take a look at the questions themselves.

6          THE COURT:  I don't -- gentlemen, I don't want you

7  guys talking over each other.

8          MR. GERON:  Sorry.  My apologies, Your Honor.

9  Q    Let's just look at Exhibit 26, please, Mr. Gordon.  It's a

10 stipulated exhibit.  That's your original statement of

11 financial affairs, isn't that correct?

12 A    Yes.

13 Q    And please take a look at Question 10 which is titled

14 other transfers?

15 A    Yes.

16 Q    The loan that you just referred to from you to Allstar,

17 that's not referenced, that's not disclosed or listed in

18 response to that question, isn't that correct?

19         MR. DAVID:  I'm sorry for that.  Which question is

20 that again, if I may have that, Your Honor?  Which question?

21         THE COURT:  I think he was asking about Question 10,

22 but why don't you rephrase, Mr. Geron, so we have a nice clean

23 record?

24         MR. GERON:  Very well.

25

1  Q    Let me start again with respect to the statement of

2  financial affairs which is Exhibit 26, and I'll start with a

3  different one first just in sequence.   Question 3(b) of the

4  statement of financial affairs, please take a look at that

5  question.

6  A    Yes.

7  Q    I'm sorry, 3(c), I misspoke, 3(c).

8  A    Okay.  Just one second.  Okay.

9  Q    Now, would you -- do you understand the definition of an

10 insider in -- for bankruptcy purposes?

11 A    I understand, generally.  I'm not a bankruptcy lawyer.  I

12 don't know specifically chapter and verse of the law, but I

13 understand what's generally referred to as an insider.

14 Q    Do you understand or did you, without disclosing the

15 substance of your conversations with Mr. Del Virginia, did Mr.

16 Del Virginia explain to you that Allstar would be considered an

17 insider of you --

18          MR. DAVID:   Objection.

19 Q    -- for purposes of bankruptcy?

20          MR. DAVID:   Objection.

21          THE COURT:   Sustained.

22 Q    What is your understanding with respect to whether Allstar

23 is an insider of you?

24 A    I believe that the term insider refers to companies in

25 which the debtor may have control or the ability to control the

1  affairs of the company.

2  Q    And do you consider Allstar to be -- to fit within that

3  definition?

4  A    I'm sorry, the definition of insider?

5  Q    Yes.

6  A    Yes, I would consider Allstar to fit within the definition

7  of insider.  However, I don't consider Allstar to be a creditor

8  who was an insider.

9  Q    Understood.  So just to confirm, the reason why the ten --

10  the $2 million transaction, the transfer that we just

11  discussed, that you just discussed, the reason that was not

12  listed in response to Question 3(b) is because -- 3(c), forgive

13  me, is because, as you just said, you did not consider Allstar

14  to be a creditor in their -- is that correct?

15  A    Yeah.  Yes.

16  Q    Okay.  And then look, please, at Question 10 of the

17  statement of financial affairs?

18  A    Okay.  Both ten -- is it 10(a) or 10(a) or both?

19  Q    10(a).

20  A    Okay.

21  Q    It's my understanding that that question -- well, what is

22  -- strike that.  The Allstar transaction that we just talked

23  about, the $2 million transaction, was not listed in response

24  to Question 10(a) either, is that correct?

25  A    That's correct.

Gordon - Cross/Geron                                32

1  Q    And it was not listed there because you consider it's not

2  a transfer, either absolutely or a security, to Allstar?

3  A    No, I did not list it for several reasons.  The first is I

4  did not consider the loan to Allstar to be outside of the

5  ordinary course of business in the which -- in the way in which

6  I conducted my affairs, either individually or vis-a-vis

7  Allstar.

8         My other issue with this question was that it was

9  referring to other transfers and all other property which

10 suggested to me that it was something other than cash that

11 would have been transferred, you know, for instance, a car or

12 valuables or something other than cash.  So based upon those

13 two concerns, I didn't think that the loan that I gave to

14 Allstar was required to be listed here.

15 Q    So it's your testimony today that a $2 million by you, in

16 less than a year before the bankruptcy, was done in the

17 ordinary course of business?

18 A    It's my testimony that I regularly engaged in providing

19 loans to Allstar and other businesses in which I was involved

20 in and, therefore, I considered that to be the ordinary course

21 of my business, both individually and in connection with

22 Allstar.

23 Q    So the answer to my question is yes, you consider a $2

24 million made last -- by you personally, made within a year of

25 the filing of the bankruptcy, you considered that loan to be in

1  the ordinary course of your business affairs?

2  A    Yes.

3  Q    And it's your testimony today that your understanding of

4  the word property on Question 10(a), that property does not

5  include cash, is that correct?

6  A    No, what I -- perhaps I didn't say it properly, but when I

7  -- I read this list all other property.  Therefore, I thought

8  that other property was other than cash transfers or payments

9  to creditors.  I thought it was some sort of other tangible

10  property that might be transferred and I didn't think that it

11  would qualify.  But even if property did refer to cash, I still

12  believe that the transfer was done in the ordinary course of my

13  business.

14  Q    And my, again, just to clarify, my, in the sentence that

15  you just used, my is you personally, we're not talking about

16  any other company, we're talking about you personally, is that

17  correct?

18          MR. DAVID:  Object to the form.

19          THE COURT:  Overruled.

20  A    My business, when I refer to my business, I imagine that

21  to mean my business in terms of my business dealings with

22  Allstar and with other companies in which I had -- I was either

23  an officer or I was a direct or indirect shareholder.

24  Q    I want to be very clear here, the ordinary business

25  affairs that we're talking about, we're -- those are your

1  personal ordinary business affairs that we're talking about --

2  A    Yes.

3  Q    -- and so it's your answer with respect to what is within

4  your ordinary course of business relates solely to your

5  personal business affairs, is that correct?

6  A    Yes.

7  Q    And so it's your testimony that within a year of the

8  filing of the bankruptcy, you made a $2 million loan and you

9  considered that to be in the ordinary course of business, is

10  that correct?

11  A    Yes.

12  Q    The ordinary course of your personal business affairs, is

13  that correct?

14  A    Yes.

15  Q    And that, because of that analysis, you did not -- you

16  determined that it was not necessary for you to disclose that

17  transaction in response to Question 10(a) of the statement of

18  financial affairs, is that correct?

19  A    Well, I didn't make the decision solely on my own.  I

20  consulted my counsel as to the facts of the situation and

21  sought his opinion and advice, as well.

22  Q    So it's your testimony today that you made this

23  determination on the advice of counsel?

24  A    I made this determination in consultation with counsel and

25  taking into consideration the advice I received.

Gordon - Cross/Geron                                35

1  Q    All right.  I want to take you, please, to Exhibit 28.

2  This is, I believe you testified to it earlier, is the

3  statement of financial affairs, I'm sorry, the second amended

4  statement of financial affairs, do you have it in front of you?

5  A    Twenty-eight, yes.

6  Q    Yes.  Take a look, please, at Question 3(c) and confirm

7  for me, please, that the transaction we just talked about with

8  respect to Allstar is not reflected in response to Question

9  3(c)?

10 A    It is not.

11 Q    And that's the same analysis, same reasons that you just

12 testified earlier applies to the answer to Question 3(c), is

13 that correct?

14 A    You mean the same reason I used for not putting it in the

15 original statement of financial affairs under 3(c)?

16 Q    Correct.

17 A    Yes.

18 Q    And likewise, with respect to the answer to Question

19 10(a), that $2 million loan is not reflected in response to the

20 answer for 10(a) either, is that correct?

21 A    That's correct, yes.

22        MR. GERON:  May I have just one moment, Your Honor?

23        THE COURT:  Yes.

24 Q    Mr. Gordon, I want to draw your attention to Question

25 10(a) on the document in front of you, question -- Exhibit 28,

1  there is a transfer there --

2  A    I'm sorry, just one second.  Yeah, okay.  I have Exhibit

3  28, Question 10(a), yup.

4  Q    Right.  There is a transfer there or a series of transfers

5  there identified to a transferee, Wurk Environments, we're

6  going to get into Wurk Environments in a moment, but am I

7  reading this correctly, that some transfers totaling something

8  like $2.5 million directly on your behalf were made to Wurk and

9  the Wurk entities and were disclosed as part of the answer to

10  Question 10(a)?

11  A    Yes.

12  Q    So these were cash transfers, right?

13  A    Yes.

14  Q    Okay.  Taking you back, please, to the so-called loan that

15  you made to Allstar, you did not receive any promissory note in

16  connection with that loan, is that correct?

17  A    No, I did not.

18  Q    And Allstar did not and does not maintain any documents

19  evidencing the loan made by you to Allstar, is that correct?

20  A    Allstar maintains a schedule of repayments of that loan,

21  but it does not have a promissory note between me and Allstar.

22          THE COURT:  Did you use the word schedule of

23  repayment or repayments, plural?

24          THE WITNESS:  I'm sorry, repayments, Your Honor.

25          THE COURT:  What's that?

 1          THE WITNESS:  It was a list of payments that Allstar

 2   made to other parties that I directed it to make as part of the

 3   repayment of my loan.  So there's a sequential list of

 4   payments, by date, by payee who -- to whom Allstar made

 5   payments on my behalf to return the loan that I had made to it.

 6   BY MR. GERON:

 7   Q    Mr. Gordon, do you recall coming to my office and giving

 8   testimony on May 6, 2010?

 9   A    (No audible response).

10   Q    And I should correct that, giving testimony on behalf of

11   Allstar on May 6, 2010?

12   A    I mean, yeah, I've been to your office on a number of

13   occasions.  Was that the 2004 examination?

14   Q    Yes --

15   A    Yes.

16   Q    -- pursuant to a 2004 examination?

17   A    Yes.

18   Q    And you were there represented by Mr. Donald David, isn't

19   that correct?

20   A    I believe so, yes.

21   Q    And do you recall being sworn in and giving testimony

22   under oath at that point?

23   A    Yes.

24   Q    Do you recall being asked the following question -- the

25   following questions by me, I was asking you questions, isn't

Gordon - Cross/Geron                                38

1  that correct?  I'm the one who was asking you the questions

2  during that deposition until the very end?

3  A    I think you and your colleague asked me questions that

4  day.

5  Q    All right.  Do you recall my asking the following

6  questions and you giving the following answers?  Question,

7  "Does Allstar maintain any documents evidencing any loans made

8  by you to Allstar?"  Answer, "By who, by me personally?"

9  Question, "You personally to Allstar?"  Answer, "I don't

10 believe so."  Question, "Does Allstar maintain any documents

11 that evidence any transfers by Allstar to you personally?"

12 Answer, "No."  Do you recall giving that -- having me ask those

13 following questions, the preceding questions and you giving

14 those answers?

15 A    Mr. Geron, we were there for about eight hours that day.

16 I don't remember the specific questions, but I take -- I

17 certainly take you word for it if you tell me that you asked me

18 that and that I -- that's how I answered.  I'm sure that took

19 place, I just don't remember the specific question being asked

20 of me.

21 Q    I -- but your testimony today is that Allstar does not

22 maintain any documents with respect to the Allstar loan, that

23 is, the loan that you made to Allstar, is that correct?

24         MR. DAVID:  Objection, Your Honor.

25         THE COURT:  Sustained.

Gordon - Cross/Geron                           39

1  Q    Please go back to Exhibit 24 which is also a stipulated

2  exhibit, do you have Exhibit 24 before you?

3  A    Yes, I do.

4  Q    And those were your original bankruptcy schedules, isn't

5  that correct?

6  A    Yes.

7  Q    Look, please, at Schedule B which starts on ST-00168.

8  A    Just one second.  Yes.

9  Q    And look, please, more specifically at Item Number 16

10 which is on Page ST-00169 and it's identified as accounts

11 receivable.

12 A    Yes.

13 Q    And there is no accounts receivable listed there, isn't

14 that correct?

15 A    That is correct.

16 Q    So as of the date of the filing of the bankruptcy, of

17 these bankruptcy schedules and the filing of your bankruptcy

18 petition, it's your -- it was your statement in your schedules

19 that you did not have any monies owed to you, is that correct?

20 A    Yes, when I -- yes, as of the date that I filed this, I

21 did not believe that there were any monies owed to me.

22 Q    All right.  Please go to Question twenty -- I'm sorry,

23 Exhibit 25.

24 A    Okay.

25 Q    Those are the second amended bankruptcy schedules, the

1  final bankruptcy schedules that you filed, isn't that correct?

2  A     Sorry, I just remembered that there was -- oh, the items

3  that were filed in February were the statement of -- yeah,

4  these schedules were the last schedules that were filed.

5  Q     And turn, please, to the same schedule, Schedule B which

6  is your personal property?

7  A     Right.

8  Q     And then turn if you could, please, to the accounts

9  receivable question section -- 16, Question 16?

10  A     Yes.

11  Q     And in this one there is the Wurk Times Square receivable

12  for $15,000, isn't that correct?

13  A     That is correct.

14  Q     But there is not anything owed by Allstar to you

15  personally, isn't that correct?

16  A     That is correct.

17  Q     And the reason that the Allstar loan is not reflected on

18  -- as an accounts receivable on Schedule B, on either of the

19  Schedule Bs, is because it's your position that the entire

20  Allstar loan was repaid before the filing of the bankruptcy,

21  isn't that correct?

22  A     That is correct.

23  Q     And it's your testimony that the Allstar loan was repaid

24  in accordance with -- or payments were made in accordance and

25  to a schedule that was prepared by Akerman Senterfitt and

1  provided to us, isn't that correct?

2  A    Well, the schedule that Akerman Senterfitt provided

3  summarized a little more than $2 million in payments that

4  Allstar had made to third parties on my behalf.  There were,

5  you know, I think that that's a fair representation to show

6  that monies were repaid to me prepetition.  There were other

7  repayments made over that loan, as well, but I believe that

8  that schedule was the one that was used by Akerman Senterfitt

9  to demonstrate the repayment of the loan.

10  Q    All right.  Turn please to --

11          THE COURT:  Akerman is Mr. David's law firm?

12          THE WITNESS:  Yeah, I'm sorry, Your Honor.  Yes.

13  Q    I'm sorry.  I should clarify.  Akerman Senterfitt is your

14  -- is Donald David's law firm and it represents you in this

15  case?

16  A    Yeah, Donald David represents me.  He's a partner at

17  Akerman Senterfitt.

18  Q    Okay.  If you would please, Mr. Gordon, turn to Exhibit

19  13?

20          MR. GERON:  This is also stipulated, Your Honor.

21  Q    Do you have it?

22  A    I'm sorry, yes.

23  Q    And this is the schedule that you were just referring to

24  as summarizing the repayment of the Allstar receivable before

25  the filing of the bankruptcy that was prepared by Akerman,

1  isn't that correct?

2         MR. DAVID:  Objection.

3         THE COURT:  Overruled.

4         MR. DAVID:  Your Honor, may I be heard?

5         THE COURT:  Yes.  Leave the room, please, Mr. Gordon.

6                (Witness exits courtroom)

7         THE COURT:  I was overruling on form, do you have a

8  different objection, Mr. David?

9         MR. DAVID:  Yes, Your Honor.  I do.  If you'll take a

10 look at Exhibit Number 14 which is right underneath it, there

11 was a corrective schedule that was sent out at Mr. Gordon's

12 behest and I certainly am not suggesting that this is a

13 deliberate act on Mr. Geron's part, but the fact of the matter

14 is that that corrected schedule is not being called to his

15 attention.  I would have no objection is we called both 13 and

16 14 to his objection (sic), but, in essence, what we're doing is

17 we're testing his memory as to whether he recalls that there

18 was a subsequent corrected schedule sent out two days later and

19 I think that it's misleading.

20        THE COURT:  All right.  Mr. Geron?

21        MR. GERON:  I don't have an objection to using both

22 of them in the initial opening set of questions.  I do want to

23 draw the attention to the -- to each one of them separately,

24 but I don't mean to be asking a memory test with respect to 13

25 versus 14.  So I'll draw the attention to 13 and 14 and then go

Gordon - Cross/Geron                                43

1  back to 13, specifically.

2              THE COURT:  All right.

3              MR. DAVID:  I have no objection to that.

4              THE COURT:  All right.  Here's what we're going to

5  do.  I'm going to sustain Mr. David's last objection.  I'm

6  going to permit you to put both documents before him and then I

7  want you to ask your questions very carefully, Mr. Geron, so

8  that to the extent that the correction bears on the accuracy of

9  an earlier answer, the record is clear.

10              MR. GERON:  Very well, Your Honor.  Thank you.

11              THE COURT:  Okay.  Bring him back now.

12                  (Witness enters courtroom)

13              MR. GERON:  May I proceed, Your Honor?

14              THE COURT:  Yes, you may.

15  BY MR. GERON:

16  Q    Mr. Gordon, I want to draw your attention to Exhibits 13

17  and 14 collectively at this point and then I'll ask you

18  specific questions with respect to this -- to these schedules

19  separately, but just together, just take my questions, please,

20  as together.  You did not prepare Exhibits 13 and 14, isn't

21  that correct?

22  A    That's correct.

23  Q    And Akerman, that is, Mr. David, as a partner in Akerman,

24  Akerman prepared those schedules on your behalf, isn't that

25  correct?

1  A    Well, I don't believe -- I believe there were other people

2  at Akerman who prepared these, but Akerman collectively would

3  have prepared them.

4  Q    Okay.  And --

5  A    I'm sorry, you just said -- I don't mean to interrupt, but

6  you had said Mr. David prepared them.  I don't know who

7  specifically prepared them, people at Akerman.

8  Q    Fair enough.  Then let me just move it up one notch,

9  Akerman prepared those schedules on your behalf, people at

10 Akerman prepared those schedules on your behalf?

11 A    That's correct, yes.

12 Q    And you've reviewed these schedules, is that correct?

13 A    Yeah, over the course of this proceeding I've reviewed the

14 schedules.

15 Q    And taking the last one just in general terms as -- the

16 last one correcting the first one, that is, 14 correcting 13,

17 that to your knowledge Schedule 14 now is true, correct and

18 complete, is that correct?

19 A    I'm sorry, true, correct and complete in what regard?

20 Q    That it lists all of the loan repayments by Allstar to you

21 on account of that $2 million loan we've been talking about?

22 A    No, I think, as I said a few minutes ago, there were other

23 repayments of the loan that Allstar made to me prepetition.  I

24 believe that this schedule simply showed that more than $2

25 million had been repaid to me prepetition and therefore

Gordon - Cross/Geron                          45

1 satisfied the loan I had made to Allstar.

2 Q    So it's your position that Schedule 14 is not a complete

3 list of the loan repayments made to you by Allstar?

4 A    No, it's my position that this document was intended to

5 show that Allstar had repaid more, a little bit more than $2

6 million of the loan that I had made to it prior to the

7 petition.  It would not be accurate to say that this schedule

8 contains all of the payments that Allstar made on my behalf on

9 account of that loan.

10 Q    So, again, you're saying that this schedule, Schedule 14,

11 is not a complete list of all of the repayments made by Allstar

12 to you on account of the loan?

13 A    That's -- it is not, yes, that is correct.

14 Q    Insofar as you're concerned though the payments that are

15 listed on Schedule 14 are, at least, some of the repayments

16 made to you on account of the Allstar loan?

17 A    Yes.

18 Q    Now, you, in fact, reviewed Schedule 13, that's the --

19 Exhibit 13, I'm sorry, after it was transmitted by Mr. David to

20 my firm, isn't that correct?

21 A    I did, yes.

22 Q    And you instructed Mr. David to make certain corrections

23 to the schedule that is attached to Exhibit 13, isn't that

24 correct?

25 A    Yeah.  Yes, at the time that this Number 13 was prepared,

Gordon - Cross/Geron                                46

1  I was traveling and I didn't get a chance to review this prior

2  to Mr. David sending it on.  When I opened it, I noticed that

3  there were two items that shouldn't have been included on that

4  list and I notified Mr. David promptly and he then corrected

5  the schedule.

6  Q    So it's your testimony that all of the payments on

7  Schedule 14 constitute payments by -- made by Allstar in

8  repayment of the $2 million loan, but to third parties, isn't

9  that correct?

10 A    I'm sorry, the first part of the question just confused me

11 a little.  Could you just repeat it?

12 Q    It is your testimony that the payments reflected on

13 Exhibit 14 -- well, let me break that down, the payments

14 reflected on Exhibit 14, those are all payments to third

15 parties, they're not payments back to you, isn't that correct?

16 A    No, that's not correct.  Do you want me to point out --

17 Q    There's one, I'm sorry, I stand corrected.  There's one

18 cash payment of $75,000 to you, isn't that right?

19 A    Yeah, it's the line item that says cash-DLG, I'm DLG.

20 Q    With that one exception, everything else is to third

21 parties, isn't that correct, all the other transfers are to

22 third parties?

23 A    Yes.

24 Q    And it's your testimony that, again, with the exception of

25 the $75,000 to you that all of those payments were made at your

Gordon - Cross/Geron                                    47

1   direction, isn't that correct?

2   A    Yes.

3   Q    And all of them were in repayment of the $2 million loan

4   that you had made to Allstar, isn't that correct?

5   A    Yes.

6   Q    I want to go back to that cash transaction, that $75,000

7   transaction, that's listed as withdraw WaMu, was that a cash

8   withdraw from Washington Mutual?

9   A    Do you mean did I withdraw it in dollar bills?

10  Q    Yes.

11  A    No.

12  Q    So you ostensibly, you moved it from one account to

13  another account of yours --

14  A    Correct.

15  Q    -- is that correct?

16  A    Yeah.

17  Q    Okay.  And that was done on September 3rd, 2009?

18  A    Yes.

19  Q    About six weeks before the filing of the bankruptcy?

20  A    Maybe seven, but, yeah, within that general period.

21  Q    All right.  Seven weeks before the filing of the

22  bankruptcy.  Quickly, just for a brief moment, if you could

23  just turn to schedule twenty -- I'm sorry, to Exhibit 25?

24  A    Twenty-five.  Okay.

25  Q    That's your second and final set of bankruptcy schedules,

Gordon - Cross/Geron                    48

1    isn't that correct?

2    A    Yes.

3    Q    Look at Schedule B, Item 2?

4    A    Schedule B, Item 2, yes?

5    Q    How much money did you have in the bank at the time of the

6    filing of the bankruptcy?

7    A    I list two accounts, one with $3,000 in it and one with

8    $147 in it.

9    Q    Now, going back now to Exhibit 14 --

10   A    Sorry, just one second.  I just have to -- okay.

11   Q    It's your testimony that Allstar made a payment to the law

12   firm of Todtman Nachamie of $10,000 on October 15th, 2009,

13   isn't that correct?

14   A    Yes.

15   Q    And it's your testimony that that $10,000 was paid by

16   Allstar in repayment of its obligation, in partial repayment of

17   its obligation to you?

18   A    Yes.

19   Q    And item further up, about midway through the list, the

20   Rogin Nassau payment, do you see that line item?

21   A    Yes.

22   Q    That's for five thousand one hundred and six point five

23   three dollars made on May 8th, 2009, isn't that correct?

24   A    Yes.

25   Q    And it's your testimony that that payment also was paid by

Gordon - Cross/Geron                                        49

1 Allstar in partial satisfaction of it's loan to you, correct?

2 A    Yes.

3 Q    Could you please turn to Exhibit 16?  That's a stipulated

4 exhibit in evidence.  Do you have it in front of you?

5 A    I do.

6 Q    This is an invoice dated April 8th, 2009, is it not?

7 A    I see 3/31 on mine.  Where are you looking on the date?

8 Q    Right under the letterhead Rogin Nassau?

9 A    Oh, I'm sorry.  The copy's a little -- I was looking at

10 the peeling through.  I apologize.  Yes, April 8th, 2009, yes.

11 Q    And the invoice amount, if you look at the next page, the

12 invoice amount if for five thousand one oh six point five

13 three, isn't that correct?

14 A    Yes.

15 Q    That's the same amount that we just highlighted as being a

16 payment by Allstar made on May 8th, 2009?

17 A    Yes.

18 Q    That's roughly 30 days, give or take, after this invoice

19 is dated?

20 A    Yes.

21 Q    And look at that invoice, please, it's address to Allstar

22 Capital, is it not?

23 A    It's addressed to me, as well as Allstar, in care of

24 another company, but, yes.

25 Q    So is it your testimony that you were the client of Rogin

Gordon - Cross/Geron                                50

1  Nassau?

2  A     I --

3          MR. DAVID:  Objection.

4          THE COURT:  Overruled.

5  A     I don't really know how Rogin Nassau detailed who its

6  clients were.  I was -- the relationship with Rogin Nassau

7  started with me.  The lawyer who did the work did legal work

8  for me and on occasion he would also do legal work for other

9  entities in which I was involved in.  I don't know who

10  technically the client was.  I know I signed an engagement

11  letter.  I don't know if Allstar had signed one.

