UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
IN RE:                           . Case No. 09-16230 (REG)
                                 .
DANIEL GORDON,                   .
                                 .
              Debtor.            .
------------------------------. Adv. No. 10-03767 (REG)
ANGELA TESE-MILNER, Trustee      .
of the Estate of Daniel          .
Gordon,                          .
                                 .
              Plaintiff,         .
                                 .
      v.                         . One Bowling Green
                                 . New York City, NY  10004-1408
DANIEL GORDON,                   .
                                 .
              Defendant.         . March 13, 2013
. . . . . . . . . . . . . . . 10:02 a.m.
```

TRANSCRIPT OF TRIAL
BEFORE HONORABLE ROBERT E. GERBER
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:             Law Offices of Gabriel Del
                               Virginia
                            By:  GABRIEL DEL VIRGINIA, ESQ.
                                 YITZHAK GREENBERG, ESQ.
                            880 Third Avenue
                            New York, NY  10022


Audio Operator:             Kevin Su



Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**
**(609) 586-2311  Fax No.  (609) 587-3599**

APPEARANCES (Cont'd):


For the Plaintiff:          Fox Rothschild, LLP
                            By:  YANN GERON, ESQ.
                                 NICOLE N. SANTUCCI, ESQ.
                                 BARRI A. FRANKFURTER, ESQ.
                            100 Park Avenue, Suite 1500
                            New York, NY  10017

For the Defendant:          Akerman Senterfitt LLP
                            By:  DONALD N. DAVID, ESQ.
                            335 Madison Avenue, Suite 2600
                            New York, NY  10017


                        - - -

# I N D E X

|  | **PAGE** |
|---|---|
| **WITNESSES FOR THE DEBTOR** | |
| DANIEL GORDON | |
| Examination by the Court | 5 |
| Cross Examination by Mr. Geron | 19 |
| | |
| **WITNESSES FOR THE TRUSTEE** | |
| DONALD DAVID | |
| Cross Examination by Mr. Geron | 29 |
| Continued Cross Examination by Mr. Geron | 35 |
| Redirect Examination by Mr. Del Virginia | 50 |
| BARTON NACHAMIE | |
| Cross Examination by Mr. Geron | 30 |
| Cross Examination by Mr. David | 34 |
| Recross Examination by Mr. Geron | 34 |

| **EXHIBITS** | **ID** | **EVD**. |
|---|---|---|
| Trustee's Binder 1 | | 54 |
| Trustee's Binder 2 | | 54 |

1          COURT CLERK:  All rise.

2          THE COURT:  Good morning, you may be seated.

3          MR. GERON:  Good morning, Your Honor.

4          MR. DAVID:  Good morning, Your Honor.

5          UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

6          MR. GERON:  Your Honor, I'm sorry about causing the

7    delay.  I got off the subway because they were saying it wasn't

8    running and then I wound up getting stuck in a cab.  So my

9    apologizes to the Court and to my co-counsel.

10          THE COURT:  That's okay.  Let's proceed.  Mr. Gordon,

11   do you want to come on up, please?  Remain standing.  I'm just

12   going to remind you that you're still under oath from

13   yesterday.

14          Ladies and gentlemen, I'm going to be questioning

15   under Federal Rule of Evidence 614.  So you understand how

16   that's going to go, I will be asking a number of questions.  I

17   remind you that you have the rights to object to my questions

18   just as you have the right to object to each other's questions.

19   And in the event that anybody does so, I will rule on them just

20   like I rule on any others.

21          I'm also going to tell you in advance that after I

22   complete my questioning, I'm going to give each of you the

23   opportunity if you choose, to avail yourself of, to ask any

24   follow-up questions that flow from my questions but needless to

25   say, not to have a do-over of anything that we did yesterday

Gordon - Court                                    5

1  and not to cover anything except as reasonably flows from

2  questions that I asked.

3  EXAMINATION BY THE COURT:

4  Q    Mr. Gordon, now have a seat, please.  Do you still have

5  the exhibit binders in front of you?

6  A    Yes, Your Honor.

7  Q    Do you have a copy of the pretrial order in front of you?

8  A    Is it -- no, unless it's in the binder.

9  Q    Okay. It appears to be a 37 page document.

10        MR. GERON:  May I approach the witness, Your Honor, I

11  have an extra copy.

12        THE COURT:  Yes, you may.  And, by the way, folks, I

13  see that my copy doesn't reflect my ever having signed off on

14  the pretrial order.  You can consider it to have been so

15  ordered by me, as of the beginning of business yesterday.  It

16  certainly is approved.  Okay.

17  Q    Mr. Gordon, would you turn, please, to the pretrial order,

18  Page 3.  And it makes reference to a place at which you

19  resided, of 151 East 85th Street in Manhattan.  Do you see that

20  reference in Paragraph 3?

21  A    Yes, Your Honor.

22  Q    Okay.  When did you live there?

23  A    I lived there very briefly beginning in the fall of 2009,

24  up until about December of 2009.

25  Q    It says that the rent for the premises was $19,000 per

Gordon - Court                                                                6

1  month, do you see that?

2  A    Yes.

3  Q    Who was the lessee of record on that lease?

4  A    Rosedale Cooley Management, Inc.

5  Q    And you told us yesterday you were a guarantor of that

6  obligation?

7  A    Yes, Your Honor.

8  Q    Okay.  Did you ever have to make payments to the landlord

9  under that guarantee?

10 A    No, Your Honor.

11 Q    Did that lease come to an end?

12 A    Well -- yes, Your Honor, it did.

13 Q    How?

14 A    Well, Your Honor, after I filed my bankruptcy petition,

15 many of the financial aspects of my life and my businesses

16 changed in a very detrimental manner and to be able to service

17 that rent became impossible.  So the landlord agreed to,

18 basically, terminate the lease after they found a replacement

19 tenant.

20 Q    How long total did you occupy that apartment?

21 A    About four months, Your Honor.

22 Q    Did you report the rental value of the premises that was

23 paid for by Rosedale Cooley on your income tax?

24 A    Yes, I believe I did.

25 Q    Now, in the summer, just before you filed, you leased

Gordon - Court                                      7

1  property at 15 Jefferys Lane, East Hampton, New York?

2  A    Yes, I did, Your Honor.

3  Q    The total rent for the lease term was $140,000?

4  A    Yes.

5  Q    Now, I'm looking at your statement of financial affairs,

6  Exhibit 26.  Could you open that, please?   Do you have it?

7  A    Yes, I do.

8  Q    And that's the original statement of financial affairs

9  that you filed on -- well, that was filed on your behalf on

10 November 22nd, 2009, am I correct?

11 A    Yes, Your Honor.

12 Q    Okay.  And then you filed an amended statement of

13 financial affairs on February 1st, 2010, which appears as

14 Exhibit 27?

15 A    Yes, Your Honor.

16 Q    And then you filed another amended statement of financial

17 affairs that was referred to as a second amended one, about 10

18 months after that, on December 10, 2010, and that's Exhibit 28,

19 am I correct?

20 A    Yes, Your Honor.

21 Q    Now, as I read Exhibits 26, 27 and 28, in their Paragraph

22 1, income from employment or operation of business, while the

23 statements of financial affairs were changed in other respects,

24 the answer to Paragraph 1, or Question Number 1 was not

25 changed.  Did I read that correctly?

Gordon - Court                                    8

1  A    Yes, Your Honor.

2  Q    Okay.  You showed an income on each of those three

3  statements of financial affairs of approximately $150,000

4  year-to-date from wages, am I correct?

5  A    Yes, Your Honor.

6  Q    And then two lines below that, you showed a negative one

7  sixty-three, seven ninety-nine, stated to be income for wages,

8  COD, interest, business, 2007; net of losses.  Am I correct?

9  A    Yes, Your Honor.

10 Q    How did you afford a rental in East Hampton for $140,000

11 for a summer, on a wage income of $150,000 and a negative

12 income of 163,000, if you take into account the number on the

13 third line?

14 A    Yes.  Your Honor, yesterday, one of the exhibits that we

15 went through was that schedule attached to my tax return and it

16 showed that there were payments made -- there was one line item

17 called income payments.  There was another line item called

18 CITADEL commissions and I think that CITADEL commissions amount

19 was in the neighborhood of 300 and something thousand dollars.

20        The lease payment on this East Hampton residence was

21 paid by CITADEL in lieu of paying me a commission that was due

22 to me.  So, I didn't pay for this lease out of my pocket,

23 necessarily, instead, CITADEL paid the rent out of commissions

24 that were otherwise due to me.

