FOX ROTHSCHILD LLP
Yann Geron
Nicole N. Santucci (Of Counsel)
Barri A. Frankfurter
100 Park Avenue, Suite 1500
New York, New York 10017
(212) 878-7900

*Special Litigation Counsel to Angela G. Tese-Milner,*
  *Chapter 7 Trustee*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

| | | |
|---|---|---|
| In re | : | Chapter 7 |
| | : | |
| DANIEL GORDON, | : | Case No. 09-16230 (REG) |
| | : | |
| Debtor. | : | |

---------------------------------------------------------x

| | | |
|---|---|---|
| ANGELA G. TESE-MILNER, TRUSTEE | : | |
| OF THE ESTATE OF DANIEL GORDON, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| -against- | : | Adv. Pro. No. 10-03767 (REG) |
| | : | |
| DANIEL GORDON, | : | |
| | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------x

**POST-TRIAL BRIEF OF CHAPTER 7 TRUSTEE, ANGELA G. TESE-MILNER, IN SUPPORT OF HER COMPLAINT SEEKING TO DENY THE DISCHARGE OF DEBTOR, DANIEL GORDON, PURSUANT TO <u>SECTION 727 OF THE BANKRUPTCY CODE</u>**

## <u>TABLE OF CONTENTS</u>

Preliminary Statement.................................................................................................1

Procedural History .....................................................................................................3

Facts ...........................................................................................................................3

   I.   FACTUAL BACKGROUND...............................................................................3

   II.   ASSETS WHICH THE DEBTOR CONCEALED ...............................................7

        A.   <u>$2 Million AllStar Receivable</u> ...............................................................7

        B.   <u>$15,000 Wurk Times Square Receivable</u> ...............................................8

        C.   <u>$1 Million Stack Receivable</u> ..................................................................9

   III.   ASSETS WHICH THE DEBTOR TRANSFERRED PRIOR TO FILING ...............10

        A.   <u>$500,000 Transfer to Wurk Times Square</u> .........................................10

        B.   <u>$650,000 Transfers to Citadel</u> ............................................................10

        C.   <u>$1.5 - $2.5 Million Transfers to Wurk Environments/Wurk Times Square</u> ....11

   IV.   FALSE OATHS AND ACCOUNTS MADE BY THE DEBTOR ...........................12

        A.   <u>Debtor Did Not List the $2 Million AllStar Transfers on his SOFA</u> ...............12

        B.   <u>Debtor Did Not List the $500,000 Wurk Times Square Transfer on his SOFA</u> ................................................................................................13

        C.   <u>Debtor Did Not List the $650,000 Citadel Transfers on his SOFA</u> ................13

        D.   <u>Debtor did not Report His Real Income on his SOFA</u>....................................14

        E.   <u>Debtor Did Not List the Chase Auto Finance Liability on his Schedules</u>........15

        F.   <u>Debtor Did Not Disclose Co-Debtor Obligations on his Schedules</u>................16

        G.   <u>Debtor Did Not Disclose Other Corporate Relationships on his SOFA</u>..........17

        H.   <u>Debtor Did Not Disclose the Transfer of the Citadel Interest</u>.........................18

Legal Argument ............................................................................................18

   I.   LEGAL STANDARD ...........................................................................18

   II.   DEBTOR'S DISCHARGE MUST BE DENIED PURSUANT TO § 727(A)(2) .......20

      A.   Section 727(a)(2)(A) Requires Denial Of Discharge Where a Debtor Fraudulently Conceals his Property ..........................................20

         i.   Debtor Fraudulently Concealed the $2 Million AllStar Receivable ........21

         ii.   Debtor Fraudulently Concealed the $15,000 Wurk TS Receivable ..........24

         iii.   Debtor Fraudulently Concealed the $1 Million Stack Receivable ...........26

      B.   Section 727(a)(2)(A) Requires Denial Of Discharge Where a Debtor Fraudulently Transfers his Property ..........................................27

         i.   Debtor Fraudulently Transferred $500,000 to Wurk Times Square .........29

         ii.   Debtor Fraudulently Transferred $650,000 to Citadel .............................30

         iii.   Debtor Fraudulently Transferred $1.5 - $2.5 Million to Wurk Environments/Wurk Times Square ...............................................32

   III.   DEBTOR'S DISCHARGE SHOULD BE DENIED PURSUANT TO § 727(A)(4) ..33

      A.   Section 727(a)(4)(A) Requires Denial Of Discharge Where a Debtor Makes a False Oath or Account ..........................................33

Conclusion ...................................................................................................40

# TABLE OF AUTHORITIES

### Cases

In re Chalik,
748 F.2d 616 (11th Cir. 1984) ...................................................34

In re Corcoran,
246 B.R. 152, 161 (Bankr. E.D.N.Y. 2000)...................................27

Diorio v. Kreisler-Borg Construction Co.,
407 F.2d 1330 (2d Cir. 1969)...................................................34

In re Gabor,
2009 Bankr. LEXIS 3110 (Bankr. S.D.N.Y. 2009) .................33, 34

In re Gardner,
384 B.R. 654 (Bankr. S.D.N.Y. 2008) .....................19, 20, 27, 33

In re Handel,
266 B.R. 585 (Bankr. S.D.N.Y. 2001) ......................................33

In re Kaiser,
722 F.2d 1574 (2d Cir. 1983).................................28, 30, 34, 37

In re Lawson,
122 F.3d, 1237 (9th Cir. 1997) ...............................................21

Marrama v. Citizens Bank of Mass.,
549 U.S. 365, 367, 127 S.Ct. 1105, 166 L.Ed. 2d 956 (2007)...................1, 19

In re McFarland,
170 B.R. 613 (Bankr. S.D. Ohio 1994)......................................21

Mileasing Co. v. Allavena (In re Allavena),
18 B.R. 527 (Bankr. E.D. Pa. 1982) ........................................21

In re Moreo,
No. 08-71258-478, 2009 WL 2929949 (Bankr. E.D.N.Y. Sept. 10, 2009) ...................34

In re Nandalall,
434 B.R. 258 (Bankr. N.D.N.Y. 2010) .....................................19

Najjar v Kablaoui (In re Kablaoui),
196 BR 705 (Bankr. S.D.N.Y. 1996)........................................28

In re Olivier,
819 F.2d 550  (5th Cir. 1987) .........................................................................21

In re Palermo,
370 B.R. 299 (Bankr. S.D.N.Y. 2007) .........................................................28

In re Pongvitayapanu,
487 B.R. 130 (Bankr. E.D.N.Y. 2013)........................................................1, 19

In re Portnoy,
201 B.R. 685 (Bankr. S.D.N.Y. 1996) .......................................................21, 27

In re Sapru,
127 B.R. 306 (Bankr. E.D.N.Y. 1991).......................................................33, 34, 39

In re Shah,
288 B.R. 23 (Bankr. E.D.N.Y. 2008) ...........................................................34

In re Sicari,
187 B.R. 861 (Bankr. S.D.N.Y. 1994) ......................................................34, 35, 39

In re Spitko,
357 B.R., 272 at 300 (Bankr. E.D. Pa. 2006)...............................................21

In re Stone,
172 F.Supp. 142, 146 (E.D.N.Y. 1959) ........................................................19

In re Sullivan,
444 B.R. 1 (Bankr. D.Mass. 2011) ..............................................................38

Tillery v. Hughes (In re Hughes),
184 B.R. 902 (Bankr. E.D. La.1995) ...........................................................28

United Bank of Denver N.A. v. Greenwalt (In re Greenwalt),
48 B.R. 804 (Bankr. D. Colo. 1985) ...........................................................28

Williams v. Hoza (In re Hoza),
373 BR 409 (Bankr. W.D. Pa. 2007) ...........................................................32

In re Woodfield,
978 F.2d 516 (9th Cir. 1992) .....................................................................28

## Statutes

11 U.S.C. § 101(31) .....................................................................................2

iv

11 U.S.C. § 727(a)(2)............................................................................................. passim

11 U.S.C. § 727(a)(4)(a) ....................................................................................... passim

<u>PRELIMINARY STATEMENT</u>

"[I]t is often said that the discharge is a privilege reserved for the 'honest but unfortunate debtor.'"  <u>In re Pongvitayapanu</u>, 487 B.R. 130, 138 (Bankr. E.D.N.Y. 2013) (citing <u>Marrama v. Citizens Bank of Mass.</u>, 549 U.S. 365, 367, 127 S.Ct. 1105, 166 L.Ed. 2d 956 (2007)).   The Debtor in this case, Daniel Gordon, a sophisticated and intelligent businessman, is neither honest nor unfortunate.  Mr. Gordon is far from the paradigmatic destitute Debtor, given that he rented a summer house in the Hamptons for $140,000 just months before he filed for bankruptcy and lived in an apartment with a rent of $19,000 per month at the time of his bankruptcy filing.   Mr. Gordon is also not an honest debtor.

Mr. Gordon's flagrant dishonesty is clearly evidenced by the multitude of false oaths contained in each version of his numerous bankruptcy filings, as well as in his efforts to hide significant assets from coming into his bankruptcy estate.  Although Mr. Gordon tried to explain away his fraudulent actions at trial, his explanations are hollow and amount to nothing more than weak excuses which are wholly insufficient to overcome the presumption that he acted with the intent to deceive his bankruptcy trustee, the bankruptcy estate, and his creditors.

Instead of being open and honest throughout this proceeding, as mandated by the Bankruptcy Code, Mr. Gordon acted in a calculated and deceitful manner when responding to questions on his bankruptcy schedules and statements of financial affairs, limiting his disclosures to information which only he himself determined as relevant disclosures.   To the extent Mr. Gordon amended his bankruptcy filings to include missing information, he generally made those changes only after the Trustee noted the omissions in the course of her examinations of Mr. Gordon, or later, in her Complaint.  Thus, even in the instances when Mr. Gordon "came clean" by amending his bankruptcy filings, he only did so because the Trustee had caught those

1

omissions as a result of her extensive and determined investigation of Mr. Gordon's pre-petition financial affairs.

