AKERMAN SENTERFITT LLP

Donald N. David
666 Fifth Avenue, 20th Floor
New York, New York 10103
(212) 880-3800
*Attorneys for Debtor Daniel Gordon*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------x

In re                                                    :
                                                         :    Chapter 7
DANIEL GORDON,                                           :
                                                         :    Case No. 09-16230 (REG)
                        Debtor.                          :
                                                         :
-----------------------------------------------------------x
ANGELA G. TESE-MILNER, TRUSTEE                           :
OF THE ESTATE OF DANIEL GORDON,                          :
                                                         :
                        Plaintiff,                       :
                                                         :
       -against-                                         :    Adv. Pro. No. 10-03767 (REG)
                                                         :
DANIEL GORDON,                                           :
                                                         :
                        Defendant.                       :
-----------------------------------------------------------x

**DEBTOR/DEFENDANT'S POST-TRIAL BRIEF IN SUPPORT OF DEBTOR'S
DISCHARGE AND IN OPPOSITION TO TRUSTEE'S COMPLAINT FOR JUDGMENT
DENYING THE DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727(A)**

# TABLE OF CONTENTS

**Page**

I.      BACKGROUND ................................................................................................. 1

      A.      Allstar ................................................................................................... 2

      B.      Wurk .................................................................................................... 3

      C.      Citadel ................................................................................................. 3

II.     THE BANKRUPTCY FILING ......................................................................... 3

III.    THE OBJECTION TO DISCHARGE ............................................................. 4

      A.      The Trustee's High Burden of Proof ................................................... 8

IV.     THE COMPLAINT'S ALLEGATIONS ........................................................ 12

      A.      The Allstar Allegations ...................................................................... 12

      B.      Wurk .................................................................................................. 15

V.      REMAINING ALLEGATIONS IN COUNT I OF THE COMPLAINT .......... 19

      A.      Stack Receivable ................................................................................ 19

      B.      Wurk Receivable ................................................................................ 20

VI.     REMAINING ALLEGATIONS IN COUNT III OF THE COMPLAINT ....... 22

      A.      Amex Transfers .................................................................................. 22

      B.      Income Statement ............................................................................... 23

      C.      IRA Contributions .............................................................................. 25

      D.      Failure To List Entities In Response To Question 18 ......................... 25

      E.      Phoenix Capital Advisors, Inc. .......................................................... 26

      F.      Hilltop Investments and Eastern Energy ............................................ 26

      G.      King Holdings LLC ............................................................................ 27

      H.      CASCAR, LP ..................................................................................... 27

      I.      McCann Construction, LLC and Boulder Heights .............................. 28

J.    Citadel ................................................................................................... 29

K.    Debtor's Role as Co-Debtor................................................................. 30

VII.    ALLEGATIONS THE TRUSTEE FAILED TO RAISE AT TRIAL ..............................33

VIII.    CONCLUSION......................................................................................................34

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*ACLI Government Securities, Inc. v. Rhoades,*
   653 F. Supp. 1388 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1287 (2d Cir.1988).................................11

*Alpert v. U.S.*
   430 F. Supp.2d 682 (N.D. Ohio, 2006)...................................................................................23

*Blonien v. C.I.R.,*
   2003 WL 22520103 (U.S.Tax Ct.,2003).................................................................................23

*Grogan v. Garner,*
   496 U.S. 279 (1991).................................................................................................................11

*Haff v. Long Island Fuel Corp.,*
   233 App.Div. 117 (2d Dept. 1931) ........................................................................................29

*Halpern v. Schwartz,*
   426 F.2d 102 (2d Cir. 1970)......................................................................................................9

*In re Aboukhater,*
   165 B.R. 904 (9th Cir. BAP 1994).........................................................................................10

*In re Adlman,*
   541 F.2d 999 (2d Cir. 1976)......................................................................................................9

*In re Barbe,*
   466 B.R. 737 (Bankr. W.D.Pa. 2012) ....................................................................................11

*In re Boyer,*
   328 Fed.Appx. 711, 2009 WL 1635922 (2d. Cir. 2009)...................................................10, 21

*In re Brundege,*
   359 B.R. 22 (Bankr. N.D.N.Y. 2007) ......................................................................................8

*In re Cacioli,*
   463 F.3d 229 (2d. Cir. 2006)....................................................................................................8

*In re Chalasani,*
   92 F.3d 1300 (2d. Cir. 1996)....................................................................................................8

*In re Chalik,*
   748 F.2d 616 (11th Cir.1984) ................................................................................................10

*In re Coombs,*
   193 B.R. 557 (Bankr. S.D.Cal., 1996) ...............................................................9, 10, 21, 35

*In re Deedon,*
  419 B.R. 1 (Bankr. D.Conn. 2009) ........................................................................................9

*In re Fraleigh*
  474 B.R. 96 (Bankr.S.D.N.Y. 2012)......................................................................................22

*In re Gollomp,*
  198 B.R. 433 (S.D.N.Y. 1996)................................................................................11, 12, 14

*In re Gugliada*
  20 B.R. 524 (Bankr. S.D.N.Y. 1982) ....................................................................12, 14, 28

*In re Harte,*
  440 B.R. 133 (Bankr. W.D. MI 2010) ............................................................................9, 13, 24

*In re Hyman,*
  502 F.3d 61 (2d Cir. 2007)......................................................................................................8

*In re Irving,*
  27 B.R. 943 (Bankr. E.D.N.Y. 1983)...............................................................................9, 21

*In re Jennings*
  349 B.R. 897 (Bankr. M.D.Fla. 2006) ................................................................................17

*In re Kokoszka,*
  479 F.2d 990 (2d Cir. 1973)....................................................................................................8

*In re Mesa Air Group, Inc.,*
  2011 WL 182450 (Bankr. S.D.N.Y. 2011)..........................................................................23

*In re Miles*
  481 B.R. 838 (Bankr. N.D.Ga. 2012) ..................................................................................16

*In re Moon*
  385 B.R. 541 (Bankr. S.D.N.Y. 2008)....................................................................................9

*In re Moseman*
  436 B.R. 398 (Bankr.E.D.Tex. 2010) ..................................................................................29

*In re Parsell,*
  172 B.R. 226 (Bankr. N.D.Ohio, 1994)................................................................................11

*In re Petersen*
  323 B.R. 512 (Bankr. N.D.Fla. 2005)............................................................................17, 23

*In re Rubin,*
  12 B.R. 436 (Bankr. S.D.N.Y. 1981.)......................................................................................9

*In re Watkins,*
    474 B.R. 625 (Bankr. N.D.Ind. 2012)..................................................................................16

*Matter of Ostwald's Estate,*
    20 Misc.2d 1001, 189 N.Y.S.2d 472 (Sur.Ct. Richmond Co. 1959) ......................................29

*Meyers v. Internal Revenue Service,*
    196 F.3d 622 (6th Cir. 1999) ................................................................................................8

*Phillips v. Miller,*
    418 B.R. 445 (Bankr. M.D. Fla. 2009) ................................................................................16

*Roos v. Aloi,*
    127 Misc.2d 864, 487 N.Y.S.2d 637 (N.Y.Sup.,1985)..........................................................29

*RSL Communications PLC v. Bildirici,*
    649 F. Supp.2d 184 (S.D.N.Y. 2009).....................................................................................29

*Singh v. Attorney General of U.S.,*
    677 F.3d 503 (3d Cir. 2012)..................................................................................................11

*Stamat v. Neary,*
    635 F.3d 974 (7th Cir. 2011) .........................................................................................11, 16

*Weiss v. Gordon,*
    32 A.D.2d 279, 301 N.Y.S.2d 839 (1st Dept.1969)...............................................................29

**STATUTES**

11 U.S.C. § 523(a) .........................................................................................................................11

11 U.S.C. § 727(a)(2)........................................................................................................... passim

11 U.S.C. § 727(a)(4)(A) ...............................................................................................................11

11 U.S.C. § 727............................................................................................................................ passim

## DEBTOR/DEFENDANT'S POST-TRIAL BRIEF IN SUPPORT OF DEBTOR'S DISCHARGE AND IN OPPOSITION TO TRUSTEE'S COMPLAINT FOR JUDGMENT DENYING THE DEBTOR'S DISCHARGE PURSUANT TO 11 U.S.C. § 727(A)

### I.   BACKGROUND

In 1999 Debtor was the head of Merrill Lynch's Global Energy Commodities trading business. (Tr. 3/12/13,9:7-9.) In 2003, the Debtor entered into a plea agreement and cooperation agreement (the "Plea Agreement") with the United States Attorney's Office for the Southern District of New York and the Enron Task Force pursuant to which the Debtor pled guilty to: (i) wire fraud, (ii) money laundering, and (iii) conspiracy to falsify books and records in relation to a $43 million energy transaction involving Merrill Lynch.   In connection with his guilty plea, the Debtor served 22 months in federal prison and forfeited $43 million to the United States Government. (Tr. 3/12/13, 19-20.)

Following the Debtor's Plea Agreement with the US Attorney's office in 2003, the Internal Revenue Service commenced an audit of his federal income tax returns for 2000, 2001 and 2002.   As part of the audit, the IRS argued that the Debtor was responsible for federal income taxes on the $43 million.   Various administrative appeals were taken within the IRS, to no avail.   Thereafter, the Debtor filed an action in the United State Tax Court contesting IRS' claim.   After discovery, motion practice and repeated continuances in furtherance of settlement negotiations, the matter was set for trial at the end of October, 2009. Despite the efforts of the Debtor – and the United States Attorney's Office's efforts on the Debtor's behalf to settle the IRS matter – by September, 2009 little progress had been made in settlement talks. (Trial Transcript ("Tr.") 3/12/13: 134-35.)