12  Q     So Allstar could have been the client, as well?

13  A     Could very well be, I just want to make sure -- I just

14  want to be as clear as I can be and I just don't know for a

15  fact if Allstar was listed as their client or if it's just

16  listed with me as the client with different subsidiary

17  operations.

18  Q     And, in fact, Rogin Nassau was rendering services to

19  Allstar in connection with a property in which Allstar has an

20  investment in Groton, Connecticut, isn't that correct?

21  A     Yes.

22  Q     And just to tie this up, as far as you can tell, as far as

23  we can tell, it would be accurate to say that the payment that

24  is on the listing of Exhibit 14, the payment to Rogin Nassau,

25  five one oh six fifty-three, that is the same -- that is

Gordon - Cross/Geron                    51

1 payment of this very same invoice that I'm showing you now as

2 Exhibit 16?

3 A    I assume so because the amounts are the same.  There's no

4 invoice number or anything referenced on the schedule, but,

5 yeah, I mean, I assume that that's the invoice that was being

6 paid.

7 Q    I want to draw you back to Exhibit 13 now, that is the --

8 A    Right.

9 Q    -- exhibit that Mr. David sent.

10        THE COURT:  You can continue, Mr. Geron, but we've

11 been going on for almost an hour and a half.  I'm going to want

12 to take a ten minute break at a convenient spot.

13        MR. GERON:  This would actually, Your Honor, be a

14 good time to break.  And then, if Your Honor will allow me, and

15 then I'll go back to Exhibit 13 in a moment.

16        THE COURT:  Okay.  We're going to take a ten minute

17 break.  Mr. Gordon, I'm instructing you, I don't want you

18 talking to your counsel or to anybody else during the break.

19 It's now a minute or two after 11:05.  We'll be back in ten

20 minutes.

21        MR. GERON:  Thank Your Honor.

22                    (Recess)

23        THE COURT:  Mr. Geron, you want to continue, please?

24 Mr. Gordon, you're still under oath.

25        MR. GERON:  Thank Your Honor.

1  BY MR. GERON:

2  Q    Mr. Gordon, before I go to Schedule 13, I want to go back

3  to Schedule 14 for just a quick moment.  Schedule 14 has 20

4  separate line items on it, does it not?

5  A    Hold on, one second.  I'll tell you.  Twenty, yes.

6  Q    You testified earlier that Schedule 14 represents some of

7  the loan repayment by Allstar, but not all of it, that's

8  correct?

9  A    Yes.

10  Q    How many other loan repayment transactions are there?

11  A    I -- sitting here today, I don't know.  I know that this

12  schedule was prepared to demonstrate that more than $2 million

13  was repaid to me or to entities to whom I directed they be

14  paid, but I don't know, sitting here today, if they're three

15  more, five more, what have you.

16  Q    Could there be ten more?

17  A    I don't think ten more, but there could be three or five

18  more.

19  Q    And that would be a guess on your part?

20  A    Yeah, to -- I mean, that's -- it's a best guess as to my

21  recollection.

22  Q    How much more than the $2 million was repaid by Allstar to

23  you?

24  A    Excuse me, I believe that the total amount of repayments

25  was approximately $2.35 million.

Gordon - Cross/Geron                    53

1  Q     And where does that number come from?

2  A     Well, that's kind of what I recall the total amount being

3  repaid on the account of the loan.  The loan was -- the -- I

4  had charged Allstar some level of interest.  Allstar was in the

5  business of making very, very high interest rate loans, some of

6  which were at 86, 89 percent rates.  So I believed that I was

7  entitled to charge Allstar a reasonable rate of interest far

8  less than that.

9  Q     When you say you charged Allstar, there was no note, isn't

10 that correct?

11 A     No, there was no note.

12 Q     And there was no loan agreement, isn't that correct?

13 A     There was no loan agreement.

14       MR. DAVID:  Objection, asked and answered.

15       THE COURT:  The note was asked, loan agreement was

16 not asked.  Objection to the first half, sustained, objection

17 to the second half, overruled.

18 Q     There was no --

19       THE COURT:  Was there a loan agreement?

20       THE WITNESS:  No, sir.

21 Q     There was no document at all that specified what interest

22 rate would be charged by you to Allstar, isn't that correct?

23 A     There was no document.  I had an understanding as to the

24 rate, but there was no document --

25 Q     And --

Gordon - Cross/Geron                        54

1  A    -- setting that forth.

2  Q    And you're understanding was by you personally as the

3  lender, isn't that correct?

4  A    I think it was me personally as the lender, but also me as

5  the officer of Allstar.

6  Q    So the understanding was you with yourself, isn't that

7  correct?

8  A    Yes.

9  Q    I want to go back to Schedule 13 now, please.  I'm sorry,

10 Exhibit 13, do you have it in front of you?

11 A    No, just one second.  I have it now.

12 Q    This exhibit reflects an e-mail and the schedule attached

13 to it transmitted by Donald David, your counsel, to my firm on

14 March 1st, 2011, isn't that correct?

15 A    Yes.

16 Q    And on this exhibit, I'm sorry, on the schedule itself,

17 there are three American Express transactions, line items,

18 isn't that correct?

19 A    Yes.

20 Q    After this original e-mail was sent by Mr. David to my

21 firm, you reviewed this schedule, isn't that correct?

22 A    Yes.

23 Q    And you noted to Mr. David that the Amex payments at

24 issue, the three line items, should not have been included in

25 that schedule, isn't that correct?

Gordon - Cross/Geron                          55

1  A    I noted for him that they were taken by me as income on my

2  tax return and therefore we're not a repayment of the loan and

3  shouldn't be on the schedule.

4  Q    And so you directed Donald David to amend the schedules,

5  correct?

6  A    I don't know that I directed him.  He said, okay, I'll fix

7  that.

8  Q    You advised Mr. David that he had made a mistake on

9  Exhibit 13, correct?

10 A    Yes, as to the American Express items.

11         THE COURT:  American Express items were taken as

12 deductions?

13         THE WITNESS:  No, Your Honor.  They were taken as

14 income to me on my personal returns, so they wouldn't have been

15 considered a loan repayment.  All of the items on these

16 schedules were treated by Allstar as loan repayment, not as

17 deductions.

18 Q    With the exception of the Amex payments that appear on

19 Schedule 13, isn't that correct?

20 A    Yes, I'm sorry.  I was referring to the corrected version,

21 yes.

22 Q    I'm -- I'll ask you, please, to turn to Exhibit 4 which is

23 the complaint and I'm going to draw also your attention to

24 Exhibit 5 which is the answer.

25 A    Excuse me.

1  Q    For the record, Exhibit 4 is the discharge complaint --

2  A    I think it's the original complaint.

3  Q    -- the original complaint dated September 28th, 2010, not

4  the amended complaint.  I'm sorry.  Now, I understand the

5  request of counsel, not the amended complaint, this is the

6  original complaint.

7  A    Yes.

8  Q    I draw your attention specifically to Paragraphs 28 and 29

9  and in those paragraphs --

10 A    I'm sorry, just hold on, one second.

11 Q    I'm sorry.  My -- forgive me.

12            MR. DAVID:  Your Honor, may I be heard?

13            THE COURT:  Yes.  Leave the room, please, Mr. Gordon.

14                (Witness exits courtroom)

15            MR. DAVID:  Your Honor, as you well know and I won't

16 go into the history, this complaint has, in fact, been

17 superseded by an amended complaint which has significantly

18 fewer allegations and significantly fewer counts.  I don't

19 believe that this complaint is properly the subject of

20 questioning.  I think only, if I could, respectfully, the

21 amended complaint which has supplanted it, by both stipulation

22 and order of this Court, is the proper complaint.

23            And particularly I would remind the Court that the

24 issue came up days ago about my wanting to examine Ms.

25 Tese-Milner about a number of allegations that are contained in

1   this complaint that we felt shouldn't have been.  I'll just put

2   it that way.  And the Court, quite properly, ruled as it did

3   and one of the grounds for doing that is that this is, in fact,

4   not the complaint that's before the Court.  If they want to ask

5   questions about a specific transaction, that, obviously, I

6   don't object to, but to try to gain some kind of leverage from

7   a complaint that is not before the Court anymore and is not an

8   issue is not proper.

9          THE COURT:  Mr. Geron, unless you're trying to match

10  up a complaint with an answer to show that something was

11  admitted, I have trouble seeing why any complaint is relevant.

12  I need help from you.

13         MR. GERON:  That's exactly the purpose of this line

14  of questioning, Your Honor.  Questions -- Paragraphs 28 and 29

15  are factual allegations.  They're not otherwise.  The answer

16  relates to those paragraphs and I'm trying to draw a

17  relationship between the allegations in the complaint and the

18  answer to those allegations.  Those allegations --

19         THE COURT:  Well, wasn't the amended complaint also

20  answered?

21         MS. SANTUCCI:  We stipulated that the original --

22  Your Honor, we had stipulated that the --

23         THE COURT:  Come to -- pull the microphone closer to

24  you, Ms. Santucci.

25         MS. SANTUCCI:  Sorry, Your Honor.  We had stipulated

Gordon - Cross/Geron                    58

1  to counsel that the original answer would still stand as it

2  relates to the allegations in the amended complaint.

3          THE COURT:  All right.  Gentlemen, I would prefer

4  that you do this by a stipulation rather than questioning the

5  witness on it.  In other words, if there was a statement in a

6  complaint and a statement of a matching answer, let's just put

7  in what the complaint said and the answer without putting this

8  in the form of questions to the witness.  And although while

9  the witness is out of the room, you -- isn't it in the pretrial

10 order or is it not in the pretrial order?  Because what you

11 guys agreed to as stipulated facts in the pretrial order is

12 maybe not the only method you could do, but certainly the

13 cleanest method of stipulating to facts.

14         MR. GERON:  Your Honor, this has to do with specific

15 transfers made by the debtor and how they're categorized by the

16 debtor.  And so I -- it's about characterization of transfers

17 and, so the transfers themselves are stipulated to have

18 occurred.  The question is that the debtor has a -- has

19 characterized them differently at different times.  And so the

20 idea was that you have the answer which characterizes them in a

21 certain way and then you have as it relates to the schedules

22 that are before the Court at this point.

23         THE COURT:  That's too abstract for me, Mr. Geron.

24 Let me see how it plays out in practice.  What were you trying

25 to  --

Gordon - Cross/Geron                              59

1           MR. GERON:  There are three --

2           THE COURT:  -- match up?

3           MR. GERON:  There are three stipulated transfers that

4  occurred to a company called CITADEL.  On January 28th and

5  then, again -- two on January 28th and one on February 26th,

6  2009.

7           THE COURT:  Now, were CITADEL transactions also in

8  the amended complaint?

9           MR. GERON:  Yes.

10          THE COURT:  Okay.  And were there any changes between

11 the original complaint and the amended complaint vis-a-vis the

12 CITADEL transactions?

13          MR. GERON:  No, Your Honor.

14          THE COURT:  Okay.  And your point is that there were

15 one or more paragraphs in both complaints that refer to the

16 CITADEL --

17          MR. GERON:  I --

18          THE COURT:  -- and you want to link an answer to the

19 first complaint to the amended complaint vis-a-vis those three

20 paragraphs?

21          MR. GERON:  Right.  And I said CITADEL, it's actually

22 two to CITADEL, one to Wurk Times Square, but exactly the same

23 thing applies.  There are three transfers and I wanted to link

24 what the answer says with respect to those transfers and

25 acknowledges with respect to those transfers with the loan

Gordon - Cross/Geron                              60

1  repayment schedule.  In fact, there is no link with the loan

2  repayment schedule.

3          THE COURT:  You want me to take what you put in the

4  amended complaint and what the answer said and for me to read

5  the answer and to match up the complaint in the answer in those

6  three instances?

7          MR. GERON:  Correct, Your Honor.

8          THE COURT:  Mr. David, let me hear from you, please?

9          MR. DAVID:  Your Honor, if I may, the three

10 transactions that we are talking about are specific

11 transactions that I believe we have stipulated when the

12 pretrial order took place.  The proper way, as far as I'm

13 concerned, to do this, and I would suggest, is rather than

14 refer to a complaint is to ask about the three transactions,

15 ask about their characterization and then, if there is an

16 inconsistency, to call the witness' attention to or even read

17 to the Court the answer as it pertains to the particular

18 transaction as an inconsistent statement, but --

19         THE COURT:  Not quite, Mr. David, because an answer

20 is a judicial admission.

21         MR. DAVID:  Well, that's why I just said that.

22         THE COURT:  So it can be introduced independently,

23 not just as a prior inconsistency.

24         MR. DAVID:  Your Honor, I'm agreeing that I'm just

25 providing an alternative method.  What I'm saying is you don't

1  need to refer to the complaint in order to do that.

2          THE COURT:  Well, as long as your opponent is going

3  by a permissible method, he doesn't have to go by your

4  preferred method.

5          MR. DAVID:  That is correct, Your Honor, but he's not

6  going by --

7          THE COURT:  Okay.  I --

8          MR. DAVID:  -- a permissible method.

9          THE COURT:  Forgive me, Mr. David.

10          MR. DAVID:  Yes, Your Honor.

11          THE COURT:  I've ruled.  My ruling is that you can

12  match up complaint and answer and tell me what you pleaded,

13  tell me what the -- what Mr. Gordon said in his answer with

14  respect to that paragraph.  You can do it three times.  We're

15  going to do it out of the room, but I don't see it as

16  appropriate for questioning to the witness himself except

17  insofar as you may want to have used the complaint and answer

18  as a predicate for further questions.

19          So I'm not agreeing with either of you, but I am not

20  saying, Mr. David, and my ruling in contrary or adverse to you

21  in this respect, he doesn't have to use the complaint and

22  answer as he might use a prior inconsistent statement.

23          Mr. Geron, tell me what is in the complaint in any

24  given paragraph.  Tell me what the answer said and if you got

25  to repeat that three times for three separate paragraphs, you

Gordon - Cross/Geron                                        62

1   can do it.  And then we bring the witness back in and you can

2   ask him further questions, but, of course, I'm not going to ask

3   -- let you ask the same question twice.

4           MR. GERON:  Okay.  I think I can do this in --

5   collectively, Your Honor.  Complaint Paragraphs 28 and 29, just

6   these original --

7           THE COURT:  Now --

8           MR. GERON:  -- complaint 28 and 29.

9           THE COURT:  Which is Exhibit 4?

10          MR. GERON:  Yes, Your Honor.

11          THE COURT:  All right.  What paragraphs again?

12          MR. GERON:  Twenty-eight and 29.

13          THE COURT:  All right.  I want to do it one at a

14  time.  I don't like compound questions.

15          MR. GERON:  Okay.  Let's just deal with --

16          THE COURT:  You can read into the record what

17  Complaint Paragraph 28 said.  And then, if you wish, you can

18  read into the answer -- into the record what the answer said

19  about Paragraph 28.

20          By the way, I'm not going to allow you to read in an

21  allegation in the complaint unless you also read in the answer

22  because the allegation is -- the complaint is merely an

23  allegations or accusation.

24          MR. GERON:  Fair enough, Your Honor.  Then let me

25  just do Paragraph 28.

1          THE COURT:  Okay.

2          MR. GERON:  Quote, on or about January 24th, 2009,

3  the debtor caused $350,000 to be transferred from the debtor's

4  Wachovia account to CITADEL Construction Corp, an insider

5  corporation of the debtor.  On or about January 28th, 2009, the

6  debtor caused $300,000 to be transferred from the debtor's

7  Wachovia account to CITADEL Construction.  And there's a

8  defined term collectively with $350,000 transfer defined as the

9  CITADEL transfers.

10         THE COURT:  Okay.  Now, what's the answer?

11         MR. GERON:  Answer is --

12         THE COURT:  Exhibit 5?

13         MR. GERON:  -- Exhibit 5, may I quote it, Your Honor?

14         THE COURT:  Yes.

15         MR. GERON:  Quote, debtor Gordon -- sorry, start

16  again.  Quote, Gordon denies the allegations of Paragraph 28 of

17  the complaint and affirmatively alleges that, prior to the

18  filing of the debtor's petition, in or about May 2009, Allstar

19  repaid Gordon and Gordon directed that the payments by the

20  loan --

21         THE COURT:  No, I think it says directed that the

22  repayment of the loan.

23         MR. GERON:  That the repayment of the loan by Gordon

24  be made in the form of transfer to Wurk TS, a wholly owned

25  subsidiary of Wurk Environments, LLC, CITADEL Construction Corp

1  and others.  The books and records of Wurk Environments, LLC,

2  which Gordon -- of which Gordon is the sole member, reflect

3  such transfers as an increase in the capital account of Gordon.

4  These transfers were also reflected on Gordon's bankruptcy

5  schedules.

6         THE COURT:  Okay.  Now, that Paragraph 28 of the

7  answer denied the allegations of 28, so the only thing you can

8  use 28 of the answer for is the amount or the portion that

9  begins and affirmatively alleges, although to the extent the

10 original 28 provides context for that, it would seemingly be

11 appropriate.

12        MR. GERON:  Fair enough.  And what I really want

13 to --

14        THE COURT:  But I'm not going to take what the

15 Paragraph 28 of the complaint said was as true.

16        MR. GERON:  The affirmative allegation was the only

17 part that I was getting to which was -- and I would submit to

18 Your Honor as follows; Paragraph 28 states that the Allstar

19 loan was repaid in or about May 2009.  What I would draw the

20 Court's attention and what I was -- this is as much for

21 summation as anything else, is that the Allstar loan repayment

22 schedule, which is Exhibit 14, has loan repayments that are

23 significantly later than May 2009.

24        THE COURT:  Well, that's as you said summation.

25 That's not appropriate for discussion now.

1          MR. GERON:  Fair enough.

2          THE COURT:  Now, in fact, I'm not even sure why you

3    need the complaint.  You -- you're just relying on portions of

4    28 and 29 and, what, 30, that follow words to the effect of

5    affirmatively alleges, affirmatively states?

6          MR. GERON:  Correct, Your Honor.

7          THE COURT:  All right.  Mr. David, did you want to be

8    heard further on this?

9          MR. DAVID:  Your Honor, I did, but I -- you, in fact,

10   took the words out of my mouth when you said that's for

11   argument, not summary and not --

12         THE COURT:  Of course.  Okay.

13         MR. GERON:  That would -- I would do -- go through

14   the same exercise with respect to 20 -- to Paragraph 29 and the

15   answer to Paragraph 29, so I think we're getting --

16         THE COURT:  Well, all right, gentlemen.

17         MR. GERON:  -- redundant.

18         THE COURT:  I'm admitting, as a judicial admission,

19   the words that follow in each of 28, 29 and 30, affirmatively

20   states.  I'm not even sure if I need the complaint for that and

21   each of you can make such arguments as you see fit on summation

22   vis-a-vis the significance, if any, of those words.  Okay.

23         Now, I'm not sure what we need the witness for on

24   this topic.  You can bring him in for your next topic.  Or if

25   there's something that's followup to that --

1          MR. GERON:  Not on this topic, Your Honor, so I can

2  -- we can move on.

3          THE COURT:  Okay.

4               (Witness enters courtroom)

5  BY MR. GERON:

6  Q    Mr. Gordon, I want to draw your attention, please, ask you

7  to turn to Exhibit 10, stipulated Exhibit 10.  If you will,

8  please, turn to the last page of that exhibit, second to last

9  page, I'm sorry.  It's marked ST-00091.  That's your signature,

10 is it not?

11 A    Yes, it is.

12 Q    And you recognize this to be an affidavit you signed in

13 opposition to the application by the trustee for a preliminary

14 injunction against you, isn't that correct?

15 A    Well, I don't think it was against me.

16 Q    Against Allstar, forgive me.

17 A    Okay.  Yes.

18 Q    I want to draw your attention, please, or ask you to turn

19 to Paragraph 97 of that affidavit.

20 A    Okay.

21 Q    Are you there?

22 A    I'm -- yes, I'm at it.

23 Q    You state in this paragraph that Allstar repaid the loans

24 you made to it, the loan, forgive me, the loan you made to it,

25 the $2 million loan in or about May 2009, isn't that correct?

Gordon - Cross/Geron                          67

1  A    Yes.

2  Q    Turn, please, briefly to Exhibit 14, the schedule.

3  A    Okay.

4  Q    There are approximately ten transactions that appear after

5  May 2009, isn't that correct?

6  A    Yes.

7  Q    Now, flipping back, again, to the affidavit, that is,

8  Exhibit 10, Paragraph 103, in it you state -- are you there

9  with me?

10 A    Yes.

11 Q    In it you state that in May 2009, you directed Allstar to

12 remit the loan repayments due to you to Wurk Environments,

13 CITADEL and others as you directed, isn't that correct?

14 A    Yes.

15 Q    So just to put a historical context, in December 2010,

16 that is, more than 14 months after the filing of the

17 bankruptcy, you signed an affidavit stating that the payments

18 have been remade -- that the Allstar payments had been made by

19 May of 2009, isn't that correct?

20 A    Well, I believe I said in or about May 2009.

21 Q    And then in March of 2011, so two months after this

22 affidavit, your counsel admitted to us what is -- what we've

23 been referring to as Exhibit 14, the schedule of Exhibit 14,

24 isn't that correct?

25 A    Yes.

Gordon - Cross/Geron                           68

1  Q    And flipping back to Exhibit 14, which we could stay on

2  for a little bit, I want to draw your specific attention to the

3  line item Wurk Times Square, LLC, which is for $1,350,000 that

4  your schedule says was made on May 15th, 2009, do you see that

5  transaction?

6  A    I do.

7  Q    So this amount was repaid by Allstar about five months

8  before the filing of the bankruptcy?

9  A    Yes.

10  Q    And this was done, again, at your exclusive direction?

11  A    Yes.

12  Q    And that went to or on behalf -- to or for the benefit of

13  Wurk Times Square which is a company that you controlled, isn't

14  that correct?

15  A    I was a -- yes, I controlled it.  I was a member of its

16  parenting company.

17  Q    On May 6th, I drew your attention to a deposition that you

18  gave at my office, a Rule 2004 deposition on May 6th, 2010, do

19  you recall that prior testimony and the prior reference to that

20  Rule 2004 examination?

21  A    Yes.

22  Q    And you appeared as Allstar's sole officer and director at

23  that deposition, isn't that correct?

24  A    I've -- I'm sorry.  I've given a number of depositions in

25  this case.  I don't know if -- I'll take a look at the

Gordon - Cross/Geron                          69

1  transcript if you like.  I just don't remember in what capacity

2  I appeared there.

3  Q    All right.  Maybe you could take a look at Exhibit 56

4  which is in the second binder.

5  A    Yeah, do you want 14 opened still, too?

6  Q    Leave 14 open.

7  A    Okay.

8  Q    Just -- I want to -- all I'm doing is trying to refresh

9  your recollection with respect to what --

10 A    I just don't want to knock anything over.

11 Q    -- let me just finish my sentence, what capacity you were

12 appearing in my office on May 6th, 2010.  And the question open

13 to you is you appeared in my office on May 6, 2010 as Allstar's

14 sole officer and director?

15 A    What was the exhibit you were pointing me too, 56?

16 Q    Fifty-six.

17 A    Thank you.

18 Q    I'm sorry.  I think I -- hold on.

19 A    I think this is a different deposition.

20 Q    Fifty-five.  I'm sorry.  I drew everybody's attention to

21 the wrong number, 55, please.

22 A    Fifty-five.

23 Q    My apologies.

24       MR. GERON:  Your Honor, I may be able to just skip

25 through this and enable -- I have the counsel's stipulation

Gordon - Cross/Geron                                    70

1  that he was there on behalf of Allstar, that might be the

2  easiest way to do this, but I'll -- we'll leave it to the

3  witness if you wish.

4          MR. DAVID:  I'm prepared --

5          THE COURT:  Anything that counsel can stipulate to, I

6  would prefer to getting the stip rather than whatever the

7  witness says.

8          MR. DAVID:  Your Honor, I'm prepared to so stipulate.

9          THE COURT:  Okay.

10         MR. GERON:  So on that date when you were testifying

11 on behalf of Allstar, you testified that the entire loan by you

12 to Allstar had been paid by June or July of 2009, do you recall

13 that?

14 A    I don't recall that specifically, I recall testifying

15 throughout this case that I believed that the loan had been

16 repaid to me by that period of time, around that period of

17 time, certainly well in advance of the petition date.

18 Q    I'm trying to pin it down though.  Let me just ask you to

19 bear with me for a second.  All right.  Do you recall being

20 asked the following question and giving the following answer?