25 Q    Now, we also talked about differences in perspective

Gordon - Court                                                    9

1    between you and your counsel and the trustee and her counsel on

2    CITADEL vehicle payments as to whether they were guarantees on

3    the one-hand or co-debtor obligations on the other.  Do you

4    remember that testimony generally?

5    A    Yes, I do.

6    Q    CITADEL was a construction company?

7    A    Yes.

8    Q    Was this a construction vehicle?

9    A    No, it was a regular vehicle.

10   Q    What kind of a vehicle was it?

11   A    It was a 2008 Range Rover.

12   Q    How was that used in CITADEL's business?

13   A    It was used for -- officers, people at the company had

14   vehicles that the company would provide them and the company

15   would pay for.  It could be used for personal purposes, but

16   also to transport people to meetings, if they were outside the

17   city or to go and visit job sites or in the general operation

18   of the business.

19        CITADEL had work throughout Connecticut, New York,

20   New Jersey, so many people were traveling to a lot of different

21   locations and jurisdictions.

22   Q    How many employees did CITADEL have in 2009?

23   A    In 2009, CITADEL had probably close to 90 employees.  It

24   would change from time-to-time because of union personnel.  So

25   they would hire people from a union and then lay them off after

Gordon - Court                                    10

1  jobs were finished.  But on average it was around 90 employees.

2  Q    To what extent, if any, did you use that vehicle?

3  A    I used the vehicle for personal matters as well as for, if

4  I was traveling on CITADEL business.  So it's hard to say, it

5  would vary from time-to-time.

6  Q    To what extent, if any, did you report the value of the

7  vehicle used for personal business, personal affairs, on your

8  income tax?

9  A    I don't know to the extent, I don't believe that I

10 allocated between the business use of the vehicle or the

11 personal use of the vehicle for purposes of my income tax

12 return.

13          If I may, Your Honor, the vehicle was registered in

14 the name of CITADEL Construction and the loan was in the name

15 of CITADEL Construction.  I was just the guarantor of the

16 obligation.

17 Q    Forgive me, but I don't remember asking this, or getting

18 the answer.  Was the value of your apartment that was paid for

19 by --

20 A    Rosedale.

21 Q    -- Rosedale, reported on your income tax?

22 A    Yes, I believe it was, Your Honor.

23 Q    Now, going back to Exhibits 26, 27 and 28, since

24 yesterday, have you now come to an understanding of what the

25 word COD means on the document that you signed?

Gordon - Court                                        11

1  A    No, I'm sorry, Your Honor, I have not.

2  Q    Did you understand any of the numbers that were shown on

3  the answer to Question Number 1, to take into account an

4  expression we used yesterday, NOLs?

5  A    Yes, Your Honor.  I believe that these lines were to

6  reflect the carryforward losses that were on my tax returns for

7  those periods of time.

8  Q    You showed zero income in 2008, was that because any

9  positive earnings were offset by NOLs?

10  A    That's correct, Your Honor.

11  Q    NOLs stands for net operating losses, doesn't it?

12  A    Yes, it does.

13  Q    What's your understanding as an intelligent layman of what

14  an NOL, or net operating loss, is?

15  A    A net operating loss, in my parlance, would mean that in a

16  given year you might incur a loss that cannot consume all of

17  the income in that year.  And so that loss can then be carried

18  forward into subsequent years to offset against income in those

19  periods.

20  Q    So by way of example, in the year 2008, when you showed a

21  zero income, that was because an NOL representing losses from

22  an earlier year, was allowed to be used for tax purposes as

23  offsetting you 2008 income?

24  A    Yes, Your Honor.

25  Q    Did you consider it necessary or desirable to show how

Gordon - Court                                    12

1   much real income you had before you subtracted losses that

2   weren't incurred in the same year but that had been incurred in

3   earlier years?

4   A    I didn't only because, only because I was producing my

5   income tax returns for those years, which would show the wages

6   and then the corresponding carryforward losses.

7   Q    And in 2008, in fact, you had approximately $267,000 of

8   wage income before the NOLs were taken into account?

9   A    Yeah, that sounds about right.

10  Q    Does that 267 include, or exclude, any in-kind payments?

11  A    It would depend, Your Honor.  On my W-2, if the in-kind

12  payment was coming from the company issuing my W-2, most likely

13  any of those payments would be reflected in the W-2.  But to

14  the extent that it was a non-W-2 in-kind payment, that would

15  show up, I believe, on a line referred to as maybe other income

16  or, I think what's otherwise known, sometimes as 1099 income.

17  Q    When you filed any one of the three statements of

18  financial affairs, Exhibits 26, 27 and 28, did you consider

19  whether it might be appropriate to show your income as anything

20  other than zero for the year 2008?

21  A    I didn't, Your Honor, only because I had produced my tax

22  returns and thought that those would answer those types of

23  questions.

24  Q    Now, the transfer of the $2 million to Allstar took place

25  in October 2008, am I correct?

Gordon - Court                                    13

1  A    Yes, Your Honor.

2  Q    And am I correct that Allstar was formed in or about

3  January of 2008?

4  A    That's correct, Your Honor.

5  Q    So that's roughly nine or ten months earlier.

6  A    Yes.

7  Q    To what extent, if any, had you made transfers to Allstar

8  in amounts of $2 million, or higher, in the ten months from

9  January 2008, at which time Allstar was formed, to October

10 2008?

11 A    Well, Your Honor, Allstar was capitalized with

12 approximately two or $3 million worth of shares of stock at its

13 inception.  And some of that stock was used to secure a credit

14 line for it, with Signature Bank.  But apart from those

15 transfers, I would make -- Allstar made loans in the several

16 hundred thousand dollar increments, up to about the 550,

17 $570,000 loan it made to Curry but, certainly, it hadn't --

18 apart from the original transfer of the shares, it hadn't made

19 multi-million, I hadn't made multi-million dollar transfers to

20 Allstar since then.

21 Q    You said multi-million in your last answer.  In the period

22 from January of 2008 to October 2008, did you make any

23 transfers from yourself to Allstar in excess of a million

24 dollars?

25 A    No, not apart from the initial capitalization.

Gordon - Court                                    14

1  Q     Your counsel, and I'm speaking of your counsel a little

2  loosely, not just Mr. David, but anybody at his firm, prepare

3  Plaintiff's Exhibit 14, which I'll invite you to look at, in or

4  about March of 2011, am I correct?

5  A     Yes, Your Honor.

6  Q     Now, by March 2011, you had been in bankruptcy for roughly

7  a year and a half?

8  A     Yes.

9  Q     To what extent, if any, were any documents generated by

10 anybody, to your knowledge, associating payments made on your

11 behalf to the loan or transfer you made to Allstar of that $2

12 million?  That is between the time it was made in October, 2008

13 and the time your counsel prepared Plaintiff's Exhibit 14 in

14 March of 2011?

15 A     I'm sorry, Your Honor.  Are you --

16 Q     Let me rephrase the question.  I'm going to object to the

17 form of my own question and rephrase.  In the period between

18 October 2008 and March 2011, what, if any, documents came into

19 being that talked about whether payments of expenses on your

20 behalf might be credited to the Allstar transfer?

21 A     I don't believe any, Your Honor.  Most of these -- the

22 understanding of the payments was all verbal or in my own

23 record keeping, in my own head, really.

24 Q     Did you keep any records other than in your own head?

25 A     Well, I had bank statements, Your Honor, from Allstar and

Gordon - Court                                    15

1  I also had obtained bank statements from some of the recipient

2  entities that I had the ability to get bank statements for,

3  such as Wurk, or CITADEL or what have you.  So we had those to

4  kind of track the repayments.

5  Q    Who is the we you used in that last answer?

6  A    Oh, I'm sorry, Your Honor.  It was primarily me and then

7  by virtue of the document production that was made, my counsel.

8  Q    Did you ever see any document that referred to the Allstar

9  $2 million transfer as a loan that came into existence before

10 March 3rd, 2011 or a day or two before that?

11 A    The document I may have seen, Your Honor, there were about

12 four temporary restraining orders that the trustee sought and

13 in connection with those, there were times that I had to

14 provide affidavits.  I also had to, on one occasion, testify

15 before Judge Gonzalez and I believe those documents consisted

16 or reflected that I believed that it was a loan, but that would

17 probably be the extent to which I would have seen those

18 documents.

19 Q    I'm not sure if I followed the answer.  The Judge Gonzalez

20 you're referring to was Bankruptcy Judge Arthur Gonzalez, now

21 retired, from whom I took this case over?

22 A    Yes, Your Honor.

23 Q    Now, are you referring to any documents that came into

24 being before there was litigation between you and the trustee?