Mr. Gordon did not facilitate the Trustee in her investigation. Indeed, while Mr. Gordon claims that he turned over thousands of pages of documents to the Trustee and her counsel, it is evident through Mr. Gordon's testimony that his intent in transmitting massive amounts of disorganized information was to shift the burden onto the Trustee to cull through this information to determine the universe of Mr. Gordon's assets and relevant financial information. Mr. Gordon challenged the Trustee to find his misconduct, and the Trustee has succeeded in doing so.

The Trustee has demonstrated that Mr. Gordon inexcusably transferred millions of dollars to insider[1] entities[2] in the year immediately preceding his bankruptcy filing even though Mr. Gordon never disclosed the majority of these transfers to the Trustee. Even more problematic is that by the time the Trustee recognized the nature and extent of the undisclosed multi-million dollar pre-petition transfers through painstaking and arduous discovery, many of the insider entities to which Mr. Gordon had made these transfers (and which Mr. Gordon had unfettered control over), had ceased operating, leaving the Trustee, the estate, and the creditors with

---

[1] Section 101(31) of the Bankruptcy Code defines "insider" to include (i) relative of the debtor or of a general partner of the debtor; (ii) partnership in which the debtor is a general partner; (iii) general partner of the debtor; or (iv) corporation of which the debtor is a director, officer, or person in control.

[2] As indicated on the Amended Schedules (See Schedule B) and Second Amended Statement of Financial Affairs (See question 18), there are over 35 insider entities of the Debtor. The insider entities relevant to this discharge proceeding are as follow: (i) *AllStar* - The Debtor is the President, sole officer and director of AllStar (See 3/12/13 Trans. at 26:6-9). The Debtor is also the sole manager of AllStar (Id. at 26:20-22). AllStar has two shareholders, the Gordon Family I, LP ("GFI") and the Carolina E. Gordon Trust ("CEG Trust"), which each own 50% (See Exhibit 10 at para. 66). The Debtor holds a 30% ownership interest in GFI (See Exhibit 12 at para. 25, footnote 4) and is the Trustee of the CEG Trust (See PTO at para. 22); (ii) *Wurk Environments* – The Debtor was the sole member of Wurk Environments (See Exhibits 24 and 25 at Schedule B); (iii) *Wurk TS* – Wurk Environments was the sole member of Wurk TS (See PTO at 28). The Debtor was the manager and/or person in control of Wurk TS (See PTO at para. 30); (iv) *McCann* – GFI is the sole member of McCann (See Exhibit 29). The Debtor has a 30% ownership interest in GFI (See Exhibit 12 at para. 15). The Debtor controls and manages the business affairs of McCann. (See 3/12/13 Trans. at 110:15–25); and (v) *Citadel* – At all relevant times, McCann was either the 100% or 50% owner of Citadel (See Exhibit 29). The Debtor was a director, officer, shareholder, member, and/or person in control of Citadel (See PTO at para. 83; See also, Exhibits 33-42).

absolutely no recourse.  Further, Mr. Gordon knowingly and with fraudulent intent did not schedule assets which could have provided value to the Estate.

Mr. Gordon does not deserve the privilege of a discharge of his debts in bankruptcy.  For the reasons set forth herein, Mr. Gordon's discharge must be denied.

## PROCEDURAL HISTORY

On October 18, 2009 (the "Petition Date"), Daniel Gordon (the "Debtor"), filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code").  See PTO at para. 6.  Angela G. Tese-Milner (the "Trustee" or "Plaintiff") was appointed interim chapter 7 trustee of the Debtor's estate, has since qualified, and is currently serving as the permanent chapter 7 trustee herein.  Id. at para. 7.

By complaint dated, September 28, 2010 (the "Complaint"), the Plaintiff commenced the instant adversary proceeding.  Id. at para. 13.

The Complaint, as amended, sought to deny the Debtor's discharge for, among other reasons, (i) concealing assets totaling in excess of $3 million, (ii) transferring funds totaling in excess of $3 million to insider entities in the year before the Petition Date, and (iii) making numerous and material false oaths and accounts in connection with his bankruptcy filings.  See Ex. 6.

A trial on this matter was conducted on May 12, 2013 and May 13, 2013.

## FACTS

**I.    FACTUAL BACKGROUND**

The Debtor attended William Prep School in New London, Connecticut but left high school early to attend college.  See 3/12/13 Trans. at 8:10-15.  Thereafter, he attended and

graduated from Boston University.  Id. at 8:16-21.  In 1997, the Debtor acquired a master's degree in development economics from Yale University.  Id. at 8:10-15.

Following his post-graduate studies, the Debtor worked briefly as an analyst at Constellation Power Source in Baltimore.  Id. at 8:25 and 9:1-2.  In or about 1998, the Debtor began working for Merrill Lynch and was in charge of the energy commodities division.  Id. at 9:3-10.  After Merrill Lynch sold its energy trading business to Alleghany Energy Global Markets, Mr. Gordon became the president of that subsidiary at Alleghany Energy.  Id. at 9:11-18.

In or about 2003, Mr. Gordon pled guilty to, and was convicted of, the following felony charges:  (i) wire fraud in connection with a scheme to defraud his employer, Merrill Lynch, of $43 million, (ii) money laundering, and (iii) conspiracy to defraud the United States.  See PTO at para. 4.  Mr. Gordon served time in prison for these crimes from late 2005 through 2007.  See 3/12/13 Trans. at 20:6–10.

At the time of his bankruptcy filing, the Debtor resided at 151 East 85th Street, Unit 10C, New York, New York.[3]  The rent for these premises was $19,000 per month.  See PTO at para. 3; See also 3/12/13 Trans. at 25:8–12 and Ex. 1.  Just months prior to his bankruptcy filing, between May 22, 2009 and September 8, 2009, the Debtor leased property located at 15 Jeffrey Lane, East Hampton, New York (the "Summer Rental").  The total rent for the Summer Rental was $140,000.  See PTO at para. 5; See also 3/12/13 Trans. at 25:13–23 and Ex. 3.

On November 22, 2009, the Debtor filed his original bankruptcy schedules (the "Schedules") and statement of financial affairs (the "Statement of Financial Affairs") and he verified the contents of these documents under penalty of perjury.  See PTO at para. 11; See also

---

[3] Although the Debtor testified that he is no longer resides at this address (See 3/13/13 Trans. at 5:18-24), he has not formally amended his petition or advised the Trustee or the Bankruptcy Court of his current address.

Exs. 24 and 26.  The Debtor read and understood the statements regarding the verification of the Schedules and Statement of Financial Affairs prior to signing them.  See 3/12/13 Trans. at 14:3– 25 and 15:1-8.

On February 1, 2010, the Debtor filed his amended statement of financial affairs (the "Amended Statement of Financial Affairs") and he verified the contents of this document under penalty of perjury.  See PTO at para. 12; See also Ex. 27.  The Debtor read and understood the statement regarding the verification of the Amended Statement of Financial Affairs when he signed it.  See 3/12/13 Trans. at 15:9–25 and 16:1-3.

By complaint dated September 28, 2010 (the "Complaint"), the Trustee commenced this adversary proceeding.  See PTO at para. 13; See also Ex. 4.  On or about October 6, 2010, the Debtor was served with a copy of the Complaint.  See PTO at para. 14.  On December 16, 2010, the Debtor filed his answer (the "Answer") to the Complaint.  Id at para. 16; See also Ex. 5.

Subsequent to being served with the Complaint, on December 10, 2010, the Debtor filed his amended bankruptcy schedules (the "Amended Schedules") and second amended statement of financial affairs (the "Second Amended Statement of Financial Affairs") and he verified the contents of these documents under the penalty of perjury.  See PTO at para. 15; See also Exs. 25 and 28.

At the request of the Debtor's counsel, on or about February 15, 2013, the Trustee amended her Complaint (the "Amended Complaint") to confirm her withdrawal of certain causes of action.  See PTO at para. 17; See also Ex. 6.  The parties stipulated that the Debtor's Answer to the original Complaint would stand as it relates to the allegations in the Amended Complaint. See 3/12/13 Trans. at 57:25 and 58:1–2.

The Amended Complaint sought to deny the Debtor's discharge for, among other reasons, (i) failing to disclose assets totaling in excess of $3 million, (ii) transferring funds totaling in excess of $3 million to insider entities in the year before the Petition Date, and (iii) making numerous and material false oaths and accounts in connection with his bankruptcy filings. See Ex. 6.

As reflected on the Schedules, as of October 22, 2008, through and including the Petition Date, the Debtor had the following liabilities: (i) various credit card balances in unknown amounts, (ii) monies owed to the United States of America for forfeiture and restitution in an unknown amount, and (iii) taxes due the Internal Revenue Service and the New York State Department of Tax and Finance, which were disputed by the Debtor. See PTO at para. 100; See also Exs. 24 and 25, at Schedules E and F.

Specifically, the liability to the USA for forfeiture and restitution was incurred somewhere between 2003 and 2005. See 3/12/13 Trans. at 113:12–21. The liability that the IRS claims to be outstanding for 2000 exceeds $17 million. Id. at 113:22–25; See also Exs. 24 and 25 at Schedule E. The liability that the IRS claims to be outstanding for 2001 exceeds $500,000. Id. at 114:1–3; See also Exs. 24 and 25 at Schedule E. The liability that the IRS claims to be outstanding for 2002 exceeds $1.3 million. Id. at 114:4–7; See also Exs. 24 and 25 at Schedule E.

Moreover, the liability that New York State claims to be outstanding for the year 2000 exceeds $11 million. Id. at 114:8–11; See also Exs. 24 and 25 at Schedule F. The liability that New York State claims to be outstanding for 2001 exceeds $300,000. Id. at 114:12–14; See also Exs. 24 and 25 at Schedule F. The liability that New York State claims to be outstanding for 2002 exceeds $4 million. Id. at 114:15-18; See also Exs. 24 and 25 at Schedule F.

Lastly, Signature Bank was listed on the Schedules and Amended Schedules as a disputed creditor in connection with a $1.7 million claim that was incurred on or about October 7, 2008. See Exs. 24 and 25 at Schedule F.