The foregoing is directly related to the instant bankruptcy proceedings in that the primary motivation for Debtor filing for bankruptcy was a then impending tax court trial. (Tr. 3/12/13, 81:21-25.) The eminence of such proceedings serves in large measure to explain the haste with

which the initial schedules were filed, and places a context to many of the claims made by the Trustee.

As many of the Complaint's allegations center around transactions involving a few discrete entities, this memorandum will address the allegations regarding each of these entities and then address the remaining allegations.

For the past ten years, the Debtor has been an entrepreneur investing in startup business ventures and aiding in their development, growth, expansion and related activities. Principal among these ventures have been Allstar Capital Inc. ("Allstar"), Wurk Environments ("Environments") and Citadel Construction Corp. ("Citadel"). The Debtor provides advisory services to these and other businesses through Rosedale Cooley Management, Inc.

A.    **Allstar**

Allstar is a Nevada corporation, incorporated on or about January 14, 2008. Since its inception, Allstar has had two equal shareholders: Gordon Family I, LP ("GFI") and the Carolina E. Gordon Trust (the "CEG Trust"). Allstar was initially capitalized with shares of stock in the New York Mercantile Exchange (the "NYMEX Stock") that were transferred to it by GFI. At all relevant times, the Debtor was the sole officer and director of Allstar. (Joint Pre-Trial Order signed on 3/12/2013 ("PTO") ¶¶ 18-22) (Tr. 3/13/13, 11:11-14).

Allstar's principal business was making high interest loans – primarily to professional athletes. From time to time, Allstar borrowed money from third parties – including the Debtor – and used those funds to finance its loans, profiting from the spread between the interest rate at which it borrows and the interest rate at which it lends. (Tr. 3/12/13, 53).

B.    **Wurk**

Environments was formed in 2008 to own and operate a fractional office space provider. The Debtor owned 95% of Environments, with GFI owning the remaining 5%. Environments' wholly owned subsidiary, Wurk Times Square ("Wurk-TS"), was also formed in 2008 and actually operated the facilities. Wurk-TS leased 60,000 square feet of office space at 1515 Broadway in New York City within which it operated its business. As part of its lease obligations, Wurk-TS was required to build out its office space to conform to its business requirements. To fund the build out, Wurk-TS depended on capital infusions from its parent company (Environments) and its parent company's members (i.e. the Debtor).[1] (Tr. 3/12/13, 131-132). Collectively, Environments and Wurk-TS shall be referred to as "Wurk."

During the course of the bankruptcy proceedings, Wurk-TS lost its leasehold due to an inability to pay its rent.

C.    **Citadel**

Citadel is a Delaware corporation that specialized in constructing commercial interiors. McCann Construction, LLC ("McCann") was a 50% shareholder of Citadel. GFI is the sole member of McCann. (Tr. 3/12/13, 141:5-9; 160:5-7). The Debtor worked as consultant to Citadel advising it in sales, financial and related matters. (Tr. 3/12/13, 182).

## II.    THE BANKRUPTCY FILING

In September 2009, with the settlement talks with the IRS at an impasse, the Debtor consulted bankruptcy counsel, retaining Gabriel Del Virginia. (Tr. 3/12/13, 11:8-9). As last minute efforts to settle the Tax Court case failed, on October 18, 2009 (the "Petition Date"), the

---

[1] Unfortunately, Wurk-TS entered into its lease agreement at the height of the New York commercial real estate market. In late 2008/early 2009, New York City rents fell. Unable to renegotiate its lease with its landlord, Wurk-TS ceased operations in November 2009.

Debtor filed a voluntary petition for relief under chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"). (Tr. 3/12/13, 135:1-6). On November 22, 2009, the Debtor filed his original bankruptcy schedules (the "Schedules") and statement of financial affairs (the "Statement of Financial Affairs"). On February 1, 2010, the Debtor filed his amended statement of financial affairs (the "Amended Statement of Financial Affairs"). On December 10, 2010, the Debtor filed his amended bankruptcy schedules (the "Amended Schedules") and second amended statement of financial affairs (the "Second Amended Statement of Financial Affairs").

### III.    THE OBJECTION TO DISCHARGE

The Trustee commenced the instant adversary proceeding to deny Debtor's discharge pursuant to Section 727 of the Bankruptcy Code, 11 U.S.C. § 727 ("§727") by filing a complaint (the "Original Complaint") on September 28, 2010. The Original Complaint included nine counts and was premised on a number of factual allegations that were untrue and legally impossible, such as allegations that the Debtor had hindered the Trustee by failing to produce Certificates of Incorporation for entities that were, by their very names, limited liability companies or failing to produce payroll tax documentation for entities that had no employees. These deficiencies were all brought to the Trustee's attention, but the Trustee refused to amend or prune the Original Complaint until Debtor requested permission to file a summary judgment motion.[2]

Following the Debtor's request, rather than defend the Original Complaint, the Trustee served and filed an amended complaint (the "Amended Complaint," or "Complaint"), by

---

[2] This delay is significant because the continuing prosecution of the Original Complaint necessarily wasted substantial time and resources in the pursuit of demonstrably faulty theories. This necessitated, for example, compliance with discovery demands that were simply irrelevant.

removing six counts, and a portion of a seventh count, from the Original Complaint.[3]  By

stipulation of the parties, Debtor's answer to the Original Complaint was deemed applicable to

the Amended Complaint.

The Amended Complaint focused on three areas: (1) allegations that Debtor concealed

certain assets with intent to hinder, delay or defraud creditors; (2) allegations that Debtor

transferred assets with intent to hinder, delay or defraud creditors; and (3) allegations that Debtor

knowingly and fraudulently made false oaths.

First, the Complaint alleges that the Debtor concealed certain assets by failing to list them

on his Schedules with intent to hinder, delay, or defraud his Creditors and/or the Trustee.  The

assets the Debtor purportedly concealed include an alleged $2 million receivable due the Debtor

from Allstar (the "Allstar Receivable"), an alleged $1 million receivable due the Debtor from

David Stack ("Stack") in connection with Stack's purchase of an interest in Citadel (the "Stack

Receivable") and an alleged $15,000 receivable due to the Debtor from Environments. At trial,

the Debtor – as well as the Debtor's counsel[4] – testified that: (a) on October 22, 2008 the Debtor

lent $2 million to Allstar in the ordinary course of Debtor's financial affairs to permit Allstar to

---

[3] Additionally, at trial, the Trustee failed to prosecute two other predicates relating to the Debtor's alleged failure to list a lawsuit on his Statement of Financial Affairs and schedule a secured creditor.

[4] Debtor's counsel, Donald David, testified pursuant to a subpoena from Trustee's counsel.  He testified at the demand of Trustee's counsel, and only after a stipulation that his testimony would not constitute grounds to disqualify him from representing Debtor.  Presumably, Trustee's counsel believed his testimony to be relevant in connection with the preparation of schedules pertaining to the Allstar Receivable, as well as his prior representation of Allstar.  In view of his public acknowledgment that the schedules had been prepared by his staff, and not him individually, it must be assumed that the Trustee's counsel sought testimony as to the process, and realized any other testimony would essentially be in the nature of hearsay.  Nonetheless, the Trustee's counsel continued his inquiry until the Court expressly acknowledged the hearsay nature of the testimony being adduced.

make certain loans (Tr. 3/12/13, 32-34; 3/13/13, 26)[5] and (b) that Allstar had repaid the Allstar Receivable by making certain payments as directed by the Debtor pre-petition. (Tr. 3/12/13, 40-41,45,52-53,129-130).  In fact, the evidence indicated that Allstar had actually paid significantly more than $2 million at Debtor's direction and behalf, including payments to his divorce counsel and payments on behalf of other entities such as Wurk-TS.

Likewise, at trial, the Debtor – as well as the Debtor's counsel who had been called to the stand by Trustee's counsel – testified that: (a) the Stack Receivable was due to McCann, which was the owner of the interest Stack acquired in Citadel, not Debtor.[6] and (b) a Retainer Agreement between the Debtor and Todtman, Nachamie, Spizz and Johns, P.C. (counsel to McCann) initially incorrectly listed the Debtor as the client but was immediately corrected. Therefore, as of the Petition Date, there was neither an "Allstar Receivable" nor a "Stack Receivable" due and owing to the Debtor and, as such, neither receivable was concealed by the Debtor.

Second, the Complaint alleges that certain capital contributions made by the Debtor - directly and indirectly - to Wurk were actually transfers made by Debtor with intent to hinder, delay, or defraud his creditors or the Trustee. At trial, Debtor showed that (a) these transfers were capital contributions made in the ordinary course of the Debtor's financial affairs (Tr.

---

[5] This claim makes little practical sense as the Allstar Loan was made 362 days prior to the Petition Date.  If the Allstar Loan was truly an attempt to hinder creditors or the Trustee, Debtor could have waited  four  days and been outside of the statutory period of § 727(a)(2).