21 This is while you were under oath in my office.  Question, "And

22 the last lose end for me, you said that your loan, your $2

23 million loan, was repaid, the second piece of that, the other

24 million dollars was repaid, how and when was that extra, that

25 other million dollars, repaid?"  Answer, "I don't specifically

1 remember, but I know that by June or July 2009, the entire

2 balance had been paid." Do you recall giving that testimony in

3 response to my question?

4 A    As I said, I don't recall the specific testimony.

5 However, I do recall testifying on at least four different

6 occasions as to that general time period in which the loan had

7 been repaid.

8 Q    So --

9 A    If you want, I'll look at the transcript.

10 Q    Just -- I'm trying pin down something.

11 A    Okay.

12 Q    You have testified that it was repaid by, and I just want

13 to make sure, by June or July, it was repaid, is that correct?

14          MR. DAVID:  I'm sorry.  Compound question there, I --

15          THE COURT:  Sustained.  It -- why don't you do it the

16 old fashioned way, Mr. Geron?  Read the question and the answer

17 from the deposition transcript and ask him if he gave -- heard

18 that question and gave that answer.

19          MR. GERON:  I thought I specifically did that.

20 Q    Do you --

21          THE COURT:  I -- and I thought he said in substance

22 that he didn't specifically remember it, but he wasn't

23 questioning it.  Now, if that isn't Mr. David's recollection,

24 then I'll ask -- I'll let you ask the question again and we'll

25 hear exactly what the witness said.

Gordon - Cross/Geron                              72

1          MR. GERON:  Fair enough.

2          MR. DAVID:  Your Honor, that's my recollection also,

3  exactly what you just said.  My objection was only to the form

4  of the last question, it was compound.

5          THE COURT:  Yes, I understand that and it was

6  technically objectionable as to form which is why I sustained

7  the objection.

8          MR. GERON:  All right.

9  BY MR. GERON:

10  Q    On May 6, 2010, do you recall being asked the following

11  question and giving the following answer in my officer under

12  oath, "How and when was that extra, that other million dollars,

13  paid?"  Answer, "I don't specifically remember, but I know that

14  by June or July 2009, the entire balance had been paid."  Do

15  you recall being asked that question and giving that answer?

16  A    I mean, I don't mean to be difficult.  I don't remember

17  that specific question.  There were many, many questions asked

18  to me that day.  However, I've been asked that question

19  numerous times throughout this proceeding and I've always

20  answered it consistent with how you just read it.  So I don't

21  dispute what you just said.

22  Q    Do you recall testifying on that day that only $1 million

23  of the $1.35 million identified on the Allstar loan repayment

24  schedules, that's Exhibit 14, was on account of the Allstar

25  loan repayment?

Gordon - Cross/Geron                          73

1  A    No, I don't recall that, specifically.

2  Q    Question, this is truncated, do you recall the following

3  question -- being asked the following question and giving the

4  following answer and I can get into further if counsel wishes

5  it.  Question, "And then there is a million dollars, could you

6  walk me through, again, what that million dollars was about?"

7  Answer, "I had previously, in 2008, given a personal loan to

8  Allstar in the amount of two million.  A million dollar portion

9  of that payment from Allstar to CITADEL was Allstar was a

10  repayment of the loan from Allstar to me.  I simply directed

11  that a million dollars go to CITADEL to partially satisfy

12  Wurk's obligation to CITADEL seeing that I was the sole member

13  of Wurk Environments which was the sole member of Wurk Times

14  Square."  Do you recall that question and that answer?

15  A    As I said, I don't recall it specifically, but I don't

16  dispute what you're saying.

17       MR. GERON:  All right.  May I have a quick moment,

18  Your Honor?

19       THE COURT:  Yes.

20       MR. GERON:  Your Honor, may I have five minutes?

21  This would be a brief --

22       THE COURT:  I'm not adverse to you have the five

23  minutes, but I'm trying to figure out the best way to do it.

24  Did you want to take an early lunch or did you want to go for

25  five minutes and then resume for another spirt before lunch or

Gordon - Cross/Geron                              74

1   what?  I do need to tell you, I don't remember whether I told

2   you that when you were here last week, that now with

3   sequestration, we no longer have the ability to go passed five

4   o'clock, so we have to shut things down at five o'clock every

5   day.  And I'm prepared to work diligently with you guys to use

6   the available time we have, but we turn into pumpkins at five

7   o'clock.

8        So I -- we can all eat an early lunch or you can have

9   the five minutes and then we'll go up to about one o'clock.  I

10  don't think we should go passed about one before we have lunch.

11  What's your preference?

12       MR. GERON:  Here's what I would suggest, Your Honor.

13  I'll finish this one question or two questions.  I'd like to

14  ask for, if Your Honor will allow us, I think even 45 minutes

15  for lunch is plenty as far as certainly my side is concerned.

16  I don't know whether that's okay for the debtor's side and then

17  we can resume at one.  I only have about two more minutes worth

18  of questions on this particular issue.

19       THE COURT:  Okay.  Do you want to be heard in

20  opposition to that, Mr. David?

21       MR. DAVID:  Your Honor, whatever works for Mr. Geron

22  and the Court is acceptable to me.

23       THE COURT:  Okay.

24       MR. DAVID:  I'd rather do lunch closer to one, so

25  that we don't have to, you know --

Gordon - Cross/Geron                          75

1          THE COURT:  I'm having trouble hearing you.

2          MR. DAVID:  I apologize.  I'll speak louder.  I said

3  I'd rather do --

4          THE COURT:  Just lift up the microphone, even if you

5  have to do it Oprah Winfrey style.

6          MR. DAVID:  I'd rather have lunch closer to one, but

7  I'm amenable to whatever the Court and Mr. Geron wants.

8          THE COURT:  Okay.  All right.  Mr. Geron, finish up

9  that mini bundle of questions you have and then we'll take a

10  recess and then we'll resume at one o'clock.

11          MR. GERON:  All right.

12  BY MR. GERON:

13  Q    Mr. Gordon, I want to ask you, please, to turn to that

14  large transcript which is Exhibit 55 in evidence or stipulated

15  into evidence and, specifically, once you're there, I'm going

16  to ask you to turn page -- the transcript page is 122, but it's

17  marked with ST, on the bottom left, ST-00614.  Let me know when

18  you're there, please.

19  A    You said Page 122?

20  Q    Top right, it says Page 122 --

21  A    Yeah.

22  Q    -- bottom left, it says --

23  A    Six one four.

24  Q    -- ST-00614?

25  A    I'm there.

Gordon - Cross/Geron                          76

1           MR. GERON:  Is the Court there, as well, Your Honor.

2           THE COURT:  Yes.

3   Q    Mr. Gordon, I'm going to ask you -- I've read this a

4   couple of times, but I want to ask you whether you recall, now

5   that you're seeing it in front of you, being asked the

6   following question and giving the following answer.  Actually,

7   the question is, "And then there was a million dollars, could

8   you walk me through, again, what that million dollars was

9   about?"  And the answer, "I had previously, in 2008, given a

10  personal loan to Allstar in the amount of two million.  A

11  million dollar portion of that payment from Allstar to CITADEL

12  was, dash, Allstar was a repayment of the loan from Allstar to

13  me.  I simply directed that million dollars go to CITADEL to

14  partially satisfy Wurk's obligation to CITADEL seeing that I

15  was the sole member of Wurk Environments which was the sole

16  member of Wurk Times Square."  Do you recall giving that answer

17  to my question above it?

18  A    It's in the transcript, so I'm sure I gave it.

19  Q    So the answer is yes?

20  A    Well, I don't specifically recall it, but I accept that

21  it's in the transcript and, therefore, I most likely gave it.

22  Q    Most likely, or you gave it?

23          MR. DAVID:  Objection, Your Honor.

24          THE COURT:  Sustained.  Mr. Geron, it's a statement

25  by a party opponent.  In the old days, it was called an

Gordon - Cross/Geron                                   77

1  admission.  In modern usage, I don't think it's hearsay, at

2  all.  In either event, you don't have to make him repeat it.

3  He's not disclaiming that whatever is in the transcript was

4  said.

5          MR. GERON:  Very well, Your Honor.  This is the end

6  of that little micro section that I was referring to.

7          THE COURT:  All right.  Then we'll take a recess

8  until one o'clock.

9          MR. DAVID:  Your Honor, would you mind if I had a cup

10 of water here when I come back or --

11         THE COURT:  No, you can have water and --

12         MR. DAVID:  Okay.

13         THE COURT:  -- Mr. David, if you or Mr. Del Virginia

14 can help him have some water for when he returns.

15         However, I don't want you discussing this case or

16 your testimony in any way over the lunch hour, Mr. Gordon.  All

17 right.  We're in recess until one o'clock.

18         MR. GERON:  Thank, Your Honor.

19         MR. DAVID:  Thank, Your Honor.

20         THE WITNESS:  Should I leave these here or --

21         THE COURT:  I'm sorry?

22         MR. DAVID:  I said thank you.

23         THE COURT:  Oh, okay.

24         MR. GERON:  I don't have an objection with the

25 binders.  The question from the witness was can he look at

Gordon - Cross/Geron                              78

1  them?

2           THE COURT:  Just leave them there.

3           MR. DAVID:  Your Honor, a small bottle?

4           THE COURT:  Any size bottle, as long as it's water,

5  you can bring it into the courtroom.

6                        (Recess)

7           THE COURT:  All right.  We'll continue.  Mr. Gordon,

8  you're still under oath.  Go ahead, Mr. Geron.

9           MR. GERON:  Thank you, Your Honor.

10                 CONTINUED CROSS EXAMINATION

11  BY MR. GERON:

12  Q    Mr. Gordon, just confirming that you followed the Judge's

13  instruction that you did not discuss in any way, shape or form

14  your testimony today with anyone during the break that we just

15  had?

16  A    That's correct.

17  Q    Okay.  Mr. Gordon, I want to focus briefly on one other

18  aspect of Allstar, and that is we talked earlier about a $2

19  million loan that you made -- you're purported to have made

20  personally to Allstar in October, October 22nd, 2008.  Do you

21  recall that that's the loan that we've been talking about?

22  A    Yes.

23  Q    You used the proceeds of that loan at Allstar to make a

24  loan by Allstar to a company called Urban Muse, isn't that

25  correct?

Gordon - Cross/Geron                        79

1   A    Yes.

2   Q    And at the time of the filing of your petition, that is as

3   of October 19th, 2009, the Urban Muse obligation back to

4   Allstar was still fully owed and owing, isn't that correct?

5   A    I believe it was.  Yes.

6   Q    It's also the fact that as -- that on October 26th, 2009,

7   one week after the filing of your bankruptcy, Urban Muse repaid

8   the $2 million loan to Allstar?

9   A    Yes.

10  Q    As of -- you testified earlier that Allstar's business is

11  to make loans.  I think that was your earlier testimony.  Do

12  you recall that?

13  A    Yeah.  Primarily.  I mean, its -- it's a -- its primary

14  business was making high interest loans.

15  Q    All right.  And one of those high interest loans was to a

16  basketball player, at least a former basketball player named

17  Eddy Curry, isn't that correct?

18  A    Yes.

19  Q    As of the petition date Allstar had a judgment against Mr.

20  Curry on account of a loan that it had made to Mr. Curry, isn't

21  that correct?

22  A    Yes.

23  Q    That Allstar receivable had been the subject of Court

24  litigation in Nevada first, isn't that correct, which is where

25  the loan was made?

1  A    There was a case -- the collection activities relating to

2  the loan began in Nevada, and once a judgment was secured in

3  Nevada it was domesticated in New York, and then proceedings

4  continued in New York.

5  Q    So, in August 2009 Allstar, your company, was awarded a

6  judgment against Mr. Curry in the amount of $1,224,522.90 plus

7  interest?

8  A    I don't recall the specific dollars and cents, but, I

9  mean, it sounds about right.

10 Q    Okay.  At least the New York leg of the litigation, the

11 domestication of that judgment in New York and then the

12 enforcement process, that was handled by Akerman Senterfitt on

13 behalf of Allstar?

14 A    Yes.

15 Q    And ultimately Allstar, using Akerman as its counsel,

16 obtained a recovery from Mr. Curry, isn't that correct?

17 A    I believe the case settled.

18 Q    How much money was recovered from Mr. Curry?

19 A    I want to say approximately $2 million.

20 Q    And Akerman's bill was paid from those proceeds, isn't

21 that correct?

22 A    Yes.  Yes.  There were proceedings relating to that, and

23 then there was all sorts -- there were about three or four

24 temporary restraining order applications that the trustee had

25 brought in the Bankruptcy Court, and somewhere along the lines

Gordon - Cross/Geron                                  81

1  the money got tied up in the Bankruptcy Court, and Akerman

2  agreed to hold it until there was resolution of these various

3  TROs, and I believe out of those proceeds they were paid their

4  fees and other counsel was paid their fees.

5           And -- I'm sorry, there was also -- as part of those

6  proceeds there was also proceeds used to settle another dispute

7  involving Signature Bank.

8  Q    You're aware of a company called Wurk Times Square, LLC,

9  are you not?

10 A    I am.

11 Q    That's a company that was formed in 2008, correct?

12 A    Yes.

13 Q    You're the sole member of Wurk Times Square?

14 A    No.

15 Q    I'm sorry.  Forgive me.  Wurk Environments is the sole

16 member of Wurk Times Square?

17 A    Yes.

18 Q    There are two members of Wurk Environments, that is you,

19 personally, and Gordon Family One LP, correct?

20 A    Correct.

21 Q    Well, I think you may have testified earlier, but I'm

22 covering this very quickly, you were the manager and the person

23 in control of Wurk Times Square, correct?

24 A    I was a manager, yes, of Wurk Times Square.

25 Q    And you controlled the operations of Wurk Times Square?

Gordon - Cross/Geron                                    82

1  A    Yes, through its parent.

2  Q    Wurk Times Square ceased operating just shortly before the

3  filing of your bankruptcy -- of your personal bankruptcy

4  petition?

5  A    At or around that period of time.

6  Q    Prior to the filing of the bankruptcy petition Wurk Times

7  Square owed you, personally, $15,000, correct?

8  A    As I later discovered after the petition, yes.

9  Q    So -- you're ahead of me.  Your original Schedule B, which

10  is Exhibit 24, which we talked about before --

11  A    So, are you -- we're done with 55?

12  Q    We're done with 55.

13  A    Okay.  I just want to put the binder to the side.

14  Q    So I'll start that question again, just to complete it.

15  So, your original schedules, that is Schedule -- Exhibit 24, do

16  not reflect the Wurk Times Square receivable of $15,000 owed to

17  you, correct?

18  A    That is correct.

19  Q    And that's because -- I think you just testified, that's

20  because you discovered that later?

21  A    Well, the filing of the petition and the schedules was

22  accelerated due to an impending tax case in the Tax Court, and

23  so there was a rush to put these schedules together.  I didn't

24  have the bank records for either my account or Wurk Times

25  Square's account at the time that these items were filed.  I

Gordon - Cross/Geron                                    83

1  subsequently got those, and verified the claim, and added that

2  receivable to the amended schedules.

3  Q    So, there just simply wasn't the time?  There wasn't the

4  time to figure out exactly the nature of this receivable, or to

5  be aware of that receivable at the time that you filed your

6  bankruptcy petition, correct?

7  A    Excuse me.  I wasn't aware of the receivable as of the

8  date that the petition was filed, otherwise I would have

9  certainly scheduled it.

10  Q    And you were not -- yes, you were not aware of it at the

11  time that the schedules were filed either, correct?

12  A    That is correct.

13  Q    Okay.  That receivable was ultimately reflected on your

14  amended Schedule B, which is the one that was filed December

15  10th, 2010?  That's Exhibit 25, correct?

16  A    I'm sorry.  Just one second.  Yes.

17  Q    Isn't it a fact that Wurk Times Square paid you the

18  $15,000 three days after your petition date?

19  A    I -- it was around the date of the petition.  You know, I

20  can't say that I recall that it was three days or four days,

21  but it was around the day of the petition.  I believe it was

22  post-petition that it was paid to me.

23  Q    And I'm asking specifically, it is within three or four

24  days after the filing of the petition, correct?

25  A    It was within a very short period of time following the

Gordon - Cross/Geron                          84

1  petition date.

2  Q    I'm sorry, but I need you to pin that down for me.  Is it

3  within a matter of a couple of days after the filing of the

4  petition?

5  A    Yeah.  I would say it's -- it's certainly within a week to

6  ten days within the petition date.

7  Q    Let's go back to Exhibit 24.  When was that filed?  Do you

8  know?  Look at the signature -- I'll strike that question and

9  I'll ask you actually, when was the signature -- when was it

10 signed?

11 A    November 22nd, 2009.

12 Q    And you filed your bankruptcy petition, again, on October

13 19th, 2009, correct?

14 A    Yes.

15 Q    So, your testimony is that you did not know about the Wurk

16 receivable at the time that the schedules were filed in

17 November of 2009, that's your position today?

18 A    Yes.  As I stated earlier I didn't have either -- I didn't

19 have Wurk's bank statements, and my bank statements were in a

20 state of flux because the account, my bank account had been

21 subject to an identity theft that's listed on my statement of

22 financial affairs, which caused Chase to freeze the account.

23 So it was next to impossible for me to get my statements for a

24 good 60 to 90 days.

25 Q    You control Wurk Times Square?  We talked about that

Gordon - Cross/Geron                          85

1  earlier, correct?

2  A    Yes.

3  Q    And Wurk Times Square paid back the $15,000 within a

4  matter of three or four days from the filing -- the filing of

5  the petition?  We talked about that as well, correct?

6  A    I said a week to ten days.

7          MR. DAVID:  Objection.  Asked and answered at least

8  three times.

9          THE COURT:  I can't hear you, Mr. David.

10         MR. DAVID:  Objection.  Asked and answered at least

11  three times, Your Honor.

12         THE COURT:  Sustained.

13  Q    In February of 2009 you transferred $500,000, you

14  personally, to Wurk Times Square, correct?

15  A    Yes.

16  Q    This is a payment that was made within eight months of

17  your October 19th, 2009 bankruptcy filing, correct?

18  A    Yes.

19  Q    And I'll submit to you that that payment is not reflected

20  in Questions 3 or 10 of the statement of financial affairs, or

21  the amended statement of financial affairs, or the second

22  amended statement of financial affairs.  We reviewed all of

23  those documents.  If you'd like, we can go through them

24  specifically.  But to your knowledge is that $500,000 payment

25  reflected in any of your statement of financial affairs?

Gordon - Cross/Geron                              86

1  A    It's not because I didn't believe it needed to be.

2  Q    Wurk Times Square ceased operating shortly after your

3  bankruptcy filing?

4  A    Yes.

5  Q    You assert that this $500,000 payment was a, quote,

6  unquote, capital contribution, correct?

7  A    Yes.

8  Q    You never recouped this capital contribution?

9  A    I did not.

10 Q    There is no way for that capital contribution to ever be

11 recouped, in fact, correct?

12 A    I don't believe so.

13 Q    You're not a member of Wurk Times Square, correct?

14 A    No, I'm not.

15 Q    Wurk Environments is the sole member, correct?

16 A    Correct.

17 Q    I want to talk to you about CITADEL Construction.  I want

18 to draw your attention to Exhibit 29, please.  Are you there,

19 Mr. Gordon?

20 A    I am.  Yes.

21 Q    Do you recognize this as a -- to be the retainer letter

22 that you signed confirming the retention of Todtman, Nachamie,

23 Spizz & Johns, correct?

24 A    Yes.

25 Q    That was signed on or about October 14th, 2009?

Gordon - Cross/Geron                              87

1  A    Yes.

2  Q    And you signed this letter in your individual capacity,

3  correct?

4  A    Just a second.  Yes, I did.  I subsequently asked Mr.

5  Nachamie, though, to correct the engagement letter, because he

6  was not being retained to represent me, but instead was being

7  retained to represent McCann (phonetic) Construction, LLC.

8  Q    All right.

9  A    And I believe he did that.

10  Q    I want to draw your attention to the second or last -- the

11  last page of this exhibit, Exhibit 29.  That's an e-mail chain

12  comprised of two e-mails between you and Bart Nachamie,

13  correct?

14  A    Yes.

15  Q    And that was produced to us as part of the documents from

16  Bart Nachamie's firm, correct?

17  A    I don't know who produced it.

18  Q    Okay.

19        MR. DAVID:  I'll stipulate to that, Your Honor.

20        MR. GERON:  Thank you.

21  Q    The second e-mail, that is the one on the bottom, that is

22  the earlier of the two e-mails, that's your e-mail to Bart

23  Nachamie, correct?

24  A    Yes.

25  Q    And that says the only modification that I would suggest

Gordon - Cross/Geron                                    88

1  is that I am the sole member of McCann Construction, LLC.

2            MR. DAVID:  Objection.  I am not.

3            MR. GERON:  I'm sorry.  I misread it.  Forgive me.

4  I'm sorry.  Let me try that again.  And that's my error.  I'm

5  moving too fast.

6  Q    Why don't you, in fact, rather than me making that error,

7  why don't you read the sentence that says, "The only

8  modification," and then the second sentence that follows it?

9  A    "The only modification that I would suggest is I am not

10 the sole member of McCann Construction, LLC.  The sole member

11 is Gordon Family One Limited Partnership, of which I am the

12 general partner."

13 Q    That e-mail does not say that the retention letter should

14 be changed in any other way other than that sole modification,

15 does it?

16 A    Well, I would not agree with that.  I -- certainly the

17 intent was that McCann Construction was retaining Mr.

18 Nachamie's firm to represent it in connection with a dispute

19 relating to agreements to which McCann Construction was a party

20 with David Stack.

21 Q    Let me just restate the question.  The e-mail that was

22 sent by you to Mr. Nachamie, you just read that statement.

23 That statement does not say that the client is being changed to

24 McCann Construction, does it?

25            MR. DAVID:  Objection.  Argumentative.

Gordon - Cross/Geron                                89

1          THE COURT:  Sustained.  You can read what the

2    document says come summation time.

3          MR. GERON:  Okay.  Can I just have two seconds, Your

4    Honor.

5          THE COURT:  Yes.

6                          (Pause)

7    Q    Mr. Gordon, turning your attention back to Exhibit 14,

8    which is the schedule of -- the purported schedule of loan

9    repayments by Allstar to you personally.

10   A    Yes.

11   Q    Are you there?

12   A    I am.

13   Q    Look at the last line item on that.  That's a payment to

14   Todtman, Nachamie, is it not?

15   A    It is.

16   Q    For $10,000, is it not?

17   A    It is.

18   Q    And that $10,000 is on account of the retention agreement

19   that we just looked at on Exhibit 29, is it not?

20   A    It is.

21   Q    I want to draw your attention to one last sentence in the

22   letter from Mr. Nachamie, the retention letter from Mr.

23   Nachamie to you.

24   A    Could you just remind me as to the exhibit number, please?

25   Q    I'm sorry.  Exhibit 29.

Gordon - Cross/Geron                          90

1  A    Thank you.  Okay.

2  Q    Follow with me, please, and confirm that I read this

3  correctly.  The second sentence of that letter --

4  A    On which page?

5  Q    The first page.  It's the second paragraph, which starts

6  with in our meeting yesterday --

7  A    Yes.

8  Q    -- you -- let me just take a step back for a moment.  You

9  -- if you look at the second page of that letter, midway

10 through the page it says, "Throughout this letter I will be

11 referring to you as the client."  Do you see that sentence?

12 A    Yes.

13 Q    Okay.  Now --

14         THE COURT:  I don't see it.  Where was that?

15         MR. GERON:  I'm sorry, Your Honor.

16         THE COURT:  Oh.  I see it.  On the second page?

17         MR. GERON:  The second page, middle of the page.

18 Q    Going back to the first page, first complete paragraph,

19 after "It was a pleasure," the second sentence, please follow

20 with me, Mr. Gordon.  "You advised me that in February of this

21 year you sold your 50 percent interest to Mr. Stack for $1

22 million, represented by a promissory note payable in two

23 tranches, the first tranche of $500,000 due and payable no

24 later than January 31st, 2010, and the balance to be due and

25 payable on March 31, 2010."  Do you see that sentence?

Gordon - Cross/Geron                    91

1  A    Yes.

2  Q    And I want to go back again, I've asked this -- but --

3  well, no, I'm not going to.  I have no further questions on

4  that particular document.  I want to draw your attention to a

5  company called CITADEL.  Are you familiar with that company?

6  A    Yes.

7  Q    You were an officer of CITADEL, isn't that correct?

8  A    I don't believe that that was the case.  I know that this

9  was an issue that arose.  I believe that CITADEL only elected

10  one officer, and that was the president, who was David Stack.

11  There may have been a time where, in Mr. Stack's absence, I was

12  required to sign a bond, and the bonding company asked that I

13  be elected secretary in order to sign that, but it would have

14  been a one-off, limited situation.