25 A    When you say litigation, do you mean this discharge

Gordon - Court                               16

1  proceeding or other litigations?

2  Q    Well, I gather in your last answer, you were talking about

3  a restraining order application that was made?

4  A    Yes, Your Honor.  Right after -- I'm sorry, I don't want

5  to presume to jump ahead, but right after this case was

6  initiated, the trustee moved for a temporary restraining order

7  against Allstar and that caused me to testify before Judge

8  Gonzalez.  I believe Judge Gonzalez denied their request.

9  There were subsequent motions for similar types of relief that

10 require us to file -- I'm sorry, required me to provide

11 affidavits as an officer for Allstar.  And when you asked me

12 about documents, I was referring to those documents in which I

13 made reference to an Allstar loan and Allstar's repayment of

14 that loan.

15 Q    Now, to what extent, if any, were there any documents

16 referring to that transfer as a loan before you got into

17 litigation with the Chapter 7 Trustee?

18 A    There wouldn't -- I don't believe there were any documents

19 other than bank statements that I would have used to keep track

20 of the repayments.

21       Oh, I'm sorry, Your Honor, just to finish up on that.

22 There were -- CITADEL had a general ledger, an accounting

23 software system that would reflect payments that it had

24 received from me as being credited to Wurk and so on and so

25 forth, but that would more along the lines of documenting

Gordon - Court                                          17

1  repayments to me as opposed to the loan itself.

2  Q    At any time before you got into litigation with the

3  trustee, was there any document that came into being showing

4  that the $2 million transfer to Allstar was, in fact, a loan

5  and not a gift or capital contribution to Allstar?

6  A    The only document I could think of, Your Honor, would be a

7  tax return filed by Allstar and documents that Allstar would

8  have filed with Signature Bank to reflect its financial

9  condition.  If it had been a capital contribution or a gift,

10 that would have shown up in those financial statements.

11 Q    Do you know that such documents exist?

12 A    I  know that the tax returns exist.

13 Q    And you produced that to the trustee's counsel?

14 A    Yes, Your Honor.

15 Q    When did that tax return get filed?

16 A    Well, the 2008 tax return would have been filed in early

17 2009.  I think by March of 2009.

18 Q    And on that 2008 income tax return, filed presumably in

19 the spring of 2009, did Allstar reflect any interest expense

20 for the obligation, vis-a-vis, that $2 million, if there was an

21 obligation?

22 A    I don't know.  Allstar reflected interest expense on its

23 tax return.  I don't know if it broke out the interest expense

24 that it incurred from my loan or for the line of credit it had

25 with Signature Bank at the time.  Allstar, Your Honor, did

1  reflect on its tax return loans.  It reflected on its tax

2  returns loans receivable from people it had lent money to and

3  if it had been, you know, if it had been a gift or a capital

4  contribution from me, those would have had to have also been

5  reflected on Allstar's tax returns.

6  Q    Well, loans receivable are balance sheet items, aren't

7  they?

8  A    Yes, but on the corporate tax return, Your Honor, there's

9  a page for the balance sheet and the changes to the balance

10  sheet.

11  Q    All right.  Now, turn back to the pretrial order, if you

12  would, Paragraph 20.

13  A    Yes.

14  Q    It says Allstar does not maintain any physical office

15  space, or own any physical property, furniture, fixtures or

16  telephones, is that correct?

17  A    Yes, Your Honor.

18  Q    And you were the president and sole officer of Allstar?

19  A    Yes, Your Honor.

20  Q    Were you also its sole employee?

21  A    Allstar did not have any employees, Your Honor.

22  Q    Didn't have any telephones, did it have a telephone

23  number?

24  A    No, Your Honor.

25  Q    What physical presence, if any, did it have in the State

Gordon - Cross/Geron                              19

1  of Nevada?

2  A    It had no physical presence other than a mail slot where

3  it could receive mail and correspondence.

4  Q    Who picked up the mail?

5  A    It was forwarded by the firm.

6         THE COURT:  I have no further questions.  You folks

7  didn't object to any questions, but you still have the right to

8  ask follow-ups, starting with you, Mr. Geron, if you wish to

9  avail yourself of that.

10         MR. GERON:  I do. I have about five minutes, Your

11 Honor.

12                    CROSS EXAMINATION

13 BY MR. GERON:

14 Q    Mr. Gordon, you were asked by the Court some questions

15 about the payment of your -- payment for the East Hampton

16 rental of $140,000.  And I believe your answers were that that

17 was paid by CITADEL, is that correct?

18 A    Yes.

19 Q    You were the signer or a signer on CITADEL's bank account,

20 isn't that correct?

21 A    Yes, I was one of several signers.

22 Q    And I believe it was your testimony that you directed

23 CITADEL to pay that payment in lieu of compensation, or I

24 suppose in payment of compensation owed to you, or commissions

25 owed to you?

1           MR. DAVID:  Object to the form.

2           MR. GERON:  I'll rephrase it.

3  Q    The payment made by CITADEL to the landlord on the East

4  Hampton property, that was in payment of commissions owed to

5  you?

6  A    Yes.

7  Q    You testified earlier to the Court's questions with

8  respect to your 2008 tax return.  And as it relates to

9  specifically the line items in response to the statement of

10 financial affairs, Question 1, do you recall that line of

11 questioning?

12 A    Yes.

13 Q    With respect to the 2008 line entry, you listed an amount

14 of zero consistently, on each of the statements of financial

15 affairs, the amended and the second amended, isn't that

16 correct?

17 A    Yes.

18 Q    In fact, isn't it, in fact, the case that you had a tax

19 over payment for the year 2008 of roughly $158,000?

20 A    Can you point me to the exhibit?

21 Q    Exhibit 59, please.

22 A    Just one second.  I have the exhibit, can you point me to

23 that line item?

24 Q    Let's just first identify that is your 2008 federal tax

25 return, 1040?

Gordon - Cross/Geron                    21

1  A    Yes.

2  Q    And you caused this to be -- you signed this and caused

3  this to be filed with the IRS, isn't that correct?

4              MR. DAVID:  Objection, Your Honor.  May I be heard?

5              THE COURT:  Yes.  Mr. Gordon, please leave.

6                        (Witness leaves)

7              MR. DAVID:  Your Honor, respectfully, I do not

8  believe that this line of questioning is oriented towards what

9  you were asking, which was, rather, the reflection of income.

10 What it is oriented towards is the fact that there was

11 originally an allegation in the original complaint and then in

12 the amended complaint which alleged that Mr. Gordon had

13 improperly applied an overpayment to his 2009 taxes.  And we

14 had, if you'll recall, a rather extensive debate and discussion

15 about what evidence was going to be adduced on that, including

16 Mr. Del Virginia having filed a declaration on that and then an

17 agreement modifying his declaration to limit it to that topic,

18 et cetera.

19        Before we came to court, you will recall yesterday at

20 the very, very beginning, there was a stipulation to the effect

21 that that claim was being withdrawn and for that reason it

22 would be unnecessary for Mr. Del Virginia's declaration to be

23 part of the court record and not only that it would be

24 unnecessary to do so, that Mr. Del Virginia would not have to

25 be called to the stand to be examined.  Now, in essence, what

Gordon - Cross/Geron                                    22

1  we're doing is, because you asked a question concerning

2  Question Number 1 on the statement of financial, we're

3  backdooring into the question of whether there was an

4  overpayment and the fact that it was applied to the 2009 tax

5  year and whether that, in fact, was proper.

6          THE COURT:  Yes.  I get it.  Mr. Geron, do you want

7  to respond?

8          MR. GERON:  Your Honor, my stipulation, on behalf of

9  the trustee that we are not looking to bar the debtor's

10  discharge for those actions because he says that it was done on

11  the advice of counsel, still stands.  It stood yesterday

12  morning, it stands today.  The Court's questions with respect

13  to the line item, 2008, raised the question about whether that

14  line item should have been zero or could have been -- the NOL

15  could have been carried forward.  And the sole purpose of my

16  questioning was to try to get to the point that that line item

17  could easily and probably should have been a negative 158,000,

18  much like the NOL was the year before.  That was the sole

19  purpose, I'm not looking to relitigate or reopen the issue

20  about how and whether that was attributable to 2009.  And I was

21  actually not going to ask about that.

22          THE COURT:  All right.  Well, the objection is

23  sustained to the extent that it might be going to relitigating

24  the propriety of the failure to show or deal with the

25  overpayment.  But I'm going to permit it for the limited

Gordon - Cross/Geron                                        23

1  purpose of contentions that the income for the year 2008 should

2  not have been shown as zero or should have been shown as zero

3  only with an explanation.