## II.    ASSETS WHICH THE DEBTOR CONCEALED

### A.    $2 Million AllStar Receivable

AllStar Capital, Inc. ("AllStar") was incorporated in the State of Nevada on or about January 14, 2008.   See PTO at para. 18.   AllStar is in the business of making financial investments and loans.  Id. at para. 19; See also 3/12/13 Trans. at 26:23–25 and 31:6–7.

AllStar does not maintain any physical office space or own any physical property, furniture, fixtures or telephones.  See PTO at para. 20; See also 3/12/13 Trans. at 27:1–8.  The Debtor personally controls the books and records of AllStar.  See 3/12/13 Trans. at 27:9–11.  At all relevant times, the Debtor was the President and the sole officer of AllStar.  See PTO at para. 21; See also 3/12/13 Trans. at 26:6-7.  The Debtor is the director of AllStar.  See 3/12/13 Trans. at 26:8–9.  Other than the Debtor, there is no one else associated with AllStar.  Id. at 26:16–18. The Debtor is the sole manager of the business affairs of AllStar.  Id. at 26:20–22.  AllStar is an insider of the Debtor.  Id. at 31:2-5.

AllStar has two shareholders – the Carolina E. Gordon Trust ("CEG Trust") and Gordon Family I, LP ("GFI").  The Debtor is the Trustee of the CEG and possesses a limited partnership interest in GFI.  See PTO at para. 22; See also 3/12/13 Trans. at 27:20–24 and 28:2-6.

Within a year of the Petition Date, on or about October 22, 2008, the Debtor made a loan to AllStar in the amount of $2,000,000 (the "AllStar Loan").[4]  See PTO at para. 23; See also

---

[4] The Debtor testified that the $2 million transfer to AllStar was used to fund a loan to Urban Muse and that Urban Muse repaid the $2 million loan to AllStar one week after the Petition Date.  See 3/12/13 Trans. at 78:17:25 and 79:1-9.  The Trustee learned of the withdrawal of the $2 million from the Debtor's account and the repayment by Urban Muse as a result of a Bankruptcy Rule 2004 subpoena she served upon Wachovia Bank.  See Exhibit 8.

3/12/13 Trans. at 28:7-16 and Ex. 8. AllStar did not provide any promissory note to the Debtor in connection with the AllStar Loan, nor did the Debtor and AllStar execute any loan agreement. See 3/12/13 Trans. at 36:14–17 and 53:12-13. The Debtor alleges that AllStar repaid the AllStar Loan prior to the Petition Date by making various direct payments to third parties on behalf of the Debtor and other non-Allstar insider entities at the direction of Debtor. See PTO at para. 25; See also Ex. 14.

As detailed below, the evidence clearly demonstrates that the AllStar Loan was never repaid and remained outstanding as of the Petition Date. In her Complaint and Amended Complaint, the Trustee noted that the Debtor failed to list the AllStar receivable on his Schedules. See Ex. 4 at para. 18; See also Ex. 6 at para. 15.

**B.      $15,000 Wurk Times Square Receivable**

Wurk Times Square LLC ("Wurk TS") was a limited liability company formed in 2008 that operated as a fractional office space provider. See PTO at para. 27; See also 3/12/13 Trans. at 81:8-12. Within six years of the Petition Date, the Debtor was an officer, director, or managing executive of Wurk TS. See Ex. 28 at question 18. The sole member of Wurk TS was Wurk Environments LLC ("Wurk Environments"). See PTO at para. 28; See also 3/12/13 Trans. at 81:15–17. The Debtor is the sole member of Wurk Environments. See Exs. 24 and 25 at Schedule B. At all relevant times, the Debtor was the manager and/or person in control of Wurk TS. See PTO at para. 30; See also 3/12/13 Trans. at 81:21–25 and 82:1.

Wurk TS ceased operating on or about the Petition Date. See PTO at para. 31; See also 3/12/13 Trans. at 82:2–5. Prior to the Petition Date, Wurk TS owed the Debtor $15,000 (the "Wurk Receivable"). See 3/12/13 Trans. at 153:19-21; See also Ex. 24 at Schedule B. Shortly after the Petition Date, Wurk TS paid the Debtor $15,000 on account of the Wurk Receivable.

See PTO at para. 32; See also Ex. 18.   The Debtor did not list the Wurk Receivable on his Schedules.  See PTO at para. 33; See also Ex. 24 at Schedule B.

The Trustee identified this omission in her Complaint and Amended Complaint.  See PTO at para. 34; See also Ex. 4 at para. 20 and Ex. 6 at para. 17.  The Debtor ultimately listed the Wurk Receivable on the Amended Schedules, which were filed after the Trustee commenced this adversary proceeding.  See PTO at para. 35; See also Ex. 25 at Schedule B.

By letter dated August 10, 2011, counsel to the Trustee demanded that the Debtor turn over to the Trustee the value of the Wurk Receivable as property of the Debtor's bankruptcy estate.  See PTO at para. 36; See also Ex. 20.  To date, the Debtor has failed to turn over the Wurk Receivable (or its value) to the Trustee.  See PTO at para. 36; See also 3/12/13 Trans. at 117:13–16.

**C.        $1 Million Stack Receivable**

Citadel was a corporation operating as a construction firm. See PTO at para. 46.

On or about October 14, 2009, the Debtor entered into a retainer agreement with Todtman, Nachamie, Spitz & Johns, P.C. (the "Retainer Agreement") concerning certain issues related to Citadel, including the sale of an interest in Citadel that occurred in February 2009.  See PTO at para. 47; See also Ex. 29.  The Debtor signed the Retainer Agreement in his individual capacity.  See 3/12/13 Trans. at 86:21–25 and 87:1–4; See also Ex. 29.  The Retainer Agreement was addressed to the Debtor personally.  See 3/13/13 Trans. at 31:12–18; See also Ex. 29.  The Retainer Agreement references the Debtor as the client.  See 3/13/13 Trans. at 31:19–25 and 32:1-2; See also Ex. 29.

The Retainer Agreement was modified by a series of emails, dated October 15, 2009, solely to reflect that Gordon Family I, LP ("GFI") was the sole member of McCann

Construction, LLC ("McCann"), as opposed to the Debtor.    See PTO at para. 48; See also Ex. 29.

The Retainer Agreement, as amended, stated that, in or about February 2009, the Debtor sold his interest in Citadel to David Stack for $1 million payable in two tranches, the first tranche of $500,000 due by January 31, 2010 and the balance to be paid by March 31, 2010 (collectively, the "Stack Receivable").  See Ex. 29.

The Stack Receivable was not disclosed on the Debtor's Schedules or Amended Schedules.  See Exs. 24 and 25 at Schedule B.

## III.   ASSETS WHICH THE DEBTOR TRANSFERRED PRIOR TO THE FILING

### A.        $500,000 Transfer to Wurk TS

Just eight months prior to the Petition Date, on or about February 26, 2009, the Debtor arranged for $500,000 to be transferred from his Wachovia Credit Line to Wurk TS (the "Wurk TS Transfer").  See PTO at para. 37; See also 3/12/13 Trans. at 85:13-18 and Ex. 32.

The Debtor asserts that the payment was a "capital contribution" to Wurk TS.   See 3/12/13 Trans. at 86:5–7.  The Debtor is not a member of Wurk TS.  Id at 86:13–14.

The Debtor has not and cannot recoup this contribution to Wurk TS (See 3/12/13 Trans. at 86:8–12) because Wurk TS ceased operating on or about the Petition Date.  (See PTO at para. 31; See also 3/12/13 Trans. at 82:2–5).

### B.        $650,000 Transfers to Citadel

Within six years of the Petition Date, the Debtor was a director, officer, shareholder, member, and/or person in control of Citadel.   See PTO at para. 83.   The Debtor signed performance and payment bonds, a retainer letter, a waiver and release, bank forms, and tax returns, among other documents, as an officer and/or principal of Citadel.  See Exs. 33 - 47.

Within one year of the Petition Date, on or about January 24, 2009, the Debtor arranged for $350,000 to be transferred from his Wachovia Credit Line to Citadel (the "First Citadel Transfer"). See PTO at para. 50; See also 3/12/13 Trans. at 92:12-17 and Ex. 30.

The Debtor asserts that the payment was a capital contribution from Wurk Environments to Wurk TS to satisfy its obligation to Citadel. See 3/12/13 Trans. at 92:23–25 and 93:1-3.

The Debtor has not and cannot recoup this contribution (See 3/12/13 Trans. at 93:4–18) because Wurk TS and Citadel ceased operating on or about the Petition Date (See PTO at para. 31 and 49) and Wurk Environments ceased operating on or before May 2010. See Ex. 55 at 115:20-22.

Within a year of the Petition Date, and within days of the First Citadel Transfer, on or about January 28, 2009, the Debtor arranged for an additional $300,000 to be transferred from his Wachovia Credit Line to Citadel (the "Second Citadel Transfer"). See PTO at para. 53; See also 3/12/13 Trans. at 93:19–25 and 94:1-3 and Ex. 31.

The Debtor asserts that the payment was a capital contribution ultimately on behalf of Wurk TS. See 3/12/13 Trans. at 94:7–9. The Debtor is not a member of Wurk TS. Id at 86:13–14.

The Debtor cannot recoup this contribution (See 3/12/13 Trans. at 94:10–12) because both Wurk TS and Citadel ceased operating on or about the Petition Date (See PTO at para. 31 and 49).

C.    **$1.5 - $2.5 Million Transfers to Wurk Environments/Wurk TS**

Wurk Environments was a limited liability company that was formed to be the sole member of Wurk TS and Wurk Management, LLC. See Ex. 55, at 109:7-11. Within six years of the Petition Date, the Debtor was an officer, director, or managing executive of Wurk

Environments.  See Ex. 28.  The Debtor is the sole member of Wurk Environments.  See  Exs. 24 and 25 at Schedule B.  Wurk Environments ceased operating on or before May 2010.  See Ex. 55, at 115:20-22.

In his Amended Statement of Financial Affairs and Second Amended Statement of Financial Affairs, the Debtor attested to transferring between $1,500,000 and $2,500,000 to or on behalf of Wurk Environments and/or Wurk TS in 2009.  See Exs. 27 and 28 at question 10.