[6] The Trustee never introduced any evidence that purported to show any indebtedness owed to Debtor by Stack.  Perhaps the Trustee intended to argue that the retainer agreement originally executed with Todtman, Nachamie, Spizz and Johns, P.C. ("TNSJ") (counsel to McCann) indicated that Debtor was the client and, therefore, by extension Debtor was the actual owner of the McCann interest.  However, as indicated in the Bart Nachamie affidavit submitted as evidence in chief at the hearing, immediately upon receiving the proposed retainer Debtor noted the error and emailed TNSJ correcting same.  Ultimately, TNSJ acknowledged that its client was McCann, not Debtor.

3/12/13, 92-94) and (b) these transfers were made five months prior to the Debtor retaining bankruptcy counsel. Even more devastating to the Trustee's claims is that all of the transfers in question – and the benefits relating thereto - escheated to Estate.[7]

Third, the Complaint alleges that the Debtor knowingly and fraudulently made false oaths by failing to schedule certain alleged co-debtor relationships, failing to properly disclose his income, and failing to schedule certain entities in which he was an officer, director or managing executive. However, the Trustee failed to meet her heavy burden in seeking to deny the Debtor's discharge, as no evidence was presented that *any* of the Debtor's allegedly false oaths were made with the intent to defraud creditors or that such statements were material. To the extent that there were omissions in scheduling any co-debtor relationships or entities in which the Debtor might be considered an insider, those omissions were unintentional and immaterial.[8]

While the Trustee alleges that the Debtor concealed millions of dollars from his creditors, none of the Debtor's creditors have objected to his discharge or joined in these proceedings.[9] Nor has she taken any action to recover any of these alleged transfers with the exception of the

---

[7] The Trustee does not dispute that the Debtor's interest in Wurk was properly listed on his schedules. Unfortunately, Wurk ultimately did not succeed and the capital contributions, along with its leasehold interest, were lost. While the Trustee appears to view the inability to recoup the Wurk investment as a significant factor, § 727 does not provide that a failed business venture is a basis to deny discharge . (Tr. 3/12/13, 94).

[8] For example, there were instances in which the Trustee claimed that Debtor was a guarantee of certain obligations, such as a car or apartment lease. There is no indication that such omissions were intentional, but more importantly there is no indication that such omissions were material because Debtor was never called upon to honor such guarantees or make payment on any obligation other than as a guarantor. (Tr. 3/13/13, 6:7-10).

[9] The bulk of the Debtor's debt was comprised of claims by the Internal Revenue Service (the "IRS"), and the New York State Department of Tax and Finance (the "NYS" and collectively, the "Taxing Authorities"), which were disputed by the Debtor. As the Court is aware, the Taxing Authorities are not reticent in enforcing their rights and have vast resources to enforce their rights. However, neither the IRS nor NYS objected to the Debtor's discharge under § 727.

Wurk and Allstar Receivable. Of equal importance, there was no evidence adduced by the Trustee that there was even one dollar in hidden assets; no stock accounts, no bank accounts, no hidden real property.   Moreover, there was no indication that even those entities that were inadvertently omitted from Debtor's schedules would have contributed a dime to the Estate, had they been listed.

A.      **The Trustee's High Burden of Proof**

The courts have readily recognized that the denial of a Debtor's discharge is the most serious of consequences; the equivalent of a financial death sentence. *In re Hyman,* 502 F.3d 61, 66 (2d Cir. 2007); *In re Brundege,* 359 B.R. 22, 29 (Bankr. N.D.N.Y. 2007) (denial of discharge thwarts the purpose of the bankruptcy proceedings by denying the debtor a fresh start).   For that reason the courts narrowly construe exceptions to discharge in favor of the "honest but unfortunate debtor." *Meyers v. Internal Revenue Service,* 196 F.3d 622, 624 (6th Cir. 1999).

Thus, when considering such a drastic sanction, a  Bankruptcy Court "should consider such factors as the intent behind the bankrupt's acts — were they wilful or was there a justifiable excuse; was there injury to the creditors..." *In re Kokoszka,* 479 F.2d 990, 997–98 (2d Cir. 1973). The severity of the penalty imposed by §727 has led the courts to strictly interpret the statutory requirements against those who object to discharge, with a corresponding liberality in favor of the Debtor. *In re Chalasani,*  92 F.3d 1300, 1310 (2d. Cir. 1996).  To achieve that end, the record "must be construed strictly against those who object to the debtor's discharge and liberally in favor of the bankrupt." *In re Cacioli,* 463 F.3d 229, 234 (2d. Cir. 2006) (internal quotations and

citations omitted). Thus, the burden is on the objector to prove all facts essential to the objection to discharge. *In re Rubin,* 12 B.R. 436, 440-441 (Bankr. S.D.N.Y. 1981.)[10]

In order to deny a debtor a discharge under §727(a)(4), the Trustee must prove: (1) Debtor made a statement under oath; (2) the statement was false; (3) Debtor knew the statement was false; (4) Debtor made the false statement with fraudulent intent; and (5) the statement related materially to the bankruptcy. *In re Harte,* 440 B.R. 133, 146 (Bankr. W.D. MI 2010) (citing *Kenney v. Smith (In re Keeney),* 227 F.3d 679, 685 (6th Cir. 2000)); *In re Irving,* 27 B.R. 943, 945–946 (Bankr. E.D.N.Y. 1983) (Under § 727(a)(2),(a)(4) the objector need not only prove the existence of an omission or a false statement, but also must prove the Debtor's actual fraudulent intent.); *In re Deedon,* 419 B.R. 1, 6 (Bankr. D.Conn. 2009) (objector must show an *actual* intent to hinder, delay or defraud creditors); *Halpern v. Schwartz,* 426 F.2d 102, 104 (2d Cir. 1970) ("The court must find that the transfer ... of property in question was effected with actual intent to hinder, delay, or defraud creditors."); *In re Adlman,* 541 F.2d 999, 1003 (2d Cir. 1976) ("Constructive fraudulent intent ... cannot be the basis for denial of discharge.").

*In re Coombs,* 193 B.R. 557, (Bankr. S.D.Cal., 1996), the Court explained the statutory requirement to prove fraudulent intent.

> Competent facts placed in evidence must point toward that fraudulent intent. If no facts point toward fraudulent intent, it cannot be found simply by cumulating the number of omissions. Neither sloppiness nor an absence of effort by the debtor supports, by itself, an inference of fraud. Courts which hold otherwise are simply devising a court-made prophylactic rule that the debtor must make substantial effort to provide accurate and complete schedules. Had the Congress intended to make such a rule, it could have done so easily, as it did with § 727(a)(3) (failure to keep adequate books and records), and (a)(5) (failure to adequately explain the loss of assets), neither of which have an express element of fraudulent intent. But the Congress did not do so, and it is not for the courts

---

[10] As this Court explained in addressing a somewhat analogous situation under §727(d), "the party seeking revocation of a fraudulently procured discharge has the burden of proving all the facts upon which revocation is conditioned by the statute." *In re Moon* 385 B.R. 541, 559 (Bankr. S.D.N.Y. 2008).

to create new bars to discharge under § 727(a), or to so distort a requisite element as to make it no element at all.

*In re Coombs,* 193 B.R. 557, 564-565 (Bankr.S.D.Cal.,1996) (internal citations omitted).

The *Coombs* Court also analyzed the mechanism to prove fraudulent intent with respect to the statute.

> The essential point is that there must be something about the adduced facts and circumstances which suggest that the debtor intended to defraud creditors or the estate. For instance, multiple omissions of material assets or information may well support an inference of fraud if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal. For instance, in *In re Chalik,* 748 F.2d 616, 618–19 (11th Cir.1984), the debtor failed to disclose dealings with twelve corporations of which he was the sole or controlling shareholder and which had $2.1 million in assets and $250,000 per month in income. The court in *In re Aboukhater,* 165 B.R. 904, 910 (9th Cir. BAP 1994) looked to the substantiality of the omission to support an inference of an intent to defraud. In other words, is there something about the omitted asset or transaction which a debtor might want to avoid disclosing. That is why the so-called badges of fraud are utilized to discern intent.

*Id.,* at 565.

The First Count in the Complaint alleges that the Debtor's discharge should be denied, pursuant to § 727(a)(2), for concealing property of the estate with intent to hinder, delay, or defraud a creditor or the Trustee. The Second Count in the Complaint alleges that Debtor's discharge should be denied, pursuant to 11 U.S.C. § 727(a)(2), for transferring property of the estate with intent to hinder, delay, or defraud a creditor or the trustee.

"To prove a § 727(a)(2) violation, a creditor must show 'an act (i.e. [,] a transfer or a concealment of property) *and* an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor),' and 'the party seeking to bar discharge must prove that *both* of these components were present during the one year period before bankruptcy.'" *In re Boyer,* 328 Fed.Appx. 711, 714, 2009 WL 1635922, *3 (2d. Cir. 2009) (emphasis supplied). Thus, the

Trustee has the burden of demonstrating such actual fraud by clear and convincing evidence.[11] *ACLI Government Securities, Inc. v. Rhoades,* 653 F. Supp. 1388 (S.D.N.Y.1987), *aff'd,* 842 F.2d 1287 (2d Cir. 1988). Thus, "[w]rongful intent is a necessary element under Section 727(a)(2)(A), and that requirement cannot be ignored since that would contravene the express statutory language." *Id; see also, Singh v. Attorney General of U.S.,* 677 F.3d 503, 508 -509 (3d Cir. 2012)(citing *In re Robinson,* 506 F.2d 1184, 1187 (2d Cir.1974)) (The statute requires that there be an intentional untruth in a matter material to the issue which is itself material.).