15         I certainly did not believe myself to be an officer,

16  and I think that there are extensive documents that Mr. Stack

17  provided that indicated that he was the only officer.

18  Q    Well, let's turn to Exhibit 33, please, and 34.

19         MR. GERON:  These are stipulated exhibits, Your

20  Honor.

21  Q    Exhibit 33, do you have that in front of you?

22  A    Yes.

23  Q    Is that your signature in the middle of the page?

24  A    Yes.

25  Q    Exhibit 34, please put that in front of you for a moment.

Gordon - Cross/Geron                         92

1  Do you have it?

2  A    Yes.

3  Q    Is that your signature in the middle of the page?

4  A    Yes.

5  Q    So, you put yourself out there as the secretary of CITADEL

6  Construction Corp. in or about March 26th, 2008, correct?

7  A    Well, as I just explained, this was --

8  Q    It was just a yes or no question.

9            MR. DAVID:  Objection.  Let the -- objection.

10           THE COURT:  Overruled.

11 A    Yes.

12 Q    January 24th, 2009, you transferred, personally, $350,000

13 to CITADEL?

14 A    Yes.

15 Q    That payment was within one year before your filing of the

16 bankruptcy petition?

17 A    Yes.

18 Q    And again, that payment, like the other payment we

19 discussed just a moment ago, that was not reflected on Question

20 3 and/or Question 10 of your statement of financial affairs,

21 any one of the three of them, correct?

22 A    For the same reason as before, correct.

23 Q    The answer is correct?  Okay.  You assert that this was a

24 capital contribution by you really to not CITADEL, but Wurk

25 Times Square, correct?

Gordon - Cross/Geron                                93

1  A    Well, it would have been a capital contribution from me to

2  Wurk Environments down to Wurk Times Square so that it could

3  pay its obligations to CITADEL.

4  Q    You did not recoup this capital contribution, correct?

5  A    No.

6  Q    And again, you're not a member of -- an actual member of

7  Wurk Times Square?  Wurk Environment is?  We covered that

8  already, correct?

9  A    Yes.

10 Q    And there's no possibility of recouping this alleged

11 capital contribution, correct?

12 A    No.

13 Q    I'm sorry.  The statement actually called for -- is there

14 any possibility -- let me rephrase the question, because I'm

15 not sure that the question and the answer were aligned.  Is

16 there any possibility of recouping this capital contribution as

17 you sit here today?

18 A    No.

19 Q    On January 28th, 2009, you transferred personally $300,000

20 to CITADEL, isn't that correct?

21 A    Yes.

22 Q    This payment is four days -- was made four days after your

23 -- the $350,000 payment that we just talked about that was made

24 to CITADEL, correct?

25 A    Yes.

1  Q    And this was, again, made within a year before the filing

2  of your bankruptcy petition?

3  A    Yes.

4  Q    This, again, was not a payment that was reflected on your

5  -- any of your statements of financial affairs, correct?

6  A    For the same reasons as previously indicated, correct.

7  Q    And you assert that this, too, was a capital contribution

8  ultimately for the benefit of Wurk Times Square, correct?

9  A    Ultimately for the benefit.  Yes.

10 Q    And again, not a recoverable contribution payment, or in

11 any way recoverable at this -- as we sit here today?

12 A    No.

13 Q    Turn, please, to Exhibit 28 for me.  We've been through

14 the 28th before.  This is your second amended, final I would

15 say, my wording, but second amended statement of financial

16 affairs, correct?

17 A    Yes.

18 Q    And that was filed December 10th, 2010, correct?

19 A    Yes.

20 Q    Look at Question 1 of the statement of financial affairs,

21 and read that to yourself, and then I'm going to ask you some

22 questions with respect to that question.  Let me know when

23 you're done.

24 A    I'm done.

25 Q    In response to Question 1 you listed gross income,

Gordon - Cross/Geron                              95

1  approximate gross income year-to-date, of $150,000, correct?

2  A    Yes.

3  Q    Isn't it a fact that your gross wages from Rosedale Cooley

4  for the period January 1, 2009 through September 25, 2009 were

5  224,999.97?

6  A    It could be.  At the time that I completed this I had

7  reduced my -- I had been reducing my salary, given the economic

8  climate, and so I made an approximation as indicated that since

9  I had reduced my salary to about $3,000 a week at that time,

10 that my earnings were about $150,000.  It was an approximation.

11 I didn't have the payroll records with me when I was -- when I

12 originally completed this.

13 Q    I'm not sure I got the answer to my question.  The gross

14 wages from Rosedale Cooley for the period of January 1, 2009

15 through September 25, 2009, were 224,999.97, correct?

16 A    I don't know what -- sitting here today I can't remember

17 exactly what my gross wages were for that period, four years

18 ago.

19 Q    Are you aware that in the joint pretrial order that was

20 signed by your counsel it is an undisputed fact, and I'll quote

21 it, it's Paragraph 60, the debtor's total earnings from

22 Rosedale Cooley Management, Inc. for the period January 1, 2009

23 through September 25, 2009 was 224,999.97.  Are you aware of

24 that?

25 A    I accept that.  You asked me if I remembered, and I didn't

Gordon - Cross/Geron                                    96

1  remember.  I was just trying to answer your question.  If it's

2  in that document, or if it's in an exhibit, I don't dispute it.

3  Q    So, just to be clear -- well, let's move on.  Are you also

4  -- the commissions that you received from CITADEL in 2009 were

5  all -- in the 2009 period were $347,263, correct?

6  A    Again, I don't remember the specific numbers, but if it's

7  in an order, or if it's in an exhibit, I certainly wouldn't

8  dispute it.

9  Q    It's -- I'm going to quote to you an undisputed fact that

10  is stipulated to by your counsel, and that is Paragraph 61 of

11  the statement of financial affairs, which states as follows,

12  "Statement 1 of the debtor's 2009 federal tax return indicates

13  that the debtor received commissions from CITADEL in the amount

14  of $347,263, and payments in kind from Allstar in the amount of

15  62,939."  Do you dispute either one of those facts?

16  A    No.

17  Q    And by the way, just to confirm before, you don't dispute

18  that you received also, in addition to the numbers that I just

19  stated, 224,999.97 from Rosedale Cooley in 2009?

20  A    I don't.

21  Q    Going back to Exhibit 28, for the line for income for 2008

22  there's a zero listed --

23  A    Yes.

24  Q    -- correct?

25  A    Yes.

Gordon - Cross/Geron                              97

1  Q    Your 2008 tax return lists gross wages for you for that

2  period, 2008, of $267,311, correct?

3  A    If you're telling me that's an exhibit I'll accept it.    I

4  don't remember what was on my tax return in 2008.   I don't have

5  any reason to dispute it.   I just don't remember it

6  specifically.

7  Q    Turn to Exhibit 59, please, which is in the second binder?

8  A    Okay.

9  Q    That's your tax return for the year 2008, is it not?

10  A    It is.

11  Q    Does this refresh your recollection that your income --

12  your gross wages were, for the year 2008, $267,311?

13  A    Yes.   It also reflects that my gross income was negative

14  $170,464, and when these documents were being prepared there

15  was extensive discussions with Mr. Del Virginia as to the most

16  appropriate number to reflect.   And if you also looked at

17  Schedule I on our schedules you'll see that on those schedules

18  I reflected the monthly income that I was receiving, and we

19  were trying to reconcile the two.

20          MR. GERON:   I move to strike the answer beyond the

21  yes that was the initial response to my question.

22          MR. DAVID:   Your Honor, I think that it's appropriate

23  because it was -- may I be heard?

24          THE COURT:   Not now, no.   I'll let you inquire as to

25  this, of course, on redirect, Mr. David, but it was sufficient

1  to answer the question with a yes or no.  So the motion is

2  granted, the motion to strike is granted.  It's without

3  prejudice to your rights to inquire on redirect.

4             MR. DAVID:  Your Honor, respectfully --

5             THE COURT:  No.  Forgive me, Mr. David.  Is there

6  something unclear about when I rule?

7             MR. DAVID:  No, Your Honor.

8  Q    At the time of your filing of the bankruptcy in October

9  2009, you were a guarantor of CITADEL's obligation to Chase

10 Auto Finance on account of an automobile note, is that correct?

11 A    Yes.

12 Q    Chase Auto Finance obligation was not listed on your

13 bankruptcy schedules, correct?

14 A    Yes.  I didn't believe it was required to be.

15            MR. GERON:  Move to strike the second part of that

16 sentence.

17            THE COURT:  Granted.

18 Q    At the time of the filing of the bankruptcy you were co-

19 obligated with Allstar on account of a Signature Bank loan,

20 isn't that correct?

21 A    That's not correct.

22 Q    Paragraph 67 of the joint pretrial order is another

23 stipulated fact by your counsel which states as follows, and

24 maybe I'm misunderstanding it.  On the petition date the debtor

25 was, little I, a co-debtor with Allstar on account of a

1  Signature Bank loan.

2              THE COURT:  Where are you reading from, Mr. Geron?

3              MR. GERON:  I'm sorry.  Joint pretrial order, exhibit

4  -- Paragraph 67, Page 10.

5  Q    Does that refresh your recollection, Mr. Gordon?

6  A    No.  I was a guarantor.  I was not a co-debtor.

7  Q    Paragraph 68 of the joint pretrial order, stipulated fact,

8  the debtor did not list the co-debtor obligation on Schedule H

9  of his schedules, of his bankruptcy schedules.  You didn't list

10  the co-obligation with Allstar on your bankruptcy schedules,

11  did you?

12  A    No.

13  Q    I want to go back for a quick moment to a piece on the

14  Chase Auto Finance.  You did ultimately list the Chase Auto

15  Finance as an obligation -- as a co-obligation, did you not?

16  A    Yes.

17  Q    When you filed your amended schedules, did you not?

18  A    Yes.

19  Q    And those were filed on December 10th, 2010, correct?

20  A    Yes.

21  Q    And that -- the trustee's original complaint in this

22  discharge was filed September 28th, 2010, correct?

23  A    Yes.

24  Q    So you amended your schedules to include the Chase

25  obligation after the complaint was filed against you, correct?

Gordon - Cross/Geron                    100

1  A    Yes.

2  Q    With respect to the Signature co-obligation, you did

3  ultimately include those in your schedules, did you not?

4  A    Yes.

5  Q    And you included those in your schedules that were filed

6  after the trustee filed their complaint, correct?

7  A    Yes.

8  Q    At the time of the filing of your bankruptcy you were co-

9  debtor with Wurk Management on account of a residential lease

10 for premises located at 455 West 37th Street, Apartment 1111,

11 correct?

12 A    No.

13 Q    I'll draw your attention again to the joint pretrial order

14 stipulated to by your counsel, Paragraph 67, which states on

15 the petition date the debtor was, 2, little I, a co-debtor with

16 Wurk Management on account of a residential lease for premises

17 located at 455 West 37th Street, Apartment 1111, New York, New

18 York.  Does that refresh your recollection?

19 A    No.  I was a guarantor.  I was not a co-debtor.

20 Q    And that guarantee obligation was not listed on your

21 initial bankruptcy petition, correct?

22 A    I didn't believe it was required to be.

23 Q    Okay.  But you did list it on the amended bankruptcy

24 petition, correct?

25 A    Yes.

Gordon - Cross/Geron                          101

1   Q    That was after the trustee filed their complaint against

2   you, correct?

3   A    Yes.

4   Q    At the time of the filing of the bankruptcy you were a co-

5   obligor, a guarantor if you wish to define it that way, with

6   Rosedale Cooley on account of a residential lease for premises

7   located at 151 East 85th Street, Unit 10C, New York, New York,

8   correct?

9   A    Well, I -- you said either or.  I consider myself a

10  guarantor.

11  Q    Okay.  Let's --

12                          (Pause)

13  Q    Look for a moment, if you will -- I'll go back to that

14  line in just a second, but look at Exhibit 24.

15  A    All right.

16  Q    And if you will, please, turn to Schedule H, H as in

17  Harry, which is ST00181.

18  A    Yes.

19  Q    That's a schedule that calls for you to list co-debtors,

20  correct?

21  A    Yes.

22  Q    And it's your testimony today that the obligation to --

23  with Rosedale Cooley, for example, does not need to be

24  reflected on that Schedule H, correct?

25  A    It was my belief at the time that Schedule H did not

Gordon - Cross/Geron                                    102

1  require me to list obligations that I guaranteed, only those

2  for which I was a co-debtor.  The lease on the Rosedale Cooley

3  apartment clearly indicates I am simply a guarantor, that's why

4  I didn't schedule it.  It was the same for the other

5  obligations, as well.

6  Q    On Schedule H --

7           THE COURT:  Pause, please.  Did you disclose the fact

8  that you were a guarantor on any of those three obligations

9  anywhere else?

10          THE WITNESS:  No, Your Honor.  I didn't think I was

11 obligated to because they were contingent, and so when I read

12 the co-debtor language on here it referenced anyone who had

13 joined me as a co-debtor.  In those situations I was just a

14 guarantor, so I didn't think I needed to reference those

15 obligations that I guaranteed, at least on this schedule.

16          MR. GERON:  May I proceed, Your Honor?

17          THE WITNESS:  I'm sorry.  If I may just finish my

18 answer?  Your Honor, I may have misspoken because on Schedule B

19 I -- I'm sorry, not Schedule B, there was one other -- I'm

20 sorry.  If I may just one second, please?  I did reference, on

21 Schedule F, for instance, on Schedule F of Exhibit 24, it's

22 ST00179, the first one there is Signature Bank.  I did

23 reference my guarantee obligation there, and I may --

24                          (Pause)

25          THE COURT:  All right.

Gordon - Cross/Geron                          103

1  Q    Is that the end of the -- I'm sorry.  Was that the end of

2  the -- so, Allstar is not referenced on Schedule F, correct?

3  A    I'm sorry?

4  Q    Allstar is not referenced as a guarantee on Schedule F,

5  correct?

6  A    A guarantee of what?

7  Q    A guarantee obligation on Schedule F, the way Signature

8  Bank is that you just drew the Court's attention to.

9  A    The Signature Bank credit line involved -- directly

10  implicated Allstar.  That was the Allstar credit line that I

11  had guaranteed.

12  Q    But -- okay.  Let me just make sure that I understand.  I

13  may have misspoken.  CITADEL.  I'm sorry.  I said -- the

14  CITADEL obligation to Chase Automotive that you guaranteed.

15  The Chase Automotive, is that listed on Schedule F?

16  A    No.  It's listed on Schedule -- the issue with the Chase

17  auto loan, if I may --

18  Q    That's not my question.  Is it listed?

19  A    It's listed in the amended schedules.

20  Q    Right.  Well, I'm going to get to that in a second.  If

21  you could, please, turn to Schedule H again, which is that

22  ST00181.  And you just testified that --

23  A    00?  I'm sorry.  181?

24  Q    00181.

25  A    Thank you.

Gordon - Cross/Geron                                            104

1  Q     Exhibit 24.  You just testified that you understand --

2  understood the language to not include guarantors, correct?

3  A     Yes.

4  Q     Okay.  Read the first two sentences out loud, please, on

5  the very top of the instructions?

6  A     "Provide the information requested concerning any person

7  or entity other than a spouse in a joint case that is also

8  liable on any debts listed by debtor in the schedules of

9  creditors.  Include all guarantors and co-signers."

10 Q     I don't know if I concluded this with respect to the

11 Signature -- the -- I'm sorry, the co-obligation, or the

12 contingent co-obligation that you have to Rosedale Cooley, that

13 was not listed in your original schedules, which is 24, but did

14 reflect -- was reflected on the amended schedules, 25, correct?

15          MR. DAVID:  I object to form.

16          THE COURT:  Sustained.  Rephrase.

17          MR. DAVID:  Can I have a moment with Mr. Geron?  I

18 may be able to straighten out what my concern is.

19          THE COURT:  Yes.  Can you do it whispering, or do I

20 need to send the witness out of the room?

21          MR. DAVID:  No.  No.  I --

22                    (Pause)

23          MR. DAVID:  I think we fixed it, Your Honor.

24          MR. GERON:  I think -- I misspoke, and I appreciate

25 Mr. David fixing that for me, or pointing that out.

Gordon - Cross/Geron                              105

1  Q    Let me take a step back.  To the extent that I'm repeating

2  myself, I only mean to stage -- to stage the question.  You

3  were co-obligated with Rosedale Cooley on account of a lease,

4  correct?

5  A    I was a guarantor.  I don't know what the meaning of co-

6  obligated.  I was a guarantor.

7  Q    Okay.

8  A    The lease is very specific that it was a guarantee.

9  Q    Okay.  Fair enough.  And that guarantee was not listed on

10 the Schedule H of the original schedules, correct?

11 A    That's correct.

12 Q    But it was listed on the Schedule H of the amended

13 schedules which were filed after the trustee's complaint,

14 correct?

15 A    That's correct.

16 Q    Okay.  At the time of the filing of the bankruptcy you

17 were also a guarantor with CITADEL on account of an auto loan

18 for a 2008 Land Rover, correct?

19 A    Yes.

20 Q    And that guarantee obligation was not listed on Schedule H

21 of your initial schedules, correct?

22 A    Correct.

23 Q    And that was listed on the amended Schedule H in your

24 amended schedules, correct, after the trustee's complaint,

25 correct?

Gordon - Cross/Geron                    106

1  A    Yes.

2  Q    Turn, please, to Question 18 of Exhibit 24.  I'm sorry.

3  No.  I misspoke.  Question 18 of Exhibit 26.  That's the

4  statement of financial affairs.  I'm summarizing.  I just want

5  to make sure that we're on the same page.  Are you with me, Mr.

6  Gordon?

7  A    Yes.

8  Q    That question requires you to list as an individual all

9  businesses in which you were an officer, director, partner,

10 manager -- managing executive, partner of a partnership, sole

11 proprietorship, essentially, as I read it, and I can be very

12 specific about this if you'd like, but any company to any

13 corporation or other such entity that -- in which you had an

14 interest, is that correct, at the time of the filing of the

15 petition?

16 A    No.  I don't read it to require me to have an interest.

17 Q    So, it would be if you had an interest or if you

18 controlled the company, correct?

19 A    Yes.

20 Q    So, any company in which you had some controlling

21 interest, or any ownership interest would have to be listed in

22 answer to Question 18 of your statement of financial affairs,

23 correct?

24 A    I don't want to nitpick on controlling interest.  I don't

25 -- I'm not exactly sure what that would mean.  I read this to

Gordon - Cross/Geron                                107

1  generally believe that if I owned an entity, or if I was an

2  officer of an entity, it should be scheduled here.

3  Q    And if you were a general partner of that entity, would

4  that be required to be listed?

5  A    Yes.  As a partner in a partnership.

6  Q    Okay.  Cascar, are you familiar with a company called

7  Cascar, C-a-s-c-a-r?

8  A    I am.

9  Q    That was formed in December 5, 2005, correct?

10 A    Yes.

11 Q    You were the general partner of Cascar?

12 A    In name only, yes.

13        MR. GERON:  Move to strike.

14 Q    Were you general partner of Cascar?

15 A    Yes.

16        THE COURT:  I'm going to deny the motion to strike.

17 You made your point, but I'm letting him answer that.

18 Q    And you were -- continued to be the general partner of

19 Cascar until March 27th, 2008, correct?

20 A    I don't remember when I ceased being the general partner

21 of Cascar.  I believe Cascar at some point was just wound down.

22 Q    And you held a 98.5 percent partner interest in Cascar,

23 initially at least, correct?

24 A    No, I don't believe so.  I'm sorry.  I'm sorry.  You said

25 initially?

Gordon - Cross/Geron                    108

1  Q    Yes.

2  A    Yeah.  That may actually -- yes.  I think so.  I'm not

3  exactly sure.  I'd have to look at the limited partnership

4  agreement.

5  Q    I want to draw your attention to Exhibit 12, please.

6  A    Okay.

7  Q    Look specifically, please, at Paragraph 6 -- I'm sorry.

8  Let me just take a step back.  This is your affidavit, is it

9  not, that was filed in this Court in connection with a motion

10 you made, your counsel made?

11 A    Yes.

12 Q    Paragraph 6 of that affidavit, and again, I'll step back,

13 that's your signature on the last page?

14 A    Just a second.

15        THE COURT:  What's the number of this exhibit, Mr.

16 Geron?

17        MR. GERON:  Exhibit 12, Your Honor.  I'm sorry.

18 A    Yes, that is my signature.

19 Q    Does that refresh your recollection about your ownership

20 interest?

21 A    Yes.  It says initially, so yes.

22 Q    All right.  So, you initially had a 98.5 percent interest

23 in Cascar?

24 A    Yes.

25 Q    Cascar is not listed in any of your statement of financial

1  affairs, correct?  In Question 18, correct?

2  A    Yes.  I didn't believe it was required.

3  Q    Mr. Gordon, I'm going to move to strike again.  The answer

4  was a yes or no.

5  A    I apologize.

6  Q    I'm going to ask -- now, with respect to CITADEL, you were

7  an officer of CITADEL as of March 26th, 2008?

8           MR. DAVID:  Asked and answered.

9           THE COURT:  Sustained.

10 Q    CITADEL was not listed in response to Question 18 of any

11 of your statement of financial affairs, correct?

12 A    Correct.

13 Q    Phoenix Capital Advisors.  You were an officer, director,

14 managing executive of Phoenix within the six years preceding

15 the filing of the bankruptcy?

16 A    Yes.

17 Q    Phoenix is not listed in response to Question 18 of any of

18 your statement of financial affairs, correct?

19 A    It is.

20 Q    I'm sorry.  Forgive me.  In your original statement of

21 financial affairs and your amended statement of financial

22 affairs, correct?

23 A    Could you point me back to the exhibit --

24 Q    Sure.

25 A    -- that -- you know, that you're working off of?  I

Gordon - Cross/Geron                    110

1  switched to the affidavit and I lost the prior exhibit.

2  Q    No problem.  28, please.

3  A    28.

4  Q    It's actually 27.

5  A    Wait a second.

6  Q    I'm sorry.  It's 26, 27 and 28.  Those are the sequence of

7  statements of financial affairs.

8  A    Okay.  Which one are we working off of?

9  A    So, I was working off of 26 and 27.  Neither of those is

10  Phoenix Capital listed in response to Question 18 of the

11  statement of financial affairs, correct?

12  A    That's not true.  Phoenix Capital's name was changed to

13  Rosedale Cooley Management, and Rosedale Cooley Management is,

14  in fact, listed in Question 18.

15  Q    McCann Construction, you were an officer, director,

16  managing executive of McCann within the six years before the

17  filing of the bankruptcy?

18  A    It's an LLC.  I wasn't a director.  I wasn't a -- there

19  were no officers.  I may have been -- I may have been a

20  manager.  I was responsible for the affairs of the business, so

21  -- I just wanted to make sure that I was just being clear,

22  because some LLCs elect officers.  Some have directors.  That

23  was not the case with McCann.

24  Q    You were responsible?  You were controlling the company?

25  A    Yeah.  I was responsible for its operations.  Yes.

Gordon - Cross/Geron                                    111

1  Q    And McCann is not listed in response to Question 18 of the

2  original statement of financial affairs or the amended

3  statement of financial affairs, correct?

4  A    That's correct.  Yes.

5  Q    And the trustee -- after the trustee filed her complaint

6  noting that omission, in December 10th, 2010 you filed the

7  amended statement of financial affairs in which McCann is

8  reflected in response to Question 18, correct?

9  A    Yes.

10         THE COURT:  Is that the first amended or the second

11  amended?

12         MR. GERON:  The second amended, Your Honor.  That's

13  the --

14         THE COURT:  The one of October 2010?

15         MR. GERON:  No.  The one of December 2010.

16         THE COURT:  December 2010.

17  Q    Hilltop Investments, LLC.  You were an officer, director,

18  and managing executive of Hilltop within the six years before

19  the filing of the bankruptcy, correct?

20  A    That is not correct.

21  Q    Look at the second amended schedule, which is Exhibit 28.

22  A    Yes.

23  Q    Hilltop Investments is reflected on that schedule,

24  correct?  Question 18?

25  A    It is.  Can I explain why?

Gordon - Cross/Geron                              112

1    Q    No.   I -- but it's not reflected in connection with that

2    same Question 18 on the original statement of financial affairs

3    or the amended statement of financial affairs, correct?

4    A    I'm sorry.  I must be on the wrong page.  Just -- just --

5    please just bear with me one second, because I don't want to be

6    on the wrong page.  It was not on the original set of statement

7    of financial affairs.  It is on the statement of financial

8    affairs filed December 10th, 2010.

9    Q    Okay.  Boulder Heights Owner LLC?  You were an officer,

10   director, manager of that company in the six years before the

11   filing of the bankruptcy?

12   A    Again, just like with McCann, Boulder didn't have

13   officers.  It didn't have directors.  I was responsible for its

14   operations.  That's correct.