4          So you can repeat that question, but be careful where

5  you go after that, Mr. Geron because I'm going to hold you to

6  what you just said in terms of your purpose, the use you're

7  going to put it to.

8          MR. GERON:  Very well.

9          MR. DAVID:  Your Honor, may I be prepared?  I'm

10 prepared to stipulate to what Mr. Geron just stated, which was

11 that it could have been shown as a minus $158,000 as opposed to

12 zero.  And that will resolve the whole issue on that.

13         THE COURT:  Will that skin the cat, Mr. Geron?

14         MR. GERON:  Yes, it will, Your Honor.

15         THE COURT:  Okay.  Then bring him back, we'll move

16 onto any further topics or give Mr. David a chance.

17         MR. GERON:  I have just one more topic, Your Honor.

18         THE COURT:  Okay.

19              (Witness enters courtroom)

20 Q   Mr. Gordon, earlier, in response to the Court's questions,

21 you've testified that you had transferred stock, capitalized, I

22 think was the word you used, the Allstar, by transferring stock

23 into Allstar, do you recall that line of questioning?

24 A   Well, I didn't say that I had -- I don't believe I said I

25 transferred, I said Allstar was initially capitalized by the

Gordon - Cross/Geron                                            24

1  transfer of stock.  I didn't -- if I did say that, I misspoke.

2  The transfer of stock to Allstar came by way of the Gordon

3  Family Limited Partnership, the shareholder of Allstar, the 50

4  percent shareholder of Allstar.

5  Q    So you, yourself, did not transfer the stock to Allstar,

6  any stock to Allstar, is that correct?

7  A    No.  The stock came from the partnership.

8         MR. DAVID:  Well, I'm confused because normally when

9  you form a company, the company issues stock, it doesn't get

10  stock.  And people, in exchange for the stock, even at the

11  formation of a corporation, put money in in exchange for the

12  stock.  Mr. Geron, forgive me, but I'm going to interrupt for a

13  clarification on that.

14         MR. GERON:  By all means, Your Honor.

15         THE WITNESS:  Yes.  Your Honor, in lieu of a cash

16  contribution, the partnership made a contribution of publicly

17  traded shares to Allstar which Allstar then used to secure a

18  line of credit.

19         THE COURT:  To what extent, if any, did money from

20  either you or any family trust, or family affiliated company,

21  get put into Allstar in January of 2008?

22         THE WITNESS:  Well, certainly -- there was no money

23  from me personally that went to Allstar, but there was money

24  from the family partnership and trust.

25         THE COURT:  I see.  And in addition to money,

Gordon - Cross/Geron                                    25

1  marketable securities owned by a family trust were put into

2  Allstar?

3            THE WITNESS:   Yes, Your Honor.

4            THE COURT:  And were those publicly traded securities

5  or marketable securities, sold to convert them to cash or were

6  they used merely as collateral?

7            THE WITNESS:  No, Your Honor, they were used a

8  collateral.

9            THE COURT:  Okay.  Back to you, Mr. Geron.  Forgive

10 me.

11 Q   Mr. Gordon, just closing the loop on that one issue.  At

12 least insofar as my own reasoning, the Court had asked you, I

13 believe, whether you, personally, had made any prior loans to

14 Allstar during its existence up to October of 2008, from

15 January to October of 2008, whether you had made any prior

16 loans of $2 million and I believe the answer was no, is that

17 correct?

18 A   Yes, I had never previously made a loan of $2 million to

19 Allstar.

20 Q   And I believe just to clarify that, you had also testified

21 that you had never made any loans of a million dollars or more

22 to Allstar, isn't that correct?

23 A   Right.  There was never a need for me to do so.

24 Q   And, lastly, did you make any loans of 500,000 and above

25 to Allstar at any point during its existence before the Allstar

Gordon - Cross/Geron                                    26

1  loan -- the $2 million loan was made?

2  A     Well, Allstar borrowed --

3  Q     I'm sorry, that's a yes or no answer.

4  A     Well, I'm sorry, then, can you repeat the question?

5  Q     Did you at point make a loan of $500,000 or more,

6  personally, to Allstar?

7  A     No.

8  Q     Did you make any loan personally of $100,000 and above to

9  Allstar, at any point?

10 A     $100,000 I may have, but not 500,000.

11 Q     May have or are you sure?  I mean, I just want --

12 A     I'm not sure sitting here today.  I may have.  It wouldn't

13 have been out of the ordinary for me to have done so on a

14 temporary basis.

15 Q     And you say it wouldn't have been out of the ordinary

16 because you recall several loans being made of 100,00 and

17 above?

18 A     No, I say that because Allstar was making a series of

19 loans at the time and from time-to-time it needed to borrow

20 money to loan out again and if there was a need and I could

21 have met that need, I most certainly would have.  So I do

22 recall making loans to Allstar, but I don't recall their

23 frequency or their specific amount sitting here today.

24 Q     Did you make -- do you recall any of those loans, when it

25 was made and what the amount of those loans would have been? A

**WWW.JJCOURT.COM**

Gordon - Cross/Geron                                    27

1       Not specifically, but as I said, they weren't in the

2   neighborhood of $500,000.

3   Q    So any of those loans would have been less than $500,000.

4   A    Yes.

5   Q    Any of those loans, I just have to pin this down, any of

6   those loans less than $200,000?

7   A    I would seem to recall them being in the neighborhood of

8   75 to $150,000.

9           MR. GERON:   Okay.  I don't have any further

10  questions, Your Honor.

11          THE COURT:   Okay, Mr. David.

12          MR. DAVID:   Your Honor, give me one moment, Your

13  Honor.   I apologize.   No, Your Honor, I don't have any further

14  questions.

15          THE COURT:   All right.   Then Mr. Gordon you're

16  excused and you may remain in the courtroom if you wish.

17          MR. GORDON:   Your Honor, do you want me to leave the

18  binders?

19          THE COURT:   Yes, leave the binders up there.   They

20  may be needed by somebody else.

21          MR. GERON:   Your Honor, I believe the next witness in

22  the sequence of things is Mr. David.   I need, literally a two

23  minute break to go to the bathroom and then come back and then

24  I can start.

25          THE COURT:   Why don't we take ten and I'll see you

David - Cross/Geron                             28

1  folks -- or actually a shade less.  Why don't we resume at

2  eleven o'clock?

3          MR. GERON:  Okay.  And if Mr. Nachamie is here at 11

4  as anticipated, then we'll take Mr. Nachamie first and then

5  I'll -- I think we spoke about this with the Court yesterday.

6          MR. DAVID:  Yes.

7          MR. GERON:  And then take Mr. David.

8          THE COURT:  Okay.  Before we take as much as ten, are

9  you guys comfortable that we'll stay on schedule and be done by

10 noon?

11         MR. GERON:  Yes, Your Honor.  I think Mr. David is --

12 I think Mr. Nachamie, having reviewed my notes, since I think

13 I'm only questioning what's cleanup from the debtor's side, I

14 think I have ten or less minutes with Mr. Nachamie and I have

15 30 minutes with Mr. David.  So I think we'll be on time.

16         THE COURT:  Okay.  Ten minutes then.  We're in

17 recess.

18         COURT CLERK:  All rise.

19                         (Recess)

20         THE COURT:  Have seats, please.  Okay, Mr. Geron.

21         MR. GERON:  Your Honor, the trustee calls Donald M.

22 David to the stand, please.

23         THE COURT:  Okay, Mr. David.

24         COURT CLERK:  Raise your right hand.

25             DONALD DAVID, TRUSTEE'S WITNESS, SWORN

David - Cross/Geron                                    29

1            THE COURT:  Have a seat, please, Mr. David.

2                      CROSS EXAMINATION

3  BY MR. GERON:

4  Q    Good morning, Mr. David.  Mr. David, you, personally, did

5  not --

6            THE COURT:  Oh, please, Mr. Geron.  Is somebody over

7  there going to be objecting if there's an improper question?

8  Will that be you, Mr. Del Virginia?

9            MR. DEL VIRGINIA:  I was just gesturing to Mr.

10  Nachamie that we're on track.

11            THE COURT:  Oh, okay.

12            MR. DEL VIRGINIA:  I guess I will be, Your Honor.

13            THE COURT:  Okay.

14            MR. GERON:  Do we want to just interrupt this and

15  take Mr. Nachamie and then come back to Mr. David?

16            THE COURT:  If he's here now.

17            MR. GERON:  He's just --

18            THE COURT:  I think you guys agreed that that would

19  be desirable.