## IV.    FALSE OATHS AND ACCOUNTS MADE BY THE DEBTOR

### A.        Debtor Did Not Disclose the $2 Million AllStar Transfers on his SOFA

As set forth above, on or about October 22, 2008, the Debtor made a $2 million AllStar Loan.  See PTO at para. 23; See also Ex. 8.

The Debtor did not list the AllStar Loan in response to question 10 of his Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs.  See PTO at para. 24; See also Exs. 26-28 at question 10.

At trial, the Debtor asserted that he did not list the AllStar Loan on his Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs, because (i) he considered it to be a "transfer in the ordinary course of business" (See 3/12/13 Trans. at 32:4–7), and (ii) he believed the word "transfer" in the Statement of Financial Affairs question at issue related to *transfers other than cash* (Id. at 32:8–14).

During the period January 2008 through October 2008, the Debtor did not make any transfers to AllStar in excess of $1 million.  See 3/13/13 Trans. at 13:21–25.  During that same period, the Debtor did not make any loans to AllStar in excess of $150,000.  Id. at 26:5–10 and 27:5-8.

The Debtor listed cash transfers he made to or on behalf of Wurk Environments and/or Wurk TS in response to the same question on his Amended Statement of Financial Affairs and Second Amended Statement of Financial Affairs. See 3/12/13 Trans. at 36:4–13; See also Exs. 27 and 28 at question 10.

The Debtor has also alleged that AllStar repaid the AllStar Loan prior to the Petition Date by virtue of it making various payments to third parties on behalf of the Debtor and other non-AllStar insider entities at the direction of Debtor. See PTO at para. 25; See also Ex. 14.

The Debtor did not list these alleged payments in response to questions 3 or 10 of the Debtor's Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs. See PTO at para. 26; See also Exs. 26-28 at questions 3 and 10.

**B.        Debtor Did Not List the $500,000 Wurk TS Transfer on his SOFA**

The Debtor did not list the Wurk TS Payment in response to question 10 of the Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs. See PTO at para. 38; See also Exs. 26-28 at question 10.

The Trustee noted this omission in her Complaint and Amended Complaint. See PTO at para. 39; See also Ex. 4 at para. 67(a) and Ex. 6 at para. 34(a).

**C.        Debtor Did Not Disclose the $650,000 Citadel Transfers on his SOFA**

The Debtor did not list the First Citadel Payment or Second Citadel Payment (collectively, the "Citadel Payments") in response to questions 3 or 10 of his Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs. See PTO at para. 51 and 54; See also Exs. 26-28 at questions 3 and 10.

13

At trial, the Debtor testified that he did not need to list the Citadel Payments in response to question 3 of his Statement of Financial Affairs because Citadel was not a creditor of his.  See 3/12/13 Trans. at 153:19-21.

Similarly, the Debtor testified that he did not need to list the Citadel Payments in response to question 10 of his Statement of Financial Affairs because he considered these payments to be capital contributions on behalf of Wurk TS in the "ordinary course of business". See 3/12/13 Trans. at 92:23–55, 93:1-3, and 94:7-9.

The Trustee identified these omissions in her Complaint and Amended Complaint.  See PTO at para. 52; See also Ex. 4 at para. 67(a) and Ex. 6 at para. 34(a).

### D.        Debtor did not Disclose His Real Income on his SOFA

Question 1 to the Statement of Financial Affairs required the Debtor to "State the ***gross*** amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business, including part-time activities either as an employee or in independent trade or business, from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year." (emphasis added)  See PTO at para. 56; See also Exs. 26-28 at question 1.

In his Statement of Financial Affairs, Amended Statement of Financial Affairs, and Second Amended Statement of Financial Affairs, the Debtor listed his gross income year-to-date (January 1, 2009 through the Petition Date) as approximately $150,000.  See 3/12/13 Trans. at 94:25 and 95:1-2; See also Exs. 26-28 at question 1.  The Debtor's response to this question does not in any way indicate that the amount listed is adjusted to be net of losses.  See 3/12/13 Trans. at 169:2-4; See also Exs. 26-28 at question 1.

The Debtor asserts that he accurately reflected his gross monthly income in response to Schedule I of the Schedules and Amended Schedules, which reflect average monthly income of approximately $34,000 (or annual income of approximately $408,000).  See 3/12/13 Trans. at 119:22–25 and 120:1–13; See also Exs. 24 and 25 at Schedule I.

The Debtor's income for 2009 exceeded $635,000, comprised of (i) the Debtor's total earnings from Rosedale Cooley Management, Inc., a company in which the Debtor is the sole shareholder (See Exs. 24 and 25 at Schedule B), for the period January 1, 2009 through September 25, 2009, which was $224,999.97 (See PTO at para. 60; See also Ex. 22), (ii) commissions from Citadel in the amount of $347,263 (See PTO at para. 61; See also Ex. 23), and (iii) payments in kind from AllStar in the amount of $62,939 (Id.).

In his Statement of Financial Affairs, Amended Statement of Financial Affairs, and Second Amended Statement of Financial Affairs, the Debtor listed his gross income for 2008 as $0.00.  See 3/12/13 Trans. at 96:21–25; See also Exs. 26-28 at question 1.  The Debtor's response to this question does not indicate that the amount listed is adjusted to be net of losses. See 3/12/13 Trans. at 168: 24–25 and 169:1; See also Exs. 26-28 at question 1.  The Debtor's tax return for 2008 reflects gross income of $267,311.  See Ex. 59.   That same tax return also reflects a tax overpayment in the amount of $157,978.  Id.

In his Statement of Financial Affairs, Amended Statement of Financial Affairs, and Second Amended Statement of Financial Affairs, the Debtor listed his gross income for 2007 as $-163,799 with an notation that this amount is net of losses.  See Exs. 26-28 at question 1.

**E.**         **Debtor Did Not Disclose the Chase Auto Finance Liability on his Schedules**

On the Petition Date, the Debtor was a guarantor of Citadel's obligation owed to Chase Auto Finance on account of an automobile note.  See PTO at para. 62; See also 3/12/13 Trans. at 98:8-11.

The Debtor did not list Chase Auto Finance on his Schedules. See PTO at para. 63; See also Ex. 24 at Schedules D, E, F and H.

The Trustee identified this omission in her Complaint and Amended Complaint.  See PTO at para. 64; See also Exs. 4 at para. 67(f) and Ex. 6 at para 34(f).

Subsequent to the filing of the Complaint, the Debtor amended his schedules to include Chase Auto Finance. See PTO at para. 66; See also Ex. 25 at Schedule D and H.

**F.      Debtor Did Not Disclose the Co-Debtor Obligations on his Schedules**

On the Petition Date, the Debtor was (i) a co-debtor with AllStar on account of a Signature Bank loan, (ii) a co-debtor with Wurk Management on account of a residential lease for the  premises located at 455 West 37th Street, Apt. 1111, New York, New York, (iii) a co-debtor with Rosedale Cooley Management Inc. on account of a residential lease for the premises located at 151 East 85th Street, Unit 10C, New York, New York, and (iv) a co-debtor with Citadel on account of an auto loan for the 2008 Land Rover (collectively, the "Co-Debtor Obligations").  See PTO at para. 67.

The Debtor did not list the Co-Debtor Obligations on his Schedules.  Id. at para. 68; See also Ex. 24 at Schedule H.

The Trustee identified these omissions in her Complaint and Amended Complaint.  See PTO at para. 69; See also Ex. 4 at para. 67(g)(h)(i) and (j) and Ex. 6 at para. 34 (g)(h)(i) and (j).

The Debtor testified that he considered these obligations to be co-guarantor obligations and not co-debtor obligations so he did not believe that they needed to be reflected on Schedule H.  See 3/12/13 Trans. at 101:25 and 102:1–5.

The instructions to Schedule H state that the Debtor was required to include "all **guarantors** and co-signers" (emphasis added).  See Exs. 24 and 25 at Schedule H.  After the Trustee filed her Complaint noting these omissions, the Debtor ultimately amended the Schedules and included the Co-Debtor Obligations.  See PTO at para. 70; See also Ex. 25 at Schedule H.

### G.    Debtor Did Not Disclose the Other Corporate Relationships on his SOFA

Within six years of the Petition Date, the Debtor was a director, officer, shareholder, member, and/or person in control of Citadel and Cascar LP ("Cascar").  See PTO at para. 83.

Cascar was formed in December 5, 2005.  See 3/12/13 Trans. at 107:9–10.  The Debtor was the general partner of Cascar (Id. at 107:11–15) and initially held a 98.5% partner interest in Cascar (Id. at 108:22-24; See also Ex. 12 at para. 6).

Within six years of the Petition Date, the Debtor signed performance and payment bonds, a retainer letter, a waiver and release, bank forms, and tax returns, among other documents, as an officer and/or principal of Citadel.  See Exs. 33-47.

The Debtor did not list Citadel or Cascar in response to question 18 of his Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs.  See PTO at para. 82; See also Exs. 26-28 at question 18.

Within six years of the Petition Date, the Debtor was an officer, director, or managing executive of Phoenix [Capital Advisors, Inc.] ("Phoenix").  See 3/12/13 Trans. at 109:13–16.

Within six years of the Petition Date, the Debtor was in control of and responsible for managing the business affairs of McCann. Id. at 110:15–25.

Within six years of the Petition Date, the Debtor was responsible for the operations of Boulder Heights Owner LLC ("Boulder Heights").  Id. at 112:9–14.

The Debtor did not list any of the following entities in response to question 18 on the Statement of his Financial Affairs or Amended Statement of Financial Affairs: McCann; Hilltop Investments LLC; Boulder Heights; Phoenix; Eastern Energy Group, Inc.; and Kings Holdings, LLC (the "Other Corporate Entities").   See PTO at para. 84; See also Exs. 26 and 27 at question 18.

The Trustee identified these omissions in her Complaint and Amended Complaint.  See PTO at para. 85; See also Exs. 4 at para. 67(e) and Ex. 6 at para. 34(e).  Subsequent to the filing of the Complaint, the Debtor filed his Second Amended Statement of Financial Affairs and listed the Other Corporate Entities.  See PTO at para. 88; See also Ex. 28 at question 18.