The Third count in the Complaint alleges that Debtor's discharge should be denied pursuant to § 727(a)(4)(A), for knowingly and fraudulently making false oaths in connection with his bankruptcy proceeding. To be actionable thereunder, however, the oath must be "knowingly and fraudulently made." *In re Barbe,* 466 B.R. 737, 745-746 (Bankr. W.D.Pa. 2012) (citing *In re Bernard,* 99 B.R. 563, 570 (Bankr. S.D.N.Y. 1989)). "[M]aterial misstatements, absent fraudulent intent, do not warrant denial of a discharge under § 727(a)(4)(A)." *In re Parsell,* 172 B.R. 226, 231 (Bankr. N.D.Ohio, 1994).

Hence, to deny discharge pursuant to 11 U.S.C. § 727(a)(4)(A), the Trustee *must* prove *all* of the elements: (1) a statement made under oath, (2) that was false, (3) known by the Debtor to be false, (4) with the intent to defraud creditors, and (5) related materially to the bankruptcy case. *In re Gollomp,* 198 B.R. 433, 437 (Bankr. S.D.N.Y. 1996).[12]

---

[11] The Supreme Court has suggested an even higher standard, saying that the objector, under 11 U.S.C. § 523(a), must prove its case by a preponderance of the evidence. *Grogan v. Garner,* 496 U.S. 279, 286-7 (1991). It then went on to determine that in proceedings to deny a debtor discharge under §727, the same preponderance standard applies. *Grogan,* 498 U.S. at 289-91. *See, also, Stamat v. Neary,* 635 F.3rd at.978.

[12] As a demonstration of the necessity of all of these elements, it is worth noting that the courts have held that even the deliberate omission of an asset deemed worthless by the Debtor is *not a*

Because the Trustee's proof was deficient in a number of these areas, it is respectfully submitted that she has not met her burden of proof.

## IV.    THE COMPLAINT'S ALLEGATIONS

A.    **The Allstar Allegations**

In or about October 22, 2008, the Debtor made a loan to Allstar (the "Allstar Loan") in the amount of $2,000,000. The Trustee alleges that the Allstar Loan was made with intent to hinder, delay, or defraud his creditors or the Trustee (the "Allstar Transfer"). The Trustee further alleges that as of the Petition Date, (a) the Allstar Loan was outstanding giving rise to the Allstar Receivable; (b) that the Debtor concealed the Allstar Receivable from the Trustee and his creditors; and (c) failed to disclose the Allstar Receivable on his Schedules and Statement of Financial Affairs.

Each of the Trustee's allegations relating to the Allstar Transfer and the Allstar Receivable must fail as a threshold matter since the Trustee failed to meet her burden of proof. As the Debtor testified, he believed that the Allstar Loan had been repaid prior to the Petition Date. (Tr. 3/12/13, 40-41). Furthermore, as addressed extensively at trial by testimony from the Debtor and Donald David, counsel to the Debtor and Allstar, Akerman Senterfitt, LLP produced a schedule[13] (the "Schedule") to the Trustee during the discovery period that listed repayments

---

basis to deny discharge. *In re Gugliada* 20 B.R. 524, 528 -529 (Bankr. S.D.N.Y. 1982)(citing *In re McCrea*, 161 Fed. 246 at 249 (2d Cir. 1908)). The failure to disclose a worthless asset is not a predicate for denying a discharge, because it is not material. *In re Gollomp* 198 B.R. 433, 440 (S.D.N.Y. 1996)(addressing § 727(a)(2)).

[13] At the trial the Trustee made a point that there were two schedules produced. However, this reflects an inadvertence in the preparation of the first schedule. Mr. David testified that the first schedule of Allstar's repayments was assembled by his assistant at his request. This document was sent to the Debtor by email to insure that it was correct. As the Debtor was out of the country he did not respond with corrections. Mr. David further testified that when he sent the schedule to the Trustee's attorney, he did so understanding that it was pursuant to his client's review. Mr. Gordon reviewed the schedule and discovered that certain payments to American

by Allstar either to the Debtor or to the Debtor's designees in an amount in excess of $2 million. (Tr. 3/12/13, 44-45).

In particular, among other expenses paid by Allstar, there were payments that incontestably represented personal amounts owed by Debtor, such as fees paid to Debtor's divorce counsel. (Tr. 3/12/13,137-139). There were other payments, such, as $1.5 million for the benefit of Wurk to fund either Wurk's operating expenses or its build-out of its leasehold, that clearly represented obligations that Debtor was required to meet in order to preserve his interests in investment entities. (Tr. 3/12/13,131-132).

At trial the Trustee offered no evidence to undermine the main thrust of the Schedule, viz. confirming that the Allstar Receivable had been repaid prior to the Petition Date, other than questioning whether two of the items listed on the Schedule - totaling $15,106.00 - were actually made for the Debtor's benefit of the Debtor. Importantly, even if the Trustee was correct, these transfers constituted less than 1% of the total repayment to the Debtor. (Tr. 3/12/13, 48-49).

Furthermore, as the Debtor and his counsel each testified at trial, there were transfers from Allstar to the Debtor in amount more than those reflected on the Schedule. (Tr. 3/12/13, 44-45; 3/13, 13,47:3-8). While there might have been some nit-picking available to the Trustee, it clearly did not rise to the level that the Court had before it clear and convincing evidence that Debtor had been acting to hide an asset that he actually thought he possessed.[14]

---

Express were not repayments to the Debtor and, as such, Trustee's counsel was immediately advised and the schedule was amended. (Tr. 3/13/13, 40-45).

[14] Somewhat analogous is the situation the court faced in *Maloney v. Harte, supra.* The objecting creditor claimed that the debtor had failed to schedule certain items of personal property, including a truck and a motorcycle. 440 B.R. at 147. The debtor testified that he believed that the property had been destroyed during Hurricane Katrina. The court found that although the evidence established non-disclosure, it did not establish fraud because the evidence did not establish that the debtor had intentionally left the items off of his schedule. *Id.*

Much like a debtor who reasonably believes an asset is worthless, the Schedule demonstrated that the Debtor reasonably believed that the $2 million had been repaid by Allstar. (Tr. 3/13/13, 48-49). *See, In re Gugliada,* 20 B.R. 524, 528 -529 (Bankr. S.D.N.Y. 1982)(citing *In re McCrea*, 161 Fed. 246 at 249 (2d Cir. 1908)). Accordingly, the Trustee failed to prove either that the Allstar Receivable was a real debt owed to Debtor, or that Debtor acted with fraudulent intent by reason of failing to reveal a receivable he did not believe existed.

At the trial, the Trustee focused on the fact the Allstar had no physical presence, other than a mailbox, and no employees, other than perhaps Debtor. (Tr. 3/12/13, 27; 3/13/13, 19:2-3). Further, it noted that the loan itself was not documented in a note, nor were the repayments documented except in a ledger of the payments made—although the loan was reflected on Allstar's tax return. (Tr. 3/12/13, 17-18). Yet, this misses the point. Whether the Allstar Loan is treated as a true loan or merely as a transfer of some unidentified sort, the simple fact is that it was repaid prior to the Petition Date, or at the least Debtor believed that it was repaid through the payments he directed.[15] As such, it was reasonable for the Debtor to omit that transfer from the schedule of his assets. Certainly, the failure to schedule such transfer cannot be said to have been made with an intent to defraud.[16] *See, e.g., In re Gollomp* 198 B.R. 433, 440 (S.D.N.Y. 1996)(addressing § 727(a)(2)).

---

[15] Examination of the Schedule shows that the documentation substantiating all payments were attached. (Tr. 3/13/13, 41: 6-9). Thus, the Trustee had the opportunity to contest any payment, but with the exception of two payments did not do so.

[16] As previously noted, in determining whether the failure to schedule the Allstar Loan was done with fraudulent intent, the Court might choose to consider the fact that the transfer was made nearly 12 months prior to the filing of the Petition. If Debtor were truly trying to hide the Allstar Loan, instead of believing that it had been repaid, all he need have done was wait four more days to file the Petition and the transfer would have been outside the scope of the statute.

B.     **Wurk**

Wurk-TS retained Citadel as the general contractor to build-out its leased premises. The

total contract price for the build-out of the Wurk-TS premises was over $6 million.     While

Wurk's landlord funded a part of the cost as tenant improvements, Wurk-TS was responsible for

the balance of the construction costs.     Practically, Wurk's only access to capital was capital

contributions from its members (i.e. the Debtor). (Tr. 3/12/13, 130-132).

As Wurk began its business operations, the Allstar Loan was outstanding and, in order to

fund Wurk, Debtor instructed Allstar to transfer funds to Wurk (or to Citadel on Wurk's behalf)

totaling $1.5 million (the "Allstar Transfer"). (Tr. 3/12/13, 130). In addition to the Allstar

Transfer, the Debtor made capital contributions to Wurk in the form of two payments to Citadel

in January 2009 of $350,000 and $300,000 ("Citadel Transfers") and $500,000 to Wurk-TS on or

about February 26, 2009 ("Wurk-TS Transfer"). (Tr. 3/12/13, 150:11-17,150-151). At trial, the

Debtor testified that the Allstar Transfer, the Citadel Transfers and the Wurk-TS Transfer were

essential to completing the build-out of the Wurk-TS premises and realizing a return from the

Wurk-TS business. If these transfers had not been made, Debtor believed Wurk would have

failed before it had the opportunity to begin. (Tr. 3/12/13,150-151).