15   Q    And after the trustee filed her complaint, Boulder was

16   added to the amended statement of financial affairs where it

17   hadn't been on the prior versions of the statement of financial

18   affairs, correct?

19   A    Yes.

20              MR. GERON:  May I have just a quick moment, just a

21   brief moment?

22              THE COURT:  Yes.

23                            (Pause)

24   Q    The last line of questioning on my side, Mr. Gordon, as --

25   from commencing from around October 22, 2008, so about a year

Gordon - Cross/Geron                            113

1  before the filing of the bankruptcy through the date of the

2  filing of the bankruptcy, you had the following general

3  categories of liabilities, one, various credit card balances in

4  unknown amounts, correct?

5  A    Yes.

6  Q    Two, monies owed to the United States of America for

7  forfeiture and restitution in an unknown amount, correct?

8  A    Yes.

9  Q    And, three, taxes due to the Internal Revenue Service and

10  New York State Department of Taxation and finance, correct?

11  A    Yes.

12  Q    The liability to the U.S. of A. for forfeiture and

13  restitution was incurred on or about 2005, correct?

14  A    I pause only because -- only because my understanding of

15  the way the forfeiture proceeding worked was that it was

16  retroactive to the date of the offense, so if you want to -- I

17  just didn't want to answer the question incorrectly.  So, the

18  forfeiture primarily occurred at the time that I entered my

19  guilty plea.

20  Q    So that was earlier than 2005?

21  A    2003.

22  Q    Okay.  The amount the IRS claimed to be outstanding for

23  your year 2000 taxes was in excess of $17 million, isn't that

24  correct?

25  A    Yes.

Gordon - Cross/Geron                    114

1  Q    The amount the IRS claimed to be outstanding for your 2001

2  year taxes was in excess of $500,000, isn't that correct?

3  A    Yes.

4  Q    And the amount the IRS claimed to be outstanding for the

5  year 2002 taxes was in excess of $1.3 million, isn't that

6  correct?

7  A    Yes.

8  Q    Turning to New York State, the amount that New York State

9  claimed to be outstanding for the year 2000 taxes was in excess

10 of $11 million, isn't that correct?

11 A    Yes.

12 Q    The amount that New York State claims to be outstanding

13 for the year 2001 taxes was in excess of $300,000, correct?

14 A    Yes.

15 Q    And the amount that New York State claimed to be

16 outstanding for the year 2002 taxes was in excess of $4

17 million, correct?

18 A    Yes.

19 Q    And lastly, on your amended schedules you listed Signature

20 Bank as a disputed creditor for $1.7 million that was incurred

21 on or around October 7th, 2008, isn't that correct?

22 A    Yes.

23           MR. GERON:  Just one moment, Your Honor?

24                    (Pause)

25 Q    Three very brief loose ends.  We talked earlier about a

1 | $15,000 accounts receivable that was owed by Wurk to you at the

2 | time of the filing.  Do you recall that line of questioning?

3 | A    Yes.

4 | Q    The trustee, by her counsel, made demand of you to pay

5 | that $15,000 to the trustee, isn't that correct?

6 | A    Yes.

7 |              MR. DAVID:  Objection.

8 |              THE WITNESS:  Sorry.

9 |              THE COURT:  Leave the room, Mr. Gordon.

10 |                    (Witness exits courtroom)

11 |         MR. DAVID:  Your Honor, there's no doubt that there

12 | is a contested adversary proceeding for turnover of that

13 | $15,000.  However, the fact that the money has not been paid

14 | is, in fact, not relevant to this proceeding, where the sole

15 | allegation was a failure to schedule the $15,000 that was paid,

16 | or was allegedly due to Mr. Gordon, and therefore it has no

17 | relevance to this proceeding, although it might very well have

18 | a relevance to the turnover proceeding.

19 |         THE COURT:  What's the defense in the turnover

20 | proceeding, that there is no obligation, or that there is some

21 | offset, or setoff, or what?

22 |         MR. DAVID:  Your Honor, I will be candid.  I do not

23 | represent Mr. Gordon in the turnover proceeding.  He is pro se.

24 | I have not -- I don't even know what the pleadings are.  I just

25 | know that it exists.

1           THE COURT:  Because the basis for the defense could

2    bear on its relevance.  If there is an admission that the

3    amount was owing to the trustee and it wasn't disclosed, that

4    might lead to one consequence, and if there were a claim of,

5    say, setoff or something else, it might give rise to a

6    different inference.

7           MR. DAVID:  I would be willing to accept Mr. Geron's

8    -- Mr. Geron probably knows what the defense is.  I don't,

9    because I'm not involved in that, but just on its face I have

10   the issue I've just raised.  That's all.

11          THE COURT:  All right.  Let me hear from Mr. Geron on

12   that.

13          MR. GERON:  We have a problem, Your Honor, because

14   Mr. Gordon hasn't answered that complaint.  That's all been put

15   on hold in favor of this, and I do think it's quite probative

16   for the Court to know that that amount has not been repaid.

17   Whether -- whatever --

18          THE COURT:  15,000 bucks in comparison to the other

19   amounts that form the basis for your claims is kind of like a

20   grain of sand on the beach, isn't it?

21          MR. GERON:  I agree, Your Honor.  It's just a matter

22   of a clear path sometimes, but I agree with Your Honor.

23          THE COURT:  I'm going to overrule the objection, but

24   I've got to tell you that the chances of it making much of an

25   impression on me in the context of the remaining evidence is

Gordon - Cross/Geron                        117

1   pretty small.  And certainly this is without prejudice to your

2   right, Mr. David, to say that it's not probative of anything,

3   that it's not material even if it is probative, of something,

4   or anything else.

5          MR. GERON:  I'll ask one question -- forgive me -- I

6   don't mean to interrupt the flow, but I'll ask just one

7   question about that, and then we'll move on, Your Honor.

8          THE COURT:  All right.  Bring him back, please.

9              (Witness enters courtroom)

10         MR. GERON:  May I proceed, Your Honor?

11         THE COURT:  Yes.

12  BY MR. GERON:

13  Q    Mr. Gordon, I just want to confirm that the $15,000 Wurk

14  receivable -- Wurk accounts receivable was not paid to the

15  trustee.

16  A    Yes.

17  Q    I also want to confirm that we talked about a -- that

18  nowhere in your bankruptcy schedules does -- is reflected an

19  obligation to you personally by Mr. Stack?  There's no accounts

20  receivable listed to you by Mr. Stack?

21  A    One doesn't exist, so no, it's not.

22  Q    And lastly, you were a principal of CITADEL, isn't that

23  correct?

24  A    That term was always loosely used at CITADEL.  I don't

25  know what its legal significance was, but I was -- I don't

Gordon - Redirect/David                                118

1  believe I was ever an officer of CITADEL.  I was primarily a

2  consultant through Rosedale Cooley.

3  Q    Okay.

4         MR. GERON:  No further questions, Your Honor.

5         THE COURT:  All right.  We'll take ten minutes, and

6  then we'll start with redirect.  During the break, Mr. Gordon,

7  no discussions with your counsel.  We are in recess until 2:20.

8                        (Recess)

9         COURT CLERK:  All rise.

10         THE COURT:  Have a seat.  Okay.  Mr. David, whenever

11  you're ready, redirect.

12         MR. DAVID:  Thank you, Your Honor.

13                   REDIRECT EXAMINATION

14  BY MR. DAVID:

15  Q    Mr. Gordon, if I might, I'd like to take you back to the

16  start of Mr. Geron's examination of you.  Please look at

17  Exhibit Number 26 -- I'm sorry 25, which is the summary of

18  schedules, second amended.  And if you would, please look at

19  the last page, which is the declaration.  Now, do you recall

20  that Mr. Geron asked you whether you, in fact, had signed that,

21  and whether you had read that declaration beforehand?

22  A    Yes.

23  Q    All right.  Sir, if I could, I draw your attention to the

24  last part of that, that they are true and correct to the best

25  of my knowledge, information and belief.  Were the facts that

Gordon - Redirect/David                                         119

1  you related in that document true to the best of your

2  knowledge, information and belief at that time?

3  A    Yes, they were.  I made every effort to complete these in

4  a truthful and complete fashion.

5  Q    And if I could, sir, if I were to ask you exactly that

6  same question concerning the declarations that were part of the

7  statement of financial affairs, both the original and the

8  amended, and the original schedule, would your answer be the

9  same?

10 A    It would be.  I -- I am far from perfect, but I believe

11 that everything I set forth in these schedules was true and

12 accurate to the best of my information, knowledge and belief.

13 Q    At that time?

14 A    Yes.

15 Q    All right.  Now, if I could, I'd like to start to go

16 through the individual topics that were the subject of

17 examination.  Let me start with the question of your income.

18 Look, if you would, please, at Exhibit Number --

19       MR. DAVID:  Give me one moment, Your Honor.  I

20 apologize.  I'm not as familiar as I might be with these

21 things.

22 Q    Please look at the Schedule I that is part of Exhibit

23 Number 25.  Now, Exhibit I is the current income of the debtor.

24 A    Yes.

25 Q    When you filled out that schedule, what did you do, if

Gordon - Redirect/David                                     120

1  anything, to try to make sure that you were accurately

2  reflecting what your then current income was?

3  A     The first thing I did was I took a look at recent pay

4  stubs that I had received to use to fill in the Line Item

5  Number 1.  And then I followed through those stubs to determine

6  the corresponding deductions for payroll taxes.  I also made

7  note of the fact that I received in kind payments, which were

8  payments made on my behalf by my employer.  And to make sure

9  that this accurately reflected my income, I added in that line

10 item on Line 13.

11 Q     And to the best of your knowledge as you sit here today,

12 was that number accurate as of that date and time?

13 A     Yes, it was.

14 Q     All right.  Now, please take a look at Exhibit Number 24,

15 which was the original summary of schedule, and again I direct

16 your attention to Schedule I, which is Page Number 182.  And

17 can you tell the Court whether you did anything different in

18 terms of filling out that same schedule at the time you filled

19 it out in connection with your original form?

20 A     No.  I did nothing different.

21 Q     And, in fact, the two schedules show the same number, do

22 they not?

23 A     They do.

24 Q     All right.  Now, Mr. Geron made a point about the fact

25 that on the statement of financial affairs you showed some

Gordon - Redirect/David                           121

1  negative numbers.  Do you recall that?

2  A    Yes, I do.

3          MR. GERON:  Objection to the form of the question,

4  Your Honor.

5          THE COURT:  Overruled.

6  Q    Let me draw your attention, if I might, to Exhibit Number

7  26, the original statement of financial affairs, and your

8  answer to Question Number 1.

9  A    Yes.

10 Q    All right.  Can you tell the Court where you got those

11 numbers from, and why you filled out those numbers the way you

12 did?

13 A    Well, I remember reviewing with my bankruptcy counsel, Mr.

14 Del Virginia, as to the best way to try to reconcile this

15 answer to tax returns that I would produce, because in prior

16 years there had been a significant loss carry forward that

17 changed -- that resulted in my adjusted gross income being

18 negative for several years, and the advice I was given was that

19 we should try to --

20         THE COURT:  Do you want to give me the substance of

21 legal advice, because once you open the door I'm not going to

22 let you close it?

23         THE WITNESS:  Okay.  Let me try to rephrase, then.

24 A    What -- the decision that was made was to attempt to

25 reconcile the statement of financial affairs to my tax returns

Gordon - Redirect/David                              122

while demonstrating my current income on Schedule I.

Q    All right.  Now, by the way, what was your current income
on Schedule I?

A    Just one second.  The average monthly income was reflected
as $33,908.44.

Q    Now, I'm not too good with math, but that's approximately
$400,000 a year you were indicating was your current income, am
I correct?

A    Yes, when factoring in the in-kind payments, yes.

Q    All right.  And if I could draw your attention to Exhibit
Number 59, can you tell the Court what that exhibit is?

A    Yes.  Exhibit 59 is my tax return 1040 from 2008.

Q    And, sir, what was the adjusted gross income that you
indicated for that year, 2008, as indicated on Page 838 of
Exhibit Number 59?

A    Minus $170,464.

Q    Sir, when you indicated on Schedule -- I'm sorry -- on the
answer to Question Number 1, on the statement of financial
affairs, both the original and the amended statement, that you
had a minus income for the year 2009, did you indicate whether
or not that was the result of a net operating loss?

A    Yes.  It --

Q    What did you say?

A    It says net of losses.

Q    All right.  Was there any intent --

1          THE COURT:  Where does the net of losses appear?

2          THE WITNESS:  I'm sorry, Your Honor.  On Question

3  Number 1 on Exhibit 26, income for wages, it's the third line

4  item.  It says, semicolon, net of losses.

5          THE COURT:  Go on.

6  Q    All right.  Sir, was there any intent when you indicated

7  those numbers in answer to Question Number 1, and when you

8  indicated in response to Schedule I, a $33,000 a month income,

9  to hinder or in some way affect adversely the trustee in the

10  performance of her duties in this case?

11  A    Absolutely not.  It was -- ironically it was quite the

12  opposite.  I was trying to provide a reconciliation to tax

13  returns so that it would be clear that I had current income,

14  and that I had current expenses, but at the same time, from a

15  tax return perspective I had a significant net loss carry

16  forward that would explain the negative income.

17  Q    Now, sir, if I could, I want to call your --

18          THE COURT:  Just a minute.  What does COD mean there?

19          THE WITNESS:  I don't know.  If I may, just one

20  second?

21                    (Pause)

22          THE WITNESS:  I don't know what COD means.  I would

23  only be guessing, Your Honor.

24          THE COURT:  Go on.

25  Q    Sir, if I could, I'd like to turn to a different topic.

Gordon - Redirect/David                    124

1  A    Yes.

2  Q    You were asked about a Chase auto loan?

3  A    Yes.

4  Q    All right.  First of all, was there one Chase auto loan,

5  or were there two?

6  A    There was one Chase auto loan.

7  Q    And who, in fact, was the obligor on the Chase auto loan?

8  A    CITADEL Construction Corp.

9  Q    And what role, if any, did you play as it relates to the

10 Chase auto loan?

11 A    I was a guarantor.

12 Q    Now, if I could, I'd like to call your attention to that

13 particular loan.  Why didn't you schedule that loan on the

14 original schedule?

15 A    I didn't schedule it on Schedule H -- I'm sorry -- on the

16 schedules.  On the schedules it was an oversight on my part,

17 and at the first 341 hearing, before -- within about five

18 minutes into it, I acknowledged right off the bat that I had

19 missed it, and that we would amend to reflect that.  I had also

20 indicated that there was an apartment lease that I had

21 guaranteed that for some reason was omitted from the schedules.

22 But I readily identified that at the very first 341 hearing.

23 Q    And did you ultimately amend your schedules to reflect

24 that?

25 A    I did.  And, Mr. David, if I may just add to that first

Gordon - Redirect/David                           125

1  question?  On the original schedules I scheduled the automobile

2  itself on Schedule B.  What I had inadvertently neglected to

3  schedule was the corresponding loan, which I then reflected on

4  the amended schedules.

5  Q   Again, did you fail to schedule -- or submit on the

6  original document the fact that you were a guarantor on an

7  automobile loan with the intent to hinder the trustee?

8  A   No.  I -- and the way I read -- the way I read H, I didn't

9  believe that I was obligated to schedule guarantees.  I didn't

10  believe I was a co-debtor, and I was not advised otherwise.

11  Q   Sir, if I could, let's look at H, and in particular I'm

12  looking at Exhibit Number 24.  At the top it says Page 17 of

13  20.  At the bottom it says ST181.  And with the Court's

14  permission, rather than just ask the witness to read it, I'm

15  going to read the first sentence.

16       "Provide the information requested concerning any

17  person or entity, other than a spouse in a joint case, that is

18  also liable on any debts listed by the debtor in the schedule

19  of creditors."  Did you list Chase as a debtor -- I'm sorry --

20  did you list Chase as a creditor in the schedule of creditors?

21  A   No.

22  Q   All right.  Why not?

23  A   I neglected to -- first of all, I was -- I simply

24  neglected to, in the very first set of schedules.  It was an

25  oversight that I sought to immediately rectify.

Gordon - Redirect/David                                    126

1    Q    By the way, how much was the auto loan?

2    A    I think around $80,000.

3    Q    And as to the apartments, who were the tenants on the two

4    residential apartments, the actual tenants under the lease?

5    A    Well, there was one lease that was taken by Wurk

6    Management for one of its employees, and on the lease involving

7    Rosedale Cooley I was the tenant.

8    Q    All right.  Now, when you say it was taken by Wurk

9    Management for one of its employees, were you the employee for

10   whom that was taken?

11   A    No.

12   Q    Who was?

13   A    His name was Joseph DeTrano.  He was the chief operating

14   officer of the company.

15   Q    Was he related to you in any way, shape or form?

16   A    No.

17   Q    Okay.  And on the one for Rosedale Cooley you were the

18   actual physical tenant, am I correct?

19   A    I was.

20   Q    But Rosedale Cooley was the tenant under the lease?

21   A    Correct.

22   Q    And you were, again, merely the guarantor, am I correct?

23   A    I was strictly the guarantor.

24   Q    And to the extent --

25            THE COURT:  Wait.  You were living in the apartment,

Gordon - Redirect/David                    127

1  but you're saying that because you put the apartment in a

2  corporate name you were only a guarantor, and nothing more than

3  that?

4          THE WITNESS:  Yes.  On the lease, Your Honor, I was

5  simply the guarantor.  The lessee under the lease was Rosedale

6  Cooley Management.

7          THE COURT:  Go on.

8  Q    Now, if I could, let's go back to the structure of some of

9  these entities, because I think it has something to do with

10 where we are.  When was Allstar formed?

11 A    January 2008.

12 Q    And it was formed as a Nevada corporation?

13 A    Yes.

14 Q    At the time at which it was formed who owned Allstar?

15 A    The Gordon Family One Limited Partnership and the Carolina

16 E. Gordon Trust were equal shareholders in Allstar.

17 Q    And did you have an interest in the Gordon Family One

18 Limited Partnership?

19 A    Yes.  I had a limited partnership interest.

20 Q    And at any point in time did you have a direct ownership

21 interest in Allstar?

22 A    No.  Never.

23 Q    But you were the one, in fact, who ran Allstar's business,

24 were you not?

25 A    I was.

Gordon - Redirect/David                                    128

1  Q    And as Mr. Geron pointed out, Allstar had no other

2  employees, it had no physical offices or anything else, am I

3  correct?

4  A    Yes.

5  Q    Its basic business was to lend money at very, very high

6  interest rates, am I correct?

7  A    Yes.

8  Q    And that, in fact, is the reason why you formed it in

9  Nevada, isn't it?

10        MR. GERON:  Object to the form of the question, Your

11  Honor.  This is --

12        MR. DAVID:  I will withdraw the form of the question.

13   Q   Why did you form the entity in Nevada?

14  A    Nevada did not have any statutes concerning usury, and so

15  when the -- when we were looking for a jurisdiction to select,

16  it was determined that Nevada would be favorable in that

17  regard.

18  Q    Now, Mr. Geron asked you about a loan involving Mr. Eddy

19  Curry, a former and not much lamented New York Knick basketball

20  player.  What was the original amount of the loan to Mr. Curry?

21  A    It was approximately $570,000.

22  Q    And approximately a year-and-a-half to two years later how

23  much did Mr. Curry owe Allstar?

24  A    A little over $2 million.

25  Q    When you made a loan --

Gordon - Redirect/David                                129

1        THE COURT:  Wait a second.  In how much period of

2  time?

3        THE WITNESS:  I believe the question was around 18

4  months or so.

5        THE COURT:  Eighteen months it went from 570,000

6  bucks to how much?

7        THE WITNESS:  A little over $2 million.

8        MR. DAVID:  89.79 percent interest, Your Honor.

9        THE COURT:  What rate of interest?

10       MR. DAVID:  89.79 percent.

11       THE COURT:  And that's legal in Nevada?

12       MR. DAVID:  It's legal in Nevada, and a New York

13  Court accepted it.

14       THE COURT:  Go on.

15  Q    So, when you made a loan of $2 million to Allstar, was it

16  your expectation that you, in fact, were going to be able to

17  get that money back?

18       MR. GERON:  Objection to the form of the question.

19  Q    Sir, did you have any expectation of being repaid when you

20  loaned Allstar $2 million?

21  A    Yes.  Absolutely.

22  Q    What was your expectation?

23  A    My expectation was that Allstar would lend that money in a

24  similar fashion and repay me.

25  Q    Over a period of time did Allstar repay you?

Gordon - Redirect/David                    130

1  A      Yes.

2  Q      And how did they repay you?

3  A      Allstar repaid me by paying certain entities that I would

4  designate to receive funds.  Much of it was related to a

5  business that I was involved in known as Wurk -- Wurk

6  Environments.

7  Q      Now, for the purpose of going through and understanding

8  Allstar, can you describe the structure and ownership of Wurk

9  Environments and Wurk Times Square?

10 A      Wurk Environments is a limited liability company with two

11 members.  I was the 95 percent member, and the Gordon Family,

12 One Limited Partnership was a five percent member.  It -- Wurk

13 Environments was the sole member of Wurk Times Square.

14 Q      And what was the business of Wurk Times Square?

15 A      Wurk Times Square offered fractional office space, so it

16 would lease space in Manhattan and it would subdivide it into

17 clusters of offices and lease out those smaller offices on

18 daily, weekly, monthly, semi-annual, annual bases.

19 Q      And if I could, did Wurk Times Square actually own any of

20 its own space?

21 A      No.  It was simply a tenant.

22 Q      All right.  And did Wurk Times Square lease out the space

23 that it was supposed to lease out, furnished or unfurnished?

24 A      Part of -- it leased the space furnished.  That was part

25 of the concept, that you wouldn't have to -- that a potential

Gordon - Redirect/David                                        131

1  tenant wouldn't have to go and rehab space, or buy furniture,

2  or buy telephones or other equipment, that all that would be

3  provided to them in one package price.

4  Q    And I may have missed it, sir, what percentage ownership

5  did you have in Wurk Environment, the parent of Wurk Times

6  Square?

7  A    Ninety-five percent.

8  Q    Did Allstar Capital have any interest at all in Wurk Times

9  Square?

10 A    No.

11 Q    Did it have any interest at all in Wurk Environments?

12 A    No.

13 Q    Was there any kind of relationship between CITADEL

14 construction, and either Wurk Times Square or Wurk

15 Environments?

16 A    Yes.

17 Q    What was the nature of that relationship?

18 A    When Wurk Times Square leased its space it had to build it

19 out to conform to its business plan.  It retained CITADEL

20 Construction to be the general contractor for that project, to

21 build out the space.

22 Q    And in connection with building out that space did there

23 come a point in time -- withdrawn.  What, if any, was the

24 source of the funding for Wurk Times Square?

25 A    You mean to build out the space?

Gordon - Redirect/David                         132

1  Q    Or for any other purpose?

2  A    Well, Wurk Times Square leased out various offices, so it

3  generated income in that respect.  It provided ancillary

4  services to its tenants and generated income in that respect.

5  But initially, it was very much dependent upon initial capital

6  contributions from its members.

7  Q    Its members being?

8  A    Myself and the Gordon Family One Limited Partnership, in

9  a much lesser degree through Wurk Environments, LLC.

10 Q    So, when the time came for Wurk to pay CITADEL for the

11 work that was done, how much did Wurk owe CITADEL?

12 A    I believe -- I believe there's an exhibit that showed the

13 total contract price for the build out to be about 6.3 or $6.4

14 million.

15 Q    And what was the source of that funding?

16 A    There was some funds provided by the landlord as an

17 incentive under the lease to induce work to take the space, but

18 the balance of it was secured through the member.

19 Q    And by the member you mean?

20 A    I mean Wurk Environments, and then through the members of

21 Wurk Environments, meaning me.

22 Q    So, when you were asked questions concerning the money

23 being paid by the Allstar entity, at your direction, to

24 CITADEL, what was the purpose of that funding?

25 A    Well, Allstar owed me money.  I needed to make

Gordon - Redirect/David                                      133

1  contributions to fund the operations of Wurk.  So I simply had

2  Allstar either pay Wurk or pay CITADEL for Wurk's obligation.

3  Q    And if I could, sir, in connection with having Allstar pay

4  CITADEL for Wurk's contribution, was that the normal course of

5  conduct which you pursued?

6  A    Yes.  I -- rather than having checking accounts for every

7  different entity, and having to issue multiple checks through

8  various bank accounts, I knew that Allstar owed me money.  I

9  knew that I was going to have to make a capital contribution to

10 Wurk.  I knew that Wurk was going to have to pay CITADEL.  I

11 figured that it would just be -- it would just be quicker and

12 easier to simply have -- to tell Allstar, look, the money that

13 you owe me, pay it to CITADEL and credit it against Wurk.