20            MR. GERON:  He's just walking in so we might as well

21  just -- if it's okay with the Court, I would like to do that.

22            THE COURT:  All right.  Forgive us, Mr. David.  I

23  think there's a consensus that that's how they'd like to do it.

24  All right.  Bring in Mr. Nachamie, please.

25            MR. DAVID:  Your Honor, may I return to the --

1          THE COURT:   Yes, of course.  Mr. Nachamie, welcome.

2    You want to come up and remain standing to be sworn, please.

3          BARTON NACHAMIE, TRUSTEE'S WITNESS, SWORN

4          THE COURT:   Okay.  Have a seat, please, Mr. Nachamie.

5          THE WITNESS:   Thank you.

6                    CROSS EXAMINATION

7    BY MR. GERON:

8    Q    Mr. Nachamie, good morning.  My name is Yann Geron.  I

9    represent the trustee in this case.  Thank you for coming in.

10   I believe, I just want to remind you that your direct testimony

11   was entered in the court record by an affidavit that you signed

12   in or about November of 2012.  I can't quite make out the date.

13   Do you recall that affidavit, sir?

14   A    Yes, I do. I don't recall the date, but I recall the

15   affidavit.

16   Q    Okay.  So this is really by nature of a brief cross

17   examination.   Your affidavit was submitted in connection with

18   a retention letter that your firm entered into on or about

19   October 14th, 2009.  Do you recall that retention letter,

20   retainer letter?

21   A    Yes.

22   Q    Okay.  Let me just get it in front of you, sir.  It's

23   Exhibit 29 in the binder that has those exhibits -- there's

24   should be two binders.  May I approach the witness so I can

25   help the witness, Your Honor?

1          THE COURT:  Yes.

2  A    I don't see -- 29?

3  Q    Sir, do you have Exhibit 29 in front of you?

4  A    Yes, I do.

5  Q    And that's an engagement letter signed by you on behalf of

6  your firm, Todtman, Nachamie, Spizz and Johns?

7  A    It appears to be electronically signed, yes.

8  Q    It was generated under your authority, sir?

9  A    Yes, it was.

10  Q    And it was transmitted to Dan Gordon by e-mail?

11  A    I believe that's correct.

12  Q    Sir, I just want to make sure to confirm, this retainer

13  letter is address to Mr. Gordon personally, is it not?

14  A    Yes, it is.

15  Q    I draw your attention to each of the headers, that is the

16  top of the second page, third page and so on.  It addresses Mr.

17  Daniel Gordon personally, does it not?

18  A    Yes, it does.

19  Q    On the middle of the page of the second page, there's a

20  definition of client, sir, do you see that?  It says throughout

21  this letter I will be referring to you as client.  Do you see

22  that sentence?  It's in the middle of the second page.  Fifth

23  paragraph, sort of independent paragraph down.  It says just --

24  A    Yes, I do, I see it.

25  Q    And so you is defined, in the letter, is Daniel Gordon, is

Nachamie - Cross/Geron                                          32

1  that correct?

2  A    That's what it says.

3         MR. DAVID:  Objection.

4  Q    And Daniel Gordon -- sorry.

5         MR. DAVID:  I objected but I'll withdraw the

6  objection, Your Honor.  You have an answer already.

7         THE COURT:  I couldn't hear you, Mr. David.

8  Q    And Daniel Gordon is the client in the letter, isn't that

9  correct?

10        MR. DAVID:  That's my fault, Your Honor.  I said I

11 objected but the witness had already answered so I'll withdraw

12 the objection.

13        THE COURT:  Okay.

14 Q    And Daniel Gordon is the client in the letter, isn't that

15 correct?

16        MR. DAVID:  Objection, Your Honor.

17        THE COURT:  I'm going to sustain that if it's

18 intended to be based on me drawing a conclusion as to an

19 ultimate fact.  Is that the basis, Mr. David?

20        MR. DAVID:  Yes, it is, Your Honor.

21        THE COURT:  All right.  I understand the factual

22 premises for your argument, Mr. Geron but I will make the

23 ultimate legal conclusion.

24        MR. GERON:  Very well, Your Honor, thank you.

25 Q    Mr. Nachamie, at the end of the letter, just confirming

1  that was executed -- that was signed to your knowledge, by

2  Daniel Gordon, isn't that correct?

3  A    It appears to be signed by Daniel Gordon.

4  Q    And, lastly, sir, jut in connection with what is Exhibit C

5  to your affidavit, it is an exchange of e-mails between you and

6  Mr. Gordon, isn't that right?  That is the last page, sir, I

7  think it's the last page of the affidavit.  Oh, I'm sorry, I

8  don't know if you have that.  It should be in that exhibit, it

9  should be the last page of that exhibit.

10  A    If it's an e-mail -- what I see here as the last page is

11  an e-mail sent October 15th, 2009.

12  Q    Correct, sir, and that's the exhibit from -- I'm sorry,

13  that's an e-mail from Dan Gordon to you asking for a

14  modification in the letter.  That is the sole e-mail that you

15  received from -- that you have received, or your firm has

16  received from Dan Gordon in connection with the modification of

17  that retainer letter?

18  A    As far as I know.

19  Q    And you confirmed that that modification was acceptable to

20  you and your firm, is that correct?

21  A    As to -- yes, I did.

22          MR. GERON:  Your Honor, that's all I needed to ask.

23  I have no further questions of Mr. Nachamie.

24          THE COURT:  Okay.  Mr. David.

25                      CROSS EXAMINATION

Nachamie - Cross/David / Recross/Geron                    34

1  BY MR. DAVID:

2  Q    Mr. Nachamie, please take a look at that e-mail which was

3  referred to.  When you received that e-mail what was your

4  understanding of that e-mail?

5  A    This was either before or after a conversation I had with

6  Mr. Gordon in preparation for a meeting I was going to have the

7  following couple of days.  That, in fact, the owner -- that he

8  was not the owner of McCann (phonetic), it was the Family

9  Limited Partnership was the owner and that would be substituted

10  as the client.

11  Q    I'm sorry, what would be substituted as the client?

12  A    The Family Limited Partnership since Dan Gordon was not an

13  owner of the company.

14  Q    So, sir, is it fair to say that you had the understanding

15  as a result of that e-mail that Mr. Gordon was not, in fact,

16  individually the client you were representing on that matter?

17  A    That's correct.

18            MR. DAVID:  No further questions.

19            THE COURT:  All right.  Mr. Geron?

20                      RECROSS EXAMINATION

21  BY MR. GERON:

22  Q    Mr. Nachamie, did you issue another retainer letter to Mr.

23  Gordon?

24  A    No, I do not believe we did.

25  Q    Did McCann Construction pay your retainer?

David - Cont'd Direct/Geron                              35

1   A    I have no present recollection as to who paid it.

2           MR. GERON:  One second, Your Honor.  I have no

3   further questions, Your Honor.

4           THE COURT:  Okay, Mr. David, any follow-up?

5           MR. DAVID:  No follow-up, Your Honor.

6           THE COURT:  All right.  Thank you, Mr. Nachamie.  You

7   needn't stay unless you choose to.

8           THE WITNESS:  Thank you very much, Your Honor.

9           THE COURT:  Have a good day.

10          MR. GERON:  The trustee recalls Mr. David to the

11  stand.

12          THE COURT:  Okay, Mr. David.  No need to be resworn.

13          MR. DAVID:  Thank you, Your Honor.

14                  CONTINUED CROSS EXAMINATION

15  BY MR. GERON:

16  Q    Mr. David, you recall all the testimony yesterday and

17  today in connection with the alleged loan repayment by Allstar

18  to Mr. Gordon, do you not?

19  A    I'm not certain that I recall it all.  I believe I recall

20  the substance of virtually all of it.

21  Q    Okay.  You did not personally manage Allstar at any point

22  did you?

23  A    No.

24  Q    You did not direct, control or witness any of the

25  transactions that are alleged to constitute loan repayments by

David - Cont'd Cross/Geron                                    36

1  Allstar to Mr. Gordon, did you?

2  A    May I look at Exhibit 14 and 13?

3  Q    By all means.  Take a look at Exhibit 13, stipulated

4  Exhibit 13 and 14.  And let me know, please, if there are any

5  of those transactions that you specifically managed, supervised

6  or controlled.

7  A    Well, I can answer the question as it was just phrased.  I

8  did not manage or control any of these transactions. I did not

9  manage or control Allstar or CITADEL or Wurk.