### H.        Debtor Did Not Disclose his Transfer of the Citadel Interest

The Retainer Agreement, as amended, stated that, in or about February 2009, the Debtor sold his interest in Citadel to David Stack for $1 million payable in two tranches, the first tranche of $500,000 due by January 31, 2010 and the balance to be paid by March 31, 2010 (collectively, the "Stack Payments").  See Ex. 29.

The transfer of this interest in Citadel was not listed in response to question 10 of the Debtor's Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs.  See Exs. 26-28 at question 10.

## LEGAL ARGUMENT

## I.   LEGAL STANDARD

The purpose of Chapter 7 of the Bankruptcy Code is to give individual debtors the chance to start over by discharging personal liability for pre-petition debts.  In re Pongvitayapanu, 487 B.R. 130, 139 (Bankr. E.D.N.Y. 2013).  However, "[t]he discharge of a bankrupt from his debts is a privilege or favor that has been granted by Congress upon such terms as it has seen fit to impose." Id. (citing In re Stone, 172 F.Supp. 142, 146 (E.D.N.Y. 1959).  As a result, it is imperative that a debtor provide full and honest disclosure and act in good faith throughout the bankruptcy process.  In re Pongvitayapanu at 138 (Bankr. E.D.N.Y. 2013).  "For this reason, it is often said that the discharge is a privilege reserved for the 'honest but unfortunate debtor.'"  Id. (citing Marrama v. Citizens Bank of Mass., 549 U.S. 365, 367, 127 S.Ct. 1105, 166 L.Ed. 2d 956 (2007).

Although granting discharge is generally favored by the law, the Bankruptcy Code "should be construed to protect the debtor only in those cases where there is no intent to violate its provisions." In re Nandalall, 434 B.R. 258, 265 (Bankr. N.D.N.Y. 2010) (citations omitted).  Sections of the Bankruptcy Code, including section 727(a) which is at issue in this case, are intended "to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs." In re Pongvitayapanu at 139 (Bankr. E.D.N.Y. 2013) (citations omitted).

When seeking the denial of a debtor's discharge, the initial "burden of persuasion rests with the objecting party to show by a preponderance of the evidence that the Debtor is not entitled to discharge."  In re Gardner, 384 B.R. 654, 662 (Bankr. S.D.N.Y. 2008).  Under some subsections of § 727(a), however, "courts have recognized a shifting burden of production."  Id at 662.  For example, "[u]nder § 727(a)(4)(A), once the objecting [party] has produced persuasive evidence of a false statement, the burden shifts to the debtor to come forward with

19

evidence to prove that it was not an intentional misrepresentation or provide some other credible explanation." Id.

The Trustee has demonstrated that this case does not concern the "honest but unfortunate" debtor and, as a result, the Debtor's discharge must be denied pursuant to §§ 727(a)(2) and 727(a)(4)(A).

## II.    DEBTOR'S DISCHARGE MUST BE DENIED PURSUANT TO § 727(A)(2)

### A.    Section 727(a)(2)(A) Requires Denial Of Discharge Where a Debtor Fraudulently Conceals his Property

According to section 727(a)(2), a debtor will be denied a discharge where that debtor:

. . . with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition[.]

11 U.S.C. § 727(a)(2).

Pursuant to Section 727(a)(2)(A), the plaintiff objecting to the debtor's discharge must establish by a preponderance of the evidence:

(1) a disposition of property, such as a transfer or concealment;

(2) a subjective intent on the debtor's part to hinder, delay or defraud one or more creditors or the bankruptcy trustee through that disposition;

(3) that the disposition of property was done by the debtor or a duly authorized agent of the debtor; and

(3) that both the disposition and subjective intent occurred within the one-year period before the petition was filed.

In re Gardner, 384 B.R. 654, 683 (Bankr. S.D.N.Y 2008).

For the Trustee to satisfy the first prong of 727(a)(2), she must show that the Debtor either transferred or concealed an asset in which he has an ownership interest during the prescribed time period. A transfer or concealment of any interest, either legal or equitable, held by the debtor is sufficient "property" pursuant to section 727(a)(2). See, e.g., Mileasing Co. v. Allavena (In re Allavena), 18 B.R. 527, 529 (Bankr. E.D. Pa. 1982) (finding transfer with fraudulent intent of leased truck sufficient to justify denial of discharge).

Moreover, closer scrutiny on such a transfer is paid when a debtor retains some beneficial interest in the transferred property. For example, concealment may be considered fraudulent if a debtor transfers title to property but retains the benefit of ownership. See In re Portnoy, 201 B.R. 685, 694 (Bankr. S.D.N.Y. 1996); see also In re Spitko, 357 B.R., 272 at 300 (Bankr. E.D. Pa. 2006) (citing In re Lawson, 122 F.3d, 1237 at 1241 (9th Cir. 1997)); In re Olivier, 819 F.2d 550, 553 (5th Cir. 1987); In re McFarland, 170 B.R. 613, 629 (Bankr. S.D. Ohio 1994). Likewise, "concealment of property is also evidenced by the debtor's 'placing assets beyond the reach of creditors or withholding knowledge thereof by fail[ing] or refus[ing] to divulge owed information." In re Portnoy, 201 B.R. 685 at 694.

### i.    Debtor Fraudulently Concealed the $2 Million AllStar Receivable

The AllStar Receivable is property of the Debtor which the Debtor concealed with the intent to hinder, delay or defraud his creditors. The evidence clearly shows that within one year prior to the bankruptcy filing, the Debtor made an entirely undocumented $2 million loan to AllStar, a company the Debtor controlled entirely, and which operated in name only, without any books and records, or offices or any physical presence. The AllStar Receivable meets all four prongs set forth above under § 727(a)(2).

The Debtor alleges that AllStar repaid the AllStar Loan before the Petition Date by making various payments to third parties on behalf of the Debtor and other non-AllStar insider

21

entities at the direction of Debtor.  Yet, the Debtor testified at trial that the understandings as to the repayment of the AllStar Loan were all in his head.  See 3/13/13 Trans. at 14:17-23.   The Debtor did not produce any evidence of the repayment of this loan from the books and records of AllStar, since AllStar does not maintain any general, ledger, receivables or payable journal.  See 3/12/13 Trans. at 27:12–18 and Ex. 17 at Sections X and XI.  Put simply, the Debtor has not provided the Court with any reliable evidence which would support the Debtor's incredible story that the AllStar Loan was repaid prior to the filing.

The only proof of the alleged loan repayment which the Debtor presented at trial was a set of highly unreliable loan repayment schedules that were prepared not by the Debtor (or even AllStar), but by Debtor's counsel in the context of a litigation commenced by the Trustee against AllStar.  See 3/12/13 Trans. at 44:8–11.

The Debtor's counsel's initial draft of the loan repayment schedule purports to show payments totaling $2,029,001.46, and contains payments that were recorded by the Debtor as income on his own tax return and which the Debtor's counsel then subsequently removed from an amended purported loan repayment schedule.  See Exs. 13 and 14.  The Debtor did not review the initial schedule before it was produced to Trustee's counsel.  See 3/12/13 Trans. at 45:18–21. The Debtor's counsel subsequently produced a revised schedule that showed alleged loan repayments totaling $2,002,281.68.  See Ex. 14.

The revised schedule, which was not amended further, is not credible evidence of the repayment of any portion of the AllStar Loan.  First, the revised schedule lists alleged loan repayments that were made through October 15, 2009.  Id. This contradicts the Debtor's pleadings that were filed with the Court on several prior occasions in which he asserted that the

AllStar Loan was repaid by May 2009.  See Ex. 5 at para. 28; See also Ex. 10 at para. 97 and 103.

Second, the revised schedule totals more than the amount of the AllStar Loan notwithstanding the fact that the loan terms were solely in the Debtor's own head (See 3/13/13 Trans. at 14:17-23), and there is no promissory note, loan agreement, or any other loan documents evidencing that the Debtor was entitled to any interest on this purported loan.  See 3/12/13 Trans. at 36:14–17 and 53:12–13 and 21-23; See also Ex. 14.

Third, the revised schedule reflects a payment in the amount of $5,106.53 to Rogin Nassau, which the Debtor testified represents repayment of an individual obligation in partial repayment of the AllStar Loan.  See 3/12/13 Trans. at 48:19–25 and 49:1–2; See also Ex. 14. However, contrary to the Debtor's assertion, the actual invoice issued by Rogin Nassau evidences that it was for services rendered on behalf of AllStar, not the Debtor.  See Ex. 16.

Fourth, the revised schedule reflects a $10,000 retainer payment to Todtman Nachamie that the Debtor alleges was a partial repayment of AllStar's loan obligation to him personally. See 3/12/13 Trans. at 175:25 and 176:1-4; See also Ex. 14.  At a subsequent point in the trial, the Debtor alleged that the Stack Receivable was due McCann, and because it was necessary for him to do so, he changed his testimony to state that the alleged payment was actually made by AllStar for the benefit of McCann.  See 3/12/13 Trans. at 176:6-8.

Fifth, although the schedule purports to incorporate various canceled checks and bank statements, those documents bear no indications that any of these payments represent AllStar Loan repayments, or that any of these payments were made for the Debtor's benefit.  See Ex. 14. In fact, the Debtor testified that between October 2008 through March 2011 (when the schedule was prepared by his counsel), there were no documents that demonstrated whether payments on

23

the Debtor's behalf might be credited on account of the AllStar Loan, and that any and all understanding of the nature of these payments was solely in the Debtor's head. See 3/13/13 Trans. at 14:16–23.

The meager evidence presented by the Debtor to purportedly demonstrate that the AllStar Loan was repaid prior to the filing is not credible. Indeed, there is no evidence of the repayment of this loan except for the Debtor's own testimony as to the understanding he had in his head between himself and AllStar, which is the Debtor's alter-ego.