The Trustee alleges that the Allstar Transfer, the Citadel Transfers and the Wurk-TS

Transfer (collectively, the "Wurk Transfers") were made by Debtor with intent to hinder, delay,

or defraud his creditors or the Trustee. Again, the Trustee failed to meet her burden of proof to

demonstrate the elements of such claim. Accordingly, this claim must fail.

As demonstrated at trial, the Wurk Transfers were capital contributions made to finance

the establishment and business operations of an entity in which Debtor owned a direct 95%

interest. (Tr. 3/12/13, 131:4-7). As such, given the fact that it was Debtor's business to create

and advise such start-up ventures, this succession of transfers were in the ordinary course of the

Debtor's business. *See, In re Miles* 481 B.R. 838, 847 (Bankr. N.D.Ga. 2012). While neither the

Bankruptcy Code nor the form of the Statement of Financial Affairs define the term "ordinary

course of business," the courts have provided some standards by which to measure such

transactions. Thus, the factors to be utilized in making such a determination focus on whether

the transfer pertained to a normal commercial and financial relationship, including but not

limited to, the length of time the parties were engaged in the type of transaction at issue, whether

the amount or form of tender differed from past practices and whether the debtor engaged in any

unusual payment activity. *Stamat v. Neary,* 635 F.3d 974, 980 (7th Cir. 2011) (citing *Kleven v.*

*Household Bank F.S.B.,* 334 F.3d 638, 642 (7th Cir. 2003)).

 In the instant case the trial established, indeed the Trustee made a point out of

establishing, that there was a regular pattern of Debtor making transfers into those entities where

he had an interest so as to finance their business operations. In the instance of Wurk, during the

two months of January and February 2009 there were three separate transfers – all to fund the

build-out of its leased space and its business operations. (Tr. 3/12/13, 130; 150:11-17,150-151).

Clearly, then, these transfers were made under these circumstances in the ordinary course of

Debtor's business.[17]

 Furthermore for the purposes of § 727 it is sufficient for the transfer to be made in what

the Debtor believes is the ordinary course of business. *See, In re Watkins,* 474 B.R. 625,

650 (Bankr. N.D.Ind. 2012)(addressing § 727(a)(2)) ("upon review of the entire record, the court

---

[17] The courts have clearly distinguished between instances in which there is a single investment in a real estate project, which would not fall within the ordinary course of the debtor's business, and a pattern of contributions by which an investor makes funds available to his ongoing ventures. *See, e.g., Phillips v. Miller,* 418 B.R. 445, 463 (Bankr. M.D. Fla. 2009), *afd,* 476 Fed. Appx. 813, 2012 WL 1071270 (11th Cir. 2012).

determines that any transaction of this nature was not made with the intent required by 11 U.S.C. § 727(a)(2), but was done in what the debtor/debtors viewed as the ordinary course."); *see also, In re Jennings* 349 B.R. 897, 913 (Bankr. M.D.Fla. 2006) (addressing § 727(a)(2))("find[ing] Defendant's testimony that he believed the sale of the Mad Max [Debtor's Yacht] was in the ordinary course of business and was therefore not required to be listed in response to Item 10 on the SOFA to be convincing.").

Finally, Debtor disclosed his ownership interest in Wurk on his Schedules and Statements. As such, Wurk and all of its assets – including the transfers Debtor funded – became and were property of the Estate as of the Petition Date. As such, for the purposes of § 727(a)(2), the Wurk Transfers were no more transfers of Debtor's property than Debtor depositing money into a savings account in his own name and then identifying such account on his filed schedules. Each of the foregoing militate against the conclusion that Debtor acted with intent to defraud his creditors. *See, e.g., In re Petersen* 323 B.R. 512, 520 (Bankr. N.D.Fla. 2005) ("Her listing the balance of the annuity on Schedule B and exempting it on Schedule C disclosed the existence of the annuity to any who cared to see, including the Plaintiffs and the trustee").

Finally, as it relates to Wurk, the Trustee alleges that Debtor failed to list the Citadel Transfers and the Wurk-TS Transfer in response to questions 3 ("Question 3") and/or 10 ("Question 10") of his Amended Statement of Financial Affairs. Yet, the Trustee's position assumes that these transfers were either a payment to the Debtor's creditor (Question 3) or a transfer that was not in the ordinary course of Debtor's business (Question 10). Neither claim was sustained by the Trustee's evidence.

Debtor was not required to list these transfers in response to Question 3 of his Amended Statement of Financial Affairs because it addresses "all payments or other transfers of property made to any creditor" of the Debtor. However, as demonstrated at trial, neither the Citadel Transfers nor the Wurk-TS Transfer were paid to a creditor of Debtor. Wurk was not Debtor's creditor – it was his company.[18] Likewise, Citadel was not Debtor's creditor because Debtor was not personally liable to Citadel for the obligations of Wurk - the payments to Citadel were made for the benefit of Wurk. (Tr. 3/12/13, 152-153). Thus, the payments to Wurk and Citadel were not payments to Debtor's creditors for the purposes of question 3.

The Debtor was also not required to list the Citadel Transfers and the Wurk-TS Transfer in response to Question 10 which "requires the debtor to list all other [transferred] property, other than property transferred in the ordinary course of the business or financial affairs of the debtor." As demonstrated at Trial, these transfers were in the ordinary course of Debtor's financial affairs. (Tr. 3/12/13, 150).[19] Simply put, Debtor started a business which required his financial support and Debtor's uncontroverted testimony is that these transfers constituted capital contributions to a business that he owed. (Tr. 3/12/13, 93,133). As such, these transfers were in the ordinary course of the Debtor's business and were not required to be listed in response to Question 10.

---

[18] At no point in these proceedings has the Trustee even attempted to prove that Wurk was a creditor of Debtor.

[19] Even if the Trustee was able to prove the Transfers to Wurk were not in the ordinary course of Debtor's affairs, the Debtor's testimony certainly demonstrates that he believed that such transfers were part of his ordinary business affairs because over the years he had funded his entities in such a fashion.

## V.    REMAINING ALLEGATIONS IN COUNT I OF THE COMPLAINT

A.    **Stack Receivable**

McCann originally owned a 100 percent of the shares in Citadel. It hired David Stack, and as part of his hiring, agreed to sell him 50 percent of Citadel. Mr. Stack did not have any money available to purchase the shares in Citadel, so instead he gave McCann a promissory note (the "Stack Note") that was secured by real estate that he owned in Florida. In 2009, Mr. Stack defaulted under the Stack Note. McCann retained Mr. Barton Nachamie and his law firm to advise it in connection with the collection issues relating to the Stack Note and the administration of Citadel itself. (Tr. 3/12/13, 141).

In connection with Mr. Nachamie's retention, McCann signed a retainer agreement ("Retainer Agreement") with Mr. Nachamie's firm. At the time that Mr. Nachamie transmitted the Retainer Agreement, it erroneously bore the Debtor as the client and not McCann's. Mr. Nachamie and the Debtor both testified that the Debtor advised Mr. Nachamie of the error and that the Debtor sent Mr. Nachamie an email clarifying that the client was in fact McCann and not the Debtor (Tr. 3/12/13, 88; 3/13/13, 34); *see also* Affidavit of Bart Nachamie in Lieu of Direct Testimony. Mr. Nachamie testified that his listing of the Debtor as the client was in error and that McCann was the client.

The Trustee's claim, as it relates to this transaction, is whether the Debtor is the actual owner of the Stack Note, and that he failed to disclose that asset. Once again, however, the Trustee failed to meet her burden of proof to demonstrate that the Debtor even owned such a note. There was no document evidencing such ownership, either directly or circumstantially. The Stack Note was not placed into evidence, although it was produced in discovery, nor was Mr. Stack called as a witness to testify that such an obligation even existed.

To the contrary, the only "evidence" the Trustee sought to rely upon was the erroneous Retainer Agreement – which was immediately corrected.  Based upon that flimsy circumstance, a mistaken retainer that made no reference to a note owed to Debtor, the Trustee alleged that Debtor concealed an outstanding receivable due from David Stack in the amount of $1,000,000 (the "Stack Receivable").  Surely, without the slightest hint that Debtor owned the Stack Receivable, the Trustee did not meet her burden of proof.

Furthermore, if the Trustee genuinely believed that Mr. Stack owed the Debtor $1 million – and such amount was property of the Debtor's Estate – why did the Trustee fail to file suit against Mr. Stack or otherwise seek to recover the Stack Receivable for the Debtor's estate and creditors?

Simply put, there is no evidence in the record to establish that Debtor ever owned an obligation of any amount from Mr. Stack, let alone a $1 million note in connection with the sale of an interest in Citadel – a corporation in which there is no evidence the Debtor ever owned an interest.  Moreover, there certainly is no evidence that Debtor ever concealed such non-existent receivable to hinder or defraud creditors.