14 Q    You had mentioned previously that you first met with Mr.

15 Del Virginia in connection with filing bankruptcy in September

16 of 2009, is that correct?

17 A    Yes.

18 Q    All right.  At the time at which you directed Allstar to

19 make the payments to CITADEL on behalf of Wurk, did you then

20 have the intent of filing bankruptcy?

21 A    No.  Absolutely not.  My decision to file bankruptcy

22 didn't occur until very close to the petition date itself.  It

23 was something that I sought very hard to avoid, and that I had

24 very much hoped to avoid.  It did not really enter into my

25 conscience until the first time I consulted Mr. Del Virginia,

Gordon - Redirect/David                                134

1    and I made no decision in that regard until the middle of

2    October 2009.

3    Q    What were the circumstances that led you to make the

4    determination to file bankruptcy?

5    A    It was motivated -- Your Honor, the -- when I entered into

6    my plea agreement with the Justice Department to resolve the

7    charges against me there was an understanding amongst the

8    parties that that would bring everything to a conclusion, and

9    that all pending issues would be settled.  The Internal Revenue

10   Service came, about a year or so later, and basically said,

11   listen, it's nice that you have an agreement with the

12   government, but we're not bound by that, and under our laws you

13   owe us taxes related to the money that was taken from Merrill

14   Lynch, regardless of the fact that it was repaid.

15        The Justice Department sought for many years on my

16   behalf to intervene with the IRS, to convince the IRS that we

17   had resolved our issues and that it was not appropriate for

18   them to pursue me.  We went through various appeal processes

19   with the IRS.  The IRS then brought about a Tax Court case.

20        Throughout this entire time members of the Justice

21   Department in Washington were pressuring the IRS to drop this

22   case, to settle the case, and as the date came closer and

23   closer and closer for the Tax Court case to be tried, the

24   Justice Department finally said, listen, we can't get the IRS

25   to budge.

Gordon - Redirect/David                                          135

1          And so, I was faced with -- I was faced with a case

2    in the Tax Court which I was advised I would most certainly

3    lose, or I was advised that the Bankruptcy Court, being a court

4    of equity, would be a more fair and reasonable environment for

5    that matter to be dealt with, and that was solely what

6    motivated my bankruptcy filing.

7          MR. GERON:  Objection, Your Honor.  I move to strike.

8    That was all hearsay.

9          MR. DAVID:  Your Honor, may I be heard?

10         THE COURT:  Yes.  Leave the room, Mr. Gordon.

11                    (Witness exits)

12         THE COURT:  First flesh out, Mr. Geron, whether

13   you're objecting to the entirety of his answer or just the

14   portion that purports to characterize the state of mind of the

15   Justice Department or the IRS.

16         MR. GERON:  The latter, Your Honor.  I'm going to

17   move to the podium, but I'm going to hide your notes here.

18   Okay?

19         MR. DAVID:  I don't need to go through that.  I'm not

20   worried --

21         MR. GERON:  Your Honor, there was a statement

22   initially -- if I followed the -- I didn't want to interrupt

23   the answer, but if I followed initially there were, like, two

24   -- the two sentences initially that were his state of mind, his

25   own state of mind, and two sentences at the very end of that

Gordon - Redirect/David                    136

1  answer that were his own state of mind.  I would not move to --

2  to strike those statements, because those were responsive to

3  the question.  I would, however, move to strike anything that

4  had to do with what was going on in the IRS, or the Justice

5  Department, what their intentions were, all of that and all

6  those communications would be hearsay.

7           MR. DAVID:  May I be heard, Your Honor?

8           THE COURT:  Of course.

9           MR. DAVID:  Yes.  Thank you.  Your Honor, if I may,

10 the fact of the matter is, the statement is not offered for the

11 truth, except as to his own state of mind.  Whether he believed

12 erroneously or he believed correctly what the Department of

13 Justice was doing, those are the things that led him to his

14 state of mind.  And because it's being offered to show what his

15 state of mind was and what the predicates for his state of mind

16 were, it is an exception to the hearsay rule.  It makes no

17 difference in the end whether the Department of Justice really

18 told the IRS this or didn't, he believed it.

19          THE COURT:  Mr. David, I understood it the first time

20 you told it to me.  You and Mr. Geron are saying roughly the

21 same thing in different ways.  The -- all of the statements

22 that he attributes to the state of mind of the IRS or the

23 Justice Department must be excluded for the accuracy of what

24 they stated.  If he heard it, they are introduced for an

25 independent purpose.  And if these statements motivated him to

1  file the bankruptcy, their accuracy doesn't matter.  So, the

2  objection on hearsay, it's not so much responsiveness, it's on

3  hearsay, is sustained, and I am therefore not taking it for the

4  truth of the matter asserted.  I am admitting it for the

5  limited purpose of the effect, if any, that it had on his state

6  of mind vis-a-vis why he filed the bankruptcy case.  Bring him

7  back.

8           MR. DAVID:  Thank you, Your Honor.

9                      (Witness enters)

10 BY MR. DAVID:

11 Q    Now, Mr. Gordon, to be clear, you acknowledged that you

12 gave $2 million to Allstar, am I correct?

13 A    Yes.

14 Q    And you acknowledge that you gave that $2 million to

15 Allstar when?

16 A    In October of 2008.

17 Q    October 22nd, 2008, am I correct?

18 A    Yes.

19 Q    And you acknowledge that it was a loan that you made to

20 Allstar, am I correct again?

21 A    Yes.

22 Q    Please look at Exhibit Number 14.  Did Allstar -- start

23 right at the very, very top, if I could.  Did Allstar have any

24 relationship with Wurk Management of its own?

25 A    No.

Gordon - Redirect/David                          138

1  Q    What was Wurk Management?

2  A    Wurk Management was the entity that was responsible for

3  administering the business of Wurk Times Square.

4  Q    And what was Wurk Management's relationship within the

5  ownership structure of Wurk Times Square?

6  A    It had an operating contract.  There was an operating

7  contract between Wurk Management and Wurk Times Square.

8  Q    Who directed Allstar to make a payment to Wurk Management

9  of $125,000?

10 A    I did.

11 Q    Why?

12 A    Because Wurk Management needed capital to start the

13 funding of hiring of employees and the other administrative

14 startup costs relating to the Wurk Times Square business.

15 Q    And was that in the ordinary course of Wurk's business

16 that you did that?

17 A    Yes.

18 Q    Who is Cooley, Godward and Kronish?

19 A    They're a law firm in New York City.

20 Q    And what was their function, if any?

21 A    They're a law firm that has represented me in a number of

22 personal matters varying from my criminal defense case, to

23 civil litigation, to matrimonial matters.

24 Q    Did they have any relationship with Allstar that would

25 cause Allstar to pay them for Allstar's own account?

Gordon - Redirect/David                    139

1  A    At one point Cooley -- at one point Cooley did do some

2  legal work for Allstar, but it was separate and distinct from

3  any of these payments.

4  Q    So for whose purpose or benefit were those payments?

5  A    Strictly for mine.

6  Q    Who is Kostelanetz & Fink?

7  A    Kostelanetz & Fink is the tax law firm that was

8  representing me in the IRS litigation in the tax court.

9  Q    Did they represent Allstar in any function?

10 A    No.

11 Q    I presume Allstar did not go to NYU Hospital?

12 A    No, I don't believe so.

13 Q    All right.  What was the payment to NYU Hospital for?

14 A    It was most likely for blood work or X-rays that were done

15 for me.

16 Q    Rainmaker Marketing?

17 A    Yeah.  They were a marketing company that provided some

18 personal marketing and business development services to me.

19 Q    Did they have anything to do with Allstar?

20 A    No.

21 Q    If I went down this list one-by-one, all right, and I

22 don't want to waste the Court's time, were any of these, with

23 the possible exception of the Rogin Nassau payment, for the

24 benefit of Allstar itself?

25 A    No.

1  Q    Were all of these payments made at your direction on your

2  behalf, or at your requirement?

3  A    Yes.  Absolutely.

4  Q    Now, you were asked about the Todtman Nachamie retainer, I

5  think it's Exhibit Number 29.  Would you please look at that?

6  A    Sure.

7  Q    You received that document through Bates Page TSNJ-060, am

8  I correct?

9  A    Yes.

10  Q    And did you respond when you received that retainer?

11  A    Yes.  I wrote to Bart Nachamie and I said that I felt the

12  retainer was fine, I just wanted to clarify the discussion that

13  he and I had had dealing with the face that the client was, in

14  fact, McCann Construction because McCann was the owner of the

15  interest in CITADEL and not me.  I did not own any interest at

16  CITADEL at any point in time.

17  Q    We'll get to the ownership interest in CITADEL in a

18  moment.  Looking at this particular document, when you wrote

19  this e-mail to Barton Nachamie indicating to him that you are

20  not the sole member of McCann, the sole member is Gordon Family

21  One Limited Partnership of which you are the general partner,

22  what was your intent?

23  A    My intent was to clarify for purposes of the document that

24  McCann Construction owned the interest in CITADEL and that

25  Gordon Family One Limited Partnership owned the interest in

Gordon - Redirect/David                              141

1   McCann.  I did not own any interest in McCann and I did not own

2   any interest in CITADEL.

3   Q    And what was the purpose of Mr. Nachamie's representation

4   in connection with this retainer letter?

5   A    McCann -- McCann originally owned a 100 percent of the

6   shares in CITADEL.  It hired an executive by the name of David

7   Stack, and as part of his hiring to run the operations, agreed

8   to sell him 50 percent of the shares in the company.  Mr. Stack

9   did not --

10            THE COURT:  Of McCann or CITADEL?

11            THE WITNESS:  Of CITADEL.  I'm sorry, Your Honor.

12  A    Mr. Stack didn't have any money available to purchase the

13  shares in CITADEL, so instead he gave McCann a promissory note

14  that was secured by some real estate that he owned in Florida.

15  Mr. Stack then defaulted under the note and McCann sought to

16  hire Mr. Nachamie and his firm to advise it in connection with

17  the collection issues relating to the note and the

18  administration of CITADEL itself.

19  Q    At any point in time, did you own any interest in CITADEL

20  Construction?

21  A    Never.

22  Q    At the current time -- first of all, is CITADEL out of

23  business now?

24  A    Yes.

25  Q    Okay.  Before -- when did CITADEL go out of business?

Gordon - Redirect/David                                    142

1   A    Right around the date of the bankruptcy petition.

2   Q    At that point in time, who was the owner of CITADEL?

3   A    At that point in time McCann Construction had begun a

4   foreclosure process on Mr. Stack's shares, and ultimately

5   settled with Mr. Stack and took his shares.  So McCann would

6   have been the sole owner of CITADEL at that point in time.

7   Q    Before the foreclosure, who was the owner of record of

8   CITADEL?

9   A    McCann owned 50 percent and Mr. Stack owned 50 percent.

10  Q    Now, if I could, you were asked about some bond

11  applications which you had signed as secretary, do you remember

12  that?

13  A    Yes.

14  Q    First of all, were you ever elected an officer of CITADEL?

15  A    No.  I do not believe so, except, potentially, solely with

16  respect to the execution of that bond on a single day when Mr.

17  Stack was not available.  I was never elected an officer of the

18  company.

19  Q    Why did you not list CITADEL as an entity on your return

20  -- I'm sorry, not return, on your schedule?

21  A    Because I genuinely didn't believe that I was an officer

22  or director of the company.  There may have been a single

23  incident solely as an accommodation to a surety company that I

24  had to act as a secretary in the absence of Mr. Stack.  But

25  there are so many numerous documents that were turned over in

Gordon - Redirect/David                                    143

1   this case where Mr. Stack signed as the president, Mr. Stack

2   made notarized statements saying that he was the only officer

3   and he was solely president of the company.  No where in any of

4   those documents am I listed or reflected as an officer because

5   I didn't -- I wasn't one.

6               MR. GERON:  Objection.  Move to strike as hearsay.

7   None of that is in the record.

8               THE COURT:  Do you want to be heard in opposition,

9   Mr. David?

10              MR. DAVID:  Yes, I do, Your Honor.

11              THE COURT:  All right.  Leave the room, Mr. Gordon.

12                       (Witness exits)

13              THE COURT:  I have some trouble seeing how anything

14  in Mr. Stack's head or anything Mr. Stack said is admissible.

15  Are you trying to justify its admissibility on some other

16  basis, Mr. David?

17              MR. DAVID:  Yes, I am, if I could, Your Honor.  The

18  standard here is whether Mr. Gordon acted with an intent to

19  delay or hinder this bankruptcy proceeding.  If he did not

20  believe himself to be an officer, and he wasn't a principal,

21  the documents show that, of CITADEL, that negates the --

22              THE COURT:  Well, the documents may say different

23  things.  You're assuming the fact that I have to decide.  When

24  he signs two documents holding himself out as secretary, that

25  goes to either or both of whether, in fact, he is the

Gordon - Redirect/David                                           144

1   secretary, or whether he doesn't care about the truthfulness of

2   what he puts his name on.

3             MR. DAVID:  Your Honor, I'm not going to argue with

4   the Court over the significance of a secretary under New York

5   Law for Corporations, but what I would point out is that if

6   Mr. Gordon is operating on the premise, as many people do, that

7   signing a document as a secretary of a corporation does not

8   make you an officer unless you are --

9             THE COURT:  Are you testifying now?

10            MR. DAVID:  No, Your Honor, I'm not.  You asked me

11  whether I wanted to address this.  I do.  It has to go to his

12  intent.  If he believed that Mr. Stack was the sole officer of

13  the corporation and he believed that he had no reason to list

14  CITADEL, that goes to his intent.

15            THE COURT:  His belief has already been admitted.

16  His explanations for why he thought he was being truthful I

17  will admit.  Any of the factual underpinnings that would make

18  his statement truthful in any way other than his belief are

19  excluded as hearsay.

20            MR. DAVID:  Yes, Your Honor.

21            THE COURT:  Bring him back.

22                       (Witness enters)

23  Q    You indicated previously that Mr. Stack had issued a note

24  in payment of certain stock that was foreclosed upon, do you

25  recall that?

Gordon - Redirect/David                    145

1  A    Yes.

2  Q    All right.  Who was that note issued to?

3  A    McCann Construction, LLC.

4  Q    Did you ever have a note from Mr. Stack for the purchase

5  of the stock of CITADEL, or for any other purpose?

6  A    No.

7  Q    Now, sir, if I could, please look at Exhibit Number 64.

8  Can you identify what that document is?

9  A    This is an application certificate for payment, otherwise

10 commonly viewed as an invoice for construction work performed

11 by CITADEL Construction Corp. for Wurk Times Square.

12 Q     Now, you had testified previously that the payments that

13 you had Allstar make to CITADEL on behalf of Wurk were in

14 connection with construction.  Can you point out to the Court

15 where on this document, if at all, the Court can find the

16 amount that allegedly Wurk owed to CITADEL as of the date of

17 this document?

18 A    Yes.  If you look at the first page of the document, Line

19 Number 8, it says current payment due, $2,655,587.40.

20 Q    Now, sir, we've discussed Wurk at this point and your

21 ownership interest in Wurk.  Did you schedule Wurk as an entity

22 in which you had an interest on your bankruptcy schedules?

23 A    Yes.

24 Q    Please look at Exhibit Number 24.  And if I can draw your

25 attention to Page 169.

Gordon - Redirect/David                                        146

1  A    Yes.

2  Q    Can you point out to the Court where the Court will find

3  your interest in Wurk on that document?

4          MR. GERON:  Your Honor, objection.  Which Wurk entity

5  are we talking about?

6          MR. DAVID:  I'm sorry.

7  Q    Wurk Environments, LLC.

8  A    It's Line 13.

9  Q    Now, to be clear, since Mr. Geron has raised the point,

10  what was the relationship between Wurk Environments, LLC and

11  Wurk TS?

12  A    Wurk Environments was the sole member of Wurk Times

13  Square.

14  Q    Now, sir, if I could draw your attention to the amended

15  complaint.  Please look at Exhibit Number 6.  Look at Paragraph

16  Number 27, sir.

17          MR. GERON:  Your Honor, I'm going to ask for a

18  sidebar on this before we go forward.

19          THE COURT:  All right.  Leave the room, Mr. Gordon.

20                      (Witness exits)

21          MR. GERON:  I'd ask for a proffer from Mr. David

22  about where we're going here because I was precluded from

23  asking with respect to the pleadings, and we were limited in

24  some respects to where the pleadings were used for purposes of

25  here.  And I want to understand where Mr. David is going before

Gordon - Redirect/David                              147

1  we get in front of the witness.

2          MR. DAVID:  With the Court's permission, I'll be glad

3  to make that proffer.  Your Honor, as you know, there are

4  certain very specific allegations against this client that

5  claim that there were certain things that he did.  I want to go

6  down each of the allegations and ask him for the facts behind

7  them and whether, in fact, if they are true so you will hear it

8  from the witness' own mouth.  Let me be specific, for example.

9          Take Paragraph 27, there's a reference there to two

10 payments, $350,000 and $300,000, those payments being made on

11 behalf of work being made through Allstar.  I'm going to ask

12 him specifically why those payments were made and why they

13 weren't specifically scheduled.  That is all that I'm going to

14 do.

15         THE COURT:  All right.  Any reply, Mr. Geron, before

16 I rule?

17         MR. GERON:  May I have just a second, Your Honor?

18         THE COURT:  I'm sorry?

19         MR. GERON:  May I have just one quick second?

20         THE COURT:  Yes.

21         MR. GERON:  No, Your Honor.  That's fine.

22         THE COURT:  All right.  I'm going to overrule the

23 objection.  You can use the complaint to say in substance, Mr.

24 David, do you agree with or deny the allegations of yada, yada,

25 paragraph of the complaint and then ask him why.  And then, of

Gordon - Redirect/David                                148

1  course, when it's time for recross, Mr. Geron has got the right

2  to go back on that to cross examine on anything that the

3  witness says in response to your questions.

4         How long has it been since we had the last break,

5  I've forgotten?

6         MR. GERON:  About an hour-and-a-half, Your Honor.

7         THE COURT:  All right.  While the witness is out

8  there, why don't we take enough time for the people who are

9  still in the courtroom to take a break and we'll resume at

10  3:30.  We're in a ten-minute recess.

11         MR. GERON:  Thank you, Your Honor.

12         MR. DAVID:  Thank you, Your Honor.

13                      (Recess)

14         THE COURT:  Have your seats, please.  Mr. David, go

15  ahead.

16  Q   Mr. Gordon, if I might, I'd like to go back for one moment

17  to the leases for the apartments and the Chase car loan.  All

18  right.  Mr. Geron pointed out that there did come a point in

19  time, did there not, when you, in fact, added those to your

20  amended schedules?

21  A   Yes.

22  Q   And what was the reason why you scheduled them on your

23  amended schedules?

24  A   This case has been going on for quite some time, and there

25  were -- we just always had very, very different points of view

Gordon - Redirect/David                                    149

1  as to what was supposed to be scheduled from our perspective as

2  opposed to what the trustee and her counsel were insisting

3  should be scheduled.  And every time we tried to make some

4  progress, it was -- the only way we would ever make progress

5  was if we were going to bring a summary judgment motion on

6  various complaints.  And so the decision, really, was made --

7          MR. GERON:  Objection, Your Honor.  If these are

8  discussions that might have happened with counsel, I don't know

9  how this has anything to do with the question that's been

10 asked.

11         MR. DAVID:  I do not disagree with the objection,

12 Your Honor.

13         THE COURT:  All right.  The testimony is stricken.

14 You better repeat the question, Mr. David.

15         MR. DAVID:  I will do, Your Honor.

16         THE COURT:  We don't have live court reporters

17 anymore.

18         MR. DAVID:  I will do so, Your Honor.  I apologize.

19 Q    Mr. Gordon, why did you decide to schedule the auto loans

20 and the residential leases on the amended schedule?

21 A    After consultation with Mr. Del Virginia, we decided that

22 out of an abundance of caution and to go above and beyond what

23 possible clarification we might be able to provide, we put it

24 on there.

25 Q    Now, sir, if I could, I'd like to go back to where I was

Gordon - Redirect/David                              150

1  before we took the break.  If you would be kind enough to look

2  at I believe it is Exhibit Number 6, which is the amended

3  complaint.

4            MR. DAVID:  Am I right, Niki?

5            MS. SANTUCCI:  That is correct.

6  Q    All right.  The amended complaint, Paragraph Number 26

7  refers to the $2 million transfer from the Wachovia line of

8  credit for the benefit of Allstar.  Is that the $2 million loan

9  that we have been discussing?

10 A    Yes.

11 Q    Paragraph Number 27 talks about $350,000 transferred from

12 Wachovia to CITADEL on January 24th, 2009, and on January 28th,

13 2009, $300,000 transferred from Wachovia to CITADEL.  What was

14 the purpose of those specific transfers?

15 A    The purpose was to satisfy obligations that Wurk had to

16 CITADEL.

17 Q    Was there any intent in transferring that property -- I'm

18 sorry -- those payments to do anything to hinder this

19 bankruptcy proceeding, which hadn't even been commenced yet?

20 A    No.  Absolutely not.

21 Q    Were those transfers made in the ordinary course of your

22 business to meet the debts of Wurk?

23 A    Yes.

24 Q    Sir, there is a reference in Paragraph Number 28 to

25 $500,000 transferred on February 26th, 2009 from Wachovia to

Gordon - Redirect/David                            151

1  Wurk Times Square.  What was the purpose of that transfer?

2  A    Again, it was to enable work to satisfy its obligations to

3  CITADEL.

4  Q    Other than the minimal rental income that Wurk was

5  generating, was there any source from meeting Wurk's business

6  expenses, other than the funds that you provided in the

7  ordinary course of the financing of that entity?

8  A    No.

9  Q    Sir, there is a reference in Paragraph Number 29 to $1.5

10  million reflected on your amended statement of financial

11  affairs.  And I'll draw your attention, if I might, to Exhibit

12  Number 27, Page Number 216, the answer to Question Number 10.

13  Could you look at that?

14  A    Yes.

15  Q    Is the $1.5 million listed in response to that question

16  inclusive of the other Wurk transfers that we've discussed, or

17  in addition to it?

18  A    In addition.

19  Q    And what was the purpose of those payments?

20  A    To -- most all of the payments to Wurk were to satisfy the

21  construction contract that Wurk had with CITADEL.

22  Q    Could Wurk have done its function -- could Wurk have done

23  its business if that construction wasn't done?

24  A    No.

25  Q    Was there, in fact, a lien put on the job as a result of

Gordon - Redirect/David                      152

1  the work that wasn't paid for?

2              MR. GERON:  Objection as to the form of the question.

3              MR. DAVID:  Withdrawn.

4  Q    Sir, do you know whether there was a lien placed -- a

5  mechanic's lien placed on Wurk's facilities?

6  A    Yes.

7  Q    What was the reason for that mechanic's lien?

8  A    There was a subcontractor that claimed that it hadn't been

9  paid for work that it had provided on the project.

10 Q    Did Wurk eventually lose its lease?

11 A    Yes.  Eventually Wurk entered into a stipulation with its

12 landlord to turn over the space to the landlord.

13 Q    And did Wurk eventually lose the equipment and the

14 furniture that it had purchased for its operations?

15 A    Yes.

16 Q    And how did that happen?

17 A    It was part of the surrender of the premises to the

18 landlord.

19 Q    And did the landlord file a lien against that equipment

20 and that furniture?

21 A    Yes.

22 Q    And, in fact, did the landlord commence a foreclosure

23 proceeding against that equipment and furniture?

24             MR. GERON:  Objection as to the form of the question.

25             THE COURT:  Sustained.

Gordon - Redirect/David                    153

1          MR. DAVID:   Withdrawn.

2  Q    Sir, did anyone file a foreclosure proceeding against the

3  furniture that Wurk had?

4  A    Yes.   The landlord did.

5  Q    And what happened?

6  A    The landlord prevailed.

7  Q    Now, sir, please look at Exhibit Number 6, and in

8  particular, at Paragraph Number 34.   We'll start with 34(a).

9  There is a reference there, again, to the $350,000 payment, and

10 the $300,000 payment, and the $500,000 payment.   And it in

11 particular notes that there was a failure to list those

12 payments in response to Question Number 3 on the statements of

13 financial affairs.   Please look at the statement of financial

14 affairs, Exhibit Number 26.   And if I might, rather than have

15 you read it, I'll read 3(b).   List each payment or other

16 transfer to any creditor made within 90 days immediately

17 proceeding the commencement of the case, unless the aggregate

18 value of all property that constitutes or is effected by such

19 transfer is less than $5,475.   Can you tell us why you didn't

20 list those payments to CITADEL?