10 Q    So as you sit here today, you are not able to testify as a

11 matter of fact, that Allstar actually repaid its loan to Dan

12 Gordon, can you?

13 A    I can testify as to certain --

14 Q    I'm sorry, that's kind of a yes or no answer.  Can you

15 answer today whether as a matter of fact known to you, that you

16 witnessed, the loan from Allstar was repaid to Dan Gordon?

17 A    I cannot answer that question yes or no.

18 Q    Okay.  Now, it's -- by all means explain.

19 A    All right.  I, in fact, do know some of these transactions

20 and was aware of some of these transactions that comprise

21 Exhibit Number 13.  Some of them I do not know of.

22 Q    Which transaction are you aware of?

23 A    I am aware of the transactions involving CITADEL

24 Construction and Wurk.  I was also aware of the relationship

25 between Wurk and Allstar because I represented Wurk, actually,

David - Cont'd Cross/Geron                          37

1  technically, one of my people who work for me, was representing

2  Wurk and, therefore, I know about some of these payments.

3  Q    Mr. David, what were the loan terms between Mr. Gordon and

4  Allstar?

5  A    I don't know anything about the loan terms, I only know

6  that certain payments were made and I was told they were in

7  return for the repayment of a loan made by Mr. Gordon well

8  before we got into this whole thing.

9  Q    Mr. David, what was the interest rate that Mr. Gordon was

10 charging Allstar?

11 A    Again, I can't tell you, I wasn't familiar with that.

12 Q    When was the loan due and payable by Allstar to Mr.

13 Gordon?

14 A    My understanding was, that it was a demand loan, at least

15 that's what I was told.

16 Q    You've never seen any documents evidencing a loan from Mr.

17 David (sic) to Allstar, isn't that correct?

18 A    Mr. David didn't make a loan --

19 Q    I'm sorry, from Mr. Gordon to Allstar.

20 A    I believe, actually, I did at one point see something

21 involving Allstar's books and records that did evidence a loan.

22 I don't recall the specifics of it at this point.

23 Q    What was --

24 A    It was an entry and it had to do with the dispute with

25 Signature Bank.

David - Cont'd Cross/Geron                    38

1  Q    So it's your testimony that there is some entry in the

2  Allstar books and records that arose in connection with the

3  Signature Bank, that evidences a loan from Dan Gordon to

4  Allstar?

5  A    No.  What I said was, what I said, which was, I remember

6  in connection with the dispute with Signature Bank that I saw

7  that there was a document which I hd received at one point from

8  Allstar, while I was dealing with Signature Bank, that

9  indicated that a loan had been made by Dan Gordon.  I can --

10 if you want I can tell you more about the circumstances, but

11 that's the best answer I can give to the question you've asked

12 so far.

13 Q    I'm trying to pin down the firsthand knowledge that you

14 have of the Allstar loan and as I understand from your

15 testimony, you do not have firsthand knowledge, that is, you

16 were not there at the item of the generation of the loan, is

17 that correct?

18 A    Correct.

19 Q    And you were not there in the actual transactions, you

20 were not controlling or witnessing the actual transactions that

21 are alleged to represent the repayment of that loan, am I

22 correct in that as well?

23 A    You're incorrect insofar as witness.

24 Q    So as counsel to the debtor, or counsel to Wurk, or any of

25 those entities, you witnessed some of those transactions?

David - Cont'd Cross/Geron                          39

1  A    As counsel to Wurk, I was aware and witnessed a payment

2  and actually more than one payment, that was made to CITADEL

3  who I was also counsel to.

4  Q    And -- sorry.

5  A    And in that connection, was apprized that it was part of

6  the process of repaying money that Dan Gordon had lent.

7  Q    Who apprized you of that?

8  A    Two people apprized me of that.  David Stack and Dan

9  Gordon.  And, actually, Kimberly Matera (phonetic) may have

10 mentioned it to me also.  I'm sorry.

11 Q    When was that conversation had with Ms. Matera?  Mind you,

12 I just want to remind you that when we talk about this, I will

13 now -- you're opening -- these are your clients, you're telling

14 me about your clients' communications.

15 A    Sir, I'm answering questions, I'm not the attorney that is

16 sitting at the table right now, to make an objection.  I have

17 no choice but to answer your questions without an objection.

18        THE COURT:  Gentlemen, while you're arguing about

19 this, I am having -- having been brought up believe that the

20 hearsay rule is applicable in federal courts, you're asking him

21 for one question after another, that elicits hearsay, Mr.

22 Geron.  I'm puzzled by that.

23        MR. GERON:  Your Honor, I'm actually surprised by the

24 answers themselves.  Maybe I should just go into a different

25 line and see whether we can tie this together.

David - Cont'd Cross/Geron                               40

1  Q    Mr. David, you have in front of you Exhibits 13 and 14.

2  Let's start with Exhibit 13, please.

3  A    Yes, sir.

4  Q    This document was prepared by you in order to provide the

5  trustee and her counsel with a summary of the transactions

6  which you allege or your client alleges represent the repayment

7  of the $2 million loan by Dan Gordon to Allstar?

8  A    May I proffer only a minor correction to that, to give you

9  a correct answer?

10 Q    Sure.

11 A    No, it was not.  It was prepared under my direction by my

12 then assistant Denise Sidler (phonetic).

13 Q    So you directed your assistant to prepare this document?

14 A    I directed my assistant to prepare a schedule of payments

15 from documents that we had that we understood to be payments

16 made by Allstar and I gave her some direction as to some of the

17 transactions that I knew about.

18 Q    You reviewed this document before it was produced to us?

19 A    I did.  And I -- I, obviously, made a mistake.

20 Q    I'm sorry, hold on.  Please, let me just ask my questions

21 then you can testify.

22 A    Certainly, please.

23 Q    Your client, Dan Gordon, did not prepare that document, is

24 that correct?

25 A    That is correct.

David - Cont'd Cross/Geron                    41

1  Q    And your that correct?

2  A    My hesitation, if I could is, I don't remember whether at

3  that time I was representing Mr. Gordon or Mr. Allstar (sic). I

4  initially did not represent Mr. Gordon in these proceedings.

5  That's my only hesitation.

6  Q    And the documents that accompany that schedule, in 13, are

7  te backups to the transactions that are listed on Exhibit 13?

8  A    That was my understanding.

9  Q    Please take a look at the checks, or wires, the various

10 backup documents for a moment.

11 A    Is there one you'd like to direct my attention to?

12 Q    Any of them, tell me which ones of them have a notation

13 that says loan repayment to Dan Gordon or something to that

14 effect.

15 A    I would presume that probably none of them do.

16 Q    Will you confirm that for me on the stand today, please?

17 A    Yes, certainly.  Just to be clear, some of these I'm not

18 capable of seeing, I apologize.  My eyesight is just not as

19 good as it used to be.  But to the best of what I can see,

20 there is nothing that expressly says that any of these are for

21 loan repayment or any other purpose.

22 Q    And yet -- well, you testified that you did not have Dan

23 Gordon -- in your direct testimony you testified that you did

24 not have Dan Gordon review this document before you sent it to

25 the trustee, is that correct?

David - Cont'd Cross/Geron                           42

1 A    That is correct.  I had sent it to Mr. Gordon by e-mail

2 and said that if I didn't get a response I would be sending it

3 on.  I wasn't aware he was not in the country at the time and

4 when I didn't get a response, I gave it to Andrez saying that

5 if there were any errors I'd correct them.  Two days later Mr.

6 Gordon did respond and I did correct it.

7 Q    Take a look, please, at the e-mail of your transmittal to

8 Andrez Carberry, whom I will stipulate to the Court was

9 formerly an colleague of mine at Fox Rothschild.  He's no

10 longer at Fox Rothschild but was dealing as counsel in this

11 matter.  Take a look if you will, please, at that exhibit to

12 your affidavit.

13 A    Which one?

14 Q    It is Exhibit 1 to your affidavit.  Do you have that?

15 A    I don't have my affidavit here.  Can you give me an

16 exhibit number?

17 Q    Exhibit 13, sir.

18 A    That's not --

19        THE COURT:  I think his affidavit is 15, isn't it?

20        UNIDENTIFIED ATTORNEY:  I'm sorry, I was talking

21 about the e-mail.

22        MR. GERON:  I'm sorry, Exhibit 15 has the -- hold on.

23 Exhibit 15 and it's Bates Number ST-00121.

24 A    Yes, I have that.  That is, I believe, the same as is the

25 cover e-mail for Exhibit 13.

David - Cont'd Cross/Geron                    43

1    Q    Sir, when you read that statement, the transmittal

2    statement to Mr. Carberry, where in that statement does it say

3    that it's subject to your client's review?

4    A    I'm just reading it, please understand.  It does not

5    specifically say that it is, sir.