Finally, the Debtor's allegations, as purportedly evidenced by the revised loan repayment schedule, are belied by the Debtor's own bankruptcy filings. If the loan had in fact been repaid by AllStar as payments to third parties on behalf of obligations owed by the Debtor, then the Debtor would have been required to disclose these payments in response to questions 3 and/or 10 on the Statement of Financial Affairs, the Amended Statement of Financial Affairs, or the Second Amended Statement of Financial Affairs. See Exs. 26-28 at questions 3 and 10. He did not do so, clearly showing that his alleged theory as to the loan repayment was a story concocted to hide the AllStar Receivable from the estate and the Trustee.

The circumstances concerning the Debtor's failure to list the AllStar Receivable unequivocally demonstrate the Debtor's fraudulent intent. Accordingly, the Debtor's concealment of the AllStar receivable requires the denial of his discharge pursuant to § 727(a)(2).

### ii.    Debtor Fraudulently Concealed the $15,000 Wurk TS Receivable

Similarly, prior to the Petition Date, the Debtor had a $15,000 receivable due from Wurk TS (See 3/12/13 Trans. at 153:19-21; See also Ex. 24 at Schedule B), another corporation wholly controlled by the Debtor, which constituted property of the estate, that he concealed from the

Trustee.  The timing involving the repayment of this receivable leaves no doubt that the Debtor intentionally concealed this asset from the Trustee and his estate.  The Wurk Receivable also meets all four prongs under § 727(a)(2).

The Debtor testified that the reason for his failure to list the Wurk Receivable on the Schedules was because he did not have the bank records for either his account or Wurk TS' account at the time the Schedules were filed (See 3/12/13 Trans. at 82:23–25).  However, this claim has no merit.  The Debtor was the manager and/or person in control of Wurk TS (See PTO at para. 30; See also 3/12/13 Trans. at 81:21–25 and 82:1).  As such, he arranged for Wurk TS to wire the $15,000 into his personal account within days of the Petition Date.  See Ex. 18. Therefore, regardless of whether the Debtor had access to the bank records, he clearly had personal knowledge of his entitlement to the Wurk Receivable as of the Petition Date as evidenced by the fact that he arranged for the transfer of funds in repayment of this obligation a mere three days after his bankruptcy filing.

Also, when taking into consideration the timing of the filing of the Schedules, it becomes clear that this explanation amounts to nothing more than a pure fabrication.  The pre-petition Wurk obligation was paid to the Debtor post-petition on October 22, 2009.  See Ex. 18. However, the Debtor did not file the Schedules until November 22, 2009.  (See Ex. 24). Clearly, the Debtor was aware of this entitlement of the Wurk Receivable at the time he filed his Schedules in that he had already arranged for Wurk TS to repay him.

The circumstances involving the timing of the repayment of the Wurk Receivable and the filing of the Schedules evidence a clear intent on the Debtor's part to defraud his bankruptcy estate.  Accordingly, his concealment of the Wurk Receivable necessitates a denial of his discharge under § 727(a)(2).

25

### iii.    Debtor Fraudulently Concealed the $1 Million Stack Receivable

Likewise, the Debtor purposefully wove a web of confusion regarding his entitlement to the Stack Receivable in an effort to conceal this asset from the Trustee.  Although the Retainer Agreement clearly indicates that this receivable was property of his estate, the Debtor attempts to justify his failure to advise the Trustee of its existence by hiding behind one of his many insider entities.

There is no doubt that the Debtor retained Todtman Nachamie in an effort to protect his interest in the Stack Receivable.  This is evidenced by the fact that the Retainer Agreement (i) was signed by the Debtor in his individual capacity, (ii) addressed to the Debtor personally, and (iii) specifically references the Debtor as the client.  See Ex. 29.  Furthermore, the Debtor included the related retainer as a payment made by AllStar on behalf of the Debtor, individually, on the alleged AllStar loan repayment schedule (See Ex. 14).

Notwithstanding this strong evidence, the Debtor attempts to argue that the Stack Receivable was due McCann.  Not only is this contrary to the plain language of the Retainer Agreement, as modified, but this allegation also needs to be considered in light of the fact that the Debtor (and not McCann) made several significant transfers to Citadel just one month prior to entering into the agreement with Mr. Stack (See Exs. 29-31).  As a result, it is not unfathomable that the Stack Receivable would have been structured such that the payment was due the Debtor in his individual capacity as a means of recapturing his recent repayments to Citadel.

This is particularly so given that the Debtor could have, but did not, produce the underlying sale agreement or note.  In fact, the Retainer Agreement was not produced by the Debtor but rather obtained by the Trustee in response to a subpoena issued to Todtman Nachmie.

Just as this Court determined in the <u>Portnoy</u> case cited above, the Debtor's placing assets outside the reach of creditors by withholding this knowledge and information evidences his fraudulent concealment. <u>In re Portnoy</u>, 201 B.R. 685 at 694.

Even if the Debtor's reasoning held any weight, which it does not, at a minimum, the Debtor was required to disclose this receivable in response to question 10 of his Statement of Financial Affairs, which he did not (<u>See</u> <u>Exs. 26-28</u> at question 10). The fact that the Stack Receivable was not disclosed in the Schedules or Amended Schedules (<u>See</u> <u>Exs. 24 and 25</u> at Schedule B), or the related transfer of the interest in Citadel was not disclosed in the Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs (<u>See</u> <u>Exs. 26-28</u> at question 10), clearly evidences the Debtor's intent to conceal this asset from the Trustee. Accordingly, the Debtor's discharge must be denied pursuant to § 727(a)(2).

**B.     <u>Section 727(a)(2)(A) Requires Denial Of Discharge Where a Debtor Fraudulently Transfers his Property</u>**

To demonstrate actual fraud in the transfer of the debtor's property, a trustee must show as a matter of law that: (1) the debtor transferred the property with actual intent to hinder, delay or defraud its creditors; and (2) the transferee had knowledge of the fraud at the time of the transfer. <u>In re Corcoran</u>, 246 B.R. 152, 161 (Bankr. E.D.N.Y. 2000). Courts recognize, however, that a trustee's ability to show direct proof of a debtor's intent to hinder, delay or defraud its creditors is rare and difficult. <u>Id.</u> As a result, "[f]raudulent intent may be inferred by circumstantial evidence or inferences drawn from a course of conduct." <u>In re Gardner</u>, 384 B.R. at 663. A trustee may rely on the "badges of fraud," which are often cited as circumstantial evidence, to establish an inference of fraudulent intent. <u>Id.</u>

The existence of 'badges of fraud' "strongly suggest that a transaction's purpose is to defraud creditors unless some other convincing explanation appears." In re Woodfield, 978 F.2d 516, 518 (9th Cir. 1992).  These badges include:

(1) a close relationship between the transferor and the transferee;

(2) that the transfer was in anticipation of a pending suit;

(3) that the transferor Debtor was insolvent or in poor financial condition at the time;

(4) that all or substantially all of the Debtor's property was transferred;

(5) that the transfer so completely depleted the Debtor's assets that the creditor has been hindered or delayed in recovering any part of the judgment; and

(6) that the Debtor received inadequate consideration for the transfer.

In re Kaiser, 722 F.2d 1574, 1582-83 (2d Cir. 1983); In re Palermo, 370 B.R. 299, 612 (Bankr. S.D.N.Y. 2007).

Notably, "[t]he shifting of assets by the debtor to a corporation wholly controlled by him is another badge of fraud." In re Kaiser at 1583 (2d Cir. 1983).

Furthermore, a gratuitous transfer or concealment raises the presumption that such transfer was made with the actual fraudulent intent necessary to deny discharge.  See Najjar v Kablaoui (In re Kablaoui), 196 BR 705, 710 (Bankr. S.D.N.Y. 1996) (granting creditor's motion for summary judgment and finding presumption of actual fraudulent intent where debtor transferred property gratuitously to relatives while experiencing financial difficulties and under the threat of property execution and/or salary garnishment); See also Tillery v. Hughes (In re Hughes), 184 B.R. 902, 908 (Bankr. E.D. La. 1995) ("The retention of the use of transferred property very strongly indicates a fraudulent motive underlying the transfer."); United Bank of Denver N.A. v. Greenwalt (In re Greenwalt), 48 B.R. 804, 807 (Bankr. D. Colo. 1985) (finding $50,000 deposit into corporate bank account was made with the intent to defraud creditors where

deposit was not disclosed in debtor's schedules, ultimately benefited debtor's step children, and debtor actually utilized one-half of the funds for his personal expenses).

### i.   Debtor Fraudulently Transferred $500,000 to Wurk TS

Like his fraudulent concealment of assets totaling over $3 million, the Debtor followed a similar pattern by fraudulently transferring over $3 million to insider entities within the year of his bankruptcy filing. One such transfer, the Wurk TS Transfer, in the amount of $500,000, was made to Wurk TS a mere eight months prior to the Petition Date. See PTO at para. 37; See also 3/12/13 Trans. at 85:13-18 and Ex. 32. It is undisputable that the funds compromising the Wurk TS Transfer were property of the Debtor because they came from his individual Wachovia Credit Line (See PTO at para. 37). Again, all four prongs of § 727(a)(2) are met.

The Wurk TS Transfer must be categorized as gratuitous in nature because the Debtor received no consideration in exchange for the transfer. The Debtor admitted that he has not, and cannot, recoup this contribution (See 3/12/13 Trans. at 86:8–12) because Wurk TS ceased operating on or about the Petition Date (See PTO at para. 31; See also 3/12/13 Trans. at 82:2–5). While the Debtor attempts to justify the Wurk TS Transfer by arguing that it was a capital contribution (See 3/12/13 Trans. at 86:5–7), this cannot be true as the Debtor is not a member of Wurk TS. See PTO at para. 28; See also 3/12/13 Trans. at 86:13–14. While this alone should be enough to presume fraudulent intent, the Wurk TS Transfer also satisfies many of the other badges of fraud.

For example, the Debtor is the sole member of Wurk Environments (See Exs. 24 and 25), which is the sole member of Wurk TS. See PTO at para. 28; See also 3/12/13 Trans. at 81:18–20. Moreover, at all relevant times, the Debtor was the manager and/or person in control of Wurk TS. See PTO at para. 30 and 3/12/13 Trans. at 68:12-16, 81:22-25, 82:1, 84:25 and 85:1-

2.  As a result, this is an insider entity, and there can be no doubt that the requisite close relationship exists between the Debtor and the Wurk entities.  See 3/12/13 Trans. at 81:21–25 and 82:1.  In fact, the Wurk TS Transfer was nothing more than a transfer of property of the Debtor to a corporation wholly controlled by the Debtor, which has been found to be a specific badge of fraud by the Second Circuit.  In re Kaiser at 1583 (2d Cir. 1983).