B.    **Wurk Receivable**

Within a week to ten days after the Petition was filed, Wurk-TS paid the Debtor $15,000 on account of monies that it owed Debtor (the "Wurk Receivable").  It is uncontested that, although Debtor listed Wurk on his Schedule and the Statement of Financial Affairs, he did not list the Wurk Receivable on his initial Statement of Financial Affairs.  Debtor explained at trial that his preparation of the initial Statement of Financial Affairs and Schedule were hurried because of the impending Tax Court trial and that he had not deliberately omitted the Wurk Receivable. (Tr. 3/12/81-83; 3/13/13).  Rather, Debtor testified that he didn't have access to

Wurk's bank statements at the time of preparing the Petition, Statement of Financial Affairs and Schedules. And his access to his own bank statements was compromised, due to a then outstanding problem with identity theft, which was noted on his Statement of Financial Affairs. (Tr. 3/12/13, 84:18-24).  As a result of the identity theft, JP Morgan Chase froze access to Debtor's account and it was next to impossible for him to access his statements for 60 to 90 days. *Id.*

The Trustee alleges that the Debtor concealed the Wurk Receivable with intent to hinder, delay, or defraud his creditors or the Trustee in violation of § 727(a)(2). "To prevail on that allegation a plaintiff must show "an act (i.e. [,] a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor)," and "the party seeking to bar discharge must prove that both of these components were present during the one year period before bankruptcy." *In re Boyer*, 328 Fed.Appx. at 714.

Respectfully, given the fact that Debtor supplied the Trustee the books and records of Wurk, as well as his own financial records once they were received; that Debtor knew that such materials would reveal any payments he had received from Wurk – is there really any reason to believe that he deliberately acted to conceal this relatively small receivable?[20]  Or is it more likely that, as Debtor testified, this omission was simply a mistake, done without the intent to hinder or defraud anyone and, as such, not a basis for denying Debtor his discharge. *In re Irving*, 27 B.R. at 945–946.

---

[20] Notably, the Wurk Receivable was a minuscule portion of the Debtor's scheduled assets. The Debtor scheduled $10,804,287.00 in personal assets on Schedule B of the Petition and the Wurk Receivable represents just .14% of the Debtor's assets. Thus, it would be absurd for the Debtor to endanger his discharge for such a  relatively small portion of his estate and, further, it is understandable how the Wurk Receivable was overlooked. *See, In re Coombs,* 193 B.R.at 565.

## VI.    REMAINING ALLEGATIONS IN COUNT III OF THE COMPLAINT

Count III of the Complaint alleges that the Debtor made false oaths in connection with his Schedules and Statement of Financial Affairs. The remaining allegations in this count that have not already been addressed relate to alleged omissions, that even if they occurred, were unintentional and have no material bearing on the Debtor's bankruptcy case. Furthermore, it is clear that §727 was not intended to impose a penalty on such non-material omissions. *In re Fraleigh* 474 B.R. 96, 105-106 (Bankr. S.D.N.Y. 2012) ["The application of § 727(a)(4) does not require the draconian, zero-tolerance execution of a technical compliance fiat.".] Here, the Debtor had long and detailed Schedules and Statements involving complex financial arrangements, all prepared under the threat of the eminent Tax Court proceeding. Importantly, the Trustee repeatedly failed to prove that the Debtor acted with fraudulent intent – an indispensable element of the Trustee's burden.

A.    **Amex Transfers**

In her Complaint, the Trustee asserts that, at a minimum, the Debtor made certain payments ("Amex Transfers") to American Express totaling at least $36,150.86 in the 90 days prior to the Petition Date. The Debtor testified that he thought that the American Express payment in question was actually a payment on account of a corporate credit card and not his own and, therefore, it wasn't his responsibility and was not required to be included on his Schedules. It was only later that he discovered that, in fact, it was not a corporate credit card and therefore needed to be scheduled. (Tr. 3/12/13, 157:5-10). As the Debtor had no conceivable gain from failing to the list the American Express payments, this demonstrates that such omission was not intentional misrepresentation. Finally, the Trustee has failed to demonstrate that the omission was material or how the Debtor would have benefited from the omission or that the Trustee or creditor were prejudiced.

B.     **Income Statement**

In her Complaint, the Trustee alleges that in response to Question 2 on his Amended

Statement of Financial Affairs, Debtor failed to list other income received during the two years

immediately preceding the commencement of his case. On his Statement of Financial Affairs,

Debtor listed approximate gross income year-to-date for 2009 of $150,000, income for 2007 of

$-163,799.00, and income for 2008 of $0.00. Debtor listed his gross income for 2007 and 2008

net of losses.[21] For the year-to-date question, Debtor showed no in-kind payments.

Debtor testified that the decision to state the income net of losses was made in

consultation with, and in reliance on, his bankruptcy counsel, and was done to reconcile this

answer to tax returns that he would produce, because in prior years there had been a significant

loss carry-forward that resulted in his adjusted gross income being negative for several years.

(Tr. 3/12/13,121:13-19).  Debtor further testified that he believed that showing his income year-

to-date without including in-kind payments was appropriate when given in conjunction with a

very detailed listing of his income in Schedule I. Debtor's Schedule I included not only his

salary income but also income in the form of "in-kind" payments which the Debtor testified he

received from his employer. (Tr. 3/12/13, 122:1-9). Having included the in-kind payment in

Schedule I, it would be inappropriate to find that Debtor attempted to defraud the Trustee and/or

his creditors by not also listing it on his Amended Statement of Financial Affairs. *See, e.g., In re*

*Petersen,* 323 B.R. 512, 520 (Bankr. N.D.Fla. 2005) ("Her listing the balance of the annuity on

---

[21] The Debtor's stated income had the notation "cod". While the Debtor did not recall at trial, the
Debtor requests that the court take judicial notice that "cod" stood for "cancellation of debt."
*See Alpert v. U.S.*  430 F.Supp.2d 682, 687 (N.D. Ohio, 2006) ("In *Friedman,* the Sixth Circuit
had to determine whether an insolvent S corporation realized cancellation of debt ("COD")
income"); *see also In re Mesa Air Group, Inc.,* 2011 WL 182450, 32 (Bankr. S.D.N.Y. 2011)
and *Blonien v. C.I.R.,* 2003 WL 22520103, 1 (U.S.Tax Ct.,2003).

Schedule B and exempting it on Schedule C disclosed the existence of the annuity to any who cared to see, including the Plaintiffs and the trustee").

In *Maloney v. Harte,* 440 B.R. at 147, the court discussed a similar issue. That discussion involved the failure of a debtor to list certain stock certificates on his Statement of Financial Affairs. The court found that he had listed them on Schedule B and, therefore, concluded that the omission from the Statement of Financial Affairs did not "amount[] to fraudulent concealment of any assets from his bankruptcy schedules, or false oath." *Id.* The court continued, "[u]nder the circumstances, the court finds that the omission from the Statement of Financial Affairs, though technically deficient, does not warrant denial of discharge." *Id.,* at 147-148.

Similarly, in the instant case, although Debtor's identification of his income was technically imperfect in retrospect, under the totality of the circumstances it should not be sufficient to warrant the denial of discharge. First, Debtor testified that the totality of his answer was intended to provide a full picture of his income (Tr. 3/12/13, 121:13-19). In providing his answer, Debtor reasonably relied on advice of his bankruptcy counsel. *Id.* [22]

Second, Debtor did not know that the Statement was false as he relied on his counsel and provided the Trustee with extensive information concerning his income, including pay stubs, tax returns, seven years of bank statements and financial information concerning his employer. Further, the Debtor properly listed the in kind payments on Schedule I. Finally, the Debtor's representation of his income on the Statement of Financial Affairs did not relate materially to the bankruptcy case. The Debtor filed because of a $46 million dollar debt to the IRS; whether or not

---

[22] Debtor's counsel was familiar with the 2007 and 2008 income tax returns and Schedule I of the Petition, thus Counsel was aware and approved of Debtor's form of listing of his income on the Statement of Financial Affairs.

the Debtor's income – as listed on the Statement of Financial Affairs – was net of loss carry-forwards or not would hardly move the dial.

C.     **IRA Contributions**

The Complaint alleges that Debtor failed to list contributions that he had made to his IRA during the year prior to filing the Petition in response to Question 10. In particular, Debtor contributed $49,000 to his IRA during the period January 2008 through May 2008, and $25,000 on May 23, 2008. These were not unusual because, given the fact that Debtor did not belong to a pension plan, he made yearly IRA contributions. (Tr. 3/12/13, 158:19-24). In response to that testimony, the Trustee neither contradicted it nor offered any evidence that would lead to a contrary conclusion, even though the Trustee had statements from Charles Schwab – the custodian of the Debtor's IRA – which showed that Debtor had IRA accounts for a period at least five years prior to the Petition Date.

Under these circumstances, it is respectfully submitted that such contributions were part of the ongoing process in which Debtor dealt with his business affairs and, therefore, such contributions were in the ordinary course of his business transactions.

D.     **Failure To List Entities In Response To Question 18.**

The Complaint alleges that the Debtor failed to list certain entities in response to question 18a on his Amended Statement of Financial Affairs. Question 18 requires:

> if the debtor is an individual, list the names, … of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partner in a partnership, sole proprietor, or was self-employed in a trade, profession, or other activity either full- or part-time... within six years immediately preceding the commencement of this case ...

According to the Trustee, Debtor failed to list the following qualifying entities: Citadel Construction Corp; McCann Construction, LLC; Hilltop Investments LLC; Boulder Heights

Owner, LLC; Phoenix Capital Advisors, Inc.; Eastern Energy; King Holdings, LLC; and Cascar LP.