21 A    Because CITADEL was not a creditor of mine.

22 Q    And there's also a reference, if I might, to Question

23 Number 10.   And if you don't mind, I'll read Question Number

24 10.   List all of the property, other than property transferred

25 in the ordinary course of business or financial affairs of the

Gordon - Redirect/David                              154

1  debtor, transferred either absolutely or as security within two

2  years immediately preceding the commencement of this case.  Why

3  did you not list those payments under Number 10?

4  A    Well, as I previously explained, I wasn't sure about the

5  term other property.  But, regardless, I considered all these

6  payments to be made in the ordinary course and, therefore, not

7  required to be listed under 10(a).

8  Q    And, finally, sir, would your answer be the same as to the

9  $2 million payment that was made to Allstar?

10 A    With respect to Question 10?

11 Q    Yes.

12 A    Yes.  With respect to both Question 10 and 3, Allstar was

13 not my creditor.  And, also, I believe that the transfer to

14 Allstar was in the ordinary course and I, again, was unsure of

15 the term other property.

16 Q    Now, when you say in the ordinary course, what was the

17 $2 million used for?

18 A    It was used to enable Allstar to make loans.

19 Q    Was there a particular loan that Allstar made?

20 A    Yes.  It made a loan to a company called Urban Muse.

21 Q    And how long after you gave it the $2 million did it make

22 that loan?

23 A    Perhaps the next day.

24 Q    In the past, had you advanced money to Allstar to permit

25 it to make loans?

Gordon - Redirect/David                    155

1  A    Yes.

2  Q    Was that, in fact, the course of business by which Allstar

3  financed its business?

4  A    Yes.

5  Q    Sir, please look at Exhibit -- I'm sorry -- to

6  Subparagraph (b).  Now, if I could, as to Subparagraph (b), I'd

7  like to draw your attention, if I might, to Exhibit Number 27,

8  and in particular --

9         MR. DAVID:  I got to get to the right place, if I

10 might have one moment, Your Honor.

11        MR. GERON:  Your Honor, I'm just going to lodge an

12 objection that this is outside the scope of my examination.  I

13 didn't --

14        THE COURT:  I can't hear you.

15        MR. GERON:  I'm sorry, Your Honor.  I'm lodging an

16 objection that this is outside the scope of my examination,

17 this particular item.

18        THE COURT:  Yes, but you took him on an adverse

19 direct, so Mr. David is allowed to put in the kinds of things

20 that he would have put in if he had put the witness on first.

21 You'll have the ability to cross examine him on anything that

22 he asks.

23        MR. DAVID:  May I have one moment, Your Honor, I

24 apologize?

25        THE COURT:  Yes, but remember that if you guys don't

Gordon - Redirect/David                              156

1  talk into microphones, the record doesn't get it.

2          MR. DAVID:  I apologize, Your Honor.  Might I have

3  one moment to locate the proper place.

4          THE COURT:  Yes.

5  Q   Mr. Gordon, I'd ask you to please look at Exhibit Number

6  28, which is the second amended statement to financial affairs,

7  and in particular at Question Number 3(b).

8  A   Yes.

9  Q   In connection with that paragraph in the second amended

10 statement to financial affairs, did you list a number of

11 different creditors to whom payments have been made?

12 A   Yes.

13 Q   In connection with that paragraph, how many of those

14 creditors did you owe in excess, or make payments in excess of

15 $5,400?

16 A   Two.

17 Q   Why did you list the other creditors in response to 3(b)

18 even though the question doesn't call for it?

19 A   For the same reason that I subsequently added co-debtors.

20 The feeling was out of an abundance of caution and to provide

21 as much clarity to the situation as we possibly could, we added

22 these items.

23 Q   Now, as to the two creditors where the payments exceeded

24 $5,400, you had listed Laura Gordon previously, had you not?

25 A   Yes.

Gordon - Redirect/David                              157

1  Q    So the only new creditor that you listed in that

2  connection was American Express, am I correct?

3  A    You're correct.

4  Q    Why hadn't you listed American Express originally?

5  A    Because I thought that the American Express payment in

6  question was actually a corporate credit card and not my own

7  and, therefore, it wasn't my responsibility.  And it was only

8  later that I discovered that, in fact, it was not being paid by

9  a corporation and, in fact, it was being paid by me and,

10 therefore, needed to be scheduled.

11          THE COURT:  Whose corporate credit card did you think

12 it was?

13          THE WITNESS:  Well, Your Honor, each one of these

14 entities had their own corporate credit card.  So Allstar had

15 its own corporate card, Wurk had its own corporate card,

16 Rosedale Cooley had its own corporate card.  So I believe it

17 could have been any of those.  It wasn't until I actually got

18 the statements and got the payments and saw that it wasn't that

19 I needed -- I realized I needed to schedule it.

20 Q    In fact, if you look at Exhibit Number 4 -- I'm sorry,

21 Exhibit Number 13, all right, you do find, do you not, two

22 payments made by Allstar of an American Express card that you

23 had previously testified concerning?

24 A    Yes.

25 Q    Did you not list American Express and the $31,000 payment

Gordon - Redirect/David                                    158

1  that had been made to American Express with the intent to

2  hinder the trustee --

3          THE COURT:  Sustained.

4  Q    What was your intent, if any, in not listing that American

5  Express payment?

6  A    I had no intent.  At the time, I believed that it was a

7  corporate card and it didn't belong here.  And when I

8  subsequently looked into it and discovered that it did belong,

9  I added it to the schedule.  There was no intent to hide it or

10 otherwise, you know, conceal it from anybody.

11 Q    All right.  Sir, please look at Paragraph Number 34(d).

12 Item number one is a transfer of $49,000 to Charles Schwab

13 concerning the IRA contribution during the periods January 2008

14 through May 2008.  You did not, in fact, list that on your

15 statement of financial affairs in response to Question Number

16 10, did you?

17 A    No.

18 Q    Why?

19 A    Because I made annual contributions to my IRA and I

20 believe that that was in the ordinary course of my business.

21 And I also was concerned about the term other property in that

22 question.  But regardless of that, I had made the contributions

23 each year.  I believe that it was nothing out of the ordinary

24 for what I was doing.

25 Q    Similarly, there is a reference to a $25,000 payment to

Gordon - Redirect/David                                    159

1  Wachovia Bank on May 23rd, 2008.  Now, that was more than a

2  year prior to you filing the petition, was it not?

3  A    Yes.

4  Q    Why didn't you list that?

5  A    Because it was a payment on a home equity line of credit

6  and I made those payments on a regular basis in the ordinary

7  course and I didn't believe that Question 10 required me to

8  list it.

9  Q    Turning, if we might, to the next page, Subparagraph (e).

10       MR. DAVID:  One moment, Your Honor, if I might.

11 Q    It's noted that you did not list on your statement of

12 financial affairs in response to Question 18(a) CITADEL

13 Construction.  Why didn't you list CITADEL Construction?

14 A    Because apart from that single situation with the bond, I

15 did not believe I was ever an officer of CITADEL.  I certainly

16 never intended to be.  And I didn't believe I was, and,

17 therefore, I didn't believe I was required to list it.

18 Q    It indicates that you didn't list McCann Construction.

19 Why not?

20 A    You know, it was most likely an oversight on my part.  I

21 should have listed it.  It just was an entity that for whatever

22 reason didn't get on the schedules.  It was my fault and it was

23 an oversight on my part.  I did list the family partnership,

24 which was the sole member of McCann.  I should have listed

25 McCann and I didn't.  I don't have an explanation for that

Gordon - Redirect/David                               160

1  omission.

2  Q    To be clear, you listed the GFI, the family limited

3  partnership on Exhibit 25 on Schedule B, did you not?

4  A    Yes.

5  Q    And GFI, the family limited partnership was, in fact, the

6  sole owner of McCann, was it not?

7  A    Yes.

8  Q    Now, sir, you didn't list Hilltop Investments, am I

9  correct?

10 A    That is correct.

11 Q    Why?

12 A    Because I wasn't an officer of Hilltop.  Hilltop had owned

13 real estate in Connecticut in 2002.  I was not an officer.  The

14 Secretary of State website didn't reflect that I was an officer

15 in Connecticut.

16          THE COURT:  You say it did or did not?

17          THE WITNESS:  It did not, Your Honor.  It referenced

18 Ed Romero as the sole manager of Hilltop.  I didn't believe I

19 was obligated to list it, as a result.

20          THE COURT:  Well, were you or were you not an

21 officer?

22          THE WITNESS:  I was not, Your Honor.

23 Q    Please look at Exhibit Number 61.

24 A    Okay.

25 Q    Can you identify for the Court what that exhibit is?

Gordon - Redirect/David                    161

1  A    Yes.  This is a printout from the Secretary of State

2  website in Connecticut, which lists Connecticut corporations

3  and LLCs and their principals and registered agents.

4  Q    And who was the manager of Hilltop?

5  A    Edward Romero.

6  Q    And is that reflected anywhere on the document?

7  A    On -- yes, on Exhibit 61.  If you look down where it says

8  principals names/titles it says Edward Romero, manager.

9  Q    And was that, to the best of your knowledge, true at all

10 times?

11 A    Yes.

12 Q    Sir, it was indicated that you did not list Boulder

13 Heights, LLC on the schedule.  Why not?

14 A    It was an oversight on my part.  I listed Allstar, which

15 is the sole member of Boulder Heights.  I was responsible for

16 the affairs of Boulder Heights and I should have listed it.

17 And it was just an oversight on my part.

18 Q    But to be clear, you did list Allstar which owned all of

19 Boulder Heights, did you not?

20 A    I did, yes.

21      MR. GERON:  Objection as to form, Your Honor.

22      MR. DAVID:  I'll rephrase.

23      THE COURT:  Sustained.

24 Q    Sir, did you take any steps in order to make it clear that

25 there was an interest in the parent of Boulder Heights?

Gordon - Redirect/David                        162

1            MR. GERON:  Objection as to form.

2            THE COURT:  Sustained.  You've been leading up and

3  down for the last hour-and-a-half, or two hours, Mr. David.

4  Mr. Geron has been very restrained in his objections, but the

5  leading has got to end.

6            MR. DAVID:  Yes, Your Honor.

7  Q    Sir, is there a relationship between Boulder Heights and

8  Allstar?

9  A    Yes.

10  Q    What is that relationship?

11  A    Allstar is the sole member of Boulder Heights.

12  Q    Did you in any way list Allstar on your schedule -- or

13  statement of financial affairs?

14  A    Yes.

15  Q    Where did you do so?

16  A    Question 18(a).

17            MR. DAVID:  I draw the Court's attention, if I might,

18  to Exhibit Number 26, Page 210.

19  Q    Sir, it was pointed out that you didn't list Phoenix

20  Capital Advisors.  Why?

21  A    Because the name -- Phoenix Capital Advisors had changed

22  its name to Rosedale Cooley Management, and that was listed on

23  Schedule 18(a) -- I'm sorry, Question 18(a).

24  Q    Sir, you were asked why you hadn't -- withdrawn.  You

25  didn't list Eastern Energy, is that correct?

Gordon - Redirect/David                    163

1  A    Yes.

2  Q    Why?

3  A    Because I wasn't the officer of Eastern Energy.

4  Q    Please look at Exhibit Number 62.  Can you identify for

5  the Court Exhibit Number 62?

6  A    Yes.  This is a printout from the State of Connecticut

7  Secretary of State website regarding corporations and LLCs and

8  their corresponding officers.

9  Q    To your knowledge, who is the officer of Eastern Energy?

10 A    F. Robert Lasaracina.

11 Q    To your knowledge, were you ever an officer or a principal

12 of Eastern Energy?

13 A    No.

14 Q    Sir, you were asked -- withdrawn.  You didn't list King

15 Holdings, LLC, did you?

16 A    No.

17 Q    Why not?

18 A    Because the Question 18(a) asked about entities within six

19 years of the petition, and Kings Holdings was transferred to

20 the U.S. Government as part of the forfeiture matter in 2002.

21 Q    After 2002, were you an officer or principal or in any way

22 related to King Holdings?

23 A    No.

24        MR. DAVID:  Your Honor, should I continue, or should

25 I wait?

Gordon - Redirect/David                                164

1          THE COURT:  Just a minute.  All right.  Go ahead.

2    Q    Sir, did you list Cascar?

3    A    No.

4    Q    Why not?

5    A    Because I was a general partner of Cascar in name only.

6    It was an entity that was set up to facilitate a marital

7    settlement agreement.  And because it owned seats on the New

8    York Mercantile Exchange, the general partner had to be a

9    member of the New York Mercantile Exchange, of which I was.

10   But I was -- the agreement, the marital agreement and the

11   partnership agreement made it very, very clear that I didn't

12   have any right to that interest and that it was solely for the

13   benefit of my then wife and daughter.  And as a result, I

14   didn't believe I needed to list it.

15   Q    Did you have any financial interest in Cascar?

16   A    My only interest in Cascar was as the general partner, and

17   that was solely for the purposes of compliance with the NYMEX

18   rules.

19   Q    All right.  But to be clear, did you get any money out of

20   Cascar?

21   A    No.

22   Q    Please look at Exhibit Number 48.

23   A    Yup.

24   Q    Can you identify Exhibit Number 48 for the Court?

25   A    This is the limited partnership agreement of Cascar, LP.

Gordon - Redirect/David                                165

1  Q     Please look at Exhibit Number 49.

2  A     Yes.

3         MR. DAVID:  Your Honor, I would only call the Court's

4  attention to the fact that this is the exhibit which the

5  trustee put the two additional pages that were missing in.  So

6  I just want to make sure.

7  Q     Can you identify Exhibit Number 49?

8  A     This is the separation agreement between my ex-wife and I.

9  Q     What document transferred or provided for your ex-wife's

10  interest in Cascar, if any?

11  A     I believe it was the separation agreement.

12  Q     And, sir, if I could, please look at Exhibit Number 51.

13  A     Yes.  This is the first amendment to the separation

14  agreement.

15  Q     Now, as it related -- well, withdrawn.  What was your

16  intent in not listing Cascar?

17  A     I had no intent.  I was familiar with the arrangement of

18  Cascar.  I was familiar with the limitations that were imposed

19  on Cascar, why it was created, what its purpose was, and I

20  didn't believe that I needed to schedule in response to this

21  question.

22  Q     Sir, Mr. Geron pointed out that there were several times

23  when you appeared and gave testimony under oath in connection

24  with this proceeding, do you recall that?

25  A     Yes.

Gordon - Redirect/David                                      166

1  Q    Do you recall that there was a meeting of creditors

2  pursuant to Section 341 of the bankruptcy code on or about

3  February 25th, 2010?

4  A    Yes.

5  Q    Please look at Exhibit Number 54.  And in particular, if I

6  might draw your attention and ask you to read to yourself --

7  well, withdrawn.  Did you in connection -- when was the first

8  time you recall advising the trustee about the Chase auto loan?

9  A    At the 341 meeting.

10            MR. DAVID:  Your Honor, if I might draw the Court's

11  attention, since this is a stipulated exhibit, to Pages 10 and

12  11 of that document.

13            THE COURT:  Which is its number?

14            MR. DAVID:  It's number 54, Your Honor.

15            THE COURT:  54 is the 341 transcript?

16            MR. DAVID:  Yes, Your Honor.

17            THE COURT:  Okay.

18  Q    And, sir, when was the first time that you recall drawing

19  the trustee's attention to the residential lease guarantees?

20  A    At the 341 hearing.

21            MR. DAVID:  Your Honor, again, if I might, I'd like

22  to draw your attention to Page 12 of Exhibit Number 54.

23  Q    You were asked, sir, about Allstar and the Signature Bank

24  -- give me a moment.  I apologize.  Hold one second.

25            MR. DAVID:  May I proceed, Your Honor?

1              THE COURT:  Yes.

2  Q    You were asked about Allstar and the Signature Bank

3  account, do you recall that, sir?

4  A    Yes.

5  Q    All right.  Did there come a point in time when you

6  scheduled that in the papers you filed with the Court?

7  A    Yes.

8  Q    Please look at Exhibit Number 24.  And in particular, if I

9  can draw your attention to Page Number ST-179.  The very first

10 item, can you identify for the Court what that account is?

11 A    It's an account with Signature Bank.

12 Q    Is that the Signature Bank account that had to do with

13 Allstar?

14 A    Yes.

15 Q    And when did you first file that and advise the trustee of

16 the existence of that obligation?

17 A    This is in the first set of schedules that were filed,

18 November 2009.

19             MR. DAVID:  Your Honor, may I have a moment to confer

20 with my co-counsel?

21             THE COURT:  Yes.

22             MR. DAVID:  Your Honor, I have no further questions.

23             THE COURT:  All right.  Mr. Geron, how long do you

24 think your recross is going to be?

25             MR. GERON:  Twenty minutes or less, Your Honor.

1       THE COURT:  Okay.  Do you want to go straight

2   forward, or do you need a break?

3       MR. GERON:  I do, Your Honor, if it's okay with the

4   Court, and with the witness.

5       THE COURT:  I'm sorry?

6       MR. GERON:  I would like to go forward right now --

7       THE COURT:  Okay.

8       MR. GERON:  -- if the witness and you are amenable.

9       THE COURT:  Okay.

10                  RECROSS EXAMINATION

11  BY MR. GERON:

12  Q    Mr. Gordon, you were asked by Mr. David and you testified

13  to the statements of financial affairs, and specifically to the

14  answers to the Question Number 1 of the stip of financial

15  affairs.  Do you recall that testimony?

16  A    Yes.

17  Q    And you testified that with respect to the 2007 income you

18  listed that number was net of losses and was a negative income,

19  is that correct?

20  A    Yes.

21  Q    And that number matched up roughly with your tax returns,

22  I think that was your testimony, as well, correct?

23  A    Yes.

24  Q    With respect to the 2008 income, it does not say in that

25  line that it's net of losses, does it?

1  A     No.

2  Q     With respect to the 2009 income, that, too, does not say

3  it's net of NOLs or losses, correct?

4  A     Correct.

5  Q     On the Schedule I, which you were referring to with Mr.

6  David, that's the schedule that was not changed between your

7  schedule filings, correct?

8  A     Correct.

9  Q     And that schedule lists in-kind payments on Line 13 at

10  $20,000 a month, is that correct?

11  A     Yes.

12  Q     Your total -- by my calculation, that would mean that it's

13  $140,000 a year of income payments, roughly, the same way we

14  were doing the rough calculation?

15         THE COURT:  20,000 a month times 12?

16         MR. GERON:  I'm sorry, Your Honor.

17  Q     Literally $240,000 a year of income payments, is that

18  correct?

19  A     Yeah, on an annualized basis.

20  Q     And that's what we were doing before, the exercise with

21  Mr. David, is annualizing this and saying that you were

22  disclosing the income because you were annualizing it, correct?

23  A     Because I was what?

24  Q     Because you were annualizing these numbers.

25  A     Yes.

Gordon - Recross/Geron                    170

1  Q    I mean, effectively, we could annualize them so there was

2  disclosure to the trustee, that was the implication of that

3  testimony, correct?

4  A    Yes.

5  Q    In fact, your annualized income for in-kind payments was

6  62,939, isn't that correct?

7  A    That was for the prior year.

8  Q    That's for 2009, isn't that correct?

9  A    Can I look at the tax return?  I don't remember the

10  exhibit number for the tax return.

11  Q    In the pretrial order, I drew the Court's attention and

12  yours to Paragraph 61 of the stipulated facts, in which your

13  counsel and you stipulated that the federal income tax returns

14  for 2009 reflect income -- I'm sorry, reflect that the debtor

15  received commissions from CITADEL, which we're going to get to

16  in a moment, and income payments from Allstar in the amount of

17  62,939, correct?

18  A    Yes.

19  Q    So does that refresh your recollection that the in-kind

20  payments were not, in fact, $240,000 as annualized, but were,

21  in fact, in fact 62,939, correct?

22  A    No.

23  Q    You had other in-kind payments, is that what your

24  testimony is today?

25  A    Yes.  This in-kind payment relates to the residential

Gordon - Recross/Geron                          171

1  lease that Rosedale Cooley was paying on my behalf.

2  Q    So you're saying that in addition to the 62,939, which you

3  disclosed on your federal tax returns as in-kind payments, you

4  had other in-kind payments that you did not disclose on your

5  tax returns, is that correct?

6  A    No.  No.  These -- these in-kind payments were in 2009.

7  Q    Right.  So you're saying now that on Schedule I you're

8  including additional in-kind payments, is that what you're

9  suggesting?

10 A    No.  I'm saying that these were ongoing in-kind payments.

11 The in-kind payments you're referencing, which were the Allstar

12 in-kind payments, were just one off, were one off in-kind

13 payments that Allstar made on account of a couple of American

14 Express bills that it paid.

15         THE COURT:  I thought the question was whether you

16 had shown the in-kind payments, vis-a-vis the apartment on your

17 income tax?

18         THE WITNESS:  I'd have to look at my tax return.

19         THE COURT:  Did I misunderstand the question, Mr.

20 Geron?

21         MR. GERON:  No.  That was exactly the question, Your

22 Honor.  While we look for that, may I just move on to a

23 separate -- to a distinct issue and then I'll come back to that

24 for a moment, or should we just keep that open?

25         THE COURT:  Yes.  Do we have the 2009 return in the

Gordon - Recross/Geron                    172

1  record, as well as the --

2          MR. GERON:  Your Honor, I'm told that we do not have

3  a complete return.  What we have is the statement that is

4  Exhibit 23, it's stipulated into evidence.  And maybe I'll draw

5  the witness' attention --

6          THE COURT:  What's that, like a transcript of a --

7          MR. GERON:  It's a federal statement.  It seems to be

8  a summary statement that comes from the tax returns.  Maybe I

9  can ask the witness what that is.  It's Exhibit 23.

10 A   How do you know this is 2009?

11 Q   Is it your testimony that it's not 2009?

12 A   I don't know.  It doesn't tell me on here that it's 2009.

13 I don't know what year it was.

14 Q   All right.  So the statement in the joint pretrial order

15 that says that your 2009 federal tax return indicates the

16 following numbers: commissions from CITADEL for 2009 of

17 347,263, and Allstar payment in-kinds of 62,939.  Those numbers

18 happen to match up to the statement that I just showed you as

19 Exhibit 23.  Is that a coincidence?

20 A   I'm sorry.  I apologize.  I lost track of the question.

21 Q   All right.  The statement that's Exhibit 23 --

22 A   Right.

23 Q   -- is that a statement from your taxes for the year 2009?

24 A   I don't know.

25 Q   Okay.  But, however, the statement that is in the joint

Gordon - Recross/Geron                                        173

1  pretrial order that says that for 2009 stipulated to by you --

2  A    Oh, I understand.

3  Q    -- has these numbers in them.  Does that refresh your

4  recollection that the statement that is Exhibit 23 refers to

5  your 2009 tax returns?

6  A    If that's in the pretrial order, then it's probably the

7  case.  I was just observing that this schedule doesn't indicate

8  that it's from 2009.

9  Q    Right.  But now you've refreshed your recollection and now

10 this schedule does, in fact, reflect the 2009 figures, correct?

11 A    If that's what's reflected in the pretrial order, than I

12 accept that.

13 Q    And so the payment in-kind that we've been referring to,

14 that's 62,939, correct?

15 A    Payment in-kind.  On Schedule I?

16 Q    No.  The payments in-kind that you received in the year

17 2009.

18 A    Right.  I believe that some of those -- some of those

19 in-kind payments related to an American Express bill that had

20 been paid.  I don't know if it was paid -- I don't know if that

21 was listed as part of the CITADEL commissions, or if it was

22 listed as in-kind payments.  One of the issues, of course, that

23 might help answer this --

24 Q    I'm not sure there's a question to you.  All I asked was

25 is the only issue --

Gordon - Recross/Geron                    174

1  A     I don't know.

2  Q     Okay.  The other thing that you covered with Mr. David was

3  that Schedule I could be extrapolated to define effectively

4  what your yearly income was by just simply multiplying by 12,

5  roughly.  And I see no where -- where is it -- the Schedule I

6  does not reflect any commission income from CITADEL, is that

7  correct?

8  A     That's correct.

9  Q     And your tax return reflects commission income for 2009

10 from CITADEL of 347,263, correct?

11 A     Yes.

12 Q     You testified to Mr. David that there was no relationship

13 between Wurk and Allstar, correct?

14 A     Yes.

15 Q     GF1LP has an ownership interest in Wurk, correct, Wurk

16 Environments?

17 A     Yes.

18 Q     Wurk Environments is the parent of Wurk Times Square,

19 correct?

20 A     Yes.

21 Q     GF1LP also has an ownership interest in Allstar, is that

22 correct?