6    Q    Does it say anything about these constituting some, but

7    not all of the loan payments?

8    A    Well, as far as I'm concerned, sir, I believe that the

9    first three sentences of the document make that clear.  And

10   certainly in the course of the conversations I had with Mr.

11   Carberry, I made that clear.

12   Q    Well, the question was very specific.  Does it say

13   anywhere in here that this represents some, but not all of the

14   transactions?

15   A    If you, sir, I'm telling you, I believe the first three

16   sentences make that clear.  And if I might note, I would say

17   that the sentence right after that certainly makes it clear.

18   Q    So your position is that that language tells us that there

19   are additional transactions.

20   A    It specifically says that when combined with the

21   previously identified documents which we provided the

22   applicable Bates numbers, this represents the production or

23   identification of all applicable documents.  Yes.

24   Q    Okay.

25   A    I refer to other documents that I had produced previously.

David - Cont'd Cross/Geron                        44

1  Q    Understood.   Take a look, please, at Exhibit 14.

2  A    Yes, sir.

3  Q    This is the corrected schedule that you prepared that

4  represents the Allstar loan repayment, isn't that correct?

5  Your firm prepared.

6  A    Yes.

7  Q    Now, you allege in your direct testimony that you sent the

8  original schedule, that is Exhibit 13, to your client and then

9  he promptly contacted you and informed you that a few of the

10 entries on the schedule should not have been listed, isn't that

11 correct?

12 A    Yes.

13 Q    And, specifically, Mr. Gordon recognized that the Amex

14 payments should not have been on that schedule, isn't that

15 correct?

16 A    Yes.

17 Q    And so, he instructed you to remove the Amex payments from

18 that schedule, isn't that correct?

19 A    No.

20 Q    He did not instruct you to remove the Amex payments?

21 A    No.

22 Q    You removed the Amex payments at whose instruction?

23 A    It was a natural consequence of being told that they were,

24 in fact, not repayments and, therefore, as an officer of the

25 court, and also because as you know, we've been pretty cordial

David - Cont'd Cross/Geron                                    45

1  with each other, I felt that it was the appropriate thing to

2  do, was to immediately advise Mr. Carberry of such and correct

3  it.

4  Q    So this was your judgment call about removing the Amex

5  line entries, this was not Mr. Gordon's instruction to you?

6  A    He didn't instruct me to do it because he didn't have a

7  role in preparing this.  He told me I made a mistake.

8  Q    I just want to make sure that we understand today that, is

9  it your testimony today that these transactions in Exhibit 14

10 represents, actually represents loan repayments by Allstar to

11 Dan Gordon?  This is your personal testimony today.

12 A    No, sir, that is not what I've said.

13 Q    So when you removed the Amex payments, the remaining

14 payments on there, do they now represent, to your knowledge,

15 personally, the repayment of loans by Allstar to Dan Gordon?

16 A    Some of them I can say that definitely.  Some of them I

17 cannot personally and definitively state.

18 Q    As to Exhibit 14, sir, did Dan Gordon review that document

19 before it was sent to Mr. Carberry?

20 A    I don't truly recall, I'm sorry.  I would think that I

21 sent it to him but I cannot confirm that.  I'm sorry.  It would

22 make sense that I would send it to him, having made a mistake

23 once.

24 Q    Did he make any further comments with respect to mistakes

25 that you might have made with respect to that schedule at any

David - Cont'd Cross/Geron                              46

1  point?

2  A    Yes.

3  Q    When did he make those comments and what was the substance

4  of those comments?

5       MR. DEL VIRGINIA:  Objection, Your Honor.

6  A    I mean, I --

7       THE COURT:  Just a minute, I've got a pending

8  objection, Mr. David.  I'm sustaining that objection on

9  attorney/client privilege grounds.  To the extent that there

10 were any authorizations to communicate to the outside world,

11 they're not privileged.  To the extent that Mr. David reports

12 anything to his client that he heard from the outside world,

13 that's not privileged.  That's the case of J.P. Foley & Company

14 v. Vanderbilt.

15      But to the extent they have internal discussions

16 about the best way to present Mr. Gordon's contentions to the

17 trustee, that's privileged.

18 Q    Let me just ask it this way then.  Did you ever correct

19 Schedule 14?  Did you provide Mr. Carberry or my firm any

20 corrections to Schedule 14?

21 A    Not as corrections.

22 Q    As? Is there another word?

23 A    Additions.

24 Q    So you've provided a schedule with additions to Schedule

25 14?

David - Cont'd Cross/Geron                    47

1  A    No.

2  Q    What additional additions did you add to Schedule 14?

3  A    I had indicated to Mr. Carberry that this was not all of

4  the transactions that comprised repayments.  And -- which was

5  rather obvious given the fact that if you notice it doesn't

6  equal $2 million exactly.  I indicated to him that there were a

7  number of other transactions.  He asked me what some of them

8  were.  If you remember, Mr. Geron, he came to my office.  He

9  sat with me and he and I searched through a database of

10  documents.

11        MR. GERON:  Move to strike, that's non-responsive,

12  Your Honor.

13        THE COURT:  I'm going to deny that.  I'm going to let

14  both of you keep going.  I've got to tell you that I have a

15  minimal basis, if any, for relying on practically anything Mr.

16  David said either supporting his client or supporting your

17  perception, Mr. Geron because everything he knows is hearsay.

18  Every source of his information is hearsay.  You established

19  that by foundation questions you asked a long time ago.

20        MR. GERON:  Then, Your Honor, I really have just one

21  more area to explore and it will be five minutes, I think.

22        THE COURT:  Okay.

23  Q    Mr. David, you testified earlier that your client -- I'm

24  sorry, actually two more areas.  One very brief one and that's

25  just a foundational question, I think.  Mr. David, you and your

David - Cont'd Cross/Geron                          48

1 firm have represented Dan Gordon and several of his entities,

2 isn't that correct?  You or your firm.

3 A    At what time?

4 Q    At any time.

5 A    At any time, the answer is yes.

6 Q    What entities of Mr. Gordon have you or your firm

7 represented?

8 A    Wurk Environment is the only entity of Mr. Gordon's that

9 I've represented but that's probably an incomplete answer.  I'm

10 just telling you that.  I don't want to deceive you.

11 Q    You did not represent Allstar?

12 A    I did, but Allstar is not Mr. Gordon's entity.

13 Q    An entity -- how about this.  Any insider entities?  Have

14 you represented any insider entities to Mr. Gordon, in addition

15 to Mr. Gordon himself?

16 A    Yes, I have.  I've represented Wurk, which I believe would

17 be an insider entity and I've represented Allstar which I

18 believe, understanding that I'm not a bankruptcy lawyer, but I

19 believe that to be an insider entity.

20 Q    And in both of those instances, your primary contact was

21 Mr. Gordon, in both of those insider entities, your primary

22 contact with Mr. Gordon?

23 A    Yes.

24 Q    With respect to Exhibit 14, this is the corrected

25 schedule.  I think you testified earlier that Mr. Gordon

David - Cont'd Cross/Geron                                        49

1  pointed out that Exhibit 13 was in error, that the Amex

2  transfers needed to be corrected and that's, in fact, what you

3  did, isn't that correct?

4  A    Yes.

5  Q    And what you stated in your affidavit is that, and I'll

6  quote it, that is all there is to it.  There was nothing

7  devious or planned or plotted by Mr. Gordon or anyone else, it

8  was simply a mistake of improperly believing that the payments

9  by Allstar reflected payments of the loan rather than

10 attributable to Mr. Gordon.  The error was mine not Mr.

11 Gordon's or anyone else's.  That's your statement, isn't that

12 correct?

13 A    Yes.

14 Q    Look at Exhibit 13, please.  And how many line item

15 transactions are there, please?

16 A    If you'll tell me what they are, I'll agree.

17 Q    Okay.  Nineteen

18 A    Okay, I'll agree.

19 Q    How many of those line items are Amex transactions?  I'll

20 tell you and you'll hopefully agree.  Three.

21 A    I only see two, give me one moment.  Three, correct.

22 Q    Look at Exhibit 14, please.  How many line items are

23 there?

24 A    I believe yesterday you said there were 20.

25 Q    Right.  So I'm just following my math for a moment.  You

David - Redirect/Del Virginia                          50

1  started with 19 on Exhibit 13, you presumably took three out

2  for Amex and wind up with 20 transactions sent on Exhibit 14,

3  is that correct?  Am I at least getting those numbers correct?