Also the Debtor had limited assets but significant personal liabilities at the time of the transfer, which included (i) various credit card balances in unknown amounts, (ii) monies owed to the United States of America for forfeiture and restitution in an unknown amount, and (iii) taxes due the Internal Revenue Service and the New York State Department of Tax and Finance, in claimed amounts in excess of $33 million.  See PTO at para. 100; See also Exs. 24 and 25 at Schedules D-F.

Finally, the Debtor testified that, at or around the time of the Wurk TS Transfer, he was worried that he would most certainly lose a Tax Court case commenced by the IRS.  See 3/12/13 Trial Trans. at 134:20-25 and 135:1-6.

Simply put, the Debtor transferred $650,000 to Wurk TS, a newly formed insider corporation, at a time when he was in poor financial condition, had personal liabilities in excess of $33 million, and was concerned about the IRS' likely victory in a pending tax litigation. Tellingly, Wurk TS ceased operations on or about the Petition Date so that neither the Trustee, on behalf of the bankruptcy estate, nor the Debtor's creditors, were able to recoup the benefits of this transfer.

### ii.  Debtor Fraudulently Transferred $650,000 to Citadel

The Debtor also made two significant transfers to Citadel, another insider corporation, nine months prior to filing for bankruptcy.  As detailed above, the Citadel Transfers totaled

$650,000 (the "Citadel Transfers").   See PTO at para. 50 and 53; See also 3/12/13 Trans. at 92:12-17 and Exs. 30 and 31.  Like the Wurk TS Transfer, there is no question that the funds compromising the Citadel Transfers were property of the Debtor in that they were also transferred directly from his personal Wachovia Credit Line.

Again, as the case law holds, the fact that these transfers were gratuitous in nature should be enough to presume the Debtor's fraudulent intent.  Specifically, although the Debtor had multi-million dollar liabilities at the time of the transfers, he received no consideration in exchange for the Citadel Transfers.  The Debtor testified that the first payment was a capital contribution from Wurk Environments to Wurk TS to satisfy its obligation to Citadel (See 3/12/13 Trans. at 92:23–55 and 93:1-3) and that the second transfer was a capital contribution ultimately on behalf of Wurk TS (Id. at 94:7–9).  However, these statements are clearly false as the Debtor is not a member of Wurk TS.  Id. at 86:13–14.  The Debtor has also admitted that he has not, and cannot, recoup these transfers (Id. at 93:4–18) because both Wurk TS, Wurk Environments and Citadel all ceased operating on or about the Petition Date (See PTO at para. 31 and 49; See also  See Ex. 55, at 115:20-22.

Additional fraudulent intent can be found with respect to the Citadel Transfers in that other badges of fraud are present.  First, a close relationship exists between the parties, as Citadel was an insider of the Debtor.  See PTO at para. 83; See also Exs. 33-47.  Second, at the time of the Citadel Transfers, the Debtor was in poor financial condition, had personal liabilities in excess of $33 million (See PTO at para. 100; See also Exs. 24 and 25 at Schedules D-F), and was concerned that he would most certainly lose the IRS Tax Court case (See 3/12/13 Trial Trans. at 134:20-25 and 135:1-6).  Finally, Citadel, Wurk TS and Wurk Environments all ceased operations on or about the Petition Date (See PTO at para. 31 and 49; See also Ex. 55, at 115:20-

22) so neither the Trustee on behalf of the bankruptcy estate, nor the Debtor's creditors, were able to recoup the benefits of these significant and improper transfers.

### iii.    Debtor Fraudulently Transferred $1.5 - $2.5 Million to Wurk Environments/Wurk TS

Additionally, the Debtor transferred between $1,500,000 and $2,500,000 to or on behalf of Wurk Environments and/or Wurk TS in 2009.  See Exs. 27 and 28 at question 10.

There is no doubt that the Debtor made these transfers with the intent to hinder, delay or defraud his creditors because the following badges of fraud are present:  (i) the Debtor did not receive any consideration in exchange for the transfers; (ii) the transfers were made to or for the benefit of insider corporations at the direction of the Debtor, (iii) the amount of the transfers, totaling as much as $2.5 million, were made at a time when the Debtor's other assets were nominal in amount as they were comprised mainly of his corporate and partnership interests (See Exs. 24 and 25 at Schedule B and Exs. 26-28 at question 10), (iv) the Debtor had liabilities in excess of $33 million at the time of the transfers, (v) the Debtor was worried that he would lose the litigation commenced by the IRS, and (vi) the Wurk entities are no longer operating so the Debtor cannot recoup the value of the transfers.[5]

Finally, with respect to all of the transfers at issue, it is the Debtor's fraudulent intent that matters most, and not the ultimate harm to the creditors.  Thus, although the Debtor's fraudulent transfers and concealment of assets aggregate in the excess of $6 million, any one of the fraudulent transfers, standing alone, is sufficient to deny his discharge.  See Williams v. Hoza (In re Hoza), 373 BR 409, 416 (Bankr. W.D. Pa. 2007) (finding that there is no minimum threshold amount that must be exceeded before section 727(a)(2) applies).   Accordingly, the Debtor's discharge must be denied pursuant to § 727(a)(2).

### III.  DEBTOR'S DISCHARGE SHOULD BE DENIED PURSUANT TO § 727(A)(4)

#### A.  Section 727(a)(4)(A) Requires Denial Of Discharge Where a Debtor Makes a False Oath or Account

Pursuant to section 727(a)(4)(A):

> "(a)     the court shall grant the debtor a discharge, unless…
> (4) the debtor knowingly and fraudulently, in or in connection with the case…
>               (A) made a false oath or account.

11 U.S.C. § 727(a)(4).

In other words, "[a] denial of discharge under § 727(a)(4)(A) requires the objecting party to prove the following elements:

(i) material false oath

(ii) knowingly and fraudulently made

(iii) in connection with a bankruptcy case."

In re Gardner, 384 B.R. at 667.  A false oath under this subsection could have been made in schedules, statements of financial affairs, or during examinations.  Id.  Similarly, omissions from a debtor's schedule generate liability under § 727(a)(4)(A).  In re Handel, 266 B.R. 585, 590 (Bankr. S.D.N.Y. 2001); see also In re Gabor, 2009 Bankr. LEXIS 3110 at 22-23 (Bankr. S.D.N.Y. 2009) ("Both omissions and affirmative misstatements constitute false statements under § 727(a)(4)(A)").

Moreover, "[m]ateriality is found if the false oath is related to the debtor's business transactions, concerns the discovery of assets, business dealings, or the existence or disposition of the debtor's property."  Gardner, 384 B.R. at 667.  Notably, "a debtor may not be able to escape denial of discharge for making false oath merely by asserting that the admittedly or falsely stated information concerned a worthless business relationship or holding."  In re Sapru,

---

[5] Laura Gordon, the Debtor's former wife, has filed a claim against the bankruptcy estate, in the amount of

33

127 B.R. 306, 315 (Bankr. E.D.N.Y. 1991). In other words, "[t]he fact that the Debtor has failed to disclose [his] interest in property that turns out to have little or no value to the estate may be the basis for denying the debtor its discharge because the determination of relevance and importance of the question is not for the Debtor to make. It is the Debtor's role simply to consider the question carefully and answer it completely and accurately." Id. (internal citations omitted); see also In re Sicari, 187 B.R. 861, 881-882 (Bankr. S.D.N.Y. 1994); In re Chalik, 748 F.2d 616 (11th Cir. 1984) (debtor's assertion that omitted or falsely stated information concerned a worthless asset will not avoid the denial of a debtor's discharge, such defense being categorized as "specious") (citing Diorio v. Kreisler-Borg Construction Co., 407 F.2d 1330 (2d Cir. 1969)).

In determining whether the debtor made a false statement with intent to deceive, the court can consider, among other factors, the debtor's level of financial sophistication." In re Moreo, No. 08-71258-478, 2009 WL 2929949, *22 (Bankr. E.D.N.Y. Sept. 10, 2009). Although actual intent must be proven, "a multitude of misstatements and omissions of fact can demonstrate a pattern of reckless disregard for the truth and intent of concealing information from the Court and its creditors." In re Shah, 288 B.R. 23, 38 (Bankr. E.D.N.Y. 2008); see also In re Sicari, 187 B.R. 861 at 882. ("fraudulent intent may be inferred, for purposes of a § 727(a)(4)(A) objection, from a debtor's reckless indifference to or cavalier disregard of the truth"). Notably, "[n]umerous omissions that display a pattern of misleading conduct are sufficient to establish a fraudulent false oath." In re Gabor, 2009 Bankr. LEXIS 3110 at 28. Moreover, a debtor's "attempts to justify his misconduct by the actions of others and **his own inadvertence are unpersuasive**." In re Kaiser at 1584 (2d Cir. 1983)(emphasis added).

Here, the Debtor made the following false oaths:

---

$3,797,324.08, as a result of certain of these transfers from the Wachovia credit line.

(1) The Debtor failed to list the AllStar Loan on his Statement of Financial Affairs or any of the subsequent amendments.  See PTO at para. 24; See also Exs. 26- 28 at question 10.

(2) The Debtor failed to list the Wurk TS Transfer on his Statement of Financial Affairs or any of the subsequent amendments.  See PTO at para. 38; See also Exs. 26-28 at question 10.

(3) The Debtor failed to list the Citadel Transfers on his Statement of Financial Affairs or any of the subsequent amendments.  See PTO at para. 51; See also Exs. 26-28 at question 10.

(4) The Debtor grossly misstated his income on his Statement of Financial Affairs, Amended Statement of Financial Affairs, and Second Amended Statement of Financial Affairs. See Exs. 26-28 at question 1.