In response, at trial Debtor testified that: (a) certain of the identified entities were, in fact, listed in the response to Question 18, (b) that Debtor believed that certain of the identified entities were not required to be listed in response to Question 18, and (c) two of the omissions were inadvertent oversights on the part of the Debtor. At no time did the Trustee establish that any of the omissions were made by the Debtor with fraudulent intent. Furthermore, none of the alleged omissions – individually or taken together – were shown to have any meaningful value or to be material to Debtor's bankruptcy case. Apart from Boulder Heights Owner, LLC, none of the entities, as of the Petition Date, had any assets or were even active entities.

E.      **Phoenix Capital Advisors, Inc.**

As to the alleged failure to list Phoenix Capital, Debtor testified that Phoenix's name was changed to Rosedale Cooley Management, and that Rosedale Cooley Management is, in fact, included in response to Question 18.

F.      **Hilltop Investments and Eastern Energy**

The Trustee asserted, without adducing any evidence, that Debtor was obliged to list Hilltop Investments, LLC and Eastern Energy. Yet, Debtor's uncontroverted testimony was that he was not an officer of Hilltop or Eastern Energy. Hilltop had owned real estate in Connecticut in 2002, but Ed Romero was the sole manager of Hilltop. (Tr. 3/12/13, 160:17-19). This was substantiated by the Connecticut Secretary of State's website which lists Edward Romero as the manager of Hilltop and does not list Debtor. Trial Exhibit 61.

Robert Lasaracina was the sole manager of Eastern Energy. (Tr. 3/12/13, 163:9-13). Again, the Connecticut Secretary of State's website reflected that the Debtor was not an officer of Eastern Energy.[23] Trial Exhibit-62.

G.    **King Holdings LLC**

Debtor's uncontroverted testimony was that he was not an officer of King Holdings in the six years prior to filing the petition. Kings Holdings was transferred to the U.S. Government as part of the Plea Agreement in 2002 and that, after that time, the Debtor was not an officer or principal or in any way related to King. (Tr. 3/12/13, 163:14-23). Again, if the Trustee chose to do so, and actually believed that Debtor's testimony was false, it would have been a simple process to determine whether such a transfer had taken place.

H.    **CASCAR, LP**

In late 2005, Debtor and his then wife began negotiating a Separation Agreement in anticipation of his upcoming incarceration. One of the assets that were to be allocated to Debtor's wife was one of Debtor's "seats" on the New York Mercantile Exchange (NYMEX). Under NYMEX rules, seats could only be owned by (a) a NYMEX member or (b) a partnership in which the NYMEX member was the general partner. As a result, CASCAR, LP was formed.

The purpose of CASCAR, LP was to own the NYMEX seat solely for the benefit of the Debtor's wife and their then infant daughter. (Tr. 3/12/13, 164-165). The Separation Agreement and Cascar's limited partnership agreement make it clear that Debtor had no economic interest in

---

[23]  Respectfully, these two entities are perfect examples of the tactics engaged in by the Trustee. Early on Debtor had indicated that he had no interest in these entities. Publicly available records were available to substantiate such, but the Trustee – with absolutely no factual basis – made these allegations anyway. Moreover, even when Debtor provided the Trustee with the print-outs of the official websites showing that he had no role in these entities, the Trustee chose not to withdraw these allegations. Not only did these tactics unnecessarily extend the cost and effort involved in this proceeding, it caused an unnecessary waste of judicial resources.

CASCAR, LP and that his duties were purely *pro forma*. (Ex# 48: the limited partnership agreement of Cascar, LP; Ex# 49: separation agreement and Ex# 51: the first amendment to the separation agreement). As such, Debtor's nominal interest truly had no value to him or the Trustee and he would have no motivation to fail to list such in order to hinder or defraud his creditors or the Trustee. *In re Gugliada*, 20 B.R. at 528 -529 .

Thus, as Debtor reasonably believed that he was not required to list his nominal interest in Cascar in response to Question 18, he should not be deprived of his discharge.

I.    **McCann Construction, LLC and Boulder Heights**

McCann and Boulder Heights Owner, LLC ("Boulder Heights Owner") were not listed on the original Statement of Financial Affairs. However, Debtor did list them on the Second Amended Statement of Financial Affairs and he scheduled the parent entity of each on his earlier filings.

Debtor testified forthrightly that McCann did not have elected officers or directors and that Debtor was responsible for the affairs of the business.    (Tr.3/12/13,110:18-23). Furthermore, McCann's sole activity was to own shares in Citadel. The failure to list McCann was not deliberate, rather the failure to list McCann was inadvertent. (Tr.3/12/13,159:19-25).

Moreover, the Debtor did list GFI (the sole member of McCann) on his Schedules. (Tr.3/12/13,160:1-6).    If Debtor's intention and purpose was to conceal the existence of McCann – or Debtor's purported role in the administration of McCann – scheduling his interest in GFI would have been at odds with such an intent.

The same analysis also applies to Debtor's inadvertent omission of Boulder Heights Owner from his answer to Question 18. Debtor listed his officer and director role with Allstar in response to Question 18.    Allstar is the sole member of Boulder Heights Owner.

(Tr.3/12/13,161:12-17). Thus, much like with McCann, Debtor's role as an officer of Boulder
Heights Owner would have been easily discoverable by the Trustee.

Hence, to the extent McCann and Boulder were required to be listed in response to
Question 18, the Debtor provided this information by listing GFI and Allstar. *See In re
Moseman*, 436 B.R. 398, 410-411 (Bankr. E.D.Tex. 2010)(identity of interest of parent and
subsidiaries for the purposes of Question 18). And, more to the point, listing the parent entities
vitiates the claim that his failure to list McCann and Boulder Heights was part of a deliberate
attempt to hide such assets.

J.    **Citadel**

The Debtor did not schedule Citadel in response to Question 18 on the Statement of
Financial Affairs. The Debtor testified he believed that Citadel had only elected one officer – its
president David Stack. (Tr.3/12/13,91:9-10). The Debtor further testified that on one occasion,
in Mr. Stack's absence, he was asked to sign a bond, and the bonding company asked that he be
acting secretary solely for the purposes of executing the bond.[24] (Tr.3/12/13,91:11-12).
Additionally, the Debtor testified on four or five other occasions he signed as principal of Citadel
and that the term "principal" was used loosely, but was not the same thing as an owner or officer.
(Tr.3/12/13,91:117-118).

---

[24]    With only two shareholders, Stack and McCann, Citadel clearly was a small close
corporation. It is not unusual for such entities to operate informally, and with less than complete
attention to the fine points of corporate governance. "Courts are not to shut their eyes to the
realities of business life." *RSL Communications PLC v. Bildirici*, 649 F.Supp.2d 184,
212 (S.D.N.Y. 2009) citing *Leslie, Semple & Garrison, Inc. v. Gavit & Co., Inc.*, 81 A.D.2d 950,
439 N.Y.S.2d 707 (3d Dep't 1981); *See also Roos v. Aloi*, 127 Misc.2d 864, 868, 487 N.Y.S.2d
637, 640 (N.Y.Sup.1985). Where warranted, this Court may, in effect, disregard the corporate
form and treat the shareholders as co-partners. Further, in such close corporations,
certain formalities may be waived. *See Weiss v. Gordon*, 32 A.D.2d 279, 301 N.Y.S.2d 839 (1st
Dept.1969); *Matter of Ostwald's Estate*, 20 Misc.2d 1001, 189 N.Y.S.2d 472 (Sur.Ct. Richmond
Co. 1959); *Haff v. Long Island Fuel Corp.*, 233 App.Div. 117, 251 N.Y.S. 67 (2d Dept.1931).

The Debtor further testified that he did not believe that he was ever an officer of director of Citadel. *Id.* David Stack swore under oath that he was the sole officer of Citadel, not Debtor. Exhibit 69, Response of Citadel to DASNY Questionnaire. To that end, Debtor's testimony regarding his relationship to Citadel and his understanding of that relationship establishes that even if he was deemed an officer, director, partner, or managing executive within the meaning of Question 18, he reasonably believed that he did not hold any position at Citadel that required a response to Question 18.

K.    **Debtor's Role as Co-Debtor**

The Complaint alleges that the Debtor failed to schedule certain obligations on Schedule H of his bankruptcy petition which were in the nature of being a co-debtor. These alleged co-debtor obligations include: (i) **Allstar**: in connection with a Signature Bank loan (the "Signature Loan"); (ii) **Wurk Management, Inc. ("WMI")**: in connection with a residential lease for the premises located at 455 West 37th Street, Apt. 1111, New York, New York (the "WMI Lease").; (iii) **Rosedale Cooley Management, Inc.** ("RCM"): in connection with a residential lease for the premises located at 151 East 85th Street, Unit 10C, New York, New York.; and (iv) **Citadel**: in connection with a Chase auto loan (the "Chase Loan") (collectively, the "Co-debtor Obligations"). In each instance, Debtor had no direct liability, but was a payment guarantor in the instance that the actual obligor defaulted. Further, in no instance was Debtor called upon to pay a dime. (Tr. 3/13/13,6:7-10.)

Schedule H states "Provide the information requested concerning any person or entity... that is also liable on any debts listed by debtor in the schedules of creditors." The Debtor testified that he did not believe any of the Co-Debtor Obligations were required to be listed on Schedule H because none of the entities involved with the Co-debtor Obligations "were also

liable on any of the debts listed by Debtor in the schedules of creditors."[25]   Instead, Debtor

testified that the Co-Debtor Obligations were obligations for which he was simply a guarantor.

Instead of the Co-Debtor Obligations being "joint obligations" of Debtor and a Third Party,

Debtor's role in the Co-Debtor Obligations was simply that as a payment guarantor in the event

of a default by the actual borrower.  Debtor was not a borrower or obligor under any of the Co-

Debtor Obligations and reasonably believed that, as a result, he was not required to include them

on Schedule H. (Tr.3/12/13,99-105).

As pertains to the Signature Loan, the borrower was Allstar.  Debtor was a guarantor.  As

a result of Debtor's guaranty of the Signature Loan – and disputes relating to same –Debtor

scheduled Signature Bank as a contingent and disputed creditor on Schedule F of his

Schedules[26].(Tr.3/12/13,102-103).  The Trustee presented no evidence to suggest that Debtor

acted with fraudulent intent in not listing Allstar on Schedule H in connection with the Signature

Loan.  And, if Debtor was required to list Allstar on Schedule H – something Debtor testified

that he believed was not required – then any such omission was simply inadvertent. If Debtor's

intention was to hide his guaranty obligation with respect to the Signature Loan, he would never

have listed Allstar with respect to the Signature Loan on Schedule F.

WMI entered into the WMI Lease for occupancy by Joseph DeTrano, the Chief

Operating Officer of Wurk-TS. Debtor, as the primary investor in Wurk, guaranteed WMI's

obligations under the WMI Lease. Debtor was not the Lessee under the WMI Lease nor did he

---

[25] The Debtor did not list on the schedule of creditors any debt regarding the WMI Apartment, RCM Lease or Chase loan.  Notably, the Trustee and her Amended Complaint did not allege that the Debtor was required to list these contingent debts.  Thus, the Debtor was not required to list the WMI Apartment, RCM Lease or Chase Loan.

[26] Litigation relating to the Signature Loan and Debtor's guaranty of same was the subject of motion practice in this case.  Ultimately, a Settlement Agreement between Debtor, Allstar, Signature Bank and the Trustee was negotiated and approved by the Court.

ever occupy the WMI Apartment. (Tr.3/12/13,126:1-16). His role was solely as guarantor on the WMI Lease, a guarantee which he never had to honor.

Similarly, RCM entered into the RCM Lease for an apartment where Debtor resided. Debtor guaranteed RCM's payment and performance under the RCM Lease. (Tr.3/12/13,126-127).

Similar to the Debtor's reasoning relating to the Signature Loan, the Debtor did not list RCM or WMI as Co-Debtors because his obligation relating to the WMI Lease and the RCM Lease was simply that as a guarantor. The Debtor was not the Lessee under the WMI Lease or the RCM Lease. The sole obligor under the WMI Lease was WMI. The sole obligor under the RCM Lease was RCM. Only in the event of a default by either WMI or RCM would an obligation to the Debtor arise.

The Chase Loan was an automobile loan between JP Morgan Chase and Citadel. The Debtor was a guarantor of the Chase Loan. (Tr.3/12/13,124:9-11). The Chase Loan was secured by a first lien on a 2009 Range Rover. (Tr.3/13/13,9:11).   The Debtor did not believe that Citadel was a "co-debtor" as the term is used in Schedule H because the Debtor was not a "borrower" under the Chase Loan but simply a guarantor.

Even more indicative of the Debtor's absence of fraudulent intent is the fact that at his first 341 conference the Debtor noted that he was a guarantor of the RCM Lease and the Chase Loan (Tr.3/12/13124:15-22). The Debtor testified that at the  "341 hearing, before – within about five minutes into it, I acknowledged right off the bat that I had missed it [the apartment and automobile], and that we would amend to reflect that." (*Id.* :15-19.)

If Debtor's interpretation of the instructions for Schedule H was erroneous, Debtor testified that any failure on his part to list the co-debtors was the result of an inadvertence.

Debtor derived no benefit from not listing the co-debtors where he was the guarantor.[27]

Moreover, the Co-Debtor Obligations were immaterial to the Estate and the Debtor's bankruptcy

case since the guarantee was never called upon and did not cost the Estate a single dime.

## VII.    ALLEGATIONS THE TRUSTEE FAILED TO RAISE AT TRIAL

There were a number of allegations that the Trustee raised in the Amended Complaint,

but failed to present at the trial.  Thus, these allegations should be rejected as a predicate for

denying Debtor's discharge.  Nonetheless, it is respectfully submitted that these allegations are

meritless in any instance.

For example, as noted previously, the Amended Complaint alleges that the Debtor failed

to list the Chase Loan on Schedule D of his bankruptcy petition, but it should be noted that

clearly Debtor was not seeking to hide anything as there was nothing he would gain from failing

to schedule same.

Similarly, the Amended Complaint alleged that Debtor failed to list a lawsuit in response

to question 4 on his Amended Statement of Financial Affairs: AG/Woo Centre Street Owner,

LLC as Counterclaim Plaintiff v. Hanover Insurance Company, Hanover Insurance Group,

Daniel L. Gordon, et al. pending under index no. 109319-09 in the Supreme Court of the State of

New York, County of New York. The Plaintiff failed to raise the matter at trial. In the Pre-

Trial Order Defendant stated:  "As of the Petition Date, the counter-claim in the Pending Law

Suit had not been served upon Debtor, and, thus, the action against Debtor on the counter-claim

had not yet been commenced."(PTO,¶53). Certainly, the Trustee, never having mentioned this

---

[27] Clearly, the instant situation is different from the more typical meaning of a co-debtor.  Where
a true co-debtor exists, the Estate benefits from disclosure of that relationship because the
Trustee might look to another party to share in the Debtor's obligation and reduce the debt of
debtor and increase the value of the estate. However, where Debtor is merely a guarantor, there
is no obligation on the part of the Debtor to pay anything absent a default by the principal
obligor.

lawsuit during the trial, did not demonstrate that Debtor did anything improper by not listing same.

## VIII.  CONCLUSION

As more fully demonstrated *supra.*, an analysis of each of the elements of each of the causes of action asserted by the Trustee can lead to only one conclusion. In each instance, the Trustee's claims are long on smoke, but short on fire. In each instance, the Trustee made wild allegations, and hinted at circumstantial claims of impropriety, but fell far short of meeting her burden of showing by the preponderance of the evidence, that the Debtor had acted with fraudulent intent. When one analyzes item by item the allegations made, while they are numerous, one finds that there is a key hole in the chain of argument. What benefit did Debtor get or realize from any of the alleged actions?

Further, while the Trustee alleges that Debtor fraudulently transferred and concealed numerous assets and made numerous false oaths regarding matters that would be material to the recovery of assets for the Estate, she has not even *attempted* to recover any assets from these transfers or omissions, other than the Wurk Receivable and Allstar Receivable. For example, if she believes that the Estate is entitled to receive $1 million from David Stack, why has she not sought to recover such a significant sum?

The Trustee had almost unfettered access to Debtor and his books and records. However, other than the Allstar Receivable and Wurk Receivable, the Trustee has not even attempted to demonstrate that these actions were done with fraudulent intent.

The simple reason for the Trustee's inaction is that there is no evidence of fraudulent intent on the part of the Debtor. None of the allegations, other than the Allstar Receivable and Wurk Receivable, even remotely relate to information that Debtor would have an incentive to conceal or avoid disclosing. For example, it is not conceivable the Debtor's failure to list that he

was guarantor on an auto loan would in some way benefit the Debtor or prejudice the creditor or Estate in some way.

Regarding the Wurk Receivable, the Debtor's testimony, supported by the evidence adduced at trial, demonstrates that the failure to schedule the Wurk Receivable was not the result of fraudulent intent.    The Debtor did not have access to his own bank statements because his bank account had been subject to an identity theft. Moreover, as Wurk is part of the Estate, the Trustee had possession of Wurk's books and records, and, as such, the Trustee would discover any payment outstanding to the Debtor. Finally, the Wurk Receivable was only a minuscule portion, .14%, of the Debtor's assets and was further dwarfed by his debt.  As such, not only did Debtor have no reason to hide the Wurk Receivable, but it cannot be considered material relative to the size of the Estate. *See In re Coombs*,  193 B.R. 557, 564 -565 (Bankr.S.D.Cal.,1996) (looking to the issue of whether "there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal".).

Regarding the Allstar Receivable, the Trustee failed to introduce any evidence that the receivable was outstanding and, as such, failed to meet her burden demonstrating there was a receivable to be scheduled. Finally, the Debtor's testimony, supported by the schedules, demonstrated that Allstar had repaid well more than $2 million by making payments on his behalf or at his direction.  Certainly, at the very least, Debtor had a good faith basis to believe that the Allstar Receivable had been repaid, and therefore lacked the fraudulent intent required to deny his discharge.

At the end of the day, Debtor asks the Court to examine the evidence and to determine that the Trustee just has not met her heavy burden to demonstrate the elements required to deny

{26430204;1}                                                    35

Debtor his discharge. And, therefore, this Court should, respectfully, dismiss all of the Trustee's causes of action in this adversary proceeding.

The Debtor respectfully asserts that the evidence proffered at trial was insufficient for the Trustee to carry her heavy burden to prove the elements required to deny Debtor his discharge and, accordingly, requests that this Court grant judgment in his favor on all counts.

Dated: New York, New York
May 20, 2013

Donald N. David
Akerman Senterfitt LLP
*Attorneys for Debtor*
666 Fifth Avenue
20th Floor
New York, New York 10103
(212) 880-3800

*of counsel*
    *Yitzhak Greenberg, Esq.*
    *Gabriel Del Virginia, Esq,*