23 A     Yes.

24 Q     You testified earlier that you did not believe that your

25 guarantee obligation on the apartment along with Rosedale

Gordon - Recross/Geron                      175

1  Cooley need to be listed on Schedule F, is that correct?

2  A    Schedule H.

3  Q    Schedule F and H; Schedule F being your creditors and

4  Schedule H being your co-debtors, co-obligors.

5  A    Okay.

6  Q    And you lived in that apartment, I think you testified to

7  a question that the Court asked you, you lived in that

8  apartment for that time?

9  A    I did very briefly, yes.

10 Q    And my understanding, I think you testified earlier, was

11 that the rent of that apartment was $19,000 a month, is that

12 correct?

13 A    Yes.

14 Q    You testified earlier that the Nachamie retention letter

15 really ought to have been a letter addressed to McCann, isn't

16 that correct?

17 A    I think I said that McCann was the client.

18 Q    Right.  So the retention letter should have been signed by

19 McCann, correct?

20 A    Yes.

21 Q    Okay.  Schedule 14 -- Exhibit 14, forgive me.

22 A    I'm sorry?

23 Q    Exhibit 14.

24 A    Right.

25 Q    It's your testimony under oath that the payment to Todtman

Gordon - Recross/Geron                              176

1  Nachamie of $10,000 was by Allstar in repayment of its loan

2  obligation -- partial repayment of its loan obligation to you,

3  correct?

4  A    Yes.

5  Q    McCann never paid that $10,000, correct?

6  A    The payment was made on behalf of -- the payment was made

7  out to -- the payment was made to Todtman Nachamie by Allstar

8  for the benefit of McCann.

9  Q    So not for your benefit?

10 A    Well, I needed to provide -- I needed to provide money to

11 McCann in order to retain Todtman Nachamie.  The only McCann

12 sole member was GFI, so I needed to contribute money down to

13 McCann in order for it to retain Todtman Nachamie.

14 Q    So your testimony is that -- I'm trying to follow the

15 bouncing ball here, so bear with me.

16      MR. DAVID:  Objection to the colloquy.

17      THE COURT:  Sustained on the colloquy.  Start over,

18 Mr. Geron.

19      MR. GERON:  Strike that.  I'm sorry.

20 Q    Your testimony is that you directed Allstar to pay

21 Nachamie in favor of a McCann obligation on account of a

22 retention letter that's addressed to you personally, is that

23 correct?

24 A    Yes.  I indicated that I thought the retention letter that

25 the client was McCann; that GFI needed to provide money to

Gordon - Recross/Geron                           177

1  McCann for it to retain Nachamie; that I needed to, therefore,

2  provide the money to GFI; and, therefore, I took the money that

3  Allstar owed me and said rather than paying me so I can pay GFI

4  to pay McCann to pay Nachamie, Allstar should just pay

5  Nachamie.

6  Q    In response to a question or two by Mr. David, you

7  testified that the Amex payments were, in fact, reflected in

8  your statement of financial affairs, isn't that correct?

9  A    I testified that I subsequently added the Amex payment

10 after I determined that it was, in fact, not a corporate card,

11 but it was a payment for me.

12 Q    Right.  And that statement of financial affairs was filed

13 December 10, 2010?

14 A    Is that 28?

15 Q    That's Exhibit 28.

16 A    Yes.

17 Q    And that was filed after the trustee had filed a complaint

18 against you, correct?

19 A    Yes.

20 Q    You testified also in response to Mr. Gordon's [sic]

21 questions that Phoenix Capital was not identified in response

22 on the statement of financial affairs Question 18 because

23 Phoenix Capital had changed its name to Rosedale Cooley.  Do

24 you recall that area of testimony?

25 A    Yes.

Gordon - Recross/Geron                        178

1  Q    The original statement of financial affairs was filed

2  approximately a month -- you testified earlier today

3  approximately a month after the filing of your bankruptcy,

4  correct?

5  A    Yes.

6  Q    Look at Question 18 -- I'm sorry, Exhibit 26, Question 18.

7  A    Yes.

8  Q    Neither Rosedale Cooley nor Phoenix Management are listed

9  on -- in response to that question as of November 22, 2009,

10  correct?

11  A    That's not true.

12  Q    Where is it?

13  A    It's the first one.

14  Q    Oh, I'm sorry.  I missed it.  I missed it.  My error.

15  Forgive me.  I read Allstar and missed it.

16  A    That's okay.  I actually missed it before myself.

17  Q    Okay.  Let me turn to the CITADEL issue.  You testified

18  earlier that, with the exception of the performance bond

19  documents, that really it was Mr. Stack who was the principal

20  player, or the principal manager of CITADEL, do you recall that

21  testimony?

22  A    Yes.

23  Q    And that you had signed those bonds, really, as an

24  accommodation to the bonding company because Mr. Stack was out

25  of the office?

1  A    Yes.  I think he was out of the country.

2  Q    Look at Exhibit Number 36, please.

3  A    Yup.

4  Q    I'm sorry, 38.

5        MR. GERON:  These are stipulated exhibits, Your

6  Honor.

7        THE COURT:  All right.

8  Q    Look at the last page of that document, please.

9  A    Yup.

10 Q    That's your signature, correct?

11 A    It is.

12 Q    So on January 7th, 2008 you signed the document as

13 principal of CITADEL Construction, is that correct?

14 A    Yes.

15 Q    Look at Exhibit 39, please.  Do you have it in front of

16 you?

17 A    Yes.

18 Q    Look at the signature page, which is the third page.

19 A    Mm-mm.

20 Q    Are you there?

21 A    Yes.

22 Q    And so on January 15th, 2008 you signed another document

23 as principal of CITADEL Construction, correct?

24 A    Yes.

25 Q    Go on, please, to Exhibit 40.

Gordon - Recross/Geron                    180

1  A    Yup.

2  Q    Is that your signature?

3  A    It is.

4  Q    You signed another document on May 2008 on behalf of

5  CITADEL Construction, isn't that correct?

6  A    Yes.

7  Q    Please go on to 41.

8  A    Right.

9  Q    Is that your signature in the middle of the page?

10  A    Yes.

11  Q    So on -- in connection with this document, I don't see a

12  date associated with it, but in connection with this document

13  you signed as principal of CITADEL Construction Corp., is that

14  correct?

15  A    It is.

16  Q    Please go on to Exhibit 46.

17  A    Okay.

18  Q    Look at the page that's Bates marked ST-00271.

19  A    Yeah.

20  Q    Is that your signature?

21  A    No.  You'll see there's a notation there.  It says for DG

22  there.  I think it's signed Garci somebody.

23  Q    So somebody signed on your behalf stating that you were

24  principal of CITADEL as of the date of the filing of this tax

25  return?

Gordon - Recross/Geron                    181

1  A    It would appear as such, yes.

2  Q    Okay.  Did you authorize this signature?

3  A    No.  But I haven't disputed that -- I haven't disputed

4  that we used the term principal very loosely there.

5  Q    I'm not sure I've asked you how the term principal was

6  being used.

7  A    Okay.

8  Q    I'm sorry to interrupt.  You did sign, or authorize

9  somebody to sign a tax return on your behalf as principal of

10 CITADEL, is that correct?

11           MR. DAVID:  Your Honor, Objection.

12           THE COURT:  Overruled.

13 A    I don't know that I authorized it, but -- you know, I

14 don't recall this tax return, but, you know, CITADEL filed tax

15 returns on a regular basis.  And so I believe the person who

16 signed this was Jessica Garcia who was the controller for

17 CITADEL.  I think Garci is really Garcia there, and she signed

18 her name there for DG.

19 Q    All right.  Let's turn to Page -- Exhibit 47, please.

20 A    Right.

21 Q    And look at the signature page of that tax return.  Is

22 that your signature?

23 A    Yes.

24 Q    So this tax return was signed by you as principal of

25 CITADEL, correct?

Gordon - Recross/Geron                                    182

1  A    Yes.

2         THE COURT:  So is it your testimony back on 46 that

3  Jessica Garcia wasn't authorized to sign your name, or that

4  principal is kind of a wishy-washy type of expression?

5         THE WITNESS:  Your Honor, my answer is both.  I don't

6  recall specifically authorizing her to sign it, but, you know,

7  I didn't tell her not to.  The point I was trying to make was

8  that principal really had no meaning, or at least it really

9  didn't have an officer-type meaning within the way it was being

10 used.  I really wasn't -- I was a consultant to CITADEL.  I

11 mostly advised the company relating to its financial affairs.

12 So I would have assisted in preparing tax returns and the like.

13 So principal was really more of just a generic term that was

14 used.  It wasn't intended to make me an officer or empower me

15 in that way.

16        THE COURT:  Are you telling me she was unauthorized

17 or not?

18        THE WITNESS:  I did not authorize her to sign my

19 name.

20        THE COURT:  No, my question isn't whether you

21 authorized.  Was she acting in an unauthorized capacity?

22        THE WITNESS:  Yeah, I didn't authorize her to sign

23 this.

24        THE COURT:  Would you please answer my question, not

25 the question you want to answer.

Gordon - Recross/Geron                                   183

1              THE WITNESS:  She was operating in an unauthorized

2    capacity.

3              MR. GERON:  May I have two minutes to confer with

4    counsel and then I think I can wrap it up, Your Honor.

5              THE COURT:  Yes.

6              MR. GERON:  Just two very brief areas, maybe four

7    questions.

8    Q    Exhibit 14, back to Exhibit 14, which is the payments made

9    on your behalf to a variety of entities.  You will remember

10   that in response to Mr. David's questions you said that these

11   payments starting roughly March of '09 and continuing through

12   October of '09 were payments made on your behalf by Allstar,

13   correct?

14   A    Yes.

15   Q    Bear with me for a second.  Okay.  Your petition was filed

16   October 20 --

17   A    19.

18   Q    -- 19, 2009.  Look, if you will, at your statement of

19   financial affairs 26 or 27 -- actually, 26 first, and then

20   we'll go to 28.  And specifically Question 3(a).  The payments

21   made between July 19th and October 19th, 2009 that appear on

22   Schedule 14, those payments were made on your behalf, correct?

23   A    Yes.

24   Q    On account of obligations that were yours, correct?

25   A    Yes.

Gordon - Recross/Geron                    184

1  Q    And those payments are not reflected as payments to your

2  creditors in response to Question 3(a) made in the 90 days

3  before the filing of the bankruptcy, is that correct?

4  A    It's because I was not an individual with primarily

5  consumer debts.  I think that's what that says.

6  Q    Your position is that your debts are primarily

7  non-consumer debts?

8  A    Yes.  That was the position that my attorney took and that

9  I then took.

10 Q    So look at Question 3(b), then.  Those payments made in

11 the 90 days before the filing of the bankruptcy that are

12 reflected on Schedule 14 -- I'm sorry, Exhibit 14.  Those

13 payments in the 90 days are not reflected as responses to

14 answer to Question 3(b) on your statement of financial affairs,

15 is that correct?

16 A    No.

17 Q    Is it correct or incorrect?

18 A    I said they're not listed.

19 Q    Okay.  And then same question for you with respect to your

20 amended statement of financial affairs, which is Exhibit 27.

21 In response to Question 3(b), you do not list the payments that

22 appear in the 90 days before the filing of the bankruptcy on

23 Exhibit 14, you do not list any of those payments in answer to

24 Question 3(b) of Exhibit 27, correct?

25 A    Correct.

Gordon - Further Redirect/David                185

1  Q    And, finally, with respect to Exhibit 28, which is your

2  final second amended statement of financial affairs, you do not

3  list any of the payments that are reflected in the 90 days as

4  having been made on your behalf by Allstar on account of your

5  obligations in response to Question 3(b) of your final

6  statement of financial affairs, is that correct?

7  A    Correct.

8          MR. GERON:  I have no further questions, Your Honor.

9          THE COURT:  All right.  Re-redirect.

10         MR. DAVID:  Your Honor, if I may, I'm only going to

11 go into two areas.

12                FURTHER REDIRECT EXAMINATION

13 BY MR. DAVID:

14 Q    Mr. Gordon, if I could, please take a look at Exhibit

15 Number -- I apologize to you now, I lost my place.  Please take

16 a look at Exhibit Number 23, that is the federal statement

17 which has been characterized as your 2009 income from CITADEL

18 and Allstar in combination, ignoring the net operating losses,

19 ignore the portfolio income from K-1s, what was your gross

20 income for that year?

21 A    I don't have the tax return.

22 Q    I understand that, but from those first two line items,

23 sir, what's indicated?

24 A    About $400,000.

25 Q    And, sir, please look at I believe it's Exhibit I, what

Gordon - Further Redirect/David                    186

1   was the monthly income that you indicated --

2   A      Schedule I, you mean?

3   Q      Schedule I.

4   A      Approximately $33,000.

5   Q      All right.  Which would work out to approximately

6   $400,000, am I correct?

7   A      Yes.

8   Q      All right.  Second question, sir.  You were asked about

9   Schedule Number 14 and the payments that were made that were

10  listed on Schedule Number 14 which you indicated had been made

11  at your direction and why they weren't listed in answer to

12  Question 3(b) of the statement of financial affairs, do you

13  recall that?

14  A      3(a) or 3(b)?

15  Q      3(b).  You answered 3(a).  You were asked about 3(b),

16  also.  3(b) is where it refers to your creditors within 90

17  days.

18  A      Yes.

19  Q      All right.  Why didn't you list the payments that are on

20  Schedule 14 under 3(b)?

21  A      Well, I wasn't paying them.  Allstar was paying them.

22  Q      And, sir, if I could, other than New York Hospital, were

23  those actually your creditors, or were they creditors -- I

24  withdraw that.  I'm sorry.  Were they payments made for your

25  account where they were your creditors, or were they creditors

Gordon - Further Recross/Geron                    187

1  of other entities where you directed the payments to be made?

2  A    No.  For instance, the Old Lyme assessor, that was for

3  property taxes related to a piece of property owned by an LLC.

4  You know, Todtman Nachamie, that was a payment that was made

5  for the benefit of McCann.  These weren't my creditors.

6          MR. DAVID:  No further questions.

7          MR. GERON:  I have about three follow-ups, Your

8  Honor.

9          THE COURT:  Yes.

10                FURTHER RECROSS EXAMINATION

11  BY MR. GERON:

12  Q    Mr. Gordon, going back to Exhibit 23.  This is a breakdown

13  of other income, correct?

14  A    Yes.

15  Q    This is not gross income, is that correct?

16  A    This is not wage income, no.

17  Q    And just to clarify, its your testimony -- it is your

18  position that Allstar repaid its loan to you by paying parties

19  that you had no obligation to pay, is that what you're saying

20  to us today?

21          MR. DAVID:  Objection.

22          THE COURT:  Overruled.

23  A    No, that's not my testimony.

24  Q    So did you have obligation to pay the parties who are

25  reflected on Exhibit 14 as having been paid in the 90 days

Gordon - Further Redirect/David                        188

1  before the filing of the bankruptcy?

2  A    There were corporate entities in which I had interest

3  that --

4  Q    It's a yes or no -- I'm sorry, but it's a yes or no

5  question.  Did you have --

6  A    I'm sorry.  Could you repeat the question?

7  Q    Did you have an obligation, contractual obligation to pay

8  the parties who appear on Exhibit 14 in the 90 days before the

9  filing of the bankruptcy?

10  A    No, I personally did not.

11         MR. GERON:  I have no further questions, Your Honor.

12         THE COURT:  Do you have any follow-up, Mr. David?

13         MR. DAVID:  Might I ask one question, Your Honor?

14         THE COURT:  Yes, you may, as long as it's limited to

15  new stuff Mr. Geron brought up.

16              FURTHER REDIRECT EXAMINATION

17  BY MR. DAVID:

18  Q    Sir, what would have happened to Wurk if you did not

19  arrange for the payment of the bill that it owed to CITADEL?

20         MR. GERON:  Objection as to form of the question.

21         THE COURT:  Sustained.

22  Q    Sir, do you know what would have happened to Wurk if the

23  CITADEL bill was not paid?

24         MR. GERON:  Objection.

25         THE COURT:  If it's knowledge and if it isn't

1  speculation, I'll permit it.

2  A    Yes.

3  Q    What?

4  A    Well, Wurk would have been sued and most likely it would

5  have been forced out of business.

6         MR. DAVID:  No further questions.

7         THE COURT:  All right.  Mr. Geron?

8         MR. GERON:  Nothing further, Your Honor.

9         THE COURT:  All right.  Well, I have questioning

10  under 614, but I can't complete the questioning and give you

11  guys your rights under 14 to ask follow-up questions based on

12  my questions in the 11 minutes that we have left.  So we'll

13  resume at 9:45 tomorrow and we'll complete the examination

14  then.

15         However, I want to find out from you how you want to

16  deal with summations and if you want to submit or waive

17  post-trial briefs, and get your sense as to when we're going to

18  have a transcript, which I would prefer to have at the time of

19  closing arguments.  First from you, Mr. Geron.

20         MR. GERON:  First in terms of how tomorrow, if I

21  could, just my understanding with Mr. David as to how tomorrow

22  plays out, beyond the Court's questions and anything that the

23  parties might have of Mr. Gordon, we have the testimony of

24  Donald David himself in connection with one distinct issue.

25  And that -- I'm estimating that that should take about a

1  half-hour, 45 minutes.  I don't anticipate -- because the

2  direct has already been submitted by affidavit, so it's really

3  just a cross.  And then we have, I believe, that the debtor is

4  going to call Bart Nachamie.  That, too, is a 20 minute

5  exercise.  So I think the sum and substance of the remaining

6  testimony is about an hour, being pessimistic, an

7  hour-and-a-half.

8          I was expecting that we can do summations, and brief

9  ones, at that, maybe limited by time by the Court, following

10  tomorrow.  But if the Court wishes to have the transcript,

11  which makes sense, we can do the summations afterwards.

12          In terms of post-trial briefs, I don't know that

13  there are any legal issues that remain in contention.  I do

14  think that the Court -- I don't know whether the Court likes to

15  have proposed findings of facts and conclusions of law, but

16  that would be something that we were anticipating the Court

17  requesting of us.

18          THE COURT:  Well, I probably would want one or the

19  other of proposed findings or post-trial briefs.  Since we

20  scheduled the trial, I was told of something that I simply

21  can't get out of that would cause me to be out of the court

22  from about noon to about 2:30.  I could resume after that.  If

23  you want to come back tomorrow afternoon and sum up then, I

24  would permit it.  But since I'm going to require one or the

25  other of proposed findings and/or post-trial briefs anyway, I

1  wonder if having the oral argument after I have those would be

2  preferable.

3           MR. DAVID:  Your Honor, may I be heard?

4           THE COURT:  You bet.

5           MR. DAVID:  Your Honor, Mr. Nachamie has submitted

6  his direct testimony by affidavit as the Court has directed.

7  What he is on for tomorrow is actually the cross examination by

8  Mr. Geron.  Mr. Nachamie, unfortunately has medical problems

9  and we were able to arrange for him to be here, Mr. Geron and

10 myself, at 11 o'clock.  I agree, I don't think his testimony

11 would take more than half-an-hour.  So if the Court is willing

12 to consider taking him at 11 o'clock, there should be no

13 problem with the Court's schedule.

14          THE COURT:  I don't see a problem with that.  From

15 what I heard Mr. Geron say, we might be done with others

16 earlier than 11, but certainly we can take a recess to have him

17 at 11.  And if I heard you right, it's unlikely that he's going

18 to go past noon.

19          MR. DAVID:  All right.  Your Honor, the second thing,

20 if I might, is I believe that respectfully I would like to have

21 the opportunity to submit post-trial briefs in connection with

22 this matter.  I believe that there are a variety of things that

23 have been thrown out there, and I think that it would be good

24 if we could present them to the Court in an organized fashion

25 with cross references to the appropriate statements and the

1  pretrial memorandum of law and the exhibits.  And I think that

2  will be helpful.  I believe the oral arguments, if I could

3  respectfully, should be after that so that the Court will be in

4  a position to have us present most cogently and carefully our

5  responses to the questions that the Court might propose.

6        The one thing which I would ask in terms of tomorrow,

7  I haven't up until this point objected to myself being called.

8  I did reserve my rights to do that when I provided an

9  affidavit.  I will not make an objection to that so long as it

10  is agreed that I am not disqualified from representing my

11  clients, given the fact that we've now gone through a whole day

12  of trial by virtue of being called upon to testify.

13        THE COURT:  All right.  Mr. Geron, he said a couple

14  of different things, each of which weren't a response.  I

15  assume on the latter point that you're not calling him as a

16  Trojan horse to get him disqualified.

17        MR. GERON:  Correct, Your Honor.  That was a --

18        THE COURT:  So that's a nonissue.

19        MR. GERON:  Nonissue.  We're waiving that issue.

20        THE COURT:  So can I confirm on the record that if he

21  doesn't object to being called, you're not going to object to

22  him continuing to serve as the debtor's counsel?

23        MR. GERON:  That is confirmed, Your Honor.

24        THE COURT:  Okay.  As far as the briefs go, I need

25  one or the other.  And if Mr. David prefers briefs, I'm not

1  sure if I would be of a mind to say no, but I want to give you

2  a chance to be heard.

3          MR. GERON:  That's fine, Your Honor.  I think it's --

4  if the Court is -- if it's one or the other, as long as it's

5  one or the other and not both, that's fine.

6          THE COURT:  I'm not going to make you guys do both.

7          MR. GERON:  Okay.

8          THE COURT:  I would want in your briefs citations to

9  the record.  And I don't -- this case isn't General Motors.  I

10  don't want you to have to pay for expedited transcripts.  Do

11  you have a sense as to how quickly you would get transcript on

12  a non-expedited basis?

13          MR. GERON:  I'm sorry, Your Honor.  I actually don't

14  know the timing of the transcript.  Can I just have one quick

15  second?

16          THE COURT:  Yes, sure.

17          MR. GERON:  It takes about -- I'm told by Ms. Litos

18  that it takes about a week to get the transcript --

19          THE COURT:  Even without paying a surcharge?

20          MR. GERON:  -- on a regular basis.  And this is a low

21  asset estate to start with, so I would just do it on a regular

22  basis.

23          There's one other accommodation that's brought to

24  mind which is Ms. Santucci was pivotal to sort of

25  quarterbacking this, along with the team that you're seeing

1  behind me, is going to be away for the week following next.

2  And so I'll just have to accommodate that to whatever extent

3  that's possible.

4         THE COURT:  I certainly don't want to be difficult on

5  that.  What I would recommend -- I'm not going to order it, but

6  I'd recommend that you and Ms. Santucci and Mr. David, and if

7  he's going to be helped by Mr. Del Virginia, put your noodles

8  together to see if you can come up with a time to submit the

9  post-trial briefs with enough time that allows for Ms. Santucci

10 to return and to get the transcript without having to pay

11 surcharges for expedited treatment.  I think under the

12 circumstances, especially since I'm going to give you guys oral

13 argument slash summation, I don't want reply post-trial briefs,

14 or even briefing seriatim.  So you'll agree on times to

15 simultaneously submit them.  If the time you agree upon is

16 reasonable, I'm not going to veto.  Okay.

17        MR. GERON:  That will be fine, Your Honor.

18        THE COURT:  And then we're going to schedule an oral

19 argument for the first time that Ms. Blum can give you after

20 I've had the briefs for about two weeks.  And the reason I got

21 to make you wait that long is, as you can imagine, I've got a

22 lot of stuff on my plate.  I've got a lot of cases.  Okay.

23        MR. GERON:  Sounds good, Your Honor.

24        THE COURT:  All right.  United States Congress will

25 be pleased with us, it's three minutes before five.  We're

195

1  adjourned.

2          MR. GERON:  Thank you very much, Your Honor.

3          THE COURT:  Yes.  Instruction that the witness

4  shouldn't talk to anybody until his examination is completed.

5          MR. GERON:  My request, Your Honor.

6          THE COURT:  Yes.  Mr. Gordon, you're not to talk to

7  your counsel on anything other than like what time to show up

8  and where.  Nothing involving your testimony or the merits of

9  the case in the broadest sense between now and the time you're

10  officially released as a witness, which will be some time

11  tomorrow.  Okay.

12          MR. GERON:  Very last request.  Can we leave our

13  exhibit binders here, Your Honor?

14          THE COURT:  Yes, you can, as long as you understand I

15  can't guarantee of anything that's in the courtroom.

16          MR. GERON:  Thank you, Your Honor.

17          THE COURT:  Okay.  We're in recess.

18                         *  *  *  *  *

19

20

21

22

23

24

25

**C E R T I F I C A T I O N**

        We, AMY RENTNER, TAMMY DeRISI and KAREN DeLUCIA, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

*Amy Rentner*
AMY RENTNER

*Tammy DeRisi*
TAMMY DeRISI

*Karen L. DeLucia*
KAREN L. DeLUCIA

J&J COURT TRANSCRIBERS, INC.        DATE:   March 21, 2013