4  A    The numbers are correct.  The conclusion is not.

5  Q    I'm not making any conclusions, I'm just simply noting

6  that the transaction on Exhibit 13 are less than the

7  transactions on Exhibit 14 but do not reflect the Amex

8  transaction, is that correct?

9  A    That is correct.

10         MR. GERON:  Okay.  I have no further questions of Mr

11 David.

12         THE COURT:  Okay.  Mr. Del Virginia, any redirect?

13         MR. DEL VIRGINIA:  Your Honor, briefly.

14                    REDIRECT EXAMINATION

15 BY MR. DEL VIRGINIA:

16 Q    Mr. David, you testified that you represented, or you

17 and/or your firm represented CITADEL Construction Corp., is

18 that correct?

19 A    Yes.

20 Q    Did there come a time when you dealt with any individuals

21 at CITADEL?

22 A    Yes.

23 Q    And who were those individuals?

24 A    Initially, it was Ed Romero and then it was Ed Romero and

25 David Stack and ultimately after one of the projects went bad,

David - Redirect/Del Virginia                    51

1 Dan Gordon came in as their consultant.

2 Q    As to Messrs. Stack and Romero, did you have an

3 understanding as to their position at CITADEL?

4 A    Yes.

5 Q    And what was that understanding?

6         MR. GERON:  Objection.  Calls for hearsay, Your

7 Honor.

8         THE COURT:  I'm going to sustain it, except insofar

9 as his understanding might have made a difference.  But that's

10 mainly a sustain, Mr. Del Virginia, unless you can give me an

11 offer of proof that the next question you're going to ask is

12 his acting based on his understanding of who they said they

13 were, I'm going to have to sustain further objections.  Putting

14 it a different way, if you're asking him what role they had or

15 what their positions were and the only source of his

16 understanding that is what they told him, that's hearsay.

17        MR. DEL VIRGINIA:  Understood, Your Honor.

18 Q    Did you attend any meetings with Messrs. Romero and Stack?

19 A    Yes.

20 Q    And did you have an understanding as to who was making the

21 operational decisions at CITADEL?

22 A    Yes.

23 Q    And what was your understanding?

24 A    My understanding as it related to the transactions that I

25 was involved in, was that Mr. Stack was the person to whom I

1  reported and who made the decisions and he signed the documents

2  effectuating those decisions.

3          MR. DEL VIRGINIA:  Thank you, Mr. David, no more

4  questions.

5          THE COURT:  All right.  Mr Geron, any follow-up

6  limited to what Mr. Del Virginia asked?

7          MR. GERON:  Nothing, Your Honor.

8          THE COURT:  All right.  Mr. David, you're released as

9  a witness and you can come on back to the counsel table.  To

10  what extent do we have any more live witnesses in this trial?

11          MR. GERON:  None that I know of, Your Honor, unless

12  Mr. David, there's something else on the list.  No, I think

13  we're done.  I think the parties did confer in connection with

14  a schedule and I can report to the Court about what that

15  conference resulted.

16          THE COURT:  Okay, go ahead, please.

17          MR. GERON:  This was putting my delay coming to court

18  into good use.  The parties conferred and we, subject to the

19  Court's approval, we agree that the post-trial submissions,

20  that is the briefs, would be put in Your Honor's hands on April

21  30th, if that's acceptable to the Court.  That would give us

22  time to get the transcripts without expedited and to file the

23  submissions.  We did not discuss a specific time, but I would

24  submit that because these are simultaneous, it would be helpful

25  to have a specific time and, therefore, perhaps, five o'clock

1  on the 30th.

2          What we did not yet clear because we need to speak

3  with Ms. Blum about that, is an argument date, sometime about

4  two or three weeks following that, subject to the Court's

5  availability, of course.

6          THE COURT:  That's agreeable in principle.  I'm going

7  to have to talk to Ms. Blum and let you guys know the exact

8  date.  We'll schedule it for date when none of you has any

9  known conflicts.

10          MR. GERON:  Okay.  I think that's the close on our

11  side, Your Honor.

12          THE COURT:  Okay, Mr. David did he get your deal

13  correct?

14          MR. DAVID:  Yes, Your Honor.

15          THE COURT:  Okay.  All right.  Post-trial briefs due

16  electronically, must be posted on ECF by five o'clock on the

17  30th.  I also need hard copies of whatever you file within 24

18  hours thereafter.  And I also want e-mailed to my chambers any

19  submissions you do in a commonly used word-processing format,

20  such as Microsoft Word or Word Perfect.

21          MR. DAVID:  Your Honor, would the Court like me to

22  formally open and close my part of this case?

23          THE COURT:  If you want to do it formally --

24          MR. DAVID:  I don't want to, I'm just --

25          THE COURT:  -- you're free to do that.  It's probably

54

1 a good practice to tie off shoelaces, kind of like you

2 suggested.  Mr. Geron, am I correct that the trustee now rests?

3 Have all of the documents been offered into evidence?

4         MR. GERON:  No.

5         THE COURT:  You said you intended to do that at the

6 --

7         MR. GERON:  No, that was -- that's a shoelace that I

8 forgot to tie, Your Honor.  I move for the admission of the

9 documents that were marked as stipulated exhibits and inside

10 the binders that are in the first and second binder, I move

11 their admission.

12        THE COURT:  Okay.  Now, to what extent -- are there

13 any where you didn't stipulate to admissibility and I have to

14 rule on evidentiary objections to any of the exhibits?

15        MR. GERON:  There are none on the trustee's side,

16 Your Honor.

17        THE COURT:  Okay.  Now, am I correct that the trustee

18 rests?

19        MR. GERON:  Yes, Your Honor.

20        THE COURT:  Okay.  Now, Mr. David, I had understood

21 that Mr. Nachamie was your witness.  I guess you had a hybrid

22 capacity.  Am I correct that you have no further witnesses?

23        MR. DAVID:  Your Honor, I have no further witnesses,

24 but, respectfully, to be clear, I did not have a hybrid

25 capacity.  My affidavit was submitted as part of an agreement

1   with the trustee who asked me to submit an affidavit explaining

2   what happened.  It was not indicated that that would be put to

3   use as an affidavit in lieu of direct and I did not object to

4   it being included in the exhibits if it was included.  I'm not

5   sure what -- I didn't object to it being included but it is --

6   I did not appear either on direct or cross on our case, I only

7   appeared on the trustee's case.

8           So my only witness, as such, on my case is Mr.

9   Nachamie.  And he testified on direct by means of affidavit and

10  was cross examined.  Quite obviously, I did direct -- I did

11  cross as of direct of Mr. Gordon and I would ask the Court as

12  part of my case to consider the totality of Mr. Gordon's

13  testimony, although I did not feel it was necessary or

14  appropriate to recall him to the stand as a witness on direct.

15          THE COURT:  Of course.  That's the way we regularly

16  do adverse directs.  So, that's fine.

17          MR. DAVID:  And, therefore, Your Honor, I would like

18  to rest my defense at this time.

19          THE COURT:  Fair enough.  Okay.  Then do we have any

20  further -- oh, did you have any additional exhibits that you

21  were introducing that haven't already been stipulated to be in?

22          MR. DAVID:  Yes, Your Honor, if I might.  I would ask

23  the Court to take judicial notice of Exhibit Number 3 in the

24  table of defendant's proposed additional exhibits.  To be clear

25  for the purposes of the record, Exhibit Number 1 was

1  unnecessary as a result of this Court's ruling on the motion in

2  limine.   Exhibit Number 2, there is a potential problem with.

3  May I have a moment to confer with Mr. Geron?

4          THE COURT:  Yes.

5          MR. GERON:  Your Honor, can I have a quick moment

6  also with Mr. David?

7          THE COURT:  Yes.

8          MR. DAVID:  Okay.  Your Honor, if I may, based upon

9  my conversations with Mr. Geron, I will not be asking that the

10  Court mark any additional exhibits.

11          THE COURT:  Not even Exhibit 3?

12          MR. DAVID:  Not even Exhibit 3, Your Honor.  Mr.

13  Geron has indicated to me that they have dropped that claim

14  and, therefore, I don't believe that it's appropriate or

15  necessary to clutter the record.

16          THE COURT:  Okay.  Then are we finished, folks?

17          MR. GERON:  Yes, Your Honor.  Thank you very much.

18          THE COURT:  All right.

19                    *  *  *  *  *

20

21

22

23

24

25

**C E R T I F I C A T I O N**

       I, ELAINE HOWELL, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter and to the best of my ability.

*Elaine Howell*
_____

ELAINE HOWELL

J&J COURT TRANSCRIBERS, INC.    DATE: March 20, 2013