(5) The Debtor failed to list Chase Auto Finance on his Schedules (See PTO at para. 63; See also Ex. 24 at Schedules D, F and H), notwithstanding the fact that the Debtor was a guarantor of Citadel's obligation owed to Chase Auto Finance on account of an automobile note.  See PTO at para. 62; See also 3/12/13 Trans. at 98:8-11.

(6) The Debtor did not list the Co-Debtor Obligations on his Schedules.  See PTO at para. 68; See also Ex. 24 at Schedule H.

(7) The Debtor did not list Citadel or Cascar on his Statement of Financial Affairs or any of the subsequent amendments.  See PTO at para. 82; See also Exs. 26-28 at question 18.

(8) The Debtor did not list the following business entities on his Statement of Financial Affairs or Amended Statement of Financial Affairs: McCann; Hilltop Investments LLC; Boulder Heights; Phoenix Capital Advisors, Inc.; Eastern Energy Group, Inc.; and Kings Holdings, LLC.  See PTO at para. 84; See also Exs. 26 and 27 at question 18.

The sheer multitude of false oaths contained in the Debtor's Schedules, coupled with the Debtor's financial sophistication, demonstrate the Debtor's "cavalier" and "reckless" disregard for the truth.  See In re Sicari, 187 B.R. at 882 (Bankr. S.D.N.Y. 1994).

Although the Debtor attempted to justify the above false oaths at trial, the Debtor's testimony is not credible and often conflicting, which is a clear indication of his fraudulent intent.  For example, the Debtor testified that he failed to list the AllStar Loan in response to question 10 of his Statement of Financial Affairs, Amended Statement of Financial Affairs, or Second Amended Statement of Financial Affairs, because he "did not consider the loan to

AllStar to be outside the ordinary course of business ... in the way in which [he] conducted [his] affairs, either individually or vis-à-vis AllStar." See 3/12/13 Trans. 1 at 32:4-7. However, when the Trustee's counsel pressed the topic of ordinary course payments at trial, the Debtor, not surprisingly, testified that he had never made any other loans to AllStar in an amount over $150,000. See 3/13/13 Trans. at 26:5-10 and 27:5-8. As the Debtor's own testimony evidences, the $2 million transfer to AllStar could not have been an ordinary course transfer because the Debtor had never before made a transfer in an amount anywhere near the magnitude of the AllStar Transfer.

When faced with a similar line of questioning at trial regarding the Citadel Payments, the Debtor responded with an outright lie. He stated that the Citadel Payments did not need to be listed in response to question 3 on his Statement of Financial Affairs because "*Citadel was not a creditor of mine*". See 3/12/13 Trans. at 153:19-21. This is clearly false as the Debtor listed Citadel as a creditor on his Schedules. See Exs. 24 and 25 at Schedule F. Likewise, the Debtor testified that he did not need to list the Citadel Payments in response to question 10 of his Statement of Financial Affairs because he considered these payments to be capital contributions on behalf of Wurk TS in the ordinary course of business. See 3/12/13 Trans. at 92:23–55, 93:1-3, and 94:7-9. However, the Debtor's reasoning must be disavowed because it is based entirely on a false premise as the Debtor was not a member of Wurk TS. Id. at 86:13-14.

Even more shocking is the explanation the Debtor provided for failing to list the AllStar Loan in response to question 10 of the Statement of Financial Affairs. Despite being a sophisticated businessperson, the Debtor incredibly states that he misunderstood the phrase "other transfers" to mean a transfer of property other than cash. See 3/12/13 Trans. at 33:7-11. He offered this justification notwithstanding the fact that the actual question states "list all

property" and that he listed other cash transfers in response to that very same question (Id. at 36:2-13; See also Exs. 27 and 28 at question 10), leaving no doubt that this justification must be disregarded.

Moreover, the Debtor justifies his failure to list Citadel in response to question 18 on his Statement of Financial Affairs by stating that he did not believe he was ever an officer of Citadel. See 3/12/13 Trans. at 159:10-17.   However, the countless documents offered into evidence demonstrate that the Debtor was an officer or principal of Citadel.  See Exs. 33-47.

The Debtor also testified that his failure to list McCann and Boulder Heights was a mere oversight.   See 3/12/13 Trans. at 159:18-20 and 161:12-14.   The Debtor's own inadvertence, however, is an unpersuasive justification for his misconduct.   In re Kaiser at 1584 (2d Cir. 1983). The Debtor's failure to list McCann and Boulder Heights is not surprising to the Trustee because these were two of the few insider entities that had significant assets.   See 3/12/13 Trans. at 141:12-18 (where the Debtor alleges that David Stack owed $1 million to McCann in connection with its alleged transfer of its interest in Citadel); See also Boulder Heights Bankruptcy Schedules (SDNY Bankr. Case No. 12-11958(REG)) at DE 6 (which lists Boulder Heights' interest in real property located in Groton, CT with an estimated value of $2.5 million).

Furthermore, the Debtor's justification for his failure to list the Co-Debtor Obligations on Schedule H is unavailing.   The Debtor testified that he considered the obligations to be co-guarantor obligations but not co-debtor obligations, and therefore believed they did not need to be reflected on Schedule H.   See 3/12/13 Trans. at 101:25 and 102:1–5.   However, the instructions to Schedule H specifically state that the Debtor was required to include "all **guarantors** and co-signers" (emphasis added).  See Exs. 24 and 25 at Schedule H.  Also, though the Debtor disavowed needing to list these obligations, after the Trustee filed her Complaint

noting these omissions, the Debtor amended the Schedules and included the Co-Debtor Obligations.  See PTO at para. 70; See also Exs. 4 at para. 67(g)(h)9(i) and (j) and Ex. 25 at Schedule H.

Notably, the fact that the Debtor subsequently amended his filings to include references to missing assets and information noted by the Trustee in her Complaint does not rectify the omissions for purposes of Section 727(a)(4) because the amendments are essentially an admission that they should have been listed in the first place.  See In re Sullivan, 444 B.R. 1, 9 (Bankr. D.Mass. 2011) (a debtor's decision to amend schedule demonstrates debtor's concession that asset should have been disclosed as an asset at the commencement of the case).

Even more unbelievable is the Debtor's testimony concerning his falsely listed income. As noted above, the Debtor grossly misstated his income for 2008 or 2009 in response to question 1 on the Statement of Financial Affairs and the subsequent amendments.  The Debtor unconvincingly attempts to explain this failure by stating that the amount listed for 2008 was net of losses and his 2009 income was properly listed on Schedule I of his bankruptcy petition.  As is detailed below, these statements are false.

In all of his bankruptcy filings, the Debtor lists his gross income for 2008 as $0.00.  See 3/12/13 Trans. at 96:21–25; See also Exs. 26-28 at question 1.  While the Debtor claims that the figure took losses into account (See 3/13/2013 Trans. at 11:2-5), the Debtor's response to this question does not state that the amount listed is net of losses (See 3/12/13 Trans. at 168: 24–25 and 169:1; See also Exs. 26-28 at question 1).  In fact, the Debtor's tax return for 2008 reflects gross income of $267,311 and a tax overpayment of $157,978.  See Ex. 59.

Notwithstanding the fact that the instructions to the question required the Debtor to list his **gross** income, the Debtor testified at trial that he did not believe it was necessary to do so

38

because the Trustee had copies of his income tax return for that year.  See 3/13/12 Trans. at 12:4-6.  In other words, the Debtor intentionally and knowingly placed the burden on the Trustee to determine the Debtor's true income, as opposed to honestly answering the question on any version of his statement of financial affairs that he filed.

Similarly, Mr. Gordon listed his year-to-date income for 2009 as $150,000.  See Exs. 26-28 at question 1.  However, as detailed above, his 2009 income exceeded $635,000.[6]  Mr. Gordon downplays the significance of this omission by stating that his monthly income was properly disclosed on Schedule H.  See 3/12/13 Trans. at 119:22–25 and 120:1–13.  However, this statement is clearly false in that Schedule I indicates that the Debtor's annual income would be approximately $408,000 (See Exs. 24 and 25 at Schedule I), over $200,000 less than his actual annual income for that year. Even if the Debtor's justification were sound, it is improper for the Debtor to continue to purposefully place an undue burden on the Trustee by forcing her to extrapolate information when the Debtor should have provided an honest answer in response to question 1 on the Statement of Financial Affairs or any of the subsequent amendments.

Finally, Mr. Gordon has argued that some of these omissions are irrelevant because, even if he had listed them on his Schedules or Statement of Financial Affairs, they would not have led to the recovery of any assets for the Estate.  This argument has no merit.  The clear and well-settled case law states that an omission is material as long as it relates to the Debtor's business activities, regardless of whether it would lead to recovery of assets for the Estate.  In re Sapru, 127 B.R. at 315.  Furthermore, the determination as to what assets and information are relevant to the bankruptcy proceeding was not one for the Debtor to make.  See In re Sicari, 187 B.R. 861 (Bankr. S.D.N.Y. 1994); see also In re Sapru, 127 B.R. 306 at 315 (determination of relevance or importance of asset is not one for the debtor to make).

39

Most importantly, had the Debtor been honest and upfront about his assets and transfers, the Trustee would have had an opportunity to recover the same for the estate.    Instead, the Debtor acted in a fraudulent and calculated manner to ensure that his creditors would not and could not recover these assets.

Accordingly, the Debtor's discharge must be denied pursuant to § 727(a)(4)(A).

## CONCLUSION

While the Trustee notes that only one exception to discharge is necessary, due to the countless and significant concealment of assets and improper transfers of the Debtor's property, as well as the numerous false oaths and testimony provided by the Debtor, the Trustee respectfully submits that the Court must deny the Debtor's discharge pursuant to §§727(a)(2) and 727(a)(4)(A).

Dated:   New York, New York           FOX ROTHSCHILD LLP
       May 20, 2013                         Special Litigation Counsel to Angela G. Test-
                                          Milner, Chapter 7 Trustee


                                   By:   */s/ Yann Geron*
                                        Yann Geron
                                        Nicole N. Santucci (Of Counsel)
                                        Barri A. Frankfurter
                                        100 Park Avenue, Suite 1500
                                        New York, New York 10017
                                        (212) 878-7900

---

[6] The Debtor's 2009 tax return was filed in October 